UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EXECUTIVE RISK INDEMNITY, INC., <br><br> Plaintiff, <br><br> - against - <br><br> WESTPORT INSURANCE CORPORATION, <br><br> Defendant. | **Case No. 08-CV-1822** <br><br> **Hon. Denise Cote** <br> **Magistrate Andrew Peck** <br><br> **NOTICE OF MOTION TO STAY ALL PROCEEDINGS PENDING OUTCOME OF STATE COURT ACTION** |

**MOTION BY:**

GARBARINI & SCHER, P.C.
Attorneys for Defendant
*Westport Insurance Corporation*

**DATE, TIME, PLACE:**

On a date and at a time to be designated by the Court, at the U.S. Courthouse, Southern District of New York, 500 Pearl Street, New York, New York 10007.

**RELIEF REQUESTED:**

An Order, to stay all proceedings pending outcome of a related state court action.

**SUPPORTING PAPERS:**

Affidavit of Gregg D. Weinstock and Memorandum of Law.

**ANSWERING AND RESPONDING PAPERS:**

To be served pursuant to the F.R.C.P. and Local Rule 6.1.

F:\CASES\16073\Notice of Motion - Fed.wpd

Dated: New York, New York
        February 29, 2008

                                Yours, etc.,

                                GARBARINI & SCHER, P.C.

                                By: _____ GW8078
                                    Gregg D. Weinstock
                                    Local Counsel for Defendant
                                    *Westport Insurance Corporation*
                                    432 Park Avenue South, 9th Floor
                                    New York, New York 10016-8013
                                    (212) 689-1113

                                WALKER WILCOX MATOUSEK, LLP
                                Attorneys for Defendant
                                *Westport Insurance Corporation*
                                225 West Washington Street, Suite 2400
                                Chicago, Illinois 60606
                                Attn: Joyce F. Noyes, Esq.
                                (312) 244-6700

TO:    KORNSTEIN, VEISZ, WEXLER &
       POLLARD, LLP
       Attorneys for Plaintiff
       *Executive Risk Indemnity, Inc.*
       757 Third Avenue
       New York, New York 10017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
EXECUTIVE RISK INDEMNITY INC.,                    :

                      Plaintiff,                    :     Case No. 08 CV 1822

                                :     Hon. Denise L. Cote

         -against-                    :     **AFFIDAVIT**

WESTPORT INSURANCE CORPORATION,                    :

                    Defendant.                    :
-------------------------------------------------------------------X

STATE OF NEW YORK    )
                          SS:
COUNTY OF NEW YORK  )

       GREGG D. WEINSTOCK, hereby declares the following under penalties of perjury:

       1.     I am an attorney duly licensed to practice law before the Courts of the State of New York and the United States District Court for the Southern District of New York and am a member of the law firm of Garbarini & Scher, P.C. I am counsel for Defendant Westport Insurance Corporation ("Westport") in this action, and as such I am fully familiar with the facts and circumstances of this case. The law firm of Walker Wilcox Matousek LLP is also acting as counsel in this case for defendant Westport.

       2.     I submit this Affidavit in support of Westport's Motion to Stay all proceedings in this action, including but not limited to responsive pleadings, discovery and pre-trial scheduling, pending resolution of an earlier filed, competing declaratory judgment action which involves the identical factual and legal issues and which was filed

by the *same* Plaintiff, Executive Risk Indemnity Inc. ("Executive Risk") against

Westport, pending in the Supreme Court of the State of New York, County of New York,

Appellate Division, First Department bearing Index No. 603624/05 (the "state court

action"). This motion is filed in lieu of an Answer and Westport reserves all of its rights

and defenses pending this motion.

3.      As more fully set forth in Westport's accompanying memorandum of law,

these federal court proceedings should be stayed in the interest of judicial economy  to

avoid the risk of conflicting results because this Court will be asked to decide identical

key issues of law and fact that are currently before the Supreme Court of the State of New

York in the earlier filed competing state court action, filed in 2005, which is significantly

advanced and which remains pending.

4.      These are complex insurance coverage matters which involve complicated,

multi-million dollar claims ("the underlying claims") against the law firm Pepper

Hamilton LLP ("Pepper") which were tendered under multiple years of professional

liability insurance policies issued by four different carriers.  In this federal court action,

Executive Risk seeks a declaration that the underlying claims are covered by a primary

policy of insurance issued by Westport to Pepper for the period 2001-2002.  Executive

Risk also seeks indemnification from Westport for monies paid by Executive Risk in

respect of the underlying claims under its own insurance policy issued to Pepper.

5.      In the 2005 state court action, Executive Risk sued Westport, Pepper and

Pepper's law partner Roderick Gagne and sought a declaration that the same Executive

Risk policies do not provide coverage for the same underlying claims on the basis that the

claims are covered by policies issued by other insurers during an earlier time period,

including the same Westport 2001-2002 primary policy, and, that the underlying claims are barred by a prior knowledge exclusion in Executive Risk's policy. Thus, this 2008 action(initiated in Supreme Court, New York County and removed to this Court by Westport) and the 2005 state court action involve the same parties, arise from the same set of facts and encompass the same issues of insurance coverage for the same claims under the same insurance policies. Moreover, the 2005 state court action was filed nearly two and a half years ago and the court has already made significant rulings on the pertinent issues. The state court granted summary judgment to various of the insurer parties which decision is now on appeal to the Appellate Division of the Supreme Court of the State of New York, First Department.

6.    To allow this action to go forward in light of the identity of parties and legal and factual issues in the state court action and given the significant progress already made in the state court action would be a waste of judicial resources and could result in inconsistent decisions on the same issue. Therefore, this Court should stay this action pending a resolution of the state court action.

For the foregoing reasons, including the reasons set forth in Westport's accompanying memorandum of law, Westport respectfully requests that this Court stay all proceedings in this action, including but not limited to responsive pleadings, discovery and pre-trial scheduling, pending resolution of a competing declaratory judgment action encompassing the same issues filed by the same Plaintiff, Executive Risk Indemnity Inc. ("Executive Risk"), pending in the Supreme Court of the State of New York, County of New York, and for such other, further, or different relief as to this court may seem just and proper.

Dated: New York, New York
      February 29, 2008

GARBARINI & SCHER, P.C.

Gregg Weinstock, Esq.
432 Park Avenue South, 9th Floor
New York, New York 10016-8013
(212) 689-1113

WALKER WILCOX MATOUSEK LLP
Robert P. Conlon, Esq.
Joyce F. Noyes, Esq.
225 West Washington Street
Suite 2400
Chicago, IL 60606-3418
Telephone:    (312) 244-6700
Facsimile:    (312) 244-6800

Attorneys for Defendant
*Westport Insurance Corporation*

Sworn to before me
the 29th day of
February, 2008

PAULETTE ROMERO
Notary Public, State of New York
No. 01RO6049073
Qualified in Queens County
Commission Expires Oct 2, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EXECUTIVE RISK INDEMNITY, INC., | **Case No. 08-CV-1822** |
| Plaintiff, | |
| - against - | **Hon. Denise Cote**<br>**Magistrate Andrew Peck** |
| WESTPORT INSURANCE CORPORATION, | **NOTICE OF MOTION TO STAY ALL PROCEEDINGS PENDING OUTCOME OF STATE COURT ACTION** |
| Defendant. | |

**MOTION BY:**                    GARBARINI & SCHER, P.C.
                                   Attorneys for Defendant
                                   *Westport Insurance Corporation*

**DATE, TIME, PLACE:**            On a date and at a time to be designated by the
                                   Court, at the U.S. Courthouse, Southern
                                   District of New York, 500 Pearl Street, New
                                   York, New York 10007.

**RELIEF REQUESTED:**             An Order, to stay all proceedings pending
                                   outcome of a related state court action.

**SUPPORTING PAPERS:**            Affidavit of Gregg D. Weinstock and
                                   Memorandum of Law.

**ANSWERING AND**
**RESPONDING PAPERS:**            To be served pursuant to the F.R.C.P. and
                                   Local Rule 6.1.

F:\CASES\16073\Notice of Motion - Fed.wpd

Dated: New York, New York
       February 29, 2008

                Yours, etc.,

                GARBARINI & SCHER, P.C.

                By: _____ GW8078
                   Gregg D. Weinstock
                   Local Counsel for Defendant
                   *Westport Insurance Corporation*
                   432 Park Avenue South, 9th Floor
                   New York, New York 10016-8013
                   (212) 689-1113

                WALKER WILCOX MATOUSEK, LLP
                Attorneys for Defendant
                *Westport Insurance Corporation*
                225 West Washington Street, Suite 2400
                Chicago, Illinois 60606
                Attn: Joyce F. Noyes, Esq.
                (312) 244-6700

TO:    KORNSTEIN, VEISZ, WEXLER &
        POLLARD, LLP
        Attorneys for Plaintiff
        *Executive Risk Indemnity, Inc.*
        757 Third Avenue
        New York, New York 10017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
EXECUTIVE RISK INDEMNITY INC.,   :

          :  Case No. 08 CV 1822
      Plaintiff,   :

          :  Hon. Denise L. Cote

          :
   -against-     :  **AFFIDAVIT**

          :
WESTPORT INSURANCE CORPORATION,  :

          :
      Defendant.  :
-------------------------------------------------------------------X

STATE OF NEW YORK  )
          SS:
COUNTY OF NEW YORK )

   GREGG D. WEINSTOCK, hereby declares the following under penalties of

perjury:

   1.  I am an attorney duly licensed to practice law before the Courts of the

State of New York and the United States District Court for the Southern District of New

York and am a member of the law firm of Garbarini & Scher, P.C. I am counsel for

Defendant Westport Insurance Corporation ("Westport") in this action, and as such I am

fully familiar with the facts and circumstances of this case. The law firm of Walker

Wilcox Matousek LLP is also acting as counsel in this case for defendant Westport.

   2.  I submit this Affidavit in support of Westport's Motion to Stay all

proceedings in this action, including but not limited to responsive pleadings, discovery

and pre-trial scheduling, pending resolution of an earlier filed, competing declaratory

judgment action which involves the identical factual and legal issues and which was filed

by the *same* Plaintiff, Executive Risk Indemnity Inc. ("Executive Risk") against

Westport, pending in the Supreme Court of the State of New York, County of New York,

Appellate Division, First Department bearing Index No. 603624/05 (the "state court

action"). This motion is filed in lieu of an Answer and Westport reserves all of its rights

and defenses pending this motion.

      3.      As more fully set forth in Westport's accompanying memorandum of law,

these federal court proceedings should be stayed in the interest of judicial economy  to

avoid the risk of conflicting results because this Court will be asked to decide identical

key issues of law and fact that are currently before the Supreme Court of the State of New

York in the earlier filed competing state court action, filed in 2005, which is significantly

advanced and which remains pending.

      4.      These are complex insurance coverage matters which involve complicated,

multi-million dollar claims ("the underlying claims") against the law firm Pepper

Hamilton LLP ("Pepper") which were tendered under multiple years of professional

liability insurance policies issued by four different carriers.  In this federal court action,

Executive Risk seeks a declaration that the underlying claims are covered by a primary

policy of insurance issued by Westport to Pepper for the period 2001-2002.  Executive

Risk also seeks indemnification from Westport for monies paid by Executive Risk in

respect of the underlying claims under its own insurance policy issued to Pepper.

      5.      In the 2005 state court action, Executive Risk sued Westport, Pepper and

Pepper's law partner Roderick Gagne and sought a declaration that the same Executive

Risk policies do not provide coverage for the same underlying claims on the basis that the

claims are covered by policies issued by other insurers during an earlier time period,

including the same Westport 2001-2002 primary policy, and, that the underlying claims are barred by a prior knowledge exclusion in Executive Risk's policy. Thus, this 2008 action(initiated in Supreme Court, New York County and removed to this Court by Westport) and the 2005 state court action involve the same parties, arise from the same set of facts and encompass the same issues of insurance coverage for the same claims under the same insurance policies. Moreover, the 2005 state court action was filed nearly two and a half years ago and the court has already made significant rulings on the pertinent issues. The state court granted summary judgment to various of the insurer parties which decision is now on appeal to the Appellate Division of the Supreme Court of the State of New York, First Department.

6.      To allow this action to go forward in light of the identity of parties and legal and factual issues in the state court action and given the significant progress already made in the state court action would be a waste of judicial resources and could result in inconsistent decisions on the same issue. Therefore, this Court should stay this action pending a resolution of the state court action.

For the foregoing reasons, including the reasons set forth in Westport's accompanying memorandum of law, Westport respectfully requests that this Court stay all proceedings in this action, including but not limited to responsive pleadings, discovery and pre-trial scheduling, pending resolution of a competing declaratory judgment action encompassing the same issues filed by the same Plaintiff, Executive Risk Indemnity Inc. ("Executive Risk"), pending in the Supreme Court of the State of New York, County of New York, and for such other, further, or different relief as to this court may seem just and proper.

Dated: New York, New York
       February 29, 2008

GARBARINI & SCHER, P.C.

*[signature]* GW-8078

Gregg Weinstock, Esq.
432 Park Avenue South, 9th Floor
New York, New York 10016-8013
(212) 689-1113

WALKER WILCOX MATOUSEK LLP
Robert P. Conlon, Esq.
Joyce F. Noyes, Esq.
225 West Washington Street
Suite 2400
Chicago, IL 60606-3418
Telephone:    (312) 244-6700
Facsimile:    (312) 244-6800

Attorneys for Defendant
*Westport Insurance Corporation*

Sworn to before me
the 29th day of
February, 2008

*[signature]*

PAULETTE ROMERO
Notary Public, State of New York
No. 01RO6049073
Qualified in Queens County
Commission Expires Oct 2, 2010

# EXHIBIT 1

**FILE COPY**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------

EXECUTIVE RISK INDEMNITY INC..

                    Plaintiff,

        -against-

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ
and WESTPORT INSURANCE CORPORATION,

                    Defendants.

------------------------------------------------

Index No. 603624/2005

**COMPLAINT**

**NEW YORK
COUNTY CLERK'S OFFICE**

**OCT 11.2 2005**

NOT COMPARED,
WITH COPY FILED

       Plaintiff Executive Risk Indemnity Inc. ("Executive Risk"), by its attorneys, as and for its

Complaint against Defendants Pepper Hamilton LLP ("Pepper Hamilton"), W. Roderick Gagné

("Gagné") and Westport Insurance Corporation ("Westport"), alleges by its own personal

knowledge or upon information and belief, as follows:

### INTRODUCTION

       1.     This is an action for a declaratory judgment to determine questions of actual

controversy between the parties. For the reasons set forth herein, Executive Risk seeks a

declaration that it has no duty, under a policy of insurance issued by Executive Risk to Pepper

Hamilton, to provide coverage to Pepper Hamilton or Gagné in connection with claims made by

Charles Stanziale, the Chapter 7 Trustee of Student Finance Corporation ("SFC"), and/or Royal

Indemnity Company ("Royal") for legal professional liability (the "Underlying Actions").

       2.     Executive Risk is entitled to a declaration that coverage under the Executive Risk

Policy is not available for any Loss incurred by Pepper Hamilton or Gagné in connection with

the Underlying Actions because (a) those Underlying Actions are deemed Claims made prior to

the commencement of the Executive Risk Policy Period and therefore are covered, if at all, by

earlier policies; or, in the alternative (b) coverage for any Loss for such Underlying Actions is barred by the Executive Risk Policy prior knowledge exclusion.

## JURISDICTION AND VENUE

3.       This Court has jurisdiction over this matter pursuant to Civil Practice Law and Rules § 3001 because plaintiff seeks a declaratory judgment with respect to a justiciable controversy.

4.       Pursuant to Civil Practice Law and Rules § 503, venue is appropriate in New York County because at the time of the commencement of this action Westport has an office located in New York County.

## PARTIES

5.       At all times hereinafter mentioned, Executive Risk was, and still is, a corporation organized under the laws of the State of Delaware, with its principal place of business in New Jersey, and was at all relevant times herein in the business of, *inter alia*, issuing excess indemnity policies. Executive Risk transacts business in the State of New York, and avails itself of the laws of the State of New York.

6.       Upon information and belief, Pepper Hamilton is a limited liability partnership. Pepper Hamilton has more than 400 lawyers practicing out of nine offices. Pepper Hamilton maintains an office in the State and County of New York at 1180 Avenue of the Americas, New York, New York and is registered in the state of New York as a foreign limited liability partnership. Pepper Hamilton designated Corporation Service Company, 80 State Street, Albany, New York 12207 as its registered agent in New York for the service of process. Pepper Hamilton transacts business in the State of New York, and avails itself of the laws of the State of New York.

7.    Defendant Gagné is a partner in Pepper Hamilton. As a partner at Pepper Hamilton, Gagné transacts business in the State of New York, and avails himself of the laws of the State of New York. Gagné also transacted business in New York in connection with Pepper Hamilton's representation of SFC with respect to SFC's credit arrangements with MBIA, a Connecticut corporation with its principal place of business in New York.

8.    Westport is a corporation organized under the laws of Missouri, with its principal place of business in Kansas. Westport is licensed by the New York State Department of Insurance, maintains an office in the State and County of New York at 1114 Avenue of the Americas, New York, New York, transacts business in the State of New York and avails itself of the laws of the State of New York.

## FACTUAL ALLEGATIONS

### The 2002-2003 Policy Period

9.    Westport issued Customized Practice Coverage Policy No. PLL-347287-5 to Pepper Hamilton LLP for the Policy Period of October 27, 2002 to October 27, 2003 (the "2002–2003 Westport Policy"). This primary layer of coverage was issued by defendant Westport in the amount of $10 million. The 2002-2003 Westport Policy is attached hereto as Exhibit "A."

10.    The first layer of excess coverage was issued by Twin City Fire Insurance Company ("Twin City") in the amount of $10 million, excess of $10 million (the "2002-2003 Twin City Policy"). The 2002-2003 Twin City Policy is attached hereto as Exhibit "B."

11.    Executive Risk issued Excess Indemnity Policy No. 8170-3836 (the "2002-2003 Executive Risk Policy") to Pepper Hamilton LLP for the Policy Period of October 27, 2002 to October 27, 2003, with a $10 million Limit of Liability, excess of $20 million in underlying

limits. The Executive Risk Policy was a second layer excess policy. The 2002–2003 Executive Risk Policy is attached hereto as Exhibit "C."

12.    The 2002-2003 Executive Risk Policy followed form to the terms and conditions of the underlying 2002-2003 Westport Policy and 2002-2003 Twin City Policy, with certain exceptions as set forth in the 2002-2003 Executive Risk Policy.

13.    A third layer of excess coverage was issued by Continental Casualty Company in the amount of $10 million, excess of $30 million.

**The 2003-2004 Policy Period**

14.    This entire tower of coverage was renewed for the Policy Period of October 27, 2003 to October 27, 2004. Westport issued Customized Practice Coverage Policy No. PLL-350772-3 to Pepper Hamilton LLP for the Policy Period of October 27, 2003 to October 27, 2004 (the "2003–2004 Westport Policy") for a primary layer of coverage of $10 million. The 2003-2004 Westport Policy is attached hereto as Exhibit "D."

15.    Twin City issued the first layer of excess coverage in the amount of $10 million, excess of $10 million (the "2003-2004 Twin City Policy"). The 2003-2004 Twin City Policy is attached hereto as Exhibit "E."

16.    Executive Risk issued Excess Indemnity Policy No. 8170-3836 to Pepper Hamilton LLP for the Policy Period of October 27, 2003 to October 27, 2004 (the "2003-2004 Executive Risk Policy"), with a $10 million Limit of Liability, excess of $20 million in underlying limits. The 2003-2004 Executive Risk Policy is attached hereto as Exhibit "F."

17.    A third layer of excess coverage was issued by Continental Casualty Company in the amount of $10 million, excess of $30 million.

18.    The 2003-2004 Executive Risk Policy followed form to the terms and conditions of the underlying 2003-2004 Westport Policy and 2003-2004 Twin City Policy, with certain exceptions as set forth in the 2003-2004 Executive Risk Policy.

**The 2001-2002 Policy Period**

19.    Westport issued Customized Practice Coverage Policy No. PLL-341513-1 to Pepper Hamilton LLP for the Policy Period of April 27, 2001 to October 27, 2002 (the "2001–2002 Westport Policy"). The 2001-2002 Westport Policy provided coverage in the amount of $20 million.

20.    Continental Casualty Company provided an excess layer of coverage in the amount of $20 million for the 2001-2002 Policy Period.

21.    Executive Risk did not issue insurance coverage to Pepper Hamilton for the Policy Period of April 21, 2001 to October 27, 2002.

**Provisions of the 2003-2004 Westport Policy**

22.    INSURING AGREEMENT I. C. of the 2003-2004 Westport Policy provides:

> If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the policy period of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

23.    The 2003-2004 Westport Policy defines CLAIM as follows:

> "CLAIM" means a demand made upon any INSURED for LOSS, as defined in each of the attached COVERAGE UNITS, including, but not limited to, service of suit or institution of

arbitration proceedings or administrative proceedings against any INSURED.

24.    The 2003-2004 Westport Policy defines POTENTIAL CLAIM as follows:

"POTENTIAL CLAIM" WHENEVER USED IN THIS COVERAGE UNIT MEANS:

1.    any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or

2.    any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED

25.    Section XIV of the 2003-2004 Westport Policy, modified by manuscript endorsement, sets forth the following Exclusion B (the "prior notice exclusion"):

This POLICY shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from:

B. [A]ny act, error, omission, circumstance or PERSONAL INJURY occurring prior to the effective date of this POLICY if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY might be the basis of a CLAIM. This exclusion does not apply to any INSURED who had no knowledge or could not have reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY might be the basis of a claim.

26.    In an Endorsement entitled "AMENDMENT OF LAWYERS PROFESSIONAL LIABILITY COVERAGE UNIT," the 2003-2004 Westport Policy also provides as follows:

In addition to those Exclusions contained in Section XIV. of the GENERAL TERMS & CONDITIONS, other than Exclusion B. which shall not apply to this COVERAGE UNIT, this COVERAGE UNIT shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from the following additional exclusion:

Any CLAIM arising out of any act, error, omission or PERSONAL INJURY occurring prior to the effective date of this Policy If, a) the matter had previously been reported to any professional liability insurance company or b) the INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission or PERSONAL INJURY at the effective date might be expected to be

the basis of a CLAIM; provided however, that subsection b) does not apply to any INSURED who had no knowledge of or could not have reasonably foreseen that any such act, error, omission or PERSONAL INJURY might be expected to be the basis of a CLAIM.

## Reporting and Notice Provision of the 2001-2002 Westport Policy

27.    In an Endorsement entitled, AMENDMENT OF III. REPORTING AND

NOTICE, the 2001-2002 Westport policy provides as follows:

> If, during the POLICY PERIOD, any INSURED first becomes aware of a POTENTIAL CLAIM and gives written notice of such POTENTIAL CLAIM to the Company during the POLICY PERIOD, or any subsequent POLICY PERIOD as a result of continuous and uninterrupted coverage with the Company, any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been made during the POLICY PERIOD.

28.    The Westport Policy Provisions cited in paragraphs 22-26 are incorporated into the 2003-2004 Executive Risk Policy.

## Pepper Hamilton's First Knowledge of a Potential Claim

29.    SFC, a client of defendants Pepper Hamilton and Gagné, was in the business of originating and acquiring non-guaranteed student loans and tuition installment agreements, primarily from trucking schools.

30.    From December 1, 1996 through April 2002, Pepper Hamilton acted as counsel for SFC, billing approximately $3.2 million to SFC for its services.

31.    Defendant Gagné in an April 18, 2002 memorandum to Pepper Hamilton management advised defendant Pepper Hamilton that a potential claim might be filed against Pepper Hamilton in connection with the firm's representation of SFC.

32.    In that memorandum Gagné stated: "I think we also need to recognize the possibility that the firm will be sued, as a deep pocket associated with SFC and these transactions, and it may be appropriate to consider whether the one course of action or another



might better mitigate this possibility." Pepper withdrew from the representation of SFC on April 24, 2002.

33.     Thereafter, by memorandum dated August 6, 2002, Gagné advised Pepper Hamilton partner Alfred Wilcox in response to a poll of the partnership regarding potential claims that he was aware of a fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for legal professional liability. Specifically, Gagné advised Wilcox that a potential claim might be filed against Pepper Hamilton in connection with the firm's representation of SFC and Royal.

34.     On September 6, 2002, before the inception of the 2002-2003 Executive Risk Policy, Alfred Wilcox, as agent for Pepper Hamilton with respect to insurance matters, completed the Westport Insurance application for the 2002-2003 policy period.    In the application, he represented that, after questioning each lawyer, Pepper Hamilton was not aware of any circumstance, act, error, or omission that might be expected to be the basis of a claim or suit for legal professional liability. Pepper Hamilton failed to advise regarding the potential claim memorialized in the Gagné memoranda.

35.     On October 25, 2002, Pepper partner Barry Abelson, as agent for Pepper Hamilton, advised Executive Risk in writing that all declarations, representations and warranties made to Westport on September 6th were deemed made to Executive Risk.    Abelson also represented that he had polled all lawyers in the firm and that there were no claims or circumstances other than those revealed in the September 6th application.    Pepper Hamilton failed to advise regarding its knowledge of the potential claim or circumstance memorialized in the Gagné memoranda.  In reliance upon these representations, Executive Risk issued the 2002-2003 Executive Risk Policy.

36.    On September 6, 2003, Partner Gagné authored a memorandum responding to the firm's annual polling inquiry concerning whether any partner was aware of an act, fact or circumstance that may be the basis of a claim or suit. In that memorandum, Partner Gagné responded affirmatively to the question whether he was aware of any fact or circumstance, act, error, omission or personal injury that might be expected to be the basis of a claim.

37.    In October 2003, after receiving Pepper Hamilton's renewal application for coverage, Executive Risk conducted a renewal meeting with Pepper Hamilton. Despite having Partner Gagné's September 6, 2003 memorandum identifying the SFC circumstance once again, Pepper Hamilton responded negatively to Executive Risk's several questions concerning whether it was aware of any claims and whether the firm was concerned about anything on the horizon. Again, in reliance upon these representations, Executive Risk issued the 2003-2004 Executive Risk Policy.

38.    Gagné's memoranda, dated April 18, 2002 and August 6, 2002, were drafted by Gagné and received by Pepper Hamilton during the 2001-2002 Policy Period, the policy year during which Executive Risk did not extend coverage to Pepper Hamilton. Both memoranda document Gagné's actual knowledge and actual belief that a potential claim might be filed against Pepper Hamilton in connection with the firm's representation of SFC and Royal.

**The Underlying Actions**

39.    On April 22 and April 27, 2004, during the 2003-2004 Policy Period, Pepper Hamilton provided Westport with written notice of a potential claim based upon a threat of suit by the bankruptcy trustee for SFC who requested that Pepper Hamilton enter into a tolling agreement.

40.     On April 23, 2004, Westport accepted notice of the SFC matter as a potential claim.

41.     On November 1, 2004, the bankruptcy trustee filed suit in Delaware Bankruptcy Court in an action styled <u>Charles A. Stanziale. Jr. as Chapter 7 Trustee of Student Finance Corporation v. Pepper Hamilton LLP. et al.</u>, against Pepper and Gagné alleging that Pepper Hamilton and Gagné are liable to SFC's creditors for breaching its fiduciary duty and for professional malpractice (the "<u>Stanziale</u> litigation").

42.     On March 15, 2005, Royal filed suit in federal district court in Delaware in an action styled <u>Royal Indemnity Company v. Pepper Hamilton LLP. et al.</u>, against Pepper Hamilton and Gagné.  Royal seeks to recover from Pepper Hamilton and Gagné the amount Royal was required to pay under its credit risk insurance policies.  Royal claims that, but for Pepper Hamilton and Gagné's fraudulent conduct the credit policies would never have been issued for SFC's benefit (the "<u>Royal</u> litigation").

## COUNT ONE

### (Claim Made Prior to Policy Period)

43.     Executive Risk realleges each and every allegation contained in paragraphs 1 to 42 as if fully set forth herein.

44.     Pepper Hamilton had continuing legal professional liability coverage with Westport from 1999 through 2004.  The Westport policy was renewed continuously and without interruption through October 2004.

45.     INSURING AGREEMENT I.C. of the 2003-2004 Westport policy provides that any claim made against any Insured which arises from a potential claim, which the Insured first became aware of during the period of a prior policy issued by Westport, shall be considered to

have been first made and reported during the policy period of the policy in effect when any Insured first became aware of such potential claim.

46.     Pepper Hamilton first became aware of the potential claim regarding SFC and Royal no later than April 18, 2002 upon receipt of the first Gagné memo.

47.     Pepper Hamilton became aware of this potential claim no later than during the 2001-2002 Policy Period, when Executive Risk did not provide insurance coverage to Pepper Hamilton.

48.     Gagné first became aware of this potential claim no later than during the 2001-2002 Policy Period, when Executive Risk did not provide insurance coverage to Gagné.

49.     By operation of INSURING AGREEMENT I.C., the continuing coverage provision in the Westport policy, the Stanziale litigation is deemed first made and reported no later than during the 2001-2002 Policy Period. Similarly, the Royal litigation is deemed first made and reported no later than during the 2001-2002 Policy Period.

50.     The Underlying Actions, the Stanziale litigation and the Royal litigation, are deemed made and reported when Executive Risk did not insure Pepper Hamilton or Gagné.

51.     Executive Risk is entitled to a declaratory judgment that, pursuant to the terms, conditions, exclusions and endorsements of the Westport Policy, the November 1, 2004 and March 2005 claims are deemed to have been first made no later than when either Pepper Hamilton or Gagné first became aware of the potential claim (no later than April 2002) and, therefore, Executive Risk is not required to indemnify Pepper Hamilton or Gagné as a result of either the Stanziale or Royal litigation.

## COUNT TWO

### (Prior Knowledge Exclusion)

52.     Executive Risk realleges each and every allegation contained in paragraphs 1 to 51 as if fully set forth herein.

53.     The 2002-2003 and 2003-2004 Westport Policies have a prior knowledge exclusion and those exclusions are incorporated and made a part of the 2002-2003 and 2003-2004 Executive Risk Policies.

54.     Gagné had actual knowledge, no later than April 18, 2002, of a circumstance that might reasonably be expected to give rise to a claim.   This was before Pepper Hamilton submitted its application for coverage with Executive Risk for the 2002-2003 Policy Period.

55.     Gagné's knowledge is imputed to Pepper Hamilton and all partners of Pepper Hamilton.

56.     Gagné's knowledge was communicated to Pepper Hamilton management prior to October 27, 2002.

57.     The knowledge of Pepper Hamilton management is imputed to Pepper Hamilton and all partners of Pepper Hamilton.

58.     Gagné and Pepper Hamilton knew or could have reasonably foreseen prior to the inception date of both the 2002-2003 and 2003-2004 Executive Risk Policies that the SFC circumstance might be the basis of a Claim.

59.     Pursuant to the prior knowledge exclusion, the Underlying Actions are excluded from coverage because Pepper Hamilton and Gagné had knowledge prior to the effective date of both the 2002-2003 and 2003-2004 Executive Risk Policies of a circumstance that might be the basis of a Claim.

60.     Executive Risk is entitled to a declaratory judgment that, pursuant to the terms of

the prior knowledge exclusion, there is no coverage with respect to the Underlying Actions.

**WHEREFORE**, Executive Risk prays for judgment as follows:

1.     Declaring that Executive Risk has no obligation to indemnify or defend Gagné or

Pepper Hamilton under the 2003-2004 Executive Risk Policy as a result of the Underlying

Actions;

2.     Awarding Executive Risk the costs of suit incurred herein, and;

3.     For such other and further relief as this Court deems just and proper.

Dated: New York, New York
      October 12, 2005

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP

By _____
Bruce S. Kaplan, Esq.
John N. Orsini, Esq.
1633 Broadway
New York, New York 10019
(212) 833-1100

KAUFMAN BORGEEST & RYAN LLP

By _____
Wayne E. Borgeest, Esq.
Joan M. Gilbride, Esq.
99 Park Avenue
New York, New York 10016
(212) 980-9600

Attorneys for Plaintiff
Executive Risk Indemnity Inc.

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

EXECUTIVE RISK INDEMNITY INC.,

               Plaintiff,

    -against-

WESTPORT INSURANCE CORPORATION,

              Defendants.

-----------------------------------------------------------------X

Index No. 08-600200

**COMPLAINT**

       Plaintiff Executive Risk Indemnity Inc. ("Executive Risk"), by its attorneys, as and for its Complaint against Defendant Westport Insurance Company ("Westport"), alleges by its own personal knowledge or upon information and belief, as follows:

### NATURE OF THE ACTION

      1.     This is an action for equitable indemnification, unjust enrichment, and a declaratory judgment relating to insurance coverage Pepper Hamilton LLP ("Pepper") has or may have for claims made by the bankruptcy trustee of Student Finance Corporation ("SFC") and Royal Indemnity Company ("Royal") in certain lawsuits in which Pepper and W. Roderick Gagné ("Gagné"), a Pepper partner, are named as defendants, to wit: *Charles A. Stanziale, Jr., as Chapter 7 Trustee of Student Finance Corporation v. Pepper Hamilton LLP, et al.*, Civil Action No. 04-1551-JJF (D. Del.), and *Royal Indemnity Company v. Pepper Hamilton LLP, et al.*, No. 1:05-cv-00165-JJF (D. Del.) (collectively, the "Underlying Actions").

      2.     Executive Risk seeks a declaration that the claims made in the Underlying Actions are covered by a professional liability policy that Westport issued to Pepper for the Policy Period of

April 27, 2001 to October 27, 2002 (the "2001 Westport Policy") because the claims asserted in the Underlying Actions are deemed to have been first made during the 2001-2002 Policy Period.

3.    Executive Risk also seeks, based upon equitable principles, to compel Westport to indemnify Executive Risk in the amount of $10 million, which represents the amount that Executive Risk advanced to Pepper and Gagné under a policy that Executive Risk issued to Pepper for the 2003-2004 Policy Period (the "2003 Executive Risk Policy"). That $10 million should have been advanced by Westport under its 2001 policy, which covered a period in which Executive Risk did not provide coverage to Pepper and Gagné. Thus, Executive Risk is entitled to equitable indemnification from Westport.

4.    Executive Risk further seeks to recover from Westport the $10 million that Executive Risk advanced to Pepper and Gagné on the ground that Westport has been unjustly enriched by Executive Risk advancing funds under its 2003 policy when Westport should have made that advance under its 2001 policy.

## PARTIES

5.    At all times hereinafter mentioned, Executive Risk was, and still is, a corporation organized under the laws of the State of Delaware, with its principal place of business in New Jersey, and was and is at all relevant times herein in the business of, *inter alia*, issuing excess indemnity policies. Executive Risk maintains an office in the State and County of New York at 55 Water Street, New York, New York, transacts business in the State of New York, and avails itself of the laws of the State of New York.

2

6.      Westport is a corporation organized under the laws of Missouri, with its principal

place of business in Kansas. Westport is licensed by the New York State Department of Insurance,

maintains an office in the State and County of New York at 1114 Avenue of the Americas, New

York, New York, transacts business in the State of New York, and avails itself of the laws of the

State of New York.

## FACTUAL ALLEGATIONS

### The 2001-2002 Policy Period

7.      Westport issued its 2001 Westport Policy, Customized Practice Coverage Policy No.

PLL-341513-1, to Pepper for the Policy Period of April 27, 2001 to October 27, 2002. The 2001

Westport Policy provided professional liability coverage in the amount of $20 million. The terms

and conditions of the 2001 Westport Policy are deemed incorporated in the Complaint.

8.      Continental Casualty Company ("CNA") issued Policy No. LLE-192857748 to

Pepper, providing $30 million of professional liability coverage excess to Westport's limits for the

same 2001-2002 Policy Period. The 2001 CNA Policy followed form to the terms and conditions

of the underlying 2001 Westport Policy, with certain exceptions as set forth in the 2001 CNA Policy.

The terms and conditions of the 2001 CNA Policy are deemed incorporated in the Complaint.

### The 2002-2003 Policy Period

9.      Westport issued Customized Practice Coverage Policy No. PLL-347287-5 to Pepper

for the Policy Period of October 27, 2002 to October 27, 2003 (the "2002 Westport Policy"). The

3

2002 Westport Policy provided professional liability coverage in the amount of $10 million. The terms and conditions of the 2002 Westport Policy are deemed incorporated in the Complaint.

10.    Pepper's first layer of excess coverage was issued by Twin City Fire Insurance Company ("Hartford") in the amount of $10 million, excess of $10 million for the Policy Period of October 27, 2002 to October 27, 2003 (the "2002 Hartford Policy"). The 2002 Hartford Policy followed form to the terms and conditions of the underlying 2002 Westport Policy, with certain exceptions as set forth in the 2002 Hartford Policy. The terms and conditions of the 2002 Hartford Policy are deemed incorporated in the Complaint.

11.    Executive Risk issued Excess Indemnity Policy No. 8170-3836 to Pepper in the amount of $10 million, excess of $20 million, for the Policy Period of October 27, 2002 to October 27, 2003 (the "2002 Executive Risk Policy"). The 2002 Executive Risk Policy followed form to the terms and conditions of the underlying 2002 Westport Policy and 2002 Hartford Policy, with certain exceptions as set forth in the 2002 Executive Risk Policy. The terms and conditions of the 2002 Executive Risk Policy are deemed incorporated in the Complaint.

12.    CNA issued a third layer of excess coverage to Pepper in the amount of $10 million, excess of $30 million, for the Policy Period of October 27, 2002 to October 27, 2003 (the "2002 CNA Policy"). The 2002 CNA Policy followed form to the terms and conditions of the underlying 2002 Westport Policy, the 2002 Hartford Policy, and the 2002 Executive Risk Policy, with certain exceptions as set forth in the 2002 CNA Policy. The terms and conditions of the CNA 2002 Policy are deemed incorporated in the Complaint.

4

**The 2003-2004 Policy Period**

13.     This entire tower of professional liability coverage for the 2002-2003 Policy Period was renewed for the Policy Period of October 27, 2003 to October 27, 2004. Westport issued Customized Practice Coverage Policy No. PLL-350772-3 to Pepper for the Policy Period of October 27, 2003 to October 27, 2004 (the "2003 Westport Policy"). The 2003 Westport Policy provided professional liability coverage in the amount of $10 million. The terms and conditions of the 2003 Westport Policy are deemed incorporated in the Complaint.

14.     Hartford issued the first layer of excess coverage to Pepper in the amount of $10 million, excess of $10 million, for the Policy Period of October 27, 2003 to October 27, 2004 (the "2003 Hartford Policy"). The 2003 Hartford Policy followed form to the terms and conditions of the underlying 2003 Westport Policy, with certain exceptions as set forth in the 2003 Hartford Policy. The terms and conditions of the 2003 Hartford Policy are deemed incorporated in the Complaint.

15.     Executive Risk issued Excess Indemnity Policy No. 8170-3836 to Pepper in the amount of $10 million, excess of $20 million, for the Policy Period of October 27, 2003 to October 27, 2004 (the "2003 Executive Risk Policy"). The 2003 Executive Risk Policy followed form to the terms and conditions of the underlying 2003 Westport Policy and 2003 Hartford Policy, with certain exceptions as set forth in the 2003 Executive Risk Policy. The terms and conditions of the 2003 Executive Risk Policy are deemed incorporated in the Complaint.

16.     CNA issued a third layer of excess coverage to Pepper in the amount of $10 million, excess of $30 million, for the Policy Period of October 27, 2003 to October 27, 2004 (the "2003 CNA Policy"). The 2003 CNA Policy followed form to the terms and conditions of the underlying

2003 Westport Policy, the 2003 Hartford Policy, and the 2003 Executive Risk Policy, with certain

exceptions as set forth in the 2003 CNA Policy. The terms and conditions of the 2003 CNA Policy

are deemed incorporated in the Complaint.

**Pertinent Coverage Provisions in the Policies**

17.     In an Endorsement entitled, AMENDMENT OF III. REPORTING AND NOTICE,

the 2001 Westport Policy provides as follows:

> If, during the POLICY PERIOD, any INSURED first becomes aware
> of a POTENTIAL CLAIM and gives written notice of such
> POTENTIAL CLAIM to the Company during the POLICY PERIOD,
> or any subsequent POLICY PERIOD as a result of continuous and
> uninterrupted coverage with the Company, any CLAIMS
> subsequently made against any INSURED arising from the
> POTENTIAL CLAIM shall be considered to have been made during
> the POLICY PERIOD.

18.     The 2003 Westport Policy states, in INSURING AGREEMENT I C, that:

> If, during this POLICY PERIOD, any INSURED provides written
> notice to the Company of a POTENTIAL CLAIM which any
> INSURED first became aware of during the period of a prior policy
> issued by the Company to the NAMED INSURED, which policy was
> Renewed continuously and without interruption through the inception
> of this POLICY, then any CLAIMS subsequently made against any
> INSURED arising from the POTENTIAL CLAIM shall be considered
> to have been first made and reported during the POLICY PERIOD of
> the policy in effect when any INSURED first became aware of such
> POTENTIAL CLAIM subject to the terms, conditions and limits of
> liability of the policy in effect at such time.

19.     The 2003 Westport Policy defines a CLAIM as:

> . . . a demand made upon any INSURED for LOSS, as defined in each
> of the attached COVERAGE UNITS, including, but not limited to,
> service of suit or institution of arbitration proceedings or
> administrative proceedings against any INSURED.

6

20.    The 2003 Westport Policy defines a POTENTIAL CLAIM as:

1.    any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or

2.    any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED.

## Pepper, Gagné and Student Finance Corp.

21.    In 1996, Gagné joined Pepper as a partner. He brought with him as a client Andrew Yao ("Yao"). Several years later, Yao founded SFC, which also became a Pepper client. Gagné was the relationship partner for both Yao and SFC. During the period 1996 through 2002, Pepper billed Yao and SFC approximately $3.2 million for its services.

22.    SFC originated and acquired non-guaranteed student loans and tuition installment agreements, primarily from trucking schools. It then pooled those loans into certificates that were sold to investors using private placement memoranda ("PPMs") that Pepper prepared.

23.    From April 2000 to November 2001, Pepper drafted eight (8) PPMs for SFC's issuance of certificates totaling over $465 million. The PPMs were circulated to potential investors, and advised them about the degree to which SFC's certificates were backed by student loan pools (the principal and interest). Each PPM also contained data concerning the performance of the loan pools that were part of the placement being issued, including loan delinquency rates. A loan which had payment more than 90 days past due was deemed in default.

24.    SFC also obtained credit risk insurance from Royal Insurance Company ("Royal"), another Pepper client. That is, Royal insured payment to those who purchased the certificates, and this was reported to potential investors in the PPMs.

7

25.    Beginning at least by 1999, the delinquency rate of the loans in various pools began to increase sharply.  To avoid having to report a substantial default rate, SFC made ever increasing payments from a reserve or forbearance account that it controlled to accounts that held installment payments from student-borrowers for the benefit of the investors.  These payments were to cover past due loan payments and avoid those loans becoming more than 90 days overdue, and, thus, in default.

26.    In 1999, SFC's forebearance payments totaled more than $2 million.  The following year, they had increased to more than $9.5 million.  By April 2002, the forbearance payments had increased to approximately $45 million, with SFC supplying approximately $39 million of that amount.

## Pepper's First Knowledge of a Potential Claim

27.    In or about March 2002, Gagné learned that there were serious problems involving SFC's securitization and the sale of loan certificates to various investors.

28.    On April 17, 2002, Gagné drafted a memo describing SFC's fraudulent conduct and Pepper's continued representation of SFC (emphasis added):

> Two officers of [SFC] . . . asserted other reasons [for the low default rate], but never said that SFC and the schools were paying for the loans.  In fact, Student Finance Corporation was taking monies to prop up these loans so that they would not go into default causing the default statistics on the loans and the static pools to be false. . . .

> The magnitude of the fraud is also very disconcerting in that Royal Indemnity Company, another client of the firm, could be significantly damaged by the losses which have been estimated at between $150 Million and $200 Million Dollars.

> [If Pepper withdraws as SFC's counsel, that] will raise the specter with the capital markets that Student Finance Corporation has done something heinous and will impair SFC's ability to bring itself out of

8

its liquidity crises. If they cannot, it will imperil the company and <u>we may be subject to suit.</u>

In addition, <u>our first line of defense</u> as well as Student Finance Corporation's is that there was no fraud since the forbearance accounts were disclosed in their financial statements. . . .

29.    The following day, April 18, 2002, Gagné revised and finalized the April 17, 2002 memo. The April 18, 2002 memo was addressed to Pepper's management and stated (emphasis added):

The crux of the issue we now face is that [SFC] was using its own funds to make payments on the student loans so that the student loans would not appear to be in default (90 days delinquent). It accounted for these payments as draws against a "forebearance account" established on their balance sheet pursuant to their agreements with the schools. We did not prepare the agreements with the schools, and were unaware of this issue until this past month. The issue came to light when SFC's latest round of financing fell through (at least in part because the proposed lender discovered this situation), and SFC was no longer had the liquidity to make up the monthly short-falls in payments.

We believe that officers of SFC lied to investors and were complicit in misrepresenting the situation to investors, financial insurers and other parties. We know that the performance data distributed by SFC [and used in the placement memoranda that Pepper prepared] did not identify payments made by SFC out of this so-called forebearance account, but rather reported them as if they were collections received from the students. We also know that Royal was not aware of this situation, and now faces significant losses as a result of these loans becoming defaulted, triggering claims under the policies they issued. Furthermore, last summer, issues were raised about the fact that the reported performance statistics on the SFC loans showed that almost 60% of the pools were remaining in a 60-day delinquencies bucket, but never becoming 90 days past due. In a meeting at which I was present in response to direct questions on this issue, two officers of [SFC] stated that it is the habit of truck drivers to pay immediately preceding a road trip and again when they return, and as a result most of the loans are always going to be in a 60-day delinquency bucket. They asserted other reasons, but never said that SFC and the schools

9

were covering the payments on the loans, as it has turned out was clearly the case. . . .

[T]o my knowledge, no one at SFC ever fully disclosed the use of the forbearance accounts, and as described above, in my presence, in response to direct questions the correct reason for the unusual performance data was not given. . . .

Royal Indemnity is conducting an audit and believes it has discovered that some of the schools were participating in a fraud and that many of the loans were fraudulent loans. In addition, they have uncovered other false statistics and SFC's failure to adhere to its own internal policies. . . . In addition, it came to my attention on Thursday or Friday of last week that SFC destroyed its Executive Committee minutes. As a result, continued representation of [SFC] by its current auditors is in question. . . .

I am finding myself in the difficult situation of never being comfortable that we have been apprised of the full facts, always trying to ensure that full disclosure is made to all parties, not being able to rely on statements of the officers that such disclosures have been made, questioning what we can reveal to these investors and continually drawing a fine ethical line. . . .

Adding to the ethical considerations is the fact that members of my family and trusts in which I am a beneficiary have made loans to Student Finance Corporation from time to time and most recently on March 5, at the request of Andrew Yao.

I think we also need to recognize the possibility that this firm will be sued, as a deep pocket associated with SFC and these transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility.

I am looking for guidance from the Finance and the Ethics Committees on what steps to take in our further representation of SFC. My preference is to resign since I no longer have confidence in the representations made to us. However, I understand this will put at substantial risk our fees and, thus, I am asking for guidance.

30.    Gagné testified that as of the time that he wrote the April 18, 2002 memo (emphasis

added):

10

> I was . . . not worried about anything that we did [in representing SFC or] our legal advice . . . . I was only concerned that we were a deep pocket, and there was a large loss, and <u>my experience with large losses, is, usually, anybody related to the transaction is getting sued</u>.

31.    On April 24, 2002, Pepper formally terminated its representation of SFC.

32.    In an e-mail dated April 25, 2002, Pepper's general counsel, Alfred Wilcox ("Wilcox"), sent a memo to Pepper attorneys explaining that Pepper had withdrawn from representing SFC, directing them to preserve their records, and stating (emphasis added):

> Do not discuss any aspect of this situation with anyone outside the firm; within the firm, discuss these matters only with those who have a need to know because they are working in the transition to successor counsel (e.g. Rod Gagné), <u>or because they are involved in protecting the firm's interests</u>. . . . It is possible that these circumstances will become the subject of media attention.

33.    On May 15, 2002, Gagné prepared a memo addressed to Wilcox "to set forth in writing my recollection of events pertaining to the representation of Student Finance Corporation," and to "assist [Pepper's General Counsel] in assessing any potential claims that . . . could have been filed . . . against Pepper."

34.    Thus, at some point during April and May 2002, Pepper and Gagné knew of acts, errors, omissions and/or circumstances which might reasonably be expected to give rise to a CLAIM against one or both of them under the 2001 Westport Policy because of their provision of professional services to SFC. Given this, Pepper and Gagné were each aware of a POTENTIAL CLAIM against them during the 2001-2002 Policy Period, and coverage for any subsequent CLAIM against Pepper and Gagné involving SFC attached during that policy period.

11

**Pepper's Claim and the Underlying Actions**

35.     During April 2004, Wilcox, Pepper's General Counsel, received a call from the attorney for SFC's bankruptcy trustee. Counsel for the trustee asked Pepper to execute an agreement tolling the statute of limitations while the trustee considered whether or not to assert claims against Pepper and its lawyers, and, if such claims were asserted, what claims might be asserted. On April 19, 2004, the trustee sent Pepper a proposed tolling agreement which subsequently was executed by the trustee, Pepper and Gagné. The tolling agreement made no demand on Pepper and/or Gagné for any damages or other alleged loss. It simply tolled the time in which a suit might be filed against Pepper, Gagné or other Pepper lawyers without it being barred by any applicable statute of limitations.

36.     On April 22 and 27, 2004, Pepper provided Westport with written notice of a POTENTIAL CLAIM by the bankruptcy trustee for SFC who had requested that Pepper enter into the tolling agreement. This was done during the 2003-2004 Policy Period, and while Westport had continually provided coverage to Pepper since at least the 2001-2002 Policy Period.

37.     On April 23, 2004, Westport accepted notice of the SFC matter as a POTENTIAL CLAIM against its INSUREDS.

38.     On November 1, 2004, the bankruptcy trustee filed suit in Delaware Bankruptcy Court in an action styled *Charles A. Stanziale, Jr., as Chapter 7 Trustee of Student Finance Corporation v. Pepper Hamilton LLP, et al.* against Pepper and Gagné, alleging that Pepper and Gagné breached their fiduciary duty and committed professional malpractice (the "Trustee Litigation").

12

39.     On March 15, 2005, Royal filed suit in federal district court in Delaware in an action styled *Royal Indemnity Company v. Pepper Hamilton LLP, et al.* against Pepper and Gagné (the "Royal Litigation"). Royal sought to recover from Pepper and Gagné the amount Royal was required to pay under its credit risk insurance policies. Royal claimed that, but for Pepper and Gagné's fraudulent conduct, the credit policies would never have been issued for SFC's benefit.

40.     As CLAIMS under its 2001 policy, Westport was exposed to paying its policy limits, $20 million, in defense costs and indemnification for the Underlying Actions. However, if coverage was somehow switched to the 2003-2004 Policy Period, Westport would limit its exposure to $10 million, and unfairly shift the burden of $10 million in policy benefits onto Executive Risk.

41.     Thus, in February 2005, Westport took the position that Pepper had not reported a POTENTIAL CLAIM in April 2004. Rather, Westport took the position that the Underlying Actions were CLAIMS first reported under the 2003 policies of Westport, Hartford, Executive Risk and CNA.    This was done solely to impose on Executive Risk obligations, including financial obligations, and duties that Westport, and not Executive Risk, owed to Pepper and Gagné under the 2001 Westport Policy.

**The Coverage Litigation and Executive Risk's Advancement of Funds**

42.     On October 12, 2005, Executive Risk filed a complaint against Pepper, Gagné and Westport seeking a declaration that Executive Risk had no obligation to pay defense costs or indemnify Pepper or Gagné under the 2003 Executive Risk Policy as a result of the Underlying Actions, and that any potential coverage was under the 2001 policies issued by Westport and CNA (the "Coverage Litigation").

13

43.    While the Coverage Action was pending, Pepper negotiated a settlement of the Underlying Actions and asked Executive Risk and the other carriers to fund the settlement.

44.    Executive Risk's claims regarding coverage had not been adjudicated. Therefore, there was potentially coverage under the 2003 Executive Risk Policy. Given this, Executive Risk agreed to advance its $10 million limits under its 2003 policy to Pepper and Gagné, subject to a reservation of rights, in order to assist Pepper in funding its settlement of the Underlying Actions. Westport, Hartford and CNA made similar advances under their 2003 policies.

45.    Notwithstanding the advances made under the 2003 policies, the coverage for the Underlying Actions is under the 2001 Policies. As such, Westport, and not Executive Risk, should have advanced Pepper and Gagné the funds necessary to settle the Underlying Actions. Executive Risk's advancement of funds, therefore, was a payment of an obligation actually owed or potentially owed Pepper and Gagné by Westport under its 2001 policy.

### FIRST CAUSE OF ACTION
(Declaration of Coverage under 2001-2002 Westport Policy)

46.    Executive Risk realleges each and every allegation contained in paragraphs 1 to 45 as if fully set forth herein.

47.    Pepper had continuing legal professional liability coverage under policies issued by Westport from at least 1999 through October 2004. This coverage was renewed continuously and without interruption during all relevant times.

48.    INSURING AGREEMENT I.C. of the 2003-2004 Westport policy provides that any CLAIM made against any INSURED which arises from a POTENTIAL CLAIM, which the Insured first became aware of during the period of a prior policy issued by Westport, shall be considered to

14

have been first made and reported during the POLICY PERIOD of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM.

49. Pepper and Gagné first became aware of POTENTIAL CLAIMS against them regarding their representation of SFC on or about April 17, 2002, when Gagné drafted his first memo, but no later than the end of May 2002. Thus, Pepper and Gagné became aware of these POTENTIAL CLAIMS during the 2001-2002 Policy Period, when Executive Risk did not provide insurance coverage to Pepper.

50. By operation of INSURING AGREEMENT I.C., the continuing coverage provision in the Westport policy, both the Trustee Litigation and the Royal Litigation are deemed CLAIMS first made and reported during the 2001-2002 Policy Period, when coverage was provided by Westport.

51. Executive Risk, therefore, is entitled to a declaratory judgment that, pursuant to the terms, conditions, exclusions and endorsements of the 2001 Westport Policy, the CLAIMS relating to the Underlying Actions are deemed to have been first made no later than when Pepper and/or Gagné first became aware of the potential claim in April-May 2002, and thus coverage for the Underlying Actions exists under the 2001 Westport Policy.

## SECOND CAUSE OF ACTION
(Equitable Indemnification)

52. Executive Risk realleges each and every allegation contained in paragraphs 1 to 45 as if fully set forth herein.

53. Executive Risk advanced $10 million under its 2003 policy to Pepper and Gagné to help fund the settlement of the Underlying Actions. This was done because there was a possibility

15

that the court in the Coverage Litigation might find coverage under the 2003 Executive Risk Policy. However, Westport should have advanced the funds necessary to settle the Underlying Actions under its 2001 policy because coverage for the Underlying Actions attached during the 2001-2002 Policy Period. As such, Executive Risk has advanced funds to satisfy an obligation that Westport owed or potentially owed Pepper and Gagné.

54.    Executive Risk is thus entitled to indemnification from Westport in the amount of $10 million as a result of Executive Risk's advancement to Pepper and Gagné of funds that Westport were obligated to provide.

<div align="center">

### THIRD CAUSE OF ACTION
(Unjust Enrichment)

</div>

55.    Executive Risk realleges each and every allegation contained in paragraphs 1 to 45 as if fully set forth herein.

56.    Executive Risk advanced $10 million under its 2003 policy to Pepper and Gagné to help fund the settlement of the Underlying Actions. In doing this, Executive Risk satisfied an obligation that Westport owed or potentially owed to Pepper and Gagné under the 2001 Westport Policy. Westport has not compensated Executive Risk for Executive Risk's discharge of its obligation to its INSUREDS, but instead has enjoyed the benefits of Executive Risk's advancement of funds by not advancing to Pepper and Gagné funds for which Westport should have advanced under its 2001 policy. As such, Westport has been unjustly enriched by Executive Risk's advancement of funds to satisfy an obligation that Westport owed or potentially owed Pepper and Gagné.

<div align="center">16</div>

57.    Executive Risk is entitled to recover $10 million from Westport, the amount in which Westport has been unjustly enriched by reason of Executive Risk's advancement to Pepper and Gagné of funds that Westport was obligated to provide.

WHEREFORE, Executive Risk demands judgment as follows:

a.    On the first cause of action, declaring that coverage for the Underlying Actions exists under the 2001 Westport Policy;

b.    On the second cause of action, awarding Executive Risk $10 million plus interest;

c.    On the third cause of action, awarding Executive Risk $10 million plus interest; and

d.    Awarding such other relief as may be just, proper and equitable, including plaintiff's costs and attorneys' fees.

Dated: New York, New York
       January 23, 2008

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

By:    William B. Pollard, III
       Catherine Montjar Irwin
757 Third Avenue
New York, New York 10017
(212) 418-8600

*Attorneys for Plaintiff Executive Risk Indemnity Inc.*

17

# EXHIBIT 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EXECUTIVE RISK INDEMNITY INC.,

               Plaintiff,

        -against-

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ, and
WESTPORT INSURANCE CORPORATION,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

: Index No.: 603624/05
:
:
:
: **AMENDED ANSWER,**
: **COUNTERCLAIMS,**
: **AND CROSS-CLAIM**
:
:
:

Defendants, Pepper Hamilton LLP and W. Roderick Gagné (collectively, the "Pepper Hamilton Defendants"), by their attorneys Dickstein Shapiro LLP, hereby amend their answer and assert the following affirmative defenses, counterclaims, and cross-claim. Pepper Hamilton Defendants generally deny each and every allegation of the Complaint that is not expressly admitted herein. Pepper Hamilton Defendants respond to each of the numbered paragraphs of the Complaint as follows:

### INTRODUCTION

1. Pepper Hamilton Defendants deny the allegations set forth in paragraph one of the Complaint, except Pepper Hamilton Defendants admit that Executive Risk seeks a declaration that there is no coverage under the Executive Risk Policy, and furthermore admit that there is a justiciable controversy between the parties.

2. The allegations contained in this paragraph are conclusions of law to which no response is required.

### JURISDICTION AND VENUE

3. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants admit the allegations set forth in paragraph three of the Complaint.

231238.03

4. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph four of the Complaint.

## PARTIES

5. Pepper Hamilton Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph five of the Complaint.

6. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny the allegations set forth in paragraph six of the Complaint, except Pepper Hamilton Defendants admit that Pepper Hamilton has more than 400 lawyers practicing out of nine offices with one office in the State and County of New York at 420 Lexington Avenue, Suite 2320, New York, New York 10170-2399 and that Corporation Service company is the registered agent for service of process on Pepper Hamilton in New York.

7. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny the allegations set forth in paragraph seven of the Complaint, except that Pepper Hamilton Defendants admit that Mr. Gagné is a partner in Pepper Hamilton and that Mr. Gagné represented SFC with respect to SFC's credit arrangements with MBIA. Pepper Hamilton Defendants further admit that MBIA is a Connecticut corporation with its principal place of business in New York.

8. Pepper Hamilton Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph eight of the Complaint.

2

## FACTUAL ALLEGATIONS

**The 2002-2003 Policy Period**

9. Pepper Hamilton Defendants deny the allegations set forth in paragraph nine of the Complaint, except Pepper Hamilton Defendants admit that Westport issued Customized Practice Coverage Policy No. PLL-347287-5 to Pepper Hamilton LLP for the Policy Period of October 27, 2002 to October 27, 2003 with limits of $10 million per claim and in the aggregate (the "2002-2003 Westport Policy").

10. Pepper Hamilton Defendants deny the allegations set forth in paragraph ten of the Complaint, except Pepper Hamilton Defendants admit that Twin City Fire Insurance Company ("Twin City") issued a policy to Pepper Hamilton Defendants with limits of $10 million per claim and in the aggregate, excess of $10 million in underlying limits (the "2002-2003 Twin City Policy").

11. Pepper Hamilton Defendants deny the allegations set forth in paragraph eleven of the Complaint, except Pepper Hamilton Defendants admit that Executive Risk issued Excess Indemnity Policy No. 8170-3836 to Pepper Hamilton Defendants for the Policy Period of October 27, 2002 to October 27, 2003, with limits of $10 million, excess of $20 million in underlying limits (the "2002-2003 Executive Risk Policy").

12. Pepper Hamilton Defendants deny the allegations set forth in paragraph twelve of the Complaint, except Pepper Hamilton Defendants admit that the 2002-2003 Executive Risk Policy provides that "[e]xcept as specifically set forth in the terms, conditions or endorsements of this policy, coverage hereunder shall apply in conformance with the terms, conditions and endorsements of the policy immediately underlying this policy...."

13. Pepper Hamilton Defendants admit that Continental Casualty Company provided excess insurance to Pepper Hamilton during the 2002-2003 Policy Period with limits of $30 million per claim and in the aggregate, excess of $30 million in underlying limits.

231238.03

**The 2003-2004 Policy Period**

14. Pepper Hamilton Defendants deny the allegations set forth in paragraph fourteen of the Complaint, except Pepper Hamilton Defendants admit that Westport issued Customized Practice Coverage Policy No. PLL-350772-3 to Pepper Hamilton Defendants for the Policy Period of October 27, 2003 to October 27, 2004 with limits of $10 million per claim and in the aggregate (the "2003-2004 Westport Policy").

15. Pepper Hamilton Defendants deny the allegations set forth in paragraph fifteen of the Complaint, except Pepper Hamilton Defendants admit that Twin City issued a policy to Pepper Hamilton Defendants for the Policy Period of October 27, 2003 to October 27, 2004 with limits of $10 million per claim and in the aggregate, excess of $10 million in underlying limits (the "2003-2004 Twin City Policy").

16. Pepper Hamilton Defendants deny the allegations set forth in paragraph sixteen of the Complaint, except Pepper Hamilton Defendants admit that Executive Risk issued Excess Indemnity Policy No. 8170-3836 to Pepper Hamilton Defendants for the Policy Period of October 27, 2003 to October 27, 2004, with limits of $10 million, excess of $20 million in underlying limits (the "2003-2004 Executive Risk Policy").

17. Pepper Hamilton Defendants admit the allegations set forth in paragraph seventeen of the Complaint.

18. Pepper Hamilton Defendants deny the allegations set forth in paragraph eighteen of the Complaint, except Pepper Hamilton Defendants admit that the 2003-2004 Executive Risk Policy provides that "[e]xcept as specifically set forth in the terms, conditions or endorsements of this policy, coverage hereunder shall apply in conformance with the terms, conditions and endorsements of the policy immediately underlying this policy...."

4

**The 2001-2002 Policy Period**

19.  Pepper Hamilton Defendants admit that Westport issued Customized Practice Coverage Policy No. PLL-341513-1 to Pepper Hamilton Defendants for the Policy Period of April 27, 2001 to October 27, 2002 with limits of $20 million per claim and in the aggregate (the "2001-2002 Westport Policy").

20.  Pepper Hamilton Defendants admit that Continental Casualty Company provided excess insurance to Pepper Hamilton during the 2001-2002 Policy Period with limits of $30 million per claim and in the aggregate, excess of $20 million in underlying limits.

21.  Pepper Hamilton Defendants deny the allegations set forth in paragraph twenty-one of the Complaint, except that Pepper Hamilton Defendants admit that Executive Risk did not issue an insurance policy to Pepper Hamilton Defendants having an April 21, 2001 to October 27, 2002 Policy Period.

**Provisions of the 2003-2004 Westport Policy**

22.  Pepper Hamilton Defendants admit the allegations set forth in paragraph twenty-two of the Complaint, and Pepper Hamilton Defendants refer Executive Risk to the 2003-2004 Westport Policy for an accurate description of its contents.

23.  Pepper Hamilton Defendants admit the allegations set forth in paragraph twenty-three of the Complaint, and Pepper Hamilton Defendants refer Executive Risk to the 2003-2004 Westport Policy for an accurate description of its contents.

24.  Pepper Hamilton Defendants admit the allegations set forth in paragraph twenty-four of the Complaint, and Pepper Hamilton Defendants refer Executive Risk to the 2003-2004 Westport Policy for an accurate description of its contents.

25.  Pepper Hamilton Defendants admit the allegations set forth in paragraph twenty-five of the Complaint, and Pepper Hamilton Defendants refer Executive Risk to the 2003-2004 Westport Policy for an accurate description of its contents.

231238.03

26. Pepper Hamilton Defendants admit the allegations set forth in paragraph twenty-six of the Complaint, and Pepper Hamilton Defendants refer Executive Risk to the 2003-2004 Westport Policy for an accurate description of its contents.

**Reporting and Notice Provision of the 2001-2002 Westport Policy**

27. Pepper Hamilton Defendants deny the allegations set forth in paragraph twenty-seven of the Complaint, except Pepper Hamilton Defendants admit that the language quoted in paragraph twenty-seven correctly recites in part the AMENDEMENT OF III. REPORTING AND NOTICE endorsement in the 2001-2002 Westport Policy.

28. Pepper Hamilton Defendants deny the allegations set forth in paragraph twenty-eight of the Complaint, except that Pepper Hamilton Defendants admit that the 2003-2004 Executive Risk Policy provides that "[e]xcept as specifically set forth in the terms, conditions or endorsements of this policy, coverage hereunder shall apply in conformance with the terms, conditions and endorsements of the policy immediately underlying this policy...."

**Pepper Hamilton's First Knowledge of a Potential Claim**

29. On information and belief, Pepper Hamilton Defendants admit the allegations set forth in paragraph twenty-nine of the Complaint.

30. Pepper Hamilton Defendants admit the allegations set forth in paragraph thirty of the Complaint.

31. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny the allegations set forth in paragraph thirty-one of the Complaint, except Pepper Hamilton Defendants admit that Mr. Gagné wrote a memorandum dated April 18, 2002, to which Pepper Hamilton Defendants refer Executive Risk for an accurate statement of its contents.

6

231238.03

32.  Pepper Hamilton Defendants admit that the April 18, 2002 memorandum is accurately quoted in part and that Pepper Hamilton sought to withdraw from its representation of SFC on April 24, 2002.

33.  Pepper Hamilton Defendants deny the allegations set forth in paragraph twenty-seven of the Complaint, except Pepper Hamilton Defendants admit that that Mr. Gagné wrote a memorandum to Alfred Wilcox on August 6, 2002, regarding Pepper Hamilton Defendants' insurance application.

34.  Pepper Hamilton Defendants deny the allegations set forth in paragraph thirty-four of the Complaint, except Pepper Hamilton Defendants admit that Alfred Wilcox completed the Westport Insurance application for the 2002-2003 policy period and in response to the question "[a]fter inquiry of each lawyer, is the Applicant, its predecessor firms or any lawyer proposed for this insurance aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability?" Mr. Wilcox checked the box labeled "No."

35.  Pepper Hamilton Defendants deny the allegations contained in paragraph thirty-five of the Complaint, except Pepper Hamilton Defendants admit that they represented to Executive Risk that there were no material changes from the time the Westport application for insurance was submitted until the date of any such representation.  The Pepper Hamilton Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation that "In reliance upon these representations, Executive Risk issued the 2002-2003 Executive Risk Policy."

36.  Pepper Hamilton Defendants deny the allegations set forth in paragraph thirty-six of the Complaint, except Pepper Hamilton Defendants admit that Mr. Gagné responded to an

7

August 25, 2003 memorandum regarding Pepper Hamilton's insurance application, to which Pepper Hamilton Defendants refers Executive Risk for an accurate statement of its contents.

37. Pepper Hamilton Defendants deny the allegations set forth in paragraph thirty-seven of the Complaint, except Pepper Hamilton Defendants admit that Pepper Hamilton had a meeting with Executive Risk in October 2003. Pepper Hamilton Defendants deny knowledge or information sufficient to form a belief as to the allegation that "Again, in reliance upon these representations, Executive Risk issued the 2003-2004 Executive Risk Policy."

38. Pepper Hamilton Defendants deny the allegations set forth in paragraph thirty-eight of the Complaint, except Pepper Hamilton Defendants admit that Mr. Gagné drafted memoranda dated April 18, 2002 and August 6, 2002 and Pepper Hamilton Defendants refer Executive Risk to those memoranda for an accurate description of their contents.

39. Pepper Hamilton Defendants admit that the allegations set forth in paragraph thirty-nine of the Complaint.

40. Pepper Hamilton Defendants admit that by letter dated April 23, 2004, Westport acknowledged written notice of a potential claim.

41. Pepper Hamilton Defendants deny the allegations set forth in paragraph forty-one of the Complaint, except that Pepper Hamilton Defendants admit that suit was filed in Delaware Bankruptcy Court in an action styled *Charles A. Stanziale, Jr. as Chapter 7 Trustee of Student Finance Corporation v. Pepper Hamilton LLP, et al.*, and Pepper Hamilton Defendants refer Executive risk to the pleadings in that action for an accurate statement of their contents.

42. Pepper Hamilton Defendants deny the allegations set forth in paragraph forty-two of the Complaint, except that Pepper Hamilton Defendants admit that suit was filed in Delaware in an action styled *Royal Indemnity Company v. Pepper Hamilton LLP., et al.*, and Pepper

8

231238.03

Hamilton Defendants refer Executive risk to the pleadings in that action for an accurate statement of their contents.

## COUNT ONE

43. No response is required to the allegations of this paragraph.

44. Pepper Hamilton Defendants admit the allegations set forth in paragraph forty-four of the Complaint.

45. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny the allegations set forth in paragraph forty-five of the Complaint, except Pepper Hamilton Defendants admit that the language of INSURING AGREEMENT I.C. of the 2003-2004 Westport Policy is set forth in paragraph twenty-seven of the Complaint and refers Executive Risk to the 2003-2004 Westport Policy for an accurate statement of its contents.

46. The allegations contained in this paragraph are conclusions of law to which no response is required.

47. The allegations contained in this paragraph are conclusions of law to which no response is required.

48. Pepper Hamilton Defendants deny the allegations set forth in paragraph forty-eight of the Complaint, except Pepper Hamilton Defendants admit that Executive Risk did not issue an insurance policy to Pepper Hamilton with a Policy Period of 2001-2002.

49. The allegations contained in this paragraph are conclusions of law to which no response is required.

50. The allegations contained in this paragraph are conclusions of law to which no response is required.

9

51. The allegations contained in this paragraph are conclusions of law to which no response is required.

## COUNT TWO

52. No response is required to the allegations of this paragraph.

53. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny the allegations set forth in paragraph fifty-three of the Complaint, except Pepper Hamilton Defendants admit that the 2002-2003 and 2003-2004 Westport Policies contain the language set forth in paragraph twenty-five of the Complaint and further admits that the 2002-2003 and 2003-2004 Executive Risk Policies provide that "[e]xcept as specifically set forth in the terms, conditions or endorsements of this policy, coverage hereunder shall apply in conformance with the terms, conditions and endorsements of the policy immediately underlying this policy...."

54. The allegations contained in this paragraph are conclusions of law to which no response is required.

55. The allegations contained in this paragraph are conclusions of law to which no response is required.

56. Pepper Hamilton Defendants deny the allegations set forth in paragraph fifty-six of the Complaint, except Pepper Hamilton Defendants admit that Gagné authored a memoranda dated April 18, 2002 and August 6, 2002.

57. The allegations contained in this paragraph are conclusions of law to which no response is required.

58. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny the allegations set forth in paragraph fifty-eight of the Complaint.

10

59. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny the allegations set forth in paragraph fifty-nine of the Complaint.

60. The allegations contained in this paragraph are conclusions of law to which no response is required. To the extent a response is deemed required, Pepper Hamilton Defendants deny the allegations set forth in paragraph sixty of the Complaint.

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The claims in the Complaint are barred, in whole or in part, by reason of the allegations and claims set forth in the Counterclaims herein, which are incorporated by reference into this Answer as if fully set forth herein.

### Third Affirmative Defense

The claims in the Complaint are barred, in whole or in part, by reason of the doctrines of estoppel and unclean hands.

### Fourth Affirmative Defense

The claims in the Complaint are barred, in whole or in part, by reason of the doctrines of waiver.

### Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part because the allegations of the underlying claims against Pepper Hamilton Defendants are within the terms of coverage provided by the insurance contracts Plaintiff issued and are not excluded therefrom.

11

231238.03

### Sixth Affirmative Defense

The Plaintiff's claims are barred in whole or in part because it has materially breached its contracts with Pepper Hamilton Defendants.

### Seventh Affirmative Defense

The Pepper Hamilton Defendants incorporate by reference, as though set forth at length, each and every legal defense asserted in any pleading in this action which is applicable to and supportive of the Pepper Hamilton Defendants' defense of this action and is not otherwise set forth herein.

The Pepper Hamilton Defendants reserve the right to amend and/or add affirmative defenses that become known to them through discovery.

12

## COUNTERCLAIMS AND CROSS-CLAIM

Defendants Pepper Hamilton LLP and W. Roderick Gagné (collectively, the "Pepper Hamilton Defendants") allege the following as their counterclaims and cross-claim against Plaintiff Executive Risk and Defendant Westport.

### Preliminary Statement

1. Pepper Hamilton LLP ("Pepper Hamilton") purchased an excess professional liability insurance policy from Executive Risk for the policy period of October 27, 2003 to October 27, 2004. That policy incorporated the terms and conditions of the underlying insurance in force during that policy period, except as set forth in the policy. Executive Risk has brought this action seeking a declaration that the 2003-2004 Executive Risk Policy is not available for any Loss incurred by the Pepper Hamilton Defendants in connection with the underlying actions.

2. The allegations of the Complaint are incorporated herein by reference, subject to and as modified by the Pepper Hamilton Defendants' Answer and Affirmative Defenses.

### The Parties

3. Pepper Hamilton is a 460 person law firm, based principally in Philadelphia. Pepper Hamilton represented Andrew M. Yao, the sole shareholder of Student Finance Corporation ("SFC"), in connection with various SFC matters.

4. W. Roderick Gagné was a Pepper Hamilton partner at all times relevant to this dispute and was the partner primarily responsible for the representation of Mr. Yao and SFC. Pepper Hamilton's representation of SFC and Mr. Yao ended in 2002.

5. Upon information and belief, Executive Risk is, and was during all relevant time periods, a corporation organized under the laws of the State of Delaware, with its principal place of business in New Jersey, and in the business of issuing policies of insurance. Upon

information and belief, Executive Risk transacts business in the State if New York and avails itself of the laws of the State of New York.

6. Upon information and belief, Westport is a corporation organized under the laws of Missouri, with its principal place of business in Kansas and in the business of issuing policies of insurance. Upon information and belief, Westport is licensed by the New York State of Department of Insurance, maintains an office in the State and County of New York, transacts business in the State of New York and avails itself of the laws of the State of New York.

7. Venue is proper in this Court pursuant to CPLR § 503(a) because Plaintiff has designated New York County.

8. During the April 27, 2001 to October 27, 2004 period, Pepper Hamilton had in force various layers of professional liability insurance policies. The policies in force during this time period are "claims made and reported" meaning that a policy is triggered if a claim is made against Pepper Hamilton during that policy year and is reported to the insurance company.

9. Pepper Hamilton's primary professional liability insurer from 2001 to 2004 was Defendant Westport. For the period April 27, 2001 to October 27, 2002, the limits of the Westport primary policy were $20 million per claim and in the aggregate. For the periods October 27, 2002 to October 27, 2003, and October 27, 2003 to October 27, 2004, the limits for each Westport policy were $10 million per claim and in the aggregate.

10. For the policy period April 27, 2001 to October 27, 2002, Pepper Hamilton also purchased an excess professional liability insurance policy from CNA. The limits of that policy were $30 million per claim and in the aggregate, excess of the $20 million limit of the underlying Westport policy.

11. For the policy years 2002 to 2004, Pepper Hamilton purchased excess professional liability insurance policies from Twin City, Executive Risk and CNA.

14

231238.03

12. Each of the Twin City policies has limits of $10 million per claim and in the aggregate, excess of the underlying Westport primary policies.

13. Each of the Executive Risk policies has limits of $10 million, excess of the underlying Westport primary policies and Twin City excess policies.

14. The CNA policy in force during the 2001-2002 policy year has limits of $30 million per claim and in the aggregate, excess of the Westport primary policies and the Twin City and Executive Risk excess policies. The CNA policy in force during the 2003-2004 policy year has limits of $10 million per claim and in the aggregate, excess of the Westport primary policies and the Twin City and Executive Risk excess policies.

15. A coverage chart depicting the above-described layered insurance program is annexed hereto as Exhibit 1.

16. Each of the Twin City policies provides that it "follows the insuring agreement(s) in the Underlying Insurance and is subject to the same warranties, conditions, exclusions, terms, and definitions except as to premium, the limits of liability, renewal, the duty to defend, or as may otherwise be changed by this policy."

17. Each of the Executive Risk policies identified provides that "[e]xcept as specifically set forth in the terms, conditions or endorsements of this policy, coverage hereunder shall apply in conformance with the terms, conditions and endorsements of the policy immediately underlying this policy...."

18. The 2001-2002 CNA Policy provides that it "follows the insuring agreement(s) in the Underlying Insurance and is subject to the same warranties, conditions, exclusions, terms, and definitions except as to premium, the limits of liability, renewal and the duty to defend, or as may otherwise be modified by this Excess Policy."

15

19. The Insuring Agreement of the Executive Risk policies provides that "[t]he [insurance company] shall provide the Insured with insurance excess of the Underlying Insurance...for claims first made against the Insured during the Policy Period...."

20. The Executive Risk policies provide that the limits of $10 million "are the limits of the Company's liability and shall be the maximum amount(s) payable, including Defense Expenses, by the Company under this policy."

21. The Executive Risk policies do not provide a definition for "claim," "loss" or "wrongful act" but, pursuant to the provisions of the Executive Risk policies, incorporate the definitions of those terms contained in the Westport primary insurance policies, as set forth in paragraph 17.

22. The Westport Policies define the term "claim" as "a demand made upon any INSURED for LOSS...including, but not limited to, service of suit...." The term "loss" is defined as "the monetary and compensatory portion of any judgment, award, or settlement..." The term "wrongful act" is defined as "any act, error, omission, (circumstance), personal injury or breach of duty in the rendition of legal services for others...arising out of the conduct of an insured's profession as a lawyer[.]"

23. The Insuring Agreement of the Westport Policies provides that "[the insurance company] shall pay on behalf of any INSURED all LOSS in excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against any INSURED during the POLICY PERIOD...by reason of any WRONGFUL ACT[.]"

24. The Insuring Agreement of the 2001-2002 Westport Policy further provides that:

> If during this POLICY PERIOD, any INSURED first becomes aware of a
> POTENTIAL CLAIM and gives written notice of such POTENTIAL
> CLAIM to the Company during this POLICY PERIOD, or during the
> POLICY PERIOD of any subsequent policy issued to the NAMED
> INSURED as a result of continuous and uninterrupted coverage with the
> Company, any CLAIMS subsequently made against any INSURED

16

arising from the POTENTIAL CLAIM shall be considered to have been first made during this POLICY PERIOD.

If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the policy period of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

25. The Insuring Agreement of the 2002-2003 and 2003-2004 Westport Policy

provides that:

If, during the current POLICY PERIOD, any INSURED first becomes aware of a POTENTIAL CLAIM and gives written notice of such POTENTIAL CLAIM to the Company either during the current POLICY PERIOD, or during the POLICY PERIOD of any subsequent policy issued to the NAMED INSURED as a result of continuous and uninterrupted coverage with the Company, any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made during the POLICY PERIOD the INSURED first became aware of a POTENTIAL CLAIM.

If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the policy period of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

26. The Westport Policies define "potential claim" as:

1. any act, error, omission, circumstance, or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any

17

INSURED under the POLICY; or 2. any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED.

27. The Westport Policies provide coverage for defense costs and set forth that Westport shall "have the right and duty to select counsel and arbitrators and to defend and CLAIM for LOSS against any INSURED...."

<u>Underlying Actions</u>

28. In April of 2002, the Pepper Hamilton Defendants terminated its representation of SFC and Mr. Yao. Subsequently, SFC filed for bankruptcy.

29. In April of 2004, the Pepper Hamilton Defendants received a letter from the Trustee in bankruptcy of SFC requesting Pepper Hamilton's consent to a tolling agreement covering claims the Trustee alleged it might have against the Pepper Hamilton Defendants. Upon receiving this communication, and within the policy periods of the 2003-2004 policies, the Pepper Hamilton Defendants put Westport, Executive Risk, Twin City and CNA on notice of a potential claim by the Trustee.

30. By letter dated April 23, 2004, Westport acknowledged receipt of notice of this potential claim.

31. By at least May 18, 2004, Executive Risk acknowledged receipt of notice of this potential claim.

32. On or about March of 2005, Royal Indemnity Company, which had provided credit risk insurance to SFC, sought leave from a Delaware court in a separately pending action to assert claims against the Pepper Hamilton Defendants arising out of Pepper Hamilton's representation of SFC. The Pepper Hamilton Defendants seek coverage for this claim under the 2003-2004 policies pursuant to their terms.

33. On November 1, 2004, a lawsuit captioned *Charles A. Stanziale, Jr., as Chapter 7 Trustee of Student Finance Corporation v. Pepper Hamilton LLP, et al.*, U.S.B.C., Dist. of

18

231238.03

Del., No. 02-1120-JBR (the "*Stanziale* Action"), was filed against the Pepper Hamilton Defendants in Delaware Bankruptcy Court, alleging that the Pepper Hamilton Defendants were liable to the creditors of SFC for losses stemming out of an alleged breach of the fiduciary duty and malpractice.

34. On March 18, 2005, a second lawsuit captioned *Royal Indemnity Co. v. Pepper Hamilton LLP, et al.*, U.S.D.C., Dist. of Del., No. 05-165 (the "*Royal* Action"), was filed against the Pepper Hamilton Defendants in federal district court in Delaware. The *Royal* Action seeks recovery of the amount Royal Indemnity Company was required to pay under its credit risk policies issued to SFC and alleges that the Pepper Hamilton Defendants was a participant in a fraud committed by SFC.

35. The *Stanziale* Action and the *Royal* Action allege that the Pepper Hamilton Defendants breached their duty in the rendition of professional services, allegations that constitute covered "wrongful acts" within the meaning of the Westport, Executive Risk, Twin City and CNA policies.

36. The plaintiffs in the *Stanziale* Action and the *Royal* Action (the "Underlying Actions") seek to recover damages against the Pepper Hamilton Defendants in an amount that implicates the coverage obligations of Westport and Executive Risk.

37. Westport is providing Pepper Hamilton with a defense in the underlying *Stanziale* Action and *Royal* Action under the 2003-2004 Westport Policy. Westport recently tendered the limits of the 2003-2004 policy to the Pepper Hamilton Defendants.

<u>The Coverage Action</u>

38. On October 12, 2005, Executive Risk commenced this lawsuit against the Pepper Hamilton Defendants and Westport, seeking a declaration that Executive Risk has no obligation under its 2003-2004 Policy to indemnify the Pepper Hamilton Defendants for any Loss incurred

231238.03

by them in connection with the Underlying Actions. That same day Executive Risk sent the

Pepper Hamilton Defendants a letter denying any obligation under its 2003-2004 Policy to

indemnify the Pepper Hamilton Defendants for any Loss incurred by them in connection with the

Underlying Actions.

39. By and through the initiation of this lawsuit and its correspondence dated

October 12, 2005, Executive Risk has communicated its intent to deny coverage for the

Underlying Actions.

<u>First Counterclaim</u>
**(Declaratory Judgment Against Executive Risk)**

40. The Pepper Hamilton Defendants repeat and reallege paragraphs 1 through 39 of

its Counterclaims as if fully set forth herein.

41. The Pepper Hamilton Defendants have complied with all terms and conditions,

including timely notice, precedent to coverage under the 2003-2004 Executive Risk Policy.

42. A genuine and justiciable controversy exists between the Pepper Hamilton

Defendants and Executive Risk within this Court's jurisdiction as to Executive Risk's obligation

to provide coverage to Pepper Hamilton Defendants for the Underlying Actions under the 2003-

2004 Executive Risk Policy.

43. The Pepper Hamilton Defendants are entitled to a declaratory judgment that they

are entitled to coverage for the Underlying Actions under the 2003-2004 Executive Risk Policy.

<u>Second Counterclaim</u>
**(Breach of Contract Against Executive Risk)**

44. The Pepper Hamilton Defendants repeat and reallege paragraphs 1 through 43 of

its Counterclaims as if fully set forth herein.

45. By its Complaint dated October 12, 2005 against the Pepper Hamilton

Defendants and its letter of that same date, Executive Risk clearly and unequivocally expressed

20

its definite and final intent not to perform its obligations under the 2003-2004 Executive Risk Policy to pay defense expenses and to indemnify Pepper Hamilton Defendants with respect to the *Stanziale* Action and *Royal* Action. Executive Risk, therefore, has breached its obligation under the 2003-2004 Executive Risk Policy to pay defense expenses and to indemnify Pepper Hamilton Defendants with respect to those actions.

46. Wherefore, Executive Risk is liable to Pepper Hamilton Defendants for all damages that Pepper Hamilton Defendants may sustain as a result of Executive Risk's breach of its duty to pay defenses expenses and to indemnify Pepper Hamilton Defendants.

### Third Counterclaim
#### (Attorneys' Fees and Costs Against Executive Risk)

47. The Pepper Hamilton Defendants repeat and reallege paragraphs 1 through 46 of its Counterclaims as if fully set forth herein.

48. Because Executive Risk filed this action against Pepper Hamilton Defendants, Pepper Hamilton Defendants have been compelled by Executive Risk to incur costs to defend against Executive Risk's attempts to avoid its obligation to pay defense expenses with respect to the *Stanziale* Action and *Royal* Action. As a result, Pepper Hamilton Defendants has paid, and continues to pay, attorneys' fees and costs related to its defense and to enforce its rights under the 2003-2004 Executive Risk Policy.

49. Because, as described in Pepper Hamilton Defendants' Counterclaims, Executive Risk is liable pursuant to the terms of the 2003-2004 Executive Risk Policy to pay the defense expenses of Pepper Hamilton Defendants with respect to the *Stanziale* Action and *Royal* Action, Executive Risk also is liable to Pepper Hamilton Defendants for the entirety of the attorneys' fees and costs incurred, and to be incurred, by Pepper Hamilton Defendants in its defense of this action and to enforce its rights under the 2003-2004 Executive Risk Policy.

21

231238.03

50. Wherefore, Executive Risk is liable to Pepper Hamilton Defendants for the attorneys' fees and costs incurred, and to be incurred, by Pepper Hamilton Defendants in its defense of this action and to enforce its rights under the 2003-2004 Executive Risk Policy.

### Cross-claim
### (Declaratory Judgment Against Westport)

51. The Pepper Hamilton Defendants repeat and reallege paragraphs 1 through 50 of its Counterclaims as if fully set forth herein.

52. As a result of Executive Risk's filing of this lawsuit, a justiciable controversy exists whether the 2003-2004 Westport Policy or the 2001-2002 Westport Policy is required to respond to the Pepper Hamilton Defendants' claim for defense and indemnity in respect of the Underlying Actions.

53. The Pepper Hamilton Defendants have complied with all terms and conditions precedent to coverage, including timely notice, under both the 2003-2004 and 2001-2002 Westport Policies.

54. The Pepper Hamilton Defendants contend Westport is obligated to defend and indemnify the Pepper Hamilton Defendants pursuant to the terms and conditions of the 2003-2004 Westport Policy. Westport currently is defending the Pepper Hamilton Defendants under the terms of the 2003-2004 Westport Policy and has tendered its limits to the Pepper Hamilton Defendants.

55. If the Court determines that the Underlying Actions are deemed claims made against the Pepper Hamilton Defendants during the period of the 2001-2002 Westport Policy then the Pepper Hamilton Defendants contend that Westport is obligated to defend and indemnify the Pepper Hamilton Defendants in respect of the Underlying Actions under the 2001-2002 Westport Policy.

22

56. Accordingly, the Pepper Hamilton Defendants are entitled to a declaratory judgment setting forth the rights and responsibilities of the parties with respect to Westport's obligation to defend the Pepper Hamilton Defendants and indemnify them for losses arising from any judgments in or settlements of the *Stanziale* Action and *Royal* actions

WHEREFORE, Pepper Hamilton Defendants demand judgment against Executive Risk and Westport herein as follows:

a. On its First Counterclaim against Executive Risk, a declaration that Executive Risk is obligated to indemnify fully Pepper Hamilton Defendants for damages and defense costs, if any, arising from any judgments in or settlements of the *Stanziale* Action and *Royal* Action, pursuant to the terms of the 2003-2004 Executive Risk Policy;

b. On its Second Counterclaim against Executive Risk, money damages for defense costs and all damages that Pepper Hamilton Defendants become obligated to pay as a result of the *Stanziale* Action and *Royal* Action, in an amount to be determined at trial, pursuant to the terms of the 2003-2004 Executive Risk Policy;

c. On its Third Counterclaim against Executive Risk, money damages for the entirety of the attorneys' fees and costs incurred, and to be incurred, by Pepper Hamilton Defendants in its defense of this action and to enforce its rights under the 2003-2004 Executive Risk Policy;

d. On its Cross-claim against Westport , a declaration that  Westport is obligated to defend the Pepper Hamilton Defendants with respect to the *Stanziale* Action and *Royal* Action and to indemnify the Pepper Hamilton Defendants for their liabilities, if any, arising from any judgments in or settlements of the *Stanziale* Action and *Royal* Action pursuant to the terms of the 2003-2004 Westport Policy, or alternatively, pursuant to the terms of the 2001-2002 Westport Policy;

e. Pre- and post-judgment interest at the rate specified by law; and

f. Such other and further relief as this Court deems just and proper.

Dated:    New York, New York
          February 14, 2007

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

23

231238.03

By: _____

Randy Paar
Joan Lewis
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 277-6500
Fax: (212) 277-6501

Attorneys for Pepper Hamilton LLP and
W. Roderick Gagné

24

231238.03

**Exhibit**

**1**

**Pepper Hamilton LLP**
Attorneys at Law

**2001 - 2004**
**PEPPER HAMILTON'S**
**MALPRACTICE INSURANCE LIABILITY PROGRAM**
**PROPERTY DAMAGE LIMITS OF LIABILITY**

(Page 1 of 1) (JANUARY 2007)

CNA
LLE-192857748
10/27/02 - 10/27/03
30M xs 20M xs 10M

CNA
LLE-192857748
10/27/03 - 10/27/04
10M xs 20M xs 10M

EXECUTIVE RISK INS. CO.
8170-3836
10/27/02 - 10/27/03
10M xs 10M xs 10M

EXECUTIVE RISK INS. CO.
8170-3836
10/27/03 - 10/27/04
10M xs 10M xs 10M

TWIN CITY FIRE INS. CO.
OOPF0214459
10/27/02 - 10/27/03
10M xs 10M

TWIN CITY FIRE INS. CO.
OOPF0214459
10/27/03 - 10/27/04
10M xs 10M

WESTPORT INS. CO.
PLL-347287-5
10/27/02 - 10/27/03
10M

WESTPORT INS. CO.
PLL-350772-3
10/27/03 - 10/27/04
10M

CNA
LLE-192857748
4/27/01 - 10/27/02
30M xs 20M

WESTPORT INS. CO.
PLL-341513-1
4/27/01 - 10/27/02
20M

Note: This coverage chart was prepared at the request of Dickstein Shapiro LLP and is intended for illustrative purposes only.
Changes to this coverage chart are likely as additional policy information is reviewed.

60M
50M
40M
30M
20M
10M
5M
4M
3M
2M
1M
500K
0

2.5M
2.25M
2.00M
1.75M
1.50M
1.25M
1.00M
750K
500K
250K

J F M A M J J A S O N D J F M A M J J A S O N D J F M A M J J A S O N D J F M A M J J A S O N D
2001      2002      2003      2004      2005

# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EXECUTIVE RISK INDEMNITY INC.,

                           Plaintiff,

          -against-

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ, and
WESTPORT INSURANCE CORPORATION,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

PEPPER HAMILTON LLP, and W. RODERICK GAGNÉ,

                      Third-Party Plaintiffs,

          -against-

CONTINENTAL CASUALTY COMPANY and TWIN CITY
FIRE INSURANCE COMPANY,

                  Third-Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No.: 603624/05

**THIRD-PARTY
COMPLAINT**

Index No.:

        Third-Party Plaintiffs, Pepper Hamilton LLP and W. Roderick Gagné (collectively, "Pepper Hamilton"), by their attorneys Dickstein Shapiro LLP, for their third-party complaint against Continental Casualty Company ("CNA") and Twin City Fire Insurance Company ("Twin City") (collectively, "Third-Party Defendants") allege as follows:

<u>Preliminary Statement</u>

        1. This is an action for declaratory judgment to determine an actual controversy between Third-Party Plaintiff Pepper Hamilton and Third-Party Defendants. For the reasons set forth herein, Pepper Hamilton seeks a declaration that the Third-Party Defendants are obligated to defend and indemnify Pepper Hamilton pursuant to the terms of certain professional liability insurance policies sold to Pepper Hamilton during the period of October 27, 2003 to October 27,

2004. In the alternative, Pepper Hamilton seeks a declaration that CNA is obligated to defend and indemnify Pepper Hamilton pursuant to the terms of a professional liability insurance policy sold to Pepper Hamilton during the period of April 27, 2001 to October 27, 2002.

2. Pepper Hamilton LLP is a law firm. Since 2001, Pepper Hamilton LLP has purchased professional liability insurance from CNA and Twin City, as well as Executive Risk Indemnity Inc. ("Executive Risk") and Westport Insurance Corporation ("Westport"), as detailed further below. The insurance purchased by Pepper Hamilton LLP provides coverage for claims of malpractice asserted against Pepper Hamilton. Executive Risk has brought an action against Pepper Hamilton and Westport seeking a declaration that the Executive Risk Policy in effect for the 2003-2004 policy period does not provide coverage for any loss incurred by Pepper Hamilton in connection with two underlying actions pending against Pepper Hamilton. Executive Risk also alleges these underlying actions are covered by the Westport Policy in effect for the 2001-2002 policy period. A true and correct copy of the Complaint is annexed as Exhibit 1.

3. Pepper Hamilton has asserted a cross-claim against co-defendant Westport seeking a declaration that the underlying actions are covered under the Westport Policy in effect for the 2003-2004 policy period. Although Pepper Hamilton maintains that the underlying actions properly are insured by the policies sold for the 2003-2004 policy period, if the Court determines that the two underlying actions are insured by the policies sold for the 2001-2002 policy period rather than the 2003-2004 policy period, Pepper Hamilton seeks a declaration that these underlying actions are covered by the Westport Policy in effect for the 2001-2002 policy period. A true and correct copy of Pepper Hamilton's Answer and Counterclaims is annexed as Exhibit 2; a true and correct copy of Westport's Answer is annexed as Exhibit 3; a true and correct copy of Executive Risk's Answer to the Counterclaims is annexed as Exhibit 4; a true and correct copy of Pepper Hamilton's Amended Answer and Counterclaims is annexed as Exhibit 5.

2

231998.04

4. Pepper Hamilton brings this third-party complaint against CNA and Twin City for a declaration as to the obligations of these two insurance companies to defend and indemnify Pepper Hamilton for the two underlying actions.

<div align="center">The Parties</div>

5. Pepper Hamilton is a 460 person law firm, based principally in Philadelphia. Pepper Hamilton represented Andrew M. Yao, the sole shareholder of Student Finance Corporation ("SFC"), in connection with various SFC matters.

6. W. Roderick Gagné was a Pepper Hamilton partner at all times relevant to this dispute and was the partner primarily responsible for the representation of Mr. Yao and SFC. Pepper Hamilton's representation of SFC and Mr. Yao ended in 2002.

7. Upon information and belief, CNA, during all relevant time periods, is a corporation organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois, and is in the business of selling policies of insurance. Upon information and belief, CNA transacts business in the State of New York and avails itself of the laws of the State of New York.

8. Upon information and belief, Twin City is a corporation organized under the laws of Indiana, with its principal place of business in Hartford, Connecticut and is in the business of selling policies of insurance. Upon information and belief, Twin City transacts business in the State of New York and avails itself of the laws of the State of New York.

9. Venue is proper in this Court pursuant to CPLR § 503(a) because Third-Party Plaintiff has designated New York County.

<div align="center">The Insurance Policies</div>

10. During the April 27, 2001 to October 27, 2004 period, Pepper Hamilton purchased various layers of professional liability insurance policies.

<div align="center">3</div>

231998.04

11.  Pepper Hamilton's primary professional liability insurer from 2001 to 2004 was Defendant Westport.  For the period April 27, 2001 to October 27, 2002, Westport sold a primary policy ("2001-2002 Westport Policy") with limits of $20 million per claim and in the aggregate.  For the periods October 27, 2002 to October 27, 2003, and October 27, 2003 to October 27, 2004, Westport sold primary policies (the "2002-2003 Westport Policy" and "2003-2004 Westport Policy," respectively) with limits of $10 million per claim and in the aggregate.

12.  For the policy period April 27, 2001 to October 27, 2002, Pepper Hamilton also purchased an excess professional liability insurance policy from Third-Party Defendant CNA ("2001-2002 CNA Policy").  The 2001-2002 CNA Policy has limits of $30 million per claim and in the aggregate, excess of the $20 million limit provided by the underlying 2001-2002 Westport Policy.

13.  For each of the policy years from 2002 to 2004, Pepper Hamilton purchased excess professional liability insurance policies from Twin City, Executive Risk and CNA.  These excess policies were purchased in layers, with Twin City providing the first excess layer, Executive Risk providing the second excess layer and CNA providing the third excess layer.

14.  Third-Party Defendant Twin City sold excess policies for the policy periods of October 27, 2002 to October 27, 2003 and October 27, 2003 to October 27, 2004 (the "2002-2003 Twin City Policy" and "2003-2004 Twin City Policy," respectively) with limits of $10 million per claim and in the aggregate, excess of the $10 million limits of the underlying Westport primary policy.

15.  Executive Risk sold excess policies for the policy periods of October 27, 2002 to October 27, 2003 and October 27, 2003 to October 27, 2004 (the "2002-2003 Executive Risk Policy" and "2003-2004 Executive Risk Policy," respectively) with limits of $10 million, excess of the underlying Westport primary policy and Twin City excess policy.

4

16. Third-Party Defendant CNA sold excess policies for the policy periods of

October 27, 2002 to October 27, 2003 and October 27, 2003 to October 27, 2004 (the "2002-

2003 CNA Policy" and "2003-2004 CNA Policy," respectively). The 2002-2003 CNA Policy

has limits of $30 million per claim and in the aggregate, excess of the underlying Westport

primary policy and the Twin City and Executive Risk excess policies. The 2003-2004 CNA

Policy has limits of $10 million per claim and in the aggregate, excess of the underlying

Westport primary policy and the Twin City and Executive Risk excess policies.

17. A coverage chart depicting the above-described layered insurance program is

annexed hereto as Exhibit 6.

18. Each of the Twin City Policies provides that it "follows the insuring agreement(s)

in the Underlying Insurance and is subject to the same warranties, conditions, exclusions, terms,

and definitions except as to premium, the limits of liability, renewal, the duty to defend, or as

may otherwise be changed by this policy."

19. Each of the CNA Policies provides that it "follows the insuring agreement(s) in

the Underlying Insurance and is subject to the same warranties, conditions, exclusions, terms,

and definitions except as to premium, the limits of liability, renewal and the duty to defend, or as

may otherwise be modified by this Excess Policy."

20. The Insuring Agreement of each of the Westport Policies provides that "[the

insurance company] shall pay on behalf of any INSURED all LOSS in excess of the deductible

which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against

any INSURED during the POLICY PERIOD...by reason of any WRONGFUL ACT[.]"

21. The Insuring Agreement of each of the Westport Policies further provides that:

> If, during the current POLICY PERIOD, any INSURED first becomes
> aware of a POTENTIAL CLAIM and gives written notice of such
> POTENTIAL CLAIM to the Company either during the current POLICY
> PERIOD, or during the POLICY PERIOD of any subsequent policy issued

231998.04

to the NAMED INSURED as a result of continuous and uninterrupted coverage with the Company, any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made during the POLICY PERIOD the Insured first became aware of a POTENTIAL CLAIM.

If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the policy period of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

22.  The Westport Policies define the term "claim" as "a demand made upon any INSURED for LOSS...including, but not limited to, service of suit...." The term "loss" is defined as "the monetary and compensatory portion of any judgment, award, or settlement...." The term "wrongful act" is defined as "any act, error, omission, (circumstance), personal injury or breach of duty in the rendition of legal services for others...arising out of the conduct of an insured's profession as a lawyer[.]"

23.  The Westport Policies define "potential claim" as:

1. any act, error, omission, circumstance, or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or 2. any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED.

24.  The Westport Policies provide coverage for defense costs and set forth that Westport shall "have the right and duty to select counsel and arbitrators and to defend and CLAIM for LOSS against any INSURED...."

25.  The Insuring Agreement of the 2002-2003 and 2003-2004 Twin City Policies provides that:

231998.04

The Company will indemnify the insured against Ultimate Net Loss which
is excess of the total limits paid under all Underlying Insurance....

26. The 2003-2003 and 2003-2004 Twin City Policies define Ultimate Net Loss as:

the total amount that the Insured is legally obligated to pay as damages for
a covered claim or suit either by adjudication or a settlement to which the
Company agrees in writing. Ultimate Net Loss also includes ... the costs
of investigation, adjustment, appraisal, and defense incurred with respect
to claims covered under this policy.

27. The Insuring Agreement of the 2002-2003 and 2003-2004 CNA Policies provides

that:

The Company will indemnify the Insured for Damages which are in
excess of the total limits paid under all Underlying Insurance....

28. The 2001-2002, 2002-2003 and 2003-2004 CNA Policies define Damages as:

the total amount that the Insured is legally obligated to pay for a covered
claim or suit either by adjudication or a settlement to which the Company
agrees in writing and includes reasonable investigation, adjustment,
appraisal and defense costs incurred.

<u>Underlying Actions</u>

29. In April of 2002, Pepper Hamilton terminated its representation of SFC and Mr.

Yao. Subsequently, SFC filed for bankruptcy.

30. In April of 2004, Pepper Hamilton received a communication from the Trustee in

bankruptcy of SFC requesting Pepper Hamilton's consent to a tolling agreement covering claims

the Trustee alleged it might have against Pepper Hamilton. Upon receiving this communication,

and within the policy periods of the 2003-2004 policies, Pepper Hamilton put Westport,

Executive Risk, Twin City and CNA on notice of a potential claim by the Trustee.

31. By letter dated April 23, 2004, Westport acknowledged receipt of notice of the

potential claim.

32. By at least May 25, 2004, Twin City acknowledged receipt of notice of the

potential claim.

7

33. By at least July 23, 2004, CNA acknowledged receipt of notice of the potential claim.

34. On or about March of 2005, Royal Indemnity Company, which had provided credit risk insurance to SFC, sought leave from a Delaware court in a separately pending action to assert claims against Pepper Hamilton arising out of Pepper Hamilton's representation of SFC. Pepper Hamilton seeks coverage for this claim under the 2003-2004 policies pursuant to their terms.

35. On November 1, 2004, a lawsuit captioned *Charles A. Stanziale, Jr., as Chapter 7 Trustee of Student Finance Corporation v. Pepper Hamilton LLP, et al.*, U.S.B.C., Dist. of Del., No. 02-1120-JBR (the "*Stanziale* Action"), was filed against Pepper Hamilton in Delaware Bankruptcy Court, alleging that Pepper Hamilton is liable to the creditors of SFC for losses stemming out of an alleged breach of fiduciary duty and malpractice.

36. On March 18, 2005, a second lawsuit captioned *Royal Indemnity Co. v. Pepper Hamilton LLP, et al.*, U.S.D.C., Dist. of Del., No. 05-165 (the "*Royal* Action"), was filed against Pepper Hamilton in federal district court in Delaware. The *Royal* Action seeks recovery of the amount Royal Indemnity Company was required to pay under its credit risk policies issued to SFC and alleges that Pepper Hamilton was a participant in a fraud committed by SFC and is liable for negligence and negligent misrepresentation.

37. The *Stanziale* Action and the *Royal* Action (collectively, the "Underlying Actions") allege that Pepper Hamilton breached its duty in the rendition of professional services. These allegations are covered within the terms of the CNA and Twin City policies.

38. The plaintiffs in the Underlying Actions seek to recover damages against Pepper Hamilton in an amount that implicates the coverage obligations of the CNA and Twin City policies.

231998.04

39. Westport is providing Pepper Hamilton with a defense in the underlying *Stanziale* Action and *Royal* Action pursuant to a purported reservation of rights expressed in a letter dated November 12, 2004. Westport is providing this defense under the 2003-2004 Westport Policy.

40. By letter dated July 20, 2005, CNA stated that it "adopts" the coverage positions taken by Westport.

41. By letter dated September 19, 2005, Twin City has reserved its rights to deny coverage.

<u>Coverage Action</u>

42. On October 12, 2005, Executive Risk commenced a lawsuit against Pepper Hamilton and Westport, seeking a declaration that Executive Risk is not obligated under the 2003-2004 Executive Risk Policy to indemnify Pepper Hamilton for any loss incurred in connection with the Underlying Actions. Executive Risk contends that Pepper Hamilton's coverage under its 2001-2002 insurance policies should apply to the Underlying Actions.

43. Pepper Hamilton answered the Executive Risk complaint and counterclaimed against Executive Risk, seeking coverage under the 2003-2004 Executive Risk Policy. Pepper Hamilton also asserted a cross-claim against Westport seeking a declaration as to whether the 2001-2002 or 2003-2004 Westport Policy should apply to the Underlying Actions.

44. Pepper Hamilton brings this Third-Party Action against CNA and Twin City to determine their obligations under policies sold to Pepper Hamilton. This Third-Party declaratory judgment action is necessary in order to obtain a full and complete adjudication of the coverage for the Underlying Actions provided by Pepper Hamilton's professional liability insurance program.

231998.04

45. Pursuant to the terms of the 2003-2004 CNA Policy, CNA is obligated to defend and indemnify Pepper Hamilton once the limits of the underlying policies have been exhausted by payment of defense costs and indemnification.

46. Pursuant to the terms of the 2003-2004 Twin City Policy, Twin City is obligated to defend and indemnify Pepper Hamilton once the limits of the underlying 2003-2004 Westport Policy have been exhausted by payment of defense costs and indemnification.

47. Alternatively, if the Court determines that Pepper Hamilton's claim should be covered under the 2001-2002 Westport Policy, then CNA must defend and indemnify Pepper Hamilton pursuant to the terms of the 2001-2002 CNA Policy once the limits of the underlying policy 2001-2002 Westport Policy have been exhausted by payment of defense costs and indemnification.

## COUNT ONE
### (Declaratory Judgment Against CNA)

48. Pepper Hamilton repeats and realleges paragraphs 1 through 47 of its allegations as if fully set forth herein.

49. By its actions, Pepper Hamilton has complied with all terms and conditions precedent to coverage under both the 2001-2002 CNA Policy and the 2003-2004 CNA Policy.

50. A genuine and justiciable controversy exists between Pepper Hamilton and CNA within this Court's jurisdiction as to which CNA policy must provide coverage to Pepper Hamilton for the Underlying Actions.

51. Westport currently is defending Pepper Hamilton pursuant to the terms of the 2003-2004 Westport Policy. Pepper Hamilton is entitled to a declaration that CNA must defend and indemnify Pepper Hamilton under the terms and conditions of the 2003-2004 CNA Policy for the Underlying Actions if and when that the limits of the policies underlying the 2003-2004 CNA Policy are exhausted by payment of defense costs and indemnification.

231998.04

52.  Alternatively, if the Court finds that Pepper Hamilton's claim is covered under the 2001-2002 Westport Policy, then Pepper Hamilton is entitled to a declaration that CNA must defend and indemnify Pepper Hamilton under the terms and conditions of the 2001-2002 CNA Policy for the Underlying Actions if and when the limits of the underlying 2001-2002 Westport Policy are exhausted by payment of defense costs and indemnification.

## COUNT TWO
### (Declaratory Judgment Against Twin City)

53.  Pepper Hamilton repeats and realleges paragraphs 1 through 52 of its allegations as if fully set forth herein.

54.  Pepper Hamilton has complied with all terms and conditions precedent to coverage in the 2003-2004 Twin City Policy.

55.  A genuine and justiciable controversy exists between Pepper Hamilton and Twin City within this Court's jurisdiction as to Twin City's obligation to provide coverage to Pepper Hamilton for the Underlying Actions.

56.  Westport currently is defending Pepper Hamilton pursuant to the terms of the 2003-2004 Westport Policy.  Pepper Hamilton is entitled to a declaration that Twin City must defend and indemnify Pepper Hamilton under the terms and conditions of the 2003-2004 Twin City Policy for the Underlying Actions if and when the limits of the underlying 2003-2004 Westport Policy are exhausted by payment of defense costs and indemnification.

WHEREFORE, Pepper Hamilton demands judgment against CNA and Twin City herein as follows:

a.  On its First Count, a declaration that CNA is obligated to pay in full the costs of Pepper Hamilton's defense of the *Stanziale* Action and *Royal* Action and to indemnify fully Pepper Hamilton for liabilities, if any, arising from any judgments in or settlement of the *Stanziale* Action and *Royal* Action pursuant to the terms of the 2003-2004 CNA Policy or, alternatively, pursuant to the terms of the 2001-2002 CNA Policy;

11                                                    231998.04

        b. On its Second Count, a declaration that Twin City is obligated to pay in full the costs of Pepper Hamilton's defense of the *Stanziale* Action and *Royal* Action and to indemnify fully Pepper Hamilton for liabilities, if any, arising from any judgments in or settlement of the *Stanziale* Action and *Royal* Action pursuant to the terms of the 2003-2004 Twin City Policy;

        c. Pre- and post-judgment interest at the rate specified by law; and

        d. Such other and further relief as this Court deems just and proper.

Dated:    New York, New York
        March 2, 2007

        Respectfully submitted,

        DICKSTEIN SHAPIRO LLP

        By: _____
        Randy Paar
        Joan Lewis
        Jeremy King
        Danielle Feldman
        1177 Avenue of the Americas
        New York, New York 10036
        Telephone: (212) 277-6500
        Fax: (212) 277-6501

        Attorneys for Pepper Hamilton LLP and
        W. Roderick Gagné

231998.04

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| EXECUTIVE RISK INDEMNITY, INC., <br><br>                  Plaintiff, <br><br>        -v- <br><br> PEPPER HAMILTON LLP, W. RODERICK GAGNE and WESTPORT INSURANCE CORPORATION, <br><br>                Defendants. | Index No. 603624-05 |
| PEPPER HAMILTON LLP and W. RODERICK GAGNE, <br><br>                Third-Party Plaintiffs, <br><br>        -v- <br><br> CONTINENTAL CASUALTY COMPANY and TWIN CITY FIRE INSURANCE COMPANY, <br><br>                Third-Party Defendants. | TP Index No. 590185-07 |

## AMENDED ANSWER AND COUNTERCLAIMS

       Third-Party Defendant, Twin City Fire Insurance Company ("Twin City"), by its

attorneys Edwards Angell Palmer & Dodge LLP, for its Amended Answer and

Counterclaims in response to the Third-Party Complaint dated March 2, 2007, alleges as

follows:

       1.  Neither admits nor denies the characterization of this action in ¶ 1 and refers

to the Third-Party Complaint for the nature of this action and the relief requested therein.

2.   Denies the allegations of ¶ 2, except admits: that Pepper Hamilton LLP is a law firm; that since 2001 it has purchased professional liability insurance from one or more of Westport, CNA, Twin City and Executive Risk (as defined in the Third-Party Complaint); that Executive Risk commenced an action against Pepper Hamilton and Westport seeking a declaratory judgment that it is not obligated to provide defense or indemnity coverage under the 2003-04 Executive Risk policy for loss incurred by Pepper Hamilton in connection with two underlying actions against Pepper Hamilton; and that Pepper Hamilton has opposed the relief requested by Executive Risk in said action.

3. Neither admits nor denies the allegations of ¶ 3 and refers to the pleadings filed in the Executive Risk declaratory judgment action for the content of such pleadings.

4. Neither admits nor denies the characterization of this action in ¶ 4 and refers to the Third-Party Complaint for the nature of this action and the relief requested therein.

5. Admits the allegations of ¶ 5.

6. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 6.

7. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 7.

8. Denies the allegations of ¶ 8, except admits Twin City is an Indiana corporation with its principal place of business in Hartford, Connecticut, and that Twin City transacts business in the State of New York.

9. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 9.

10. Admits the allegations of ¶ 10.

STM_231033_2.DOC/SCASHER

11. Admits the allegations of ¶ 11.

12. Admits the allegations of ¶ 12.

13. Admits the allegations of ¶ 13.

14. Admits the allegations of ¶ 14.

15. Admits the allegations of ¶ 15.

16. Admits the allegations of ¶ 16.

17. Admits the allegations of ¶ 17.

18. Denies the allegations of ¶ 18 and refers to the cited policies for the text thereof..

19. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 19 and refers to the cited policy for the text thereof.

20. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 20 and refers to the cited policy for the text thereof.

21. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 21 and refers to the cited policies for the text thereof.

22. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 22 and refers to the cited policies for the text thereof.

23. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 23.

24. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 24.

25. Denies the allegations of ¶ 25 and refers to the cited policies for the text thereof.

STM_231033_2.DOC/SCASHER

26. Denies the allegations of ¶ 26 and refers to the cited policies for the text thereof.

27. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 27 and refers to the cited policies for the text thereof.

28. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 28 and refers to the cited policies for the text thereof.

29. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 29.

30. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 30, except admits Twin City received a communication from Pepper Hamilton relating to a potential claim by the Trustee.

31. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 31.

32. Denies the allegations of ¶ 32, except admits Twin City communicated its receipt of the Pepper Hamilton communication relating to a potential claim by the Trustee.

33. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 33.

34. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 34.

35. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 35.

STM_231035_2.DOC/SCASHER

36. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 36.

37. Denies the allegations of ¶ 37.

38. Denies the allegations of ¶ 38.

39. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 39.

40. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 40.

41. Admits the allegations of ¶ 41.

42. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 42 and refers to the pleadings for the text thereof.

43. Neither admits nor denies the characterization of the pleadings in ¶ 43 and refers to the pleadings for their nature and requested relief.

44. Neither admits nor denies the characterization of the Third-Party Action in ¶ 44 and refers to the papers therein for the nature thereof.

45. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 45.

46. Denies the allegations of ¶ 46, except admits the 2003-2004 Twin City Policy is the first layer excess policy to the primary 2003-2004 Westport Policy and refers to the text of said policies for the terms and provisions thereof.

47. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 47.

48. In response to ¶ 48 repeats and realleges its responses to ¶¶ 1-47.

STM_231033_2.DOC/SCASHER

49. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 49.

50. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 50.

51. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 51.

52. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 52.

53. In response to ¶ 53 repeats and realleges its responses to ¶¶ 1-52.

54. Denies the allegations of ¶ 54.

55. Admits the allegations of ¶ 55.

56. Denies the allegations of ¶ 56.


### First Affirmative Defense and First Counterclaim

57. Twin City issued Excess Insurance Policy Number 00 PF 0214459 to Pepper Hamilton effective for the policy period October 27, 2003-04 (the "Twin City Policy"). The Twin City Policy provides a limit of liability of $10 million each claim and in the aggregate excess of the $10 million each claim and in the aggregate limit of liability and the $500,000 each and every claim deductible of Policy No. PLL-350772-3 issued by Westport Insurance Corporation ("Westport") to Pepper Hamilton (the "Westport Policy").

58. An endorsement to the Westport Policy (modifying a provision at Section XIV Amendment of Exclusion B) excludes coverage for any claim arising out of "any

act, error, omission, circumstance or PERSONAL INJURY occurring prior to the
effective date of this Policy if any INSURED at the effective date knew or could have
reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY
might be the basis of a CLAIM."

59. Upon information and belief, the acts, errors, omissions and circumstances
alleged by the plaintiffs against the Third-Party Plaintiffs in the Stanziale and Royal
Actions (which actions are referenced at ¶¶35-36 of the Third Party Complaint) (the
"Underlying Actions") occurred prior to October 27, 2003, which was the effective date
of both the Westport and Twin City Policies, and at said date Third-Party Plaintiffs knew
or could have reasonably foreseen that such acts, errors, omissions and circumstances
might be the basis of a claim against them.

60. By reason of the foregoing, the Twin City Policy does not afford coverage for
the Underlying Actions.

### Second Affirmative Defense and Second Counterclaim

61. An endorsement to the Westport Policy, Amendment of Lawyers Professional
Liability Coverage Unit, states that Exclusion B "shall not apply to this COVERAGE
UNIT" and adds that the COVERAGE UNIT "shall not apply to any CLAIM based upon,
arising out of, attributable to, or directly or indirectly resulting from … [a]ny CLAIM
arising out of any act, error, omission or PERSONAL INJURY occurring prior to the
effective date of this Policy if … the INSURED at the effective date knew or could have
reasonably foreseen that such act, error, omission or PERSONAL INJURY at the
effective date might be expected to be the basis of a CLAIM; provided however, that

subsection b) does not apply to any INSURED who had no knowledge of or could not have reasonably foreseen that any such act, error, omission or PERSONAL INJURY might be expected to be the basis of a CLAIM."

62. Upon information and belief, the acts, errors and omissions alleged by the plaintiffs in the Underlying Actions against Third-Party Plaintiffs occurred prior to October 27, 2003, which was the effective date of both the Westport and Twin City Policies, and at said date Third-Party Plaintiffs knew or could have reasonably foreseen that such acts, errors and omissions might be expected to be the basis of a claim against them.

63. By reason of the foregoing, the Twin City Policy does not afford coverage for the Underlying Actions.

### Third Affirmative Defense and Third Counterclaim

64. Section VII.D.2. of the Twin City Policy provides: "This policy does not apply to any claim: *** 2. arising out of any act, error, or omission committed prior to the inception date of this policy which the insured knew or should have known could result in a claim, but failed to disclose to the Company at inception."

65. Upon information and belief, the acts, errors or omissions alleged by the plaintiffs in the Underlying Actions against Third-Party Plaintiffs were committed prior to October 27, 2003, which was the inception date of the Twin City Policy, and at said date Third-Party Plaintiffs knew or should have known that such acts, errors or omissions could result in a claim against them, but they failed to disclose the same to Twin City on said date.

- 8 -

STM_231033_2.DOC/SCASHER

66. By reason of the foregoing, the Twin City Policy does not afford coverage for the Underlying Actions.

<u>Fourth Affirmative Defense and Fourth Counterclaim</u>

67. Section I.C. of the Westport Policy provides: "If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the policy period of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time." The 2003-2004 Westport Policy defines POTENTIAL CLAIM as inter alia "any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY."

68. During the policy period of the Westport Policy, Third-Party Plaintiffs provided written notice to Westport of acts, errors, omissions or circumstances which might reasonably be expected to give rise to a claim against them by the plaintiffs in the Underlying Actions and which acts, errors, omissions or circumstances eventually gave rise to the Underlying Actions.

69. Upon information and belief, Third-Party Plaintiffs first became aware of such acts, errors, omissions or circumstances during the policy period of the policies of

insurance that were maintained by Pepper Hamilton for the period October 27, 2001 to October 27, 2002.

70. The first policy of insurance issued to Third-Party Plaintiffs by Twin City incepted on October 27, 2002, upon the expiration of policies of insurance issued to Pepper Hamilton by insurers other than Twin City.

71. By reason of the foregoing, neither the 2003-2004 Twin City Policy nor any other policy of insurance issued to Pepper Hamilton by Twin City affords coverage for the Underlying Actions.

<div align="center">Fifth Affirmative Defense and Fifth Counterclaim</div>

72. In a warranty letter to Twin City dated November 14, 2003, Pepper Hamilton stated: "This is to acknowledge that, after inquiry, I am not aware of any claims and/or circumstances, acts, errors or omissions that might be expected to be the basis of a claim or suit."

73. Upon information and belief, on said date Pepper Hamilton was aware of the claims and/or circumstances, acts, errors or omissions that might be expected to be the basis of a claim or suit and which eventually formed the basis of the claim or suit in the Underlying Actions.

74. By reason of said breach of warranty, the Twin City Policy does not afford coverage for the Underlying Actions.

STM_231033_2.DOC/SCASHER

### Sixth Affirmative Defense and Sixth Counterclaim

75. The Twin City Policy follows form to the Westport Policy and is subject to the same warranties, conditions, exclusions, terms, and definitions except as to premium, the limits of liability, renewal, or the duty to defend.

76. Twin City adopts and incorporates, as if fully stated herein, the Third through the Eleventh Affirmative Defenses contained in Westport's Answer in this action.

75. By reason of the application of the warranties, conditions, exclusions, terms and definitions referred to in the Third through Eleventh Affirmative Defenses contained in Westport's Answer to the Complaint in this action, Twin City Policy does not afford coverage for the Underlying Actions.

WHEREFORE, Twin City requests that the Court enter judgment in this action as follows:

1. Dismissing the Third-Party Complaint as against Twin City;

2. Declaring that the matters for which Third Party Plaintiffs have demanded coverage are not covered under the Twin City Policy;

3. Declaring that Twin City has no obligation under the Twin City Policy to indemnify Third Party Plaintiffs for any of the matters or legal expenses for which Third Party Plaintiffs have demanded coverage;

4. That Twin City be awarded and recover its costs of suit;

5. That Twin City be awarded its reasonable attorneys' fees; and

6. That the Court award such other and further relief as it deems just and proper.

- 11 -

Dated: June 25, 2007

EDWARDS ANGELL PALMER & DODGE LLP

By:

Samuel B. Mayer
Scott H. Casher
750 Lexington Avenue
New York, New York 10022
212.308.4411

*Attorneys For Twin City Fire Insurance Company*

To:

Joan L. Lewis, Esq.
Dickstein Shapiro LLP
Attorneys for Pepper Hamilton LLP and W. Roderick Gagne
1177 Avenue of the Americas
New York, NY 10036
212.277.6640

Robert Conlon, Esq.
Walker Wilcox Matousek, LLP
Attorneys for Westport Insurance Corporation
225 West Washington Street, Suite 2400
Chicago, Il 60606
312.244.6767

William B. Pollard, III, Esq.
Kornstein Veisz Wexler & Pollard, LLP
Attorneys for Executive Risk Indemnity Inc.
757 Third Avenue
New York, New York 10017
212.418.8617

Kevin M. Mattessich, Esq.
Cozen O'Connor
Attorneys for Continental Casualty Company
45 Broadway, Suite 1600
New York, NY 10006
212.908.1252

STM_231033_2.DOC/SCASHER

# EXHIBIT 6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

EXECUTIVE RISK INDEMNITY, INC.,

Index No.: 603624/05

Plaintiff,

-against-

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ
and WESTPORT INSURANCE CORPORATION,

Defendants.

-----------------------------------------------------------------x

PEPPER HAMILTON LLP and
W. RODERICK GAGNÉ,

Index No.: 590185/07

Third-Party Plaintiffs,

**THIRD-PARTY ANSWER,
AFFIRMATIVE DEFENSES
AND COUNTERCLAIMS OF
CONTINENTAL CASUALTY
COMPANY**

-against-

CONTINENTAL CASUALTY COMPANY and
TWIN CITY FIRE INSURANCE COMPANY,

Third-Party Defendants.

-----------------------------------------------------------------x

Third-Party Defendant CONTINENTAL CASUALTY COMPANY ("Continental

Casualty"), by its attorneys, COZEN O'CONNOR, as and for an answer to Third-Party

Plaintiffs' Third-Party Complaint, responds as follows:

1.    Continental Casualty neither admits nor denies the allegations contained in

paragraph "1" of the Third-Party Complaint as they are a description of the lawsuit to which no

response is required.

2.    Continental Casualty neither admits nor denies the allegations contained in

paragraph "2" of the Third-Party Complaint to the extent that they deviate from the pleading

requirements found in CPLR §3014 such as to render it impossible to respond.  In a good faith

effort to comply with its obligations under the CPLR, Continental Casualty admits that Pepper

Hamilton LLP ("Pepper Hamilton") is a law firm; that Pepper Hamilton purchased insurance from Continental Casualty and other insurers; that Executive Risk Indemnity, Inc. ("Executive Risk") sued Pepper Hamilton and Westport Insurance Corporation ("Westport"); and, that an apparent copy of the Complaint in the Executive Risk Litigation is appended to the Third-Party Complaint at Exhibit 1.

3.      Continental Casualty neither admits nor denies the allegations contained in paragraph "3" of the Third-Party Complaint to the extent that they deviate from the pleading requirements of CPLR §3014 such as to render it impossible to respond. In a good faith effort to comply with its obligations under the CPLR, Continental Casualty admits that Pepper Hamilton cross-claimed against Westport in the Executive Risk Litigation; that an apparent copy of Pepper Hamilton's Answer and Counterclaims in the Executive Risk Litigation is appended at Exhibit 2; that an apparent copy of Westport's Answer in the Executive Risk Litigation is appended at Exhibit 3; that an apparent copy of Executive Risk's Answer to the Counterclaims in the Executive Risk Litigation is appended as Exhibit 4; and, that an apparent copy of Pepper Hamilton's Amended Answer and Counterclaims in the Executive Risk Litigation is appended at Exhibit 5.

4.      Continental Casualty neither admits nor denies the allegations contained in paragraph "4" of the Third-Party Complaint as they are a description of Third-Party Plaintiffs' intent in bringing the within action to which no response is required.

**The Parties**

5.      Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "5" of the Third-Party Complaint.

2

6. Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "6" of the Third-Party Complaint.

7. Continental Casualty neither admits nor denies the allegations contained in paragraph "7" of the Third-Party Complaint to the extent they consist of conclusions of law to which no response is required, except that Continental Casualty admits that it is a corporation organized under the laws of the State of Illinois, that it maintains a business office in Chicago, Illinois, and that it is in the insurance business.

8. Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "8" of the Third-Party Complaint.

9. Continental Casualty neither admits nor denies the allegations contained in paragraph "9" of the Third-Party Complaint as they call for a legal conclusion to which no response is required.

10. Continental Casualty neither admits nor denies the allegations contained in paragraph "10" of the Third-Party Complaint as the allegations are sufficiently vague as to render an answer impossible, except admits that it is aware that Pepper Hamilton has purchased various insurance policies.

11. Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "11" of the Third-Party Complaint, except admits that Westport has represented itself to be an insurer of Pepper Hamilton. In addition, certain of the allegations of paragraph "11" of the Third-Party Complaint refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

12.    Continental Casualty admits that Pepper Hamilton purchased an excess insurance policy from Continental Casualty. The remaining allegations of paragraph "12" of the Third-Party Complaint refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

13.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "13" of the Third-Party Complaint, except Continental Casualty admits that Pepper Hamilton purchased excess insurance from Continental Casualty at times between 2002 to 2004, and that it is aware that Twin City Fire Insurance Company ("Twin City") and Executive Risk were insurers of Pepper Hamilton. The remaining allegations of paragraph "13" of the Third-Party Complaint refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

14.    Continental Casualty neither admits nor denies the allegations contained in paragraph "14" of the Third-Party Complaint as it lacks knowledge or information sufficient to form a belief as to the truth thereof, and to the extent that the allegations refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

15.    Continental Casualty neither admits nor denies the allegations contained in paragraph "15" of the Third-Party Complaint as it lacks knowledge or information sufficient to form a belief as to the truth thereof, and to the extent that the allegations refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

4

16.    Continental Casualty neither admits nor denies the allegations contained in paragraph "16" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein, except that Continental Casualty admits that it sold excess insurance policies to Pepper Hamilton during the years 2002 to 2004.

17.    Continental Casualty neither admits nor denies the allegations contained in paragraph "17" of the Third-Party Complaint to the extent that they refer to a document which speaks for itself, and Continental Casualty refers this Honorable Court to such document for the contents therein.

18.    Continental Casualty neither admits nor denies the allegations contained in paragraph "18" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

19.    Continental Casualty neither admits nor denies the allegations contained in paragraph "19" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

20.    Continental Casualty neither admits nor denies the allegations contained in paragraph "20" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

21.    Continental Casualty neither admits nor denies the allegations contained in paragraph "21" of the Third-Party Complaint to the extent that they refer to documents which

5

speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

22.    Continental Casualty neither admits nor denies the allegations contained in paragraph "22" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

23.    Continental Casualty neither admits nor denies the allegations contained in paragraph "23" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

24.    Continental Casualty neither admits nor denies the allegations contained in paragraph "24" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

25.    Continental Casualty neither admits nor denies the allegations contained in paragraph "25" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

26.    Continental Casualty neither admits nor denies the allegations contained in paragraph "26" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein..

27.    Continental Casualty neither admits nor denies the allegations contained in paragraph "27" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

28.    Continental Casualty neither admits nor denies the allegations contained in paragraph "28" of the Third-Party Complaint to the extent that they refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

## Underlying Actions

29.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "29" of the Third-Party Complaint.

30.    Continental Casualty neither admits nor denies allegations contained in paragraph "30" of the Third-Party Complaint to the extent it lacks knowledge or information sufficient to form a belief as to the truth therein and to the extent the allegations call for a legal conclusion to which no response is required.  Continental admits that it has received information concerning comments between Pepper Hamilton and the SFC Trustee.

31.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation of paragraph "31" of the Third-Party Complaint.

32.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation of paragraph "32" of the Third-Party Complaint.

33.    Continental Casualty neither admits nor denies the allegations contained in paragraph "33" of the Third-Party Complaint to the extent they call for a legal conclusion to which no response is required, except Continental Casualty admits that, on or about July 23,

2004, it sent correspondence to Pepper Hamilton regarding the SFC Trustee's communication to Pepper Hamilton.

34.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph "34" of the Third-Party Complaint except admits that Pepper Hamilton has sought coverage with respect to matters involving a lawsuit asserted against it by Royal Indemnity Company ("Royal").

35.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "35" of the Third-Party Complaint.  In addition, certain of the allegations of paragraph "35" of the Third-Party Complaint refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

36.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "36" of the Third-Party Complaint.  In addition, certain of the allegations of paragraph "36" of the Third-Party Complaint refer to documents which speak for themselves, and Continental Casualty refers this Honorable Court to such documents for the contents therein.

37.    As for its part, Continental Casualty denies the allegations contained in paragraph "37" of the Third-Party Complaint to the extent these allegations refer to insurance coverage provided by Continental Casualty, it neither admits nor denies those allegations that relate to the coverage obligations of Twin City and as to which Continental Casualty has insufficient knowledge, and as to the remaining allegations which refer to documents that speak for themselves, Continental Casualty refers this Honorable Court to such documents for the contents therein.

8

38.    Continental Casualty neither admits nor denies the allegations contained in paragraph "38" of the Third-Party Complaint as they are sufficiently ambiguous and vague as to render it impossible to respond.

39.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "39" of the Third-Party Complaint.

40.    Continental Casualty neither admits nor denies the allegations contained in paragraph "40" of the Third-Party Complaint to the extent that they refer to a document which speaks for itself, and Continental Casualty refers this Honorable Court to such document for the contents therein, except Continental Casualty admits that it wrote to Pepper Hamilton on or about July 20, 2005.

41.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "41" of the Third-Party Complaint.

### Coverage Action

42.    Continental Casualty neither admits nor denies the allegations contained in paragraph "42" of the Third-Party Complaint to the extent they call for a legal conclusion to which no response is required, except admits that Executive Risk has sued Pepper Hamilton and Westport.

43.    Continental Casualty neither admits nor denies the allegations contained in paragraph "43" of the Third-Party Complaint to the extent they call for a legal conclusion to which no response is required, except admits that Executive Risk has sued Pepper Hamilton and Westport.

44.     Continental Casualty neither admits nor denies the allegations contained in paragraph "44" of the Third-Party Complaint as they call for a legal conclusion to which no response is required.

45.     Continental Casualty denies each and every allegation contained in paragraph "45" of the Third-Party Complaint.

46.     Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "46" of the Third-Party Complaint.

47.     Continental Casualty denies each and every allegation contained in paragraph "47" of the Third-Party Complaint.

<div align="center">

**COUNT ONE**
**(Declaratory Judgment Against CNA)**

</div>

48.     Continental Casualty incorporates by reference in their entirety its responses to paragraphs "1" through "47," inclusive.

49.     Continental Casualty denies the allegations contained in paragraph "49" of the Third-Party Complaint.

50.     Continental Casualty neither admits nor denies the allegations contained in paragraph "50" of the Third-Party Complaint as they call for a legal conclusion to which no response is required.

51.     Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the first sentence of the allegations contained in paragraph "51" of the Third-Party Complaint. Continental Casualty denies the remaining allegations contained in paragraph "51" of the Third-Party Complaint.

52.     Continental Casualty denies the allegations contained in paragraph "52" of the Third-Party Complaint.

**COUNT TWO**
**(Declaratory Judgment Against Twin City)**

53.    Continental Casualty incorporates by reference in their entirety its responses to paragraphs "1" through "52," inclusive.

54.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "54" of the Third-Party Complaint.

55.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "55" of the Third-Party Complaint.

56.    Continental Casualty lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "56" of the Third-Party Complaint.

**REQUEST FOR RELIEF**

**WHEREFORE,** Third-Party Defendant CONTINENTAL CASUALTY COMPANY respectfully requests that: 1) all of Third-Party Plaintiffs' claims be denied; 2) Third-Party Plaintiffs' Third-Party Complaint be dismissed with prejudice; 3) judgment be entered in favor of Third-Party Defendant CONTINENTAL CASUALTY COMPANY; and, 4) Third-Party Defendant CONTINENTAL CASUALTY COMPANY be awarded its costs, attorneys fees, disbursements, and all other relief that the Court may deem just and proper.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1.    Third-Party Plaintiffs' claims are barred for failing to state a claim or claims upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

2.    Third-Party Plaintiffs' claims are not ripe and/or do not present a justiciable case or controversy in that the applicable primary policy of insurance issued by Westport Insurance Corporation has not been exhausted.

### THIRD AFFIRMATIVE DEFENSE

3.    Third-Party Plaintiffs' claims are barred under the doctrine of waiver.

### FOURTH AFFIRMATIVE DEFENSE

4.    Third-Party Plaintiffs' claims are barred under the doctrine of unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

5.    Third-Party Plaintiffs' claims are barred by the doctrine of estoppel.

### SIXTH AFFIRMATIVE DEFENSE

6.    Third-Party Plaintiffs claims are barred or diminished for failure to mitigate damages or losses.

12

## SEVENTH AFFIRMATIVE DEFENSE

7.     Third-Party Defendant CONTINENTAL CASUALTY COMPANY asserts that, because Pepper Hamilton misrepresented information concerning the nature of the risk for which coverage was sought, the 2001-2002 excess insurance policy issued to Third-Party Plaintiffs should be rescinded and declared void *ab initio*.

## EIGHTH AFFIRMATIVE DEFENSE

8.     Third-Party Defendant CONTINENTAL CASUALTY COMPANY asserts that, because Pepper Hamilton misrepresented information concerning the nature of the risk for which coverage was sought, the 2002-2003 excess insurance policy issued to Third-Party Plaintiffs should be rescinded and declared void *ab initio*.

## NINTH AFFIRMATIVE DEFENSE

9.     Third-Party Defendant CONTINENTAL CASUALTY COMPANY asserts that, because Pepper Hamilton misrepresented information concerning the nature of the risk for which coverage was sought, the 2003-2004 excess insurance policy issued to Third-Party Plaintiffs should be rescinded and declared void *ab initio*.

## TENTH AFFIRMATIVE DEFENSE

10.     Third-Party Defendant CONTINENTAL CASUALTY COMPANY is entitled to a declaration that coverage is precluded for the matters asserted in the underlying Student Finance Corporation-related litigation based upon the operation of Exclusion (B) (Prior

13

Knowledge/Acts Exclusion) of the 2003-2004 primary policy issued by Westport Insurance Corporation.

## ELEVENTH AFFIRMATIVE DEFENSE

11.    Third-Party Defendant CONTINENTAL CASUALTY COMPANY is entitled to a declaration that it is not obligated to defend or indemnify Third-Party Plaintiffs in and for the underlying Student Finance Corporation-related matters based upon the "known loss" and/or "loss in progress" doctrines because the loss was known to Pepper Hamilton before it applied for insurance.

## TWELFTH AFFIRMATIVE DEFENSE

12.    Third-Party Defendant CONTINENTAL CASUALTY COMPANY is entitled to a declaration that certain damages alleged in the underlying Student Finance Corporation-related matters do not constitute "Loss" under the Policies.

## THIRTEENTH AFFIRMATIVE DEFENSE

13.    Third-Party Defendant CONTINENTAL CASUALTY COMPANY is entitled to a declaration that Continental Casualty is not obligated to provide coverage to Pepper Hamilton and/or Gagné for the Underlying Litigation as they have breached duties owed to Continental Casualty under the Policies, at law and in equity, including the duty to mitigate losses.

14

## COUNTERCLAIMS

NOW COMES Third-Party Defendant CONTINENTAL CASUALTY COMPANY ("Continental Casualty"), by and through its undersigned counsel, and as and for its Counterclaims states and alleges as follows:

### I.    Introduction

1.    Continental Casualty files the within Counterclaims against Third-Party Plaintiffs Pepper Hamilton, LLP ("Pepper") and W. Roderick Gagné seeking rescission of certain insurance policies based upon their failure to disclose in the respective policy applications material facts they knew concerning circumstances that were likely to give rise to a claim or potential claim under the policies.

2.    Alternatively, in the event that these Policies are not rescinded, Continental Casualty seeks a declaration that coverage is precluded under the Policies, by operation of the policy language and as a matter of law, as a result of Pepper's and Gagné's prior knowledge of the claim circumstances at issue, as well as their failure to mitigate their potential exposure.

### II.    The Counterclaim Parties

3.    Continental Casualty is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.

4.    Upon information and belief, Pepper Hamilton, LLP is and was at all relevant times a law firm, principally based in Philadelphia, Pennsylvania, with offices in various states, including New York.

5.    Upon information and belief, W. Roderick Gagné is an attorney licensed to practice law in Pennsylvania and Florida, and he has practiced law with the Pepper firm since 1996.

### III.    Jurisdiction and Venue

6.    A justiciable case or controversy exists between the parties hereto. This Court has jurisdiction over the controversy under Civil Practice Law and Rules § 3001.

7.    Venue is proper in New York County pursuant to CPLR § 503 because Continental Casualty has an office located in New York County.

### IV.    Gagné's Personal Involvement With Yao and SFC

8.    At all relevant times herein, Gagné and Pepper represented a businessman named Andrew M. Yao as well as businesses with which Yao was associated.

9.    Yao owned Student Finance Corporation ("SFC"), a company that originated and acquired educational loans to students of truck driving schools across the country. Pepper and Gagné represented Yao and SFC.

10.    Gagné and Pepper reportedly provided SFC with general corporate legal services, which included the preparation of private placement memoranda concerning the securitization of SFC's loan acquisitions.

11.    Some of SFC's largest private investors were members of Gagné's own family, including trusts established for the benefit of Gagné and his family (the "Gagné Family Trusts"). Gagné is alleged to have served as counsel to both the Gagné Family Trusts and SFC during certain of those investment transactions.

16

## V.    The Student Finance Corporation Transaction

12.    In relevant part, SFC financed its student loan operations using secured transactions with warehouse lending institutions.  SFC sold the newly-purchased loans to a designated special purpose entity ("SPE"), which SPE in turn financed its purchases from SFC by issuing notes and certificates to private investors backing the purchase of the loans.  The investors were issued private placement memoranda as certificates of their investment.  The loans were placed in a trust, to which the note and certificate-holding investors were apparently the beneficiary.

13.    Sometime in 1998, SFC approached Royal Indemnity Company ("Royal"), seeking credit risk insurance to cover the potential loss of the principal student loan amounts plus ninety days interest in the event a student loan went into default.

14.    In connection with obtaining information about the loans Royal was being asked to insure, SFC allegedly provided Royal with historical performance data from its loan portfolio.

15.    Royal has subsequently alleged that the data provided to it by SFC was false and that the information, *inter alia*, misstated default rates and concealed SFC's approval of non-conforming loans.

16.    Purportedly, SFC misstated information concerning its loan portfolio in order to secure further investment and lending, along with credit insurance from Royal.

17.    Eventually, SFC's fraudulent loan practices led to its collapse and bankruptcy in or about June 2002.

18.    SFC's bankruptcy was thereafter converted into Chapter 7 liquidation proceedings and the Bankruptcy Court appointed a Trustee in bankruptcy (the "SFC Trustee" or "Trustee").

19.     The Trustee has alleged that, just before the collapse of SFC, Gagné, using his unique position as counsel to the company and to the Gagné Family Trusts, was able to have millions of dollars of his family's money transferred out of the company in an insider deal before SFC was forced into bankruptcy. The Trustee has also complained about the inherent conflicts of interest created by the apparent dual representation of SFC and the Gagné Family Trusts.

## VI.    The Underlying Litigation Against Pepper and Gagné

20.     On or about November 4, 2004, the SFC Trustee filed a complaint in the United States Bankruptcy Court for the District of Delaware, Adversary Proceeding No. 04-56423, as part of the SFC Bankruptcy Case No. 02-11620, against Pepper and Gagné, as well as certain Gagné Family Trusts and Gagné family members who invested in SFC. The reference to the Bankruptcy Court was withdrawn and the case was eventually transferred to the United States District Court for the District of Delaware, under Civil Action No. 04-1551.

21.     The Trustee alleges Pepper and Gagné ignored obvious conflicts of interest by simultaneously representing SFC and the Gagné Family investors and of breaching their duties to SFC by either assisting in the fraud at SFC or by failing to recognize and advise SFC of the adverse impact of its conduct.

22.     The Trustee contends that Pepper and Gagné ignored the obvious signs of SFC's impending collapse but did nothing to advise the company or its lenders and creditors of the approaching financial demise.

23.     The Trustee Complaint alleged the following causes of action: 1) breach of fiduciary duty (against Pepper and Gagné); 2) deepening insolvency (against Pepper, Gagné and the Family); 3) negligent misrepresentation (against Pepper and Gagné); 4) legal malpractice (against Pepper and Gagné); 5) aiding and abetting breach of fiduciary duty (against Pepper and

Gagné); 6) civil conspiracy (against Gagné and the Family); 7) fraudulent conveyance (against the Family); 8) reclamation of estate property (against the Family); 9) equitable subordination (against Pepper, arising out Pepper's claim for outstanding fees); 10) preference claim (against Pepper, to reclaim $985,475 in fees paid to Pepper from June 2001 to May 2002); and 11) preference claim (against the members of the Gagné Family).

24.    The Trustee Complaint seeks compensatory damages, costs, interest and fees. The Trustee Complaint further seeks to void almost $985,475 in attorneys' fee payments made to Pepper and seeks to have Pepper's claim for past-due attorneys' fees subordinated to those of other SFC creditors.

25.    On or about March 18, 2005, Royal sued Pepper, Gagné and others in the United States District Court for the District of Delaware.

26.    Royal alleges Pepper and Gagné were willing participants in a fraudulent enterprise.

27.    More specifically, the Royal Complaint alleged, "Pepper and Gagné were aware of SFC's practice of making payments to disguise student loan default rates from at least 1999. Pepper and Gagné hid this information from Royal and issued knowingly false and misleading Private Placement Memoranda that, among other things, ensured Royal continued issuing the SFC Policies." (Royal Complaint, at ¶ 74).

28.    As against Pepper and/or Gagné, the Royal Complaint alleges the following causes of action: 1) civil violations of the Racketeering Influenced and Corrupt Organizations ("RICO") Act (against Gagné); 2) conspiracy to commit civil RICO Act violations (against Gagné); 3) conspiracy to commit civil fraud (against all defendants; 4) fraud, fraudulent inducement and fraudulent concealment (against all defendants); 5) aiding and abetting fraud

(against all defendants); 6) negligence and negligent misrepresentation (against all defendants); 7) deepening insolvency (against all defendants); and 8) aiding abetting breach of fiduciary duty (against all defendants).

29.     Royal seeks unspecified compensatory, consequential and punitive damages, along with interest, costs and attorneys' fees, for each of the various counts. Royal also seeks treble damages against Gagné on the RICO counts.

30.     Upon information and belief, both the Trustee and Royal actions remain on-going at the time of this filing.

### VII.    Pepper Hamilton's Knowledge of the SFC Fraud

31.     It is alleged in the Underlying Litigation that Pepper and Gagné knew of elements of a fraud at SFC since as early as 1999, when Gagné and/or Pepper came into possession of documents showing SFC's improper loan practices.

32.     On March 2, 2000, Gagné wrote an email to Yao giving advice with respect to the school loan contracts Yao and SFC asked Pepper to modify. Gagné's communication also included advice about the forbearance payments now at the heart of the Underlying Litigation. That email stated, in relevant part, as follows:

> As you can tell, I think the use of School Reserves to make monthly payments on the Student Loans will take a considerable amount of thought and work to wind through the bankruptcy issues, the consumer finance laws, the School Agreements, the Royal Policy and the Term Securitizations. The confluence of parties and disciplines and the need to track the payments from another source may make the problem not feasible but we will take a crack at it.

> In addition, we will have to see how the Capital Markets will react. I alluded to the fact that the market already is leery of how complicated the deals are for there (sic) size. Adding this factor will considerably compound the complexity. I know you said that they should not rely on it.

However, if they should not then it looks like SFC is manipulating the pool performance.

\*\*\*

The final element is Royal who will be directly affected and is if the plan is being used now. The discussion with Royal will be difficult. They are a little skittish right now ... .

## VIII.  Gagné's April 18, 2002 Memorandum

33.    Gagné and Pepper continued to represent Yao and SFC for several years after the March 2, 2000, email communication and until sometime around the time SFC collapsed and entered bankruptcy.

34.    On or about April 18, 2002, Gagné directed a memorandum to the Ethics and Finance Committees of the Pepper firm, as well as Pepper partner Alfred H. "Chub" Wilcox.

35.    Upon information and belief, Wilcox served as Pepper's general in-house counsel and/or risk manager and was responsible for handling insurance matters for the firm, including executing insurance applications, procuring insurance policies and notifying insurers of any claims or circumstances likely to give rise to a claim.

36.    The memorandum set forth circumstances of the SFC representation and generally discussed Gagné's concerns that "officers of SFC lied to investors" about loan repayment practices.

37.    The memorandum identified Gagné's concerns of "ethical considerations" arising out of the SFC situation.

38.    Gagné further advised in the memorandum, "Adding to the ethical considerations is the fact that members of my family and trusts in which I am a beneficiary have made loans to Student Finance Corporation from time to time and most recently on March 5, [2002] at the request of Andrew Yao."

21

39.    In the April 18, 2002, memorandum, Gagné wrote, "I think we also need to recognize the possibility that this firm will be sued, as a deep pocket associated with SFC and these transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility."

40.    Upon information and belief, before the April 18, 2002 memorandum was put in final, a draft was proposed.

41.    The draft April 18, 2002, memorandum discussed the possibility that the firm would be sued.

42.    Also, in the draft April 2002 memorandum, Gagné addressed SFC's request in 2000 for advice in modifying its form school loan documents and, in describing his response to that request, Gagné detailed his knowledge *in or around 2000* of the facts and circumstances that are now at issue in the Underlying Litigation:

> The revised school agreements in which these forbearance accounts were created were drafted by another law firm, Fox Rothschild. When we were given this task, I strongly recommended against it because I thought that the forbearance accounts could create misrepresentation in the static pool and to Royal Indemnity Company for the reasons that we are seeing now. They did not like my answer and took it to another firm. However, certain aspects of the agreements were implemented into the student loans by the Wilmington office so as to comply with the state consumer lending laws. This is another example of their answer shopping.

43.    That draft language of Gagné's April 18, 2002 memorandum was removed from the final version, which final version contained the contrary, and apparently false, representation by Gagné that, "We did not prepare the agreements with the schools, and were unaware of this issue [the alleged SFC forbearance payment fraud] until this past month."

22

## IX.    The Insurance Applications and Policies

44.    During the relevant times herein, the Pepper firm applied for and obtained certain legal malpractice insurance policies for the benefit of the firm and its lawyers. A series of claims made and reported policies were issued by different carriers for the policy years 2001-2002, 2002-2003 and 2003-2004.

### A.    The 2001-2002 Application and Legal Malpractice Policies

45.    Pepper submitted to Westport Insurance Corporation ("Westport") a "Renewal Application for Lawyers Professional Liability Insurance (Claims Made and Reported Basis)" (the "2001-2002 Application"), signed and dated March 6, 2001, seeking insurance for the 2001-2002 Policy Period.

46.    The 2001-2002 Application was also provided to Continental Casualty for its consideration in underwriting excess insurance to Pepper for the 2001-2002 Policy Period.

47.    The 2001-2002 Application requested: "PLEASE NOTE: If you know of any claims or incidents that you have not reported, please notify the company prior to renewal."

48.    The Pepper firm did not notify Continental Casualty of any such incidents.

49.    The 2001-2002 Application further provided:

> The undersigned represents that the statements set forth herein are true, complete and accurate and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known, to the best of his/her knowledge, and agrees that the application shall become the basis of any coverage and a part of any policy that may be issued by the Company. The execution of this application does not bind the undersigned to purchase any coverage offered, nor does the receipt and/or review of this application bind the company to offer coverage or issue a policy.

> The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis.

23

50.     Westport issued to Pepper a Customized Practice Coverage Policy No. PLL-341513-1 (the "2001-2002 Primary Policy") for the Policy Period of April 21, 2001, to October 27, 2002.  The 2001-2002 Primary Policy had a Limit of Liability of $20 million, subject to a $500,000 Deductible.

51.     In reliance on the representations made in the 2001-2002 Application, Continental Casualty issued to Pepper a Lawyers Excess Professional Liability Policy No. LLE-192857748 (the "2001-2002 Continental Excess Policy") for the same Policy Period as the 2001-2002 Primary Policy.  The 2001-2002 Continental Excess Policy had an aggregate Limit of Liability of $30 million, excess of $20 million in underlying insurance and a $500,000 Deductible.

52.     The 2001-2002 Continental Excess Policy provides, both on the face of the Policy Declarations page and on the face of the Policy's terms and conditions, as follows:

> THIS IS A CLAIMS MADE AND REPORTED POLICY.  EXCEPT TO SUCH EXTENT AS MAY BE PROVIDED HEREIN, THIS POLICY IS LIMITED TO LIABILITY FOR THOSE CLAIMS THAT BOTH FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS WITH YOUR INSURANCE AGENT OR BROKER.

53.     In relevant part, the 2001-2002 Continental Excess Policy further provides:

> In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company in the Application, including all attachments, a copy of which is attached hereto and made a part hereof, and subject to the declarations and endorsements of this Excess Policy, the Company agrees as follows:
>
> I.     INSURING AGREEMENT
>
> The Company will indemnify the Insured for Damages which are in excess of the total limits paid under all Underlying Insurance arising from claims first made and reported to the Company during the Policy Period as specified in Item 2. of the Declarations.

24

> The insurance afforded by this Excess Policy follows the insuring agreement(s) in the Underlying Insurance and is subject to the same warranties, conditions, exclusions, terms and definitions, except as to premium, the limits of liability, renewal and the duty to defend or as may otherwise be modified by this Excess Policy.

54.     By its terms, therefore, the 2001-2002 Continental Excess Policy is a claims-made-and-reported policy, and it follows form to all underlying insurance.

### B.     The 2002-2003 Application and Legal Malpractice Policies

55.     Pepper submitted to Westport a "Professional Premier for Lawyers - Application for Law Firms with more than 34 Attorneys - (Claims Made and Reported Basis)" (the "2002-2003 Application"), signed by partner Wilcox and dated September 6, 2002.

56.     The 2002-2003 Application was also provided to Continental Casualty for its consideration in underwriting excess insurance to Pepper.

57.     In connection with the 2002-2003 Application, Pepper conducted an internal poll of its attorneys to obtain information germane to the Application.

58.     In response to the inquiry, Gagné authored a memorandum to Wilcox, dated August 6, 2002 (the "2002 Insurance Questionnaire").

59.     In the 2002 Insurance Questionnaire memorandum, and in response to the question of whether he was "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of the (sic) claim or suit for lawyers professional liability," Gagné responded as follows:

> The only two matters of which I am aware are the Student Finance Corporation transactions of which you are familiar and the Royal Indemnity Company representation. The only Royal representation that I currently think any claim could be made is where we represented them in a transaction which they terminated hours before the closing for a variety of reasons. I do not think we will be implicated in the Royal Indemnity Company matter since an action has not been filed and the action really

25

lies against our client. With regard to the Student Finance Corporation action, two law suit (sic) have been filed in two different states and to date, we have not been named in either action. I am not certain as to whether we will be joined in the future.

60. In the 2002-2003 Application, Pepper did not list the facts or circumstances of either the "Student Finance Corporation transactions" or "Royal Indemnity Company transactions" identified by Gagné in the 2002 Insurance Questionnaire.

61. More specifically, Pepper was asked the following in the 2002-2003 Application:

> 20. A. After inquiry of each lawyer, is the Applicant, its predecessor firms or any lawyers proposed for this insurance aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability?

62. Pepper responded to Question 20 of the 2002-2003 Application by checking the box marked "No."

63. The 2002-2003 Application, signed by Wilcox on behalf of the Pepper firm, further stated as follows:

> The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis for only those claims that are made against the insured and reported while the policy is in force and that coverage ceases with the termination of the policy. All claims will be excluded that result from any acts, circumstances or situations known prior to the inception of coverage being applied for, that could reasonably be expected to result in a claim.
>
> The undersigned represents that the statements set forth herein and in all supplemental forms and attachments are true, complete and accurate and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known, and agrees that this application shall become the basis of any coverage that be issued by the Company.
>
> \*\*\*

26

> The applicant understands and agrees that she or he is obligated to report any changes in the information provided in this application that occur after the date of the application.

64.    Westport issued to Pepper a Customized Practice Coverage Policy No. PLL-347287-5 (the "2002-2003 Primary Policy") for the Policy Period of October 27, 2002, to October 27, 2003.  The 2002-2003 Primary Policy had a Limit of Liability of $10 million, subject to a $500,000 Deductible.

65.    Twin City Fire Insurance Company ("Twin City") issued to Pepper an Excess Claims Made Liability Insurance Policy No. 00 PF 0214459 (the "2002-2003 First Excess Policy") for the same Policy Period as the 2002-2003 Primary Policy.  The 2002-2003 First Excess Policy had a Limit of Liability of $10 million, excess of $10 million in underlying insurance and a $500,000 Deductible.

66.    Executive Risk Indemnity Inc. ("Executive Risk") issued to Pepper an Excess Indemnity Policy No. 8170-3836 (the "2002-2003 Second Excess Policy") for the same Policy Period as the 2002-2003 Primary Policy.  The 2002-2003 Second Excess Policy had a Limit of Liability of $10 million, excess of the $20 million in underlying insurance and a $500,000 Deductible.

67.    In reliance on the representations made in the 2002-2003 Application, Continental Casualty issued to Pepper a Lawyers Excess Professional Liability Policy No. LLE-192857748 (the "2002-2003 Continental Excess Policy") for the same Policy Period as the 2002-2003 Primary Policy.  The 2002-2003 Continental Excess Policy had an aggregate Limit of Liability of $10 million, excess of $30 million in underlying insurance and a $500,000 Deductible.

68.    The 2002-2003 Continental Excess Policy provides, both on the face of the Policy Declarations page and on the face of the Policy's terms and conditions, as follows:

27

THIS IS A CLAIMS MADE AND REPORTED POLICY. EXCEPT TO SUCH EXTENT AS MAY BE PROVIDED HEREIN, THIS POLICY IS LIMITED TO LIABILITY FOR THOSE CLAIMS THAT BOTH FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS WITH YOUR INSURANCE AGENT OR BROKER.

69.     In relevant part, the 2002-2003 Continental Excess Policy further provides:

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company in the Application, including all attachments, a copy of which is attached hereto and made a part hereof, and subject to the declarations and endorsements of this Excess Policy, the Company agrees as follows:

I.     INSURING AGREEMENT

The Company will indemnify the Insured for Damages which are in excess of the total limits paid under all Underlying Insurance arising from claims first made and reported to the Company during the Policy Period as specified in Item 2. of the Declarations.

The insurance afforded by this Excess Policy follows the insuring agreement(s) in the Underlying Insurance and is subject to the same warranties, conditions, exclusions, terms and definitions, except as to premium, the limits of liability, renewal and the duty to defend or as may otherwise be modified by this Excess Policy.

70.     By its terms, therefore, the 2002-2003 Continental Excess Policy is a claims-made-and-reported policy, and it follows form to all underlying insurance.

## C.     The 2003-2004 Renewal and Legal Malpractice Policies

71.     Pepper sought renewed malpractice insurance for the 2003-2004 Policy Year.

72.     In connection with the renewal coverage it sought, Pepper conducted an internal poll of its attorneys to obtain information for the insurance renewal.

73.     In response to this inquiry, Gagné submitted a document he signed and dated September 4, 2003 (the "2003 Insurance Questionnaire").

74.    In the 2003 Insurance Questionnaire, Gagné responded in the affirmative that he was then "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers' professional liability." He further advised, "I have spoken to both Charlie [Leasure] and Chub [Wilcox] with respect to the SFC matter."

75.    However, nothing submitted by Pepper in connection with its 2003-2004 renewal of its malpractice insurance program disclosed the facts or circumstances of the "SFC matter" identified by Gagné in the 2003 Insurance Questionnaire.

76.    Westport issued to Pepper a Customized Practice Coverage Policy No. PLL-350772-3 (the "2003-2004 Primary Policy") for the Policy Period of October 27, 2003, to October 27, 2004. The 2003-2004 Primary Policy had a Limit of Liability of $10 million, subject to a $500,000 Deductible.

77.    Twin City issued to Pepper an Excess Claims Made Liability Insurance Policy No. 00 PF 0214459 (the "2003-2004 First Excess Policy") for the same Policy Period as the 2003-2004 Primary Policy. The 2003-2004 First Excess Policy had a Limit of Liability of $10 million, excess of $10 million in underlying insurance and a $500,000 Deductible.

78.    Executive Risk issued to Pepper an Excess Indemnity Policy No. 8170-3836 (the "2003-2004 Second Excess Policy") for the same Policy Period as the 2003-2004 Primary Policy. The 2003-2004 Second Excess Policy had a Limit of Liability of $10 million, excess of the $20 million in underlying insurance and a $500,000 Deductible.

79.    In reliance on Pepper's representations in connection with the 2003-2004 renewal, Continental Casualty issued to Pepper a Lawyers Excess Professional Liability Policy No. LLE-192857748 (the "2003-2004 Continental Excess Policy") for the same Policy Period as the 2003-

29

2004 Primary Policy. The Policy had an aggregate Limit of Liability of $10 million, excess of

$30 million in underlying insurance and a $500,000 Deductible.

80.    The 2003-2004 Continental Excess Policy provides, both on the face of the Policy

Declarations page and on the face of the Policy's terms and conditions, as follows:

> THIS IS A CLAIMS MADE AND REPORTED POLICY. EXCEPT TO
> SUCH EXTENT AS MAY BE PROVIDED HEREIN, THIS POLICY IS
> LIMITED TO LIABILITY FOR THOSE CLAIMS THAT BOTH FIRST
> MADE AGAINST THE INSURED AND REPORTED TO THE
> COMPANY DURING THE POLICY PERIOD. PLEASE READ THE
> POLICY CAREFULLY AND DISCUSS WITH YOUR INSURANCE
> AGENT OR BROKER.

81.    In relevant part, the 2003-2004 Continental Excess Policy further provides:

> In consideration of the payment of the premium, and in reliance on all
> statements made and information furnished to the Company in the
> Application, including all attachments, a copy of which is attached hereto
> and made a part hereof, and subject to the declarations and endorsements
> of this Excess Policy, the Company agrees as follows:
>
> I.    INSURING AGREEMENT
>
> The Company will indemnify the Insured for Damages which are in
> excess of the total limits paid under all Underlying Insurance arising from
> claims first made and reported to the Company during the Policy Period as
> specified in Item 2. of the Declarations.
>
> The insurance afforded by this Excess Policy follows the insuring
> agreement(s) in the Underlying Insurance and is subject to the same
> warranties, conditions, exclusions, terms and definitions, except as to
> premium, the limits of liability, renewal and the duty to defend or as may
> otherwise be modified by this Excess Policy.

82.    By its terms, therefore, the 2003-2004 Continental Excess Policy is a claims-

made-and-reported policy, and it follows form to all underlying insurance.

83.    In a letter dated April 27, 2004, Pepper wrote to the primary insurer, Westport, reporting for the first time a "threatened claim" relating to the SFC matter under the 2003-2004 Policy.

## AS AND FOR A FIRST COUNTERCLAIM

### Rescission of the 2001-2002 Continental Excess Policy

84.    Continental Casualty repeats and re-alleges paragraphs "1" through "83" as if fully set forth herein.

85.    As alleged by the Underlying Litigation, Pepper and/or Gagné had knowledge of the purported fraud occurring at SFC since at least 1999, and were at various points thereafter, and through various communications thereafter, the primary drafters of many of SFC's critical documents that carried out the purported fraud, including form loan documents.

86.    Therefore, Gagné and/or Pepper knew since at least 1999, and certainly no later than Gagné's March 2, 2000, email to Yao, that they were representing SFC in matters that they knew would result in SFC potentially "manipulating the performance pool" and that they knew "directly affected" Royal.

87.    Pepper never disclosed to Continental Casualty in the 2001-2002 Application or otherwise, despite Pepper's and/or Gagné's knowledge as alleged in the Underlying Litigation, the circumstances of the fraud at SFC and Pepper's and/or Gagné's continued representation of SFC nonetheless.  Pepper and/or Gagné knew or should have known that such facts reasonably might be expected to be the basis of a claim or suit for lawyers professional liability.

88.    The representations made by Pepper and Gagné in the firm's 2001-2002 Application were false.

89.     The representations made by Pepper and Gagné in the firm's 2001-2002 Application were material to the risk Continental Casualty was then being asked to insure.

90.     At the time the representations made by Pepper and Gagné in the firm's 2001-2002 Application were made, Pepper and/or Gagné knew that the representations were false and Pepper and/or Gagné made those representations in bad faith.

91.     Continental Casualty relied on the representations made by Pepper and Gagné in the firm's 2001-2002 Application.

92.     Continental Casualty will return to Pepper the premium charged for this and other Policies for which Continental Casualty herein seeks rescission.

93.     Continental Casualty is therefore entitled to an Order rescinding and declaring as void *ab initio* the 2001-2002 Continental Excess Policy.

## AS AND FOR A SECOND COUNTERCLAIM

### Rescission of the 2002-2003 Continental Excess Policy

94.     Continental Casualty repeats and re-alleges paragraphs "1" through "93" as if fully set forth herein.

95.     At the time Wilcox completed, signed and dated the 2002-2003 Application for the Pepper firm, Gagné and the Pepper firm's Finance and Ethics Committees, together with Chub Wilcox, were aware or should have been aware that the SFC-related issues identified by Gagné amounted to "any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability" as sought by Question 20 of the 2002-2003 Application.

96.     In response to Question 20, Pepper responded, "No."

97.    Gagné's April 18, 2002, memorandum, on which Wilcox was copied, set forth "ethical considerations" of the SFC-related problems and reached the conclusion that, "I think we also need to recognize the possibility that this firm will be sued ... ."

98.    Moreover, Gagné's 2002-2003 Insurance Questionnaire responses identified "two matters" that Gagné "expected to be the basis of the (sic) claim or suit for lawyers professional liability."

99.    The representations made by Pepper in the firm's 2002-2003 Application were false.

100.    The representations made by Pepper and Gagné in the firm's 2002-2003 Application were material to the risk Continental Casualty was then being asked to insure.

101.    At the time the representations made by Pepper and Gagné in the firm's 2002-2003 Application were made, Pepper and/or Gagné knew that the representations were false and Pepper and/or Gagné made those representations in bad faith.

102.    Continental Casualty relied on the representations made by Pepper and Gagné in the firm's 2002-2003 Application.

103.    Continental Casualty will return to Pepper the premium charged for this and other Policies for which Continental Casualty herein seeks rescission.

104.    Continental Casualty is therefore entitled to an Order rescinding and declaring as void *ab initio* the 2002-2003 Continental Excess Policy.

33

## AS AND FOR A THIRD COUNTERCLAIM

### Rescission of the 2003-2004 Continental Excess Policy

105.    Continental Casualty repeats and re-alleges paragraphs "1" through "104" as if fully set forth herein.

106.    In addition to the April 18, 2002, Gagné memorandum and the 2002 Insurance Questionnaire, Gagné responded affirmatively in the 2003 Insurance Questionnaire when asked to identify whether he was "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers' professional liability."    Gagné additionally stated, "I have spoken to both Charlie [Leasure] and Chub [Wilcox] with respect to the SFC matter."    However, Pepper never listed the "SFC matter" in the 2003-2004 Application.

107.    The failure to disclose this information in the 2003-2004 Policy Year renewal process, and therefore the representations made by Pepper and Gagné in the firm's 2003-2004 renewal, were false.

108.    The representations made by Pepper and Gagné in the firm's 2003-2004 renewal were material to the risk Continental Casualty was then being asked to insure.

109.    At the time the representations made by Pepper and Gagné in the firm's 2003-2004 renewal were made, Pepper and/or Gagné knew that the representations were false and Pepper and/or Gagné made those representations in bad faith.

110.    Continental Casualty relied on the representations made by Pepper and Gagné in the firm's 2003-2004 renewal.

111.    Continental Casualty will return to Pepper the premium charged for this and other Policies for which Continental Casualty herein seeks rescission.

34

112.    Continental Casualty is therefore entitled to an Order rescinding and declaring as void *ab initio* the 2003-2004 Continental Excess Policy.

## AS AND FOR A FOURTH COUNTERCLAIM

### Declaration of No Coverage for the Underlying Litigation Based Upon Operation of Prior Knowledge Exclusion (B) of the 2003-2004 Policy

113.    Continental Casualty repeats and re-alleges paragraphs "1" through "112" as if fully set forth herein.

114.    The 2003-2004 Primary Policy contains an Exclusion B precluding coverage for matters which the Insured had prior knowledge (the "Prior Knowledge Exclusion"), that provides as follows:

> This POLICY shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from:
>
> B.    any act, error, omission, circumstance or PERSONAL INJURY occurring prior to the effective date of this POLICY if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY might be the basis of a CLAIM. This exclusion does not apply to any INSURED who had no knowledge or could not have reasonably foreseen that such act, error, omission, circumstance or PERSONAL INJURY might be the basis of a claim.

115.    In his April 18, 2002, memorandum to the Ethics and Finance Committees of the Pepper firm, Gagné wrote, "I think we also need to recognize the possibility that this firm will be sued, as a deep pocket associated with SFC and these transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility."

116.    In the 2002 Insurance Questionnaire memorandum, authored by Gagné and dated August 6, 2002, and in response to the question of whether he was "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of

the (sic) claim or suit for lawyers professional liability," Gagné responded, as detailed above, that he was in fact aware of two matters, including "the Student Finance Corporation transactions" and "the Royal Indemnity Company representation."

117.    In the 2003 Insurance Questionnaire, signed by Gagné and dated September 4, 2003, Gagné responded in the affirmative that he was then "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers' professional liability." He further advised, "I have spoken to both Charlie and Chub with respect to the SFC matter."

118.    Prior to the effective date of the 2003-2004 Continental Excess Policy, Pepper and Gagné knew, or could have reasonably foreseen, an act, error, omission, circumstance or personal injury that might be the basis of a claim.

119.    The Underlying Litigation against Pepper and Gagné is based upon, arises out of, is attributable to, or has directly or indirectly resulted from such act, error, omission, circumstance or personal injury that Pepper and Gagné knew, or could have reasonably foreseen, prior to the effective date of the 2003-2004 Continental Excess Policy, might be the basis of a claim.

120.    The Prior Knowledge Exclusion applies to the Underlying Litigation, and Continental Casualty is not obligated to provide coverage for any of the Underlying Litigation or related matters.

### AS AND FOR A FIFTH COUNTERCLAIM

#### Declaration That Underlying Litigation are "Known Loss" or "Loss in Progress"

121.    Continental Casualty repeats and re-alleges paragraphs "1" through "120" as if fully set forth herein.

122.    Pepper and Gagné knew, as early as 1999, that the firm was experiencing a "known loss" or a "loss in progress" with regard to the SFC-related matters, which, in fact, resulted in the Underlying Litigation.

123.    Continental Casualty is not obligated to provide coverage under the 2001-2002, 2002-2003 and/or 2003-2004 Continental Excess Policy to Pepper and Gagné for the Underlying Litigation for losses known to the Insured before such policy was issued.

### AS AND FOR A SIXTH COUNTERCLAIM

### Declaration That Certain of the Damages Sought by the Underlying Litigation Do Not Constitute "Loss" Under the Relevant Policy

124.    Continental Casualty repeats and re-alleges paragraphs "1" through "123" as if fully set forth herein.

125.    The 2003-2004 Primary Policy, at Lawyers Professional Liability Coverage Unit, Section VIII(D), provides:

> D.    "LOSS" WHENEVER USED IN THIS COVERAGE UNIT MEANS the monetary and compensatory portion of any judgment, award of settlement, provided that always LOSS shall not include:
>
> 1.    civil or criminal fines, penalties, fees or sanctions;
>
> 2.    punitive or exemplary damages, including the multiplied portion of any multiple damages;
>
> 3.    the return by any INSURED of any fees or remuneration paid to any INSURED; or
>
> 4.    any form of non-monetary relief.

126.    Certain damages sought by the Trustee and/or Royal in the Underlying Litigation does not constituted covered "Loss" under the Policies.

127.   As detailed above, Count X of the Trustee Complaint seeks as damages $985,475 in fees paid to Pepper between June 2001 and May 2002.

128.   In accordance with Section VIII(D)(3) quoted above, the damages sought by Count X of the Trustee Complaint are not covered "Loss" under the relevant Policies.

129.   As detailed above, the Royal Complaint seeks punitive and treble damages against Pepper and/or Gagné for their allegedly wrongful conduct.

130.   In accordance with Section VIII(D)(2) quoted above, the punitive and treble damages sought by the Royal Complaint against Pepper and/or Gagné are not covered "Loss" under the relevant Policies.

## AS AND FOR A SEVENTH COUNTERCLAIM

### Declaration That Continental Casualty Owes No Coverage Obligations to Pepper as it Breached Duties Owed to Continental Casualty

131.   Continental Casualty repeats and re-alleges paragraphs "1" through "130" as if fully set forth herein.

132.   The 2003-2004 Continental Excess Policy incorporates the following Clause:

>   A.   All INSUREDS shall cooperate with the [Insurer] in providing information requested by the [Insurer] regarding any CLAIM or GRIEVANCE reported under the POLICY. All INSUREDS shall cooperate with the [Insurer] in the investigation of any GRIEVANCE and in the defense, investigation *and settlement of any CLAIM.* Upon the [Insurer's] request, the INSURED(S) shall submit to examination or questioning under oath, attend hearings, depositions and trials and assist in effecting settlements, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits.

(emphasis added).

133.   Section VI of the 2003-2004 Continental Excess Policy states: "The Company may, at its sole discretion, elect to participate in the investigation, settlement or defense of any

claim against any Insured for matters covered by this Excess Policy, even if the Underlying Insurance has not been exhausted."

134.    Pepper and Gagné each had a duty under the terms and conditions of the Policies, as well under the law and in equity, to take no action which would unnecessarily cause any of its insurance policies to be exposed to loss or potential loss.

135.    Pepper and Gagné each had a duty under the terms and conditions of the Policies, as well under the law and in equity, to mitigate any exposure to the relevant Continental Excess Policies.

136.    Pepper and Gagné each had a duty under the law and in equity to mitigate their potential exposure in the Underlying Litigation.

137.    In a letter dated June 28, 2005, Pepper advised Continental Casualty about a "high/low" arrangement Attorney Wilcox had negotiated, on behalf of the Pepper firm and Gagné, with plaintiffs in the Underlying Litigation.

138.    The June 28, 2005, letter advised Continental Casualty of the following:

> In the absence of an ability to effect a complete settlement, the alternative of a "high/low" approach naturally suggests itself, and I have initially explored with [the SFC Trustee] and his counsel the plaintiffs' willingness to enter into such an arrangement. They advise that *plaintiffs are willing to enter into a "high/low" agreement* in which plaintiffs would agree to look solely to the Firm's insurers for satisfaction of any judgment they might obtain (assuming the litigation is unable to be compromised by settlement as all parties learn more, through discovery, as to their relative strengths and weaknesses), provided that plaintiffs would be assured of receiving a "low" of $12 million regardless of any verdict in the case, *and would limit themselves to a "high" of $30 million, again regardless of how high over that a verdict might be.*

(emphasis added).

39

139.    The 2003-2004 Continental Excess Policy was in excess of $30 million in underlying coverage and, by its terms and conditions, would not respond until the $30 million in underlying insurance had been exhausted by the actual payment of loss.

140.    Pepper requested that, despite its attachment point, Continental agreed to contribute to half of any amount paid by Pepper to the underlying plaintiffs in the proposed "high/low" agreement.

141.    Because the underlying policies would not "exhaust" under Pepper's proposal, Continental Casualty did not accept that proposal.

142.    Thereafter, on or about August 23, 2005, Attorney Wilcox wrote to Westport a letter that was copied to Continental Casualty.

143.    Pepper's August 23, 2005, letter to Westport stated as follows:

> I had suggested the $30 million number because my thinking was that if the "high/low" agreement eliminated any risk to our fourth layer of coverage, provided by [Continental Casualty], then [Continental Casualty] might be willing to contribute to the cost of the "low," if and when the "low" became relevant.
>
> ***
>
> Because [Continental Casualty] was not willing to share any part of the "low," I did not feel that I could interest plaintiffs in a "low" significantly less than $10 million, without offering to bump up the "high." *Moreover, because [Continental Casualty] had not been interested, I did not feel that I needed to keep the "high" at a number below their incept point.* I therefore called [the Trustee's attorney], reported that [Continental Casualty] was not willing to participate financially, that I therefore could not get anywhere close to his target of $10 million for a low, and asked whether he would interested in a low of $2 million and high of $40 million (again, it being understood that any payment above the low would be only from Pepper's available insurance, not from Pepper).

(emphasis added).

144.    By rejecting the offer of the plaintiffs in the Underlying Litigation to limit the exposure to $30.0 million, Pepper has unnecessarily exposed the 2003-2004 Continental Excess Policy to potential loss and Pepper has failed to mitigate any exposure to that Policy.

145.    Pepper breached its duties to Continental Casualty by these actions and has unnecessarily, and in knowing and flagrant disregard of its duties under the Policies, at law and in equity, exposed the 2003-2004 Continental Casualty excess layer of insurance to potential loss.

146.    As a result of the breach of these duties under the Policies, at law and in equity, Continental Casualty is not obligated to provide coverage to Pepper and/or Gagné for the Underlying Litigation.

WHEREFORE, Third-Party Defendant CONTINENTAL CASUALTY COMPANY demands judgment against Third-Party Plaintiffs PEPPER HAMILTON LLP and W. RODERICK GAGNÉ as follows:

a)    As to its First Counterclaim, Continental Casualty seeks an Order rescinding and declaring as void *ab initio* the 2001-2002 Continental Excess Policy;

b)    As to its Second Counterclaim, Continental Casualty seeks an Order rescinding and declaring as void *ab initio* the 2002-2003 Continental Excess Policy;

c)    As to its Third Counterclaim, Continental Casualty seeks an Order rescinding and declaring as void *ab initio* the 2003-2004 Continental Excess Policy;

d)    As to its Fourth Counterclaim, Third-Party Defendant CONTINENTAL CASUALTY COMPANY seeks an Order declaring that it is not obligated to defend or indemnify Pepper or Gagné in the Trustee and Royal Actions based upon operation of the Prior Knowledge Exclusion;

e)    As to its Fifth Counterclaim, Third-Party Defendant CONTINENTAL CASUALTY COMPANY seeks an Order declaring that it is not obligated to defend or indemnify Pepper or Gagné in the Trustee and Royal Actions based upon the "known loss" and/or "loss in progress" doctrines;

42

f)    As to its Sixth Counterclaim, Third-Party Defendant CONTINENTAL CASUALTY COMPANY seeks an Order declaring that certain damages alleged in the Underlying Litigation do not constitute "Loss" under the Policies;

g)    As to its Seventh Counterclaim, Third-Party Defendant CONTINENTAL CASUALTY COMPANY seeks an Order declaring that Continental Casualty is not obligated to provide coverage to Pepper and/or Gagné for the Underlying Litigation on the basis of their breach of duties under the Policies, at law and in equity;

h)    Awarding Continental Casualty its costs and reasonable attorneys' fees; and/or

i)    For such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        May 8, 2007

                                        Yours etc.,

                                        COZEN O'CONNOR

                        By:    _____
                                        Kevin M. Mattessich
                                        Patrick M. Kennell
                                        Cozen O'Connor
                                        45 Broadway – 16th Floor
                                        New York, New York  10006
                                        Phone:  (212) 509-9400
                                        Facsimile:  (212) 509-9492
                                        *Attorneys for Third-Party Defendant*
                                        CONTINENTAL CASUALTY COMPANY

43

# EXHIBIT 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
EXECUTIVE RISK INDEMNITY INC.,                    :    Index No.: 603624/05
                                                  :
                       Plaintiff,                 :    **REPLY TO AMENDED**
                                                  :    **COUNTERCLAIMS OF**
           -against-                              :    **THIRD-PARTY**
                                                  :    **DEFENDANT TWIN**
PEPPER HAMILTON LLP, W. RODERICK GAGNÉ and        :    **CITY FIRE INSURANCE**
WESTPORT INSURANCE CORPORATION,                   :    **COMPANY**
                                                  :
                       Defendants.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                                  :
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ,        :    TP Index No.: 590185/07
                                                  :
                                                  :
                 Third-Party Plaintiffs,          :
                                                  :
           -against-                              :
                                                  :
CONTINENTAL CASUALTY COMPANY and                  :
TWIN CITY FIRE INSURANCE COMPANY,                 :
                                                  :
                 Third-Party Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Defendants / Third-Party Plaintiffs, Pepper Hamilton LLP ("Pepper

Hamilton") and W. Roderick Gagné (collectively, "Pepper Hamilton Defendants"), by

their attorneys Dickstein Shapiro LLP, hereby reply to the amended counterclaims of

Third-Party Defendant Twin City Fire Insurance Company ("Twin City"). Pepper

Hamilton Defendants deny each and every allegation of the amended counterclaims

that is not expressly admitted herein. Pepper Hamilton Defendants respond to the

numbered paragraphs of Twin City's amended counterclaims and assert affirmative

defenses as follows:

<u>First Affirmative Defense and First Counterclaim</u>

57.    Deny the allegations set forth in paragraph 57 of Twin City's amended counterclaims, except admit that Pepper Hamilton purchased Excess Lawyers Professional Liability Policy Number 00 PF 0214459 ("2003-2004 Twin City Policy") from Twin City for the policy period October 27, 2003 through October 27, 2004, and respectfully refer to the 2003-2004 Twin City Policy for the complete and accurate content thereof.

58.    Deny the allegations set forth in paragraph 58 of Twin City's amended counterclaims, and respectfully refer to Westport Policy Number PLL-350772-3 ("2003-2004 Westport Policy") for the complete and accurate content thereof.

59.    Deny the allegations set forth in paragraph 59 of Twin City's amended counterclaims, except admit that both the 2003-2004 Westport Policy and the 2003-2004 Twin City Policy had an effective date beginning October 27, 2003, and respectfully refer to the Complaints in the referenced Stanziale and Royal actions (the "Underlying Actions") for the allegations contained therein.

60.    State that the allegations set forth in paragraph 60 of Twin City's amended counterclaims are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 60 of Twin City's amended counterclaims.

<u>Second Affirmative Defense and Second Counterclaim</u>

61.    Deny the allegations set forth in paragraph 61 of Twin City's amended counterclaims, except admit that Pepper Hamilton purchased the 2003-2004 Westport Policy, and respectfully refer to the 2003-2004 Westport Policy for the complete and accurate content thereof.

2

62.     Deny the allegations set forth in paragraph 62 of Twin City's amended counterclaims, except admit that the 2003-2004 Westport Policy and the 2003-2004 Twin City Policy had an effective date beginning October 27, 2003, and respectfully refer to the referenced Complaints in the Underlying Actions for the allegations contained therein.

63.     State that the allegations set forth in paragraph 63 are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 63 of Twin City's amended counterclaims.

### Third Affirmative Defense and Third Counterclaim

64.     Deny the allegations set forth in paragraph 64 of Twin City's amended counterclaims, except admit that Pepper Hamilton purchased the 2003-2004 Twin City Policy, and respectfully refer to the 2003-2004 Twin City Policy for the complete and accurate content thereof.

65.     Deny the allegations set forth in paragraph 65 of Twin City's amended counterclaims, except admit that the 2003-2004 Twin City Policy had an effective date beginning October 27, 2003, and respectfully refer to the referenced Complaints in the Underlying Actions for the allegations contained therein.

66.     State that the allegations set forth in paragraph 66 are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 66 of Twin City's amended counterclaims.

### Fourth Affirmative Defense and Fourth Counterclaim

3

67.    Deny the allegations set forth in paragraph 67 of Twin City's amended counterclaims, except admit that Pepper Hamilton purchased the 2003-2004 Westport Policy, and clarify that the quoted provision appears in the Lawyers Professional Liability Coverage Unit, and respectfully refer to the 2003-2004 Westport Policy for the complete and accurate content thereof.

68.    Deny the allegations set forth in paragraph 68 of Twin City's amended counterclaims, except admit that during the policy period of the 2003-2004 Westport Policy Pepper Hamilton gave Westport written notice of claims asserted by the bankruptcy trustee for SFC, and respectfully refer to the referenced written notice for the complete and accurate content thereof.

69.    Deny the allegations set forth in paragraph 69 of Twin City's amended counterclaims, and clarify that the policy period of the so-called "2001-2002" policies sold to Pepper Hamilton is April 27, 2001 to October 27, 2002.

70.    Admit the allegations set forth in paragraph 70 of Twin City's amended counterclaims.

71.    State that the allegations set forth in paragraph 71 are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 71 of Twin City's amended counterclaims.

### Fifth Affirmative Defense and Fifth Counterclaim

72.    Deny the allegations set forth in paragraph 72 of Twin City's amended counterclaims, except admit that Pepper Hamilton sent a letter dated November 14, 2003 to USI Insurance Service, and respectfully refer to the November 14, 2003 letter for the complete and accurate content thereof.

4

73.    Deny the allegations set forth in paragraph 73 of Twin City's amended counterclaims.

74.    State that the allegations set forth in paragraph 74 are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 74 of Twin City's amended counterclaims.

Sixth Affirmative Defense and Sixth Counterclaim

75.    State that the allegations set forth in paragraph 75 are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 75 of Twin City's amended counterclaims, except admit that Pepper Hamilton purchased the 2003-2004 Twin City Policy, and respectfully refer to the 2003-2004 Twin City Policy for the complete and accurate content thereof.

76.    State that all of the Westport Affirmative Defenses adopted and incorporated by Twin City are conclusions of law, to which no response is required, but in the event that a response is deemed required, deny the Affirmative Defenses adopted and incorporated in paragraph 76 of Twin City's amended counterclaims, to the extent they misstate the substantive policy provisions to which they refer. Pepper Hamilton Defendants respectfully refer to the 2003-2004 Twin City Policy for the complete and accurate content thereof

77.    Deny the allegations set forth in paragraph 77 [incorrectly listed as paragraph 75 in Twin City's amended counterclaims] of Twin City's amended counterclaims.

5

## AFFIRMATIVE DEFENSES

### First Affirmative Defense to Twin City's Amended Counterclaims

Twin City's amended counterclaims fail to state a claim upon which relief can be granted.

### Second Affirmative Defense to Twin City's Amended Counterclaims

Twin City's counterclaims are barred, in whole or in part, by reason of the allegations and claims set forth in the Pepper Hamilton Defendants' Third-Party Complaint, which are incorporated by reference into this Answer as if fully set forth herein.

### Third Affirmative Defense to Twin City's Amended Counterclaims

Twin City's counterclaims are barred, in whole or in part, by reason of the doctrines of estoppel and unclean hands.

### Fourth Affirmative Defense to Twin City's Amended Counterclaims

Twin City's counterclaims are barred, in whole or in part, by reason of the doctrine of waiver.

### Fifth Affirmative Defense to Twin City's Amended Counterclaims

Twin City's counterclaims are barred, in whole or in part, because the allegations of the underlying claims against Pepper Hamilton Defendants are within the terms of coverage provided by the 2003-2004 Twin City Policy and are not excluded therefrom.

### Sixth Affirmative Defense to Twin City's Amended Counterclaims

Twin City's counterclaims are barred, in whole or in part, because Twin City has materially breached its contracts with Pepper Hamilton Defendants.

6

<u>Seventh Affirmative Defense to Twin City's Amended Counterclaims</u>

The Pepper Hamilton Defendants incorporate by reference, as though fully set forth herein, each and every legal defense asserted in any pleading in this action which is applicable and supportive of the Pepper Hamilton Defendants' defense of Twin City's counterclaims.

<u>Eight Affirmative Defense to Twin City's Amended Counterclaims</u>

The Pepper Hamilton Defendants reserve the right to amend and add affirmative defenses that become known to them through discovery.

Dated:     New York, New York
           July 16, 2007

                                   Respectfully submitted,

                                   DICKSTEIN SHAPIRO LLP

                                   By:
                                      Randy Paar
                                      Edward Tessler
                                      Joan Lewis
                                      1177 Avenue of the Americas
                                      New York, New York 10036
                                      Telephone: (212) 277-6500
                                      Fax: (212) 277-6501
                                      *Attorneys for Pepper Hamilton LLP and*
                                      *W. Roderick Gagné*

7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXECUTIVE RISK INDEMNITY INC.,                    Index No.: 603624/05

                     Plaintiff,

          -against-

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ and
WESTPORT INSURANCE CORPORATION,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PEPPER HAMILTON LLP and W. RODERICK GAGNÉ,        TP Index No.: 590185/07


             Third-Party Plaintiffs,

          -against-

CONTINENTAL CASUALTY COMPANY and
TWIN CITY FIRE INSURANCE COMPANY,

            Third-Party Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


## REPLY TO AMENDED COUNTERCLAIMS OF THIRD-PARTY DEFENDANT TWIN CITY FIRE INSURANCE COMPANY


**DICKSTEIN SHAPIRO LLP**
Attorneys for Defendants
and Third-Party Plaintiffs
**PEPPER HAMILTON LLP and W. RODERICK GAGNÉ**
1177 Avenue of the Americas
New York, New York 10036
(212) 277-6500


DOCSNY-258284v01

# EXHIBIT 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| EXECUTIVE RISK INDEMNITY INC., | :    Index No.: 603624/05 |
|            Plaintiff, | : |
| | :    **REPLY TO** |
| | :    **COUNTERCLAIMS OF** |
|         -against- | :    **THIRD-PARTY** |
| | :    **DEFENDANT** |
| PEPPER HAMILTON LLP, W. RODERICK GAGNÉ and | :    **CONTINENTAL** |
| WESTPORT INSURANCE CORPORATION, | :    **CASUALTY COMPANY** |
| | : |
|            Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |
|---|---|
| | : |
| PEPPER HAMILTON LLP and W. RODERICK GAGNÉ, | :    TP Index No.: 590185/07 |
| | : |
| | : |
|         Third-Party Plaintiffs, | : |
| | : |
|         -against- | : |
| | : |
| CONTINENTAL CASUALTY COMPANY and | : |
| TWIN CITY FIRE INSURANCE COMPANY, | : |
| | : |
|         Third-Party Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       Defendants / Third-Party Plaintiffs, Pepper Hamilton LLP ("Pepper

Hamilton") and W. Roderick Gagné (collectively, "Pepper Hamilton Defendants"), by

their attorneys Dickstein Shapiro LLP, hereby reply to the counterclaims of Third-Party

Defendant Continental Casualty Company ("CNA"). Pepper Hamilton Defendants

deny each and every allegation of the counterclaims that is not expressly admitted

herein. Pepper Hamilton Defendants respond to the numbered paragraphs of CNA's

counterclaims and assert affirmative defenses as follows:

## I.　　Introduction

1.　　Deny the allegations set forth in paragraph 1 of CNA's counterclaims, except admit that CNA purports to file counterclaims and respectfully refer to the counterclaims for the relief they purport to seek.

2.　　Deny the allegations set forth in paragraph 2 of CNA's counterclaims, except admit that CNA purports to file counterclaims and respectfully refer to the counterclaims for the relief they purport to seek.

## II.　　The Counterclaim Parties

3.　　On information and belief, admit the allegations set forth in paragraph 3 of CNA's counterclaims.

4.　　Admit the allegations set forth in paragraph 4 of CNA's counterclaims.

5.　　Admit the allegations set forth in paragraph 5 of CNA's counterclaims.

## III.　　Jurisdiction and Venue

6.　　State that the allegations set forth in paragraph 6 of CNA's counterclaims are conclusions of law to which no response is required, except admit that a justiciable case or controversy exists between the parties.

7.　　State that the allegations set forth in paragraph 7 of CNA's counterclaims are conclusions of law to which no response is required.

## IV.　　Gagné's Personal Involvement with Yao and SFC

8.　　Deny the allegations set forth in paragraph 8 of CNA's counterclaims, except admit that for a certain period of time Gagné and Pepper Hamilton represented Andrew N. Yao ("Yao") and certain businesses with which Yao was associated.

9.　　Deny the allegations set forth in paragraph 9 of CNA's counterclaims, except admit that Yao was the sole shareholder of Student Finance Corporation ("SFC")

2

except for the period February 2000 – January 2001 when he was the 90% shareholder of SFC, that SFC was in the business of originating and acquiring non-guaranteed student loans and tuition installment agreements, primarily from trucking schools, and that Gagné and Pepper Hamilton, among other lawyers and law firms, represented Yao and SFC.

10.    Deny the allegations set forth in paragraph 10 of CNA's counterclaims, except admit that Gagné and Pepper Hamilton provided SFC with certain general corporate legal services, which included assistance with the preparation of certain private placement memoranda concerning the securitization of SFC's student loan portfolios.

11.    Deny the allegations set forth in paragraph 11 of CNA's counterclaims, except admit that Gagné served as counsel to the Gagné Family Trusts and was one of the Pepper Hamilton attorneys working on SFC matters during certain loan transactions between SFC and the Gagné Family Trusts, and further state that the parties waived any conflict of interests.

### V.    The Student Finance Corporation Transaction

12.    Deny the allegations set forth in paragraph 12 of CNA's counterclaims, except admit that SFC arranged warehouse lines of credit with institutional lenders, that certain special purpose entities ("SPE") would borrow on the warehouse lines of credit to fund purchases of non-guaranteed student loans and tuition installment agreements, that as a warehouse line of credit reached its credit limit, SFC would repurchase the student loans and re-sell them to a new SPE which then would transfer the student loan portfolio to a trust, that certain of the student loan portfolios were placed into

3

securitizations, and that securitization certificates were purchased by qualified institutional buyers.

13.  Admit the allegations set forth in paragraph 13 of CNA's counterclaims.

14.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14 of CNA's counterclaims, and respectfully refer to the complaint filed by Royal ("Royal Complaint") in the case captioned *Royal Indemnity Co. v. Pepper Hamilton LLP et al.*, No. 05-0165, pending in the District Court for the District of Delaware, for the allegations contained therein.

15.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15 of CNA's counterclaims, and respectfully refer to the Royal Complaint for the allegations contained therein.

16.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 16 of CNA's counterclaims, and respectfully refer to the Royal Complaint for the allegations contained therein.

17.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17 of CNA's counterclaims.

18.  Admit the allegations set forth in paragraph 18 of CNA's counterclaims.

19.  Deny the allegations of paragraph 19 of CNA's counterclaims, and respectfully refer to the complaint filed by SFC's bankruptcy trustee ("SFC Complaint") in the case captioned *Stanziale v. Pepper Hamilton LLP et al.*, No. 04-1551, pending in the District Court for the District of Delaware, for the allegations contained therein.

## VI.    The Underlying Litigation against Pepper and Gagné

20.  Deny the allegations set forth in paragraph 20 of CNA's counterclaims, except admit that on or about November 1, 2004 the bankruptcy trustee filed a

4

complaint in the United States Bankruptcy Court for the District of Delaware,
Adversary Proceeding No. 04-56423, as part of Bankruptcy Case No. 02-11620, against
numerous defendants, including the Pepper Hamilton Defendants, and respectfully
refer CNA to the SFC Complaint for the identity of the other parties named in that
lawsuit, and admit that the reference to the Bankruptcy Court was withdrawn and the
case was transferred to the District Court for the District of Delaware under Civil Action
No. 40-1551.

21.     Deny the allegations set forth in paragraph 21 of CNA's counterclaims,
and respectfully refer to the SFC Complaint for the allegations contained therein.

22.     Deny the allegations set forth in paragraph 22 of CNA's counterclaims,
and respectfully refer to the SFC Complaint for the allegations contained therein.

23.     Deny the allegations set forth in paragraph 23 of CNA's counterclaims as
those allegations pertain to the Pepper Hamilton Defendants, deny knowledge or
information sufficient to form a belief as to the allegations set forth in paragraph 23 of
CNA's counterclaims as those allegations pertain to the remaining defendants, and
respectfully refer to the SFC Complaint for the allegations contained therein.

24.     Deny the allegations set forth in paragraph 24 of CNA's counterclaims as
those allegations pertain to the Pepper Hamilton Defendants, deny knowledge or
information sufficient to form a belief as to the allegations set forth in paragraph 24 of
CNA's counterclaims as those allegations pertain to the remaining defendants, and
respectfully refer to the SFC Complaint for the allegations contained therein.

25.     Admit the allegations set forth in paragraph 25 of CNA's counterclaims.

26.     Deny the allegations set forth in paragraph 26 of CNA's counterclaims,
and respectfully refer to the Royal Complaint for the allegations contained therein.

27.     Deny the allegations set forth in paragraph 27 of CNA's counterclaims, and respectfully refer to the Royal Complaint for the allegations contained therein.

28.     Deny the allegations set forth in paragraph 28 of CNA's counterclaims, and respectfully refer to the Royal Complaint for the allegations contained therein.

29.     Deny the allegations set forth in paragraph 29 of CNA's counterclaims, and respectfully refer to the Royal Complaint for the allegations contained therein.

30.     Admit the allegations set forth in paragraph 30 of CNA's counterclaims.

### VII.    Pepper Hamilton's Knowledge of the SFC Fraud

31.     Deny the allegations set forth in paragraph 31 of CNA's counterclaims, and deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation."

32.     Deny the allegations set forth in paragraph 32 of CNA's counterclaims, except admit that Gagné wrote an email to Yao dated March 2, 2000, and respectfully refer to the referenced email for the complete content thereof.

### VIII.   Gagné's April 18, 2002 Memorandum

33.     Deny the allegations set forth in paragraph 33 of CNA's counterclaims, except admit that Gagné and Pepper Hamilton continued to represent Yao and SFC for a period of time after the date of the referenced email.

34.     Deny the allegations set forth in paragraph 34 of CNA's counterclaims, except admit that Gagné authored a memorandum dated April 18, 2002 that states that it is directed to the Pepper Hamilton Finance Committee with a copy to the Pepper Hamilton Ethics Committee and Alfred H. Wilcox.

35.     Deny the allegations set forth in paragraph 35 of CNA's counterclaims, except admit that Wilcox has served as counsel to Pepper Hamilton and that his duties

6

as counsel included obtaining professional liability insurance for the firm and notifying insurance companies of claims and circumstances as required pursuant to the relevant insurance policies.

36.     Deny the allegations set forth in paragraph 36 of CNA's counterclaims, and respectfully refer to the referenced memorandum for the complete and accurate content thereof.

37.     Deny the allegations set forth in paragraph 37 of CNA's counterclaims, and respectfully refer to the referenced memorandum for the complete and accurate content thereof.

38.     Deny the allegations set forth in paragraph 38 of CNA's counterclaims, and respectfully refer to the referenced memorandum for the complete and accurate content thereof.

39.     Deny the allegations set forth in paragraph 39 of CNA's counterclaims, and respectfully refer to the referenced memorandum for the complete and accurate content thereof.

40.     Deny the allegations set forth in paragraph 40 of CNA's counterclaims, except admit that a draft of the April 18, 2002 memorandum was prepared.

41.     Deny the allegations set forth in paragraph 41 of CNA's counterclaims, and respectfully refer to the referenced memorandum for the complete and accurate content thereof.

42.     Deny the allegations set forth in paragraph 42 of CNA's counterclaims, and respectfully refer to the referenced memorandum for the complete and accurate content thereof.

7

43.     Deny the allegations set forth in paragraph 43 of CNA's counterclaims, and respectfully refer to the referenced memoranda for the complete and accurate content thereof.

### IX.     The Insurance Applications and Policies

44.     Deny the allegations set forth in paragraph 44 of CNA's counterclaims, except admit that Pepper Hamilton applied for and obtained certain professional liability insurance policies for the benefit of the firm and its lawyers, and respectfully refer to the referenced policies themselves for the complete and accurate content thereof.

### A.     The 2001-2002 Application and Legal Malpractice Policies

45.     Deny the allegations set forth in paragraph 45 of CNA's counterclaims, except admit that Pepper Hamilton submitted to Colburn Insurance Service a document with the heading "Renewal Application for Lawyers Professional Liability Insurance (Claims Made and Reported Basis)" (the "2001-2002 Application"), signed and dated March 6, 2001, and respectfully refer to the referenced document itself for the complete and accurate content thereof.

46.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 46 of CNA's counterclaims.

47.     Deny the allegations set forth in paragraph 47 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

48.     Deny the allegations set forth in paragraph 48 of CNA's counterclaims because no time period is designated regarding any notification by Pepper Hamilton.

49.    Deny the allegations set forth in paragraph 49 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

50.    Deny the allegations set forth in paragraph 50 of CNA's counterclaims, except admit that Pepper Hamilton purchased Customized Practice Coverage Policy Number PLL-341513-1 (the "2001-2002 Primary Policy") from Westport for the policy period April 27, 2001 through October 27, 2002, and respectfully refer to the 2001-2002 Primary Policy for the complete and accurate content thereof.

51.    Deny the allegations set forth in paragraph 51 of CNA's counterclaims, except admit that Pepper Hamilton purchased Lawyers Excess Professional Liability Policy Number LLE-192857748 (the "2001-2002 CNA Excess Policy") from CNA for the same policy period as the 2001-2002 Primary Policy, and respectfully refer to the 2001-2002 CNA Excess Policy for the complete and accurate content thereof.

52.    Deny the allegations set forth in paragraph 52 of CNA's counterclaims, and respectfully refer to the 2001-2002 CNA Excess Policy for the complete and accurate content thereof.

53.    Deny the allegations set forth in paragraph 53 of CNA's counterclaims, and respectfully refer to the 2001-2002 CNA Excess Policy for the complete and accurate content thereof.

54.    State that the allegations set forth in paragraph 54 of CNA's counterclaims are conclusions of law to which no response is required, and respectfully refer to the 2001-2002 CNA Excess Policy for the complete and accurate content thereof.

9

**B.    The 2002-2003 Application and Legal Malpractice Policies**

55.    Deny the allegations set forth in paragraph 55 of CNA's counterclaims, except admit that Pepper Hamilton submitted a document with the heading "Professional Premier for Lawyers – Application for Law Firms with more than 34 Attorneys (Claims-Made and Reported Basis)" (the "2002-2003 Application"), signed by Alfred H. Wilcox and dated September 6, 2002.

56.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 56 of CNA's counterclaims.

57.    Deny the allegations set forth in paragraph 57 of CNA's counterclaims, except admit that Pepper Hamilton sent a memorandum dated July 22, 2002 to Pepper Hamilton attorneys in connection with Pepper Hamilton's application for professional liability insurance, and respectfully refer to the memorandum itself for the complete and accurate content thereof.

58.    Deny the allegations set forth in paragraph 58 of CNA's counterclaims, except admit that Gagné authored a memorandum to Wilcox dated August 6, 2002 in response to the memorandum dated July 22, 2002.

59.    Deny the allegations set forth in paragraph 59 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

60.    Deny the allegations set forth in paragraph 60 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

DOCSNY-249521v03

61.     Deny the allegations set forth in paragraph 61 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

62.     Deny the allegations set forth in paragraph 62 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

63.     Deny the allegations set forth in paragraph 63 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

64.     Deny the allegations set forth in paragraph 64 of CNA's counterclaims, except admit that Pepper Hamilton purchased Customized Practice Coverage Policy Number PLL-347287-5 (the "2002-2003 Primary Policy") from Westport for the policy period October 27, 2002 through October 27, 2003, and respectfully refer to the 2002-2003 Primary Policy for the complete and accurate content thereof.

65.     Deny the allegations set forth in paragraph 65 of CNA's counterclaims, except admit that Pepper Hamilton purchased Excess Claims Made Liability Insurance Policy Number 00 PF 0214459 (the "2002-2003 First Excess Policy") from Twin City for the same policy period as the 2002-2003 Primary Policy, and respectfully refer to the 2002-2003 First Excess Policy for the complete and accurate content thereof.

66.     Deny the allegations set forth in paragraph 66 of CNA's counterclaims, except admit that Pepper Hamilton purchased Excess Indemnity Policy Number 8170-3836 (the "2002-2003 Second Excess Policy") from Executive Risk for the same policy period as the 2002-2003 Primary Policy, and respectfully refer to the 2002-2003 Second Excess Policy for the complete and accurate content thereof.

11

67.     Deny knowledge or information sufficient to form a belief as to whether CNA issued the referenced policy "in reliance on the representations made in the 2002-2003 Application," and deny the remaining allegations set forth in paragraph 67 of CNA's counterclaims, except admit that Pepper Hamilton purchased Lawyers Excess Professional Liabilty Policy Number LLE-192857748 (the "2002-2003 CNA Excess Policy") from CNA for the same policy period as the 2002-2003 Primary Policy, and respectfully refer to the 2002-2003 CNA Excess Policy for the complete and accurate content thereof.

68.     Deny the allegations set forth in paragraph 68 of CNA's counterclaims, and respectfully refer to the 2002-2003 CNA Excess Policy for the complete and accurate content thereof.

69.     Deny the allegations set forth in paragraph 69 of CNA's counterclaims, and respectfully refer to the 2002-2003 CNA Excess Policy for the complete and accurate content thereof.

70.     State that the allegations set forth in paragraph 70 of CNA's counterclaims are conclusions of law to which no response is required, and respectfully refer to the 2002-2003 CNA Excess Policy for the complete and accurate content thereof.

C.     The 2003-2004 Renewal and Legal Malpractice Policies

71.     Deny the allegations set forth in paragraph 71 of CNA's counterclaims, except admit that Pepper Hamilton sought professional liability insurance for the policy period October 27, 2003 through October 27, 2004.

72.     Deny the allegations set forth in paragraph 72 of CNA's counterclaims, except admit that Pepper Hamilton sent a memorandum dated August 25, 2003 to Pepper Hamilton attorneys in connection with Pepper Hamilton's application for

professional liability insurance, and respectfully refer to the memorandum itself for the complete and accurate content thereof.

73.    Deny the allegations set forth in paragraph 73 of CNA's counterclaims, except admit that Gagné responded to the August 25, 2003 memorandum by a document he signed and dated September 4, 2003.

74.    Deny the allegations set forth in paragraph 74 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

75.    Deny the allegations set forth in paragraph 75 of CNA's counterclaims, and respectfully refer to the referenced application for the complete and accurate content thereof.

76.    Deny the allegations set forth in paragraph 76 of CNA's counterclaims, except admit that Pepper Hamilton purchased Customized Practice Coverage Policy Number PLL-350772-3 (the "2003-2004 Primary Policy") from Westport for the policy period October 27, 2003 through October 27, 2004, and respectfully refer to the 2003-2004 Primary Policy for the complete and accurate content thereof.

77.    Deny the allegations set forth in paragraph 77 of CNA's counterclaims, except admit that Pepper Hamilton purchased Excess Claims Made Liability Insurance Policy Number 00 PF 0214459 (the "2003-2004 First Excess Policy") from Twin City for the same policy period as the 2003-2004 Primary Policy, and respectfully refer to the 2003-2004 First Excess Policy for the complete and accurate content thereof.

78.    Deny the allegations set forth in paragraph 78 of CNA's counterclaims, except admit that Pepper Hamilton purchased Excess Indemnity Policy Number 8170-3836 (the "2003-2004 Second Excess Policy") from Executive Risk for the same policy

period as the 2003-2004 Primary Policy, and respectfully refer to the 2003-2004 Second Excess Policy for the complete and accurate content thereof.

79.     Deny knowledge or information sufficient to form a belief as to whether CNA issued the referenced policy "in reliance on Pepper's representations in connection with the 2003-2004 renewal," and deny the remaining allegations set forth in paragraph 79 of CNA's counterclaims, except admit that Pepper Hamilton purchased Excess Professional Liability Policy Number LLE-192857748 (the "2003-2004 CNA Excess Policy") from CNA for the same policy period as the 2003-2004 Primary Policy, and respectfully refer to the 2003-2004 CNA Excess Policy for the complete and accurate content thereof.

80.     Deny the allegations set forth in paragraph 80 of CNA's counterclaims, and respectfully refer to the 2003-2004 CNA Excess Policy for the complete and accurate content thereof.

81.     Deny the allegations set forth in paragraph 81 of CNA's counterclaims, and respectfully refer to the 2003-2004 CNA Excess Policy for the complete and accurate content thereof.

82.     State that the allegations set forth in paragraph 82 of CNA's counterclaims are conclusions of law to which no response is required, and respectfully refer to the 2003-2004 CNA Excess Policy for the complete and accurate content thereof.

83.     Deny the allegations set forth in paragraph 83 of CNA's counterclaims, except admit that Pepper Hamilton sent a letter to Westport dated April 27, 2004, and respectfully refer to the referenced letter for the complete and accurate content thereof.

14

## AS AND FOR A FIRST COUNTERCLAIM

### Rescission of the 2001-2002 Continental Express Policy

84.    Repeat and reallege the responses of the preceding paragraphs as if fully set forth herein.

85.    Deny the allegations set forth in paragraph 85 of CNA's counterclaims, and deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation."

86.    Deny the allegations set forth in paragraph 86 of CNA's counterclaims.

87.    Deny the allegations set forth in paragraph 87 of CNA's counterclaims, deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation," and respectfully refer to the referenced application for the complete and accurate content thereof.

88.    Deny the allegations set forth in paragraph 88 of CNA's counterclaims.

89.    State that the allegations set forth in paragraph 89 of CNA's counterclaims are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 89 of CNA's counterclaims.

90.    Deny the allegations set forth in paragraph 90 of CNA's counterclaims.

91.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 91 of CNA's counterclaims.

92.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 92 of CNA's counterclaims.

15

93.     State that the allegations set forth in paragraph 93 of CNA's counterclaims are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny that CNA is entitled to the relief requested.

## AS AND FOR A SECOND COUNTERCLAIM

### Rescission of the 2002-2003 CNA Excess Policy

94.     Repeat and reallege the responses of the preceding paragraphs as if fully set forth herein.

95.     State that the allegations set forth in paragraph 95 of CNA's counterclaims are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 95 of CNA's counterclaims.

96.     Deny the allegations set forth in paragraph 96 of CNA's counterclaims, and respectfully refer to the referenced application for the complete and accurate content thereof.

97.     Deny the allegations set forth in paragraph 97 of CNA's counterclaims, and respectfully refer to the referenced memorandum for the complete and accurate content thereof.

98.     Deny the allegations set forth in paragraph 98 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

99.     Deny the allegations set forth in paragraph 99 of CNA's counterclaims.

100.    State that the allegations set forth in paragraph 100 of CNA's counterclaims are conclusions of law to which no response is required, but in the event

that a response is deemed necessary deny the allegations set forth in paragraph 100 of CNA's counterclaims.

101.    Deny the allegations set forth in paragraph 101 of CNA's counterclaims.

102.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 102 of CNA's counterclaims.

103.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 103 of CNA's counterclaims.

104.    State that the allegations set forth in paragraph 104 of CNA's counterclaims are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny that CNA is entitled to the relief requested.

### AS AND FOR A THIRD COUNTERCLAIM

### Rescission of the 2003-2004 CNA Excess Policy

105.    Repeat and reallege the responses of the preceding paragraphs as if fully set forth herein.

106.    Deny the allegations set forth in paragraph 106 of CNA's counterclaims, and respectfully refer to the referenced documents for the complete and accurate content thereof.

107.    State that the allegations set forth in paragraph 107 of CNA's counterclaims are incomprehensible as written and thus incapable of a response, but in the event that a response is deemed necessary, the Pepper Hamilton Defendants deny the allegations set forth in paragraph 107 of CNA's counterclaims.

108.    State that the allegations set forth in paragraph 108 of CNA's counterclaims are conclusions of law to which no response is required, but in the event

17

that a response is deemed necessary deny the allegations set forth in paragraph 108 of CNA's counterclaims.

109.    Deny the allegations set forth in paragraph 109 of CNA's counterclaims.

110.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 110 of CNA's counterclaims.

111.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 111 of CNA's counterclaims.

112.    State that the allegations set forth in paragraph 112 of CNA's counterclaims are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny that CNA is entitled to the relief requested.

<div align="center">

**AS AND FOR A FOURTH COUNTERCLAIM**
**Declaration of No Coverage for the Underlying Litigation Based Upon Operation of**
**Prior Knowledge Exclusion (B) of the 2003-3004 Policy**

</div>

113.    Repeat and reallege the responses of the preceding paragraphs as if fully set forth herein.

114.    Deny the allegations set forth in paragraph 114 of CNA's counterclaims, and respectfully refer to the 2003-2004 Primary Policy for the complete and accurate content thereof.

115.    Deny the allegations set forth in paragraph 115 of CNA's counterclaims, and respectfully refer to the referenced memorandum for the complete and accurate content thereof.

116.    Deny the allegations set forth in paragraph 116 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

<div align="center">

18

</div>

117. Deny the allegations set forth in paragraph 117 of CNA's counterclaims, and respectfully refer to the referenced document for the complete and accurate content thereof.

118. State that the allegations set forth in paragraph 118 of CNA's counterclaims are conclusions of law to which no response is required, but in the event that a response is deemed necessary deny the allegations set forth in paragraph 118 of CNA's counterclaims.

119. State that the allegations set forth in paragraph 119 of CNA's counterclaims are conclusions of law to which no response is required, and deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation."

120. State that the allegations set forth in paragraph 120 of CNA's counterclaims are conclusions of law to which no response is required, and deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation."

<div align="center">AS AND FOR A FIFTH COUNTERCLAIM</div>

<div align="center">Declaration that Underlying Litigation are "Known Loss" or "Loss in Progress"</div>

121. Repeat and reallege the responses of the preceding paragraphs as if fully set forth herein.

122. State that the allegations set forth in paragraph 122 of CNA's counterclaims are conclusions of law to which no response is required, and deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation."

<div align="center">19</div>

123.    State that the allegations set forth in paragraph 123 of CNA's
counterclaims are conclusions of law to which no response is required, and deny
knowledge or information as to what CNA purports to mean by the term "Underlying
Litigation."

### AS AND FOR A SIXTH COUNTERCLAIM
**Declaration that Certain of the Damages Sought by the Underlying Litigation Do Not
Constitute "Loss" Under the Relevant Policy**

124.    Repeat and reallege the responses of the preceding paragraphs as if fully
set forth herein.

125.    Deny the allegations set forth in paragraph 125 of CNA's counterclaims,
and respectfully refer to the 2003-2004 Primary Policy for the complete and accurate
content thereof.

126.    State that the allegations set forth in paragraph 126 of CNA's
counterclaims are conclusions of law to which no response is required, and deny
knowledge or information as to what CNA purports to mean by the term "Underlying
Litigation."

127.    Deny the allegations set forth in paragraph 127 of CNA's counterclaims,
and respectfully refer to the SFC Complaint for the complete and accurate content
thereof.

128.    State that the allegations set forth in paragraph 128 of CNA's
counterclaims are conclusions of law to which no response is required, but in the event
that a response is deemed necessary deny the allegations set forth in paragraph 128 of
CNA's counterclaims.

129.    Deny the allegations set forth in paragraph 129 of CNA's counterclaims, and respectfully refer to the Royal Complaint for the complete and accurate content thereof.

130.    State that the allegations set forth in paragraph 130 of CNA's counterclaims are conclusions of law to which no response is required.

## AS AND FOR A SEVENTH COUNTERCLAIM
### Declaration that Continental Casualty Owes No Coverage Obligations to Pepper as it Breached Duties Owed to Continental Casualty

131.    Repeat and reallege the responses of the preceding paragraphs as if fully set forth herein.

132.    Deny the allegations set forth in paragraph 132 of CNA's counterclaims, · and respectfully refer to the 2003-2004 CNA Excess Policy for the complete and accurate content thereof.

133.    Deny the allegations set forth in paragraph 133 of CNA's counterclaims, and respectfully refer to the 2003-2004 CNA Excess Policy for the complete and accurate content thereof.

134.    State that the allegations set forth in paragraph 134 of CNA's counterclaims are conclusions of law to which no response is required.

135.    State that the allegations set forth in paragraph 135 of CNA's counterclaims are conclusions of law to which no response is required.

136.    State that the allegations set forth in paragraph 136 of CNA's counterclaims are conclusions of law to which no response is required, and deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation."

21

137.    Deny the allegations set forth in paragraph 137 of CNA's counterclaims, except admit that Pepper Hamilton sent a letter to CNA dated June 28, 2005, and respectfully refer to the referenced letter for the complete and accurate content thereof.

138.    Deny the allegations set forth in paragraph 138 of CNA's counterclaims, and respectfully refer to the referenced letter for the complete and accurate content thereof.

139.    Deny the allegations set forth in paragraph 139 of CNA's counterclaims, except admit that the 2003-2004 CNA Excess Policy has limits excess of the underlying Westport primary policy and the Twin City and Executive Risk excess policies, and respectfully refer to the referenced 2003-2004 CNA Excess Policy for the complete and accurate content thereof.

140.    Deny the allegations set forth in paragraph 140 of CNA's counterclaims, and respectfully refer to the referenced letter for the complete and accurate content thereof.

141.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 141 of CNA's counterclaims.

142.    Admit the allegations set forth in paragraph 142 of CNA's counterclaims.

143.    Deny the allegations set forth in paragraph 143 of CNA's counterclaims, and respectfully refer to the referenced letter for the complete and accurate content thereof.

144.    State that the allegations set forth in paragraph 144 of CNA's counterclaims are conclusions of law to which no response is required, and deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation."

22

145.    State that the allegations set forth in paragraph 145 of CNA's counterclaims are conclusions of law to which no response is required but in the event that a response is deemed necessary deny the allegations set forth in paragraph 145 of CNA's counterclaims.

146.    State that the allegations set forth in paragraph 146 of CNA's counterclaims are conclusions of law to which no response is required, and deny knowledge or information as to what CNA purports to mean by the term "Underlying Litigation."

23

## AFFIRMATIVE DEFENSES TO CNA'S COUNTERCLAIMS

### First Affirmative Defense to CNA's Counterclaims

CNA's counterclaims fail to state a claim upon which relief can be granted.

### Second Affirmative Defense to CNA's Counterclaims

CNA's counterclaims are barred, in whole or in part, by reason of the allegations and claims set forth in the Pepper Hamilton Defendants' Third-Party Complaint, which are incorporated by reference into this Answer as if fully set forth herein.

### Third Affirmative Defense to CNA's Counterclaims

CNA's counterclaims are barred, in whole or in part, by reason of the doctrines of estoppel and unclean hands.

### Fourth Affirmative Defense to CNA's Counterclaims

CNA's counterclaims are barred, in whole or in part, by reason of the doctrine of laches.

### Fifth Affirmative Defense to CNA's Counterclaims

CNA's counterclaims are barred, in whole or in part, by reason of the doctrine of waiver.

### Sixth Affirmative Defense to CNA's Counterclaims

CNA's counterclaims are barred, in whole or in part, because the allegations of the underlying claims against Pepper Hamilton Defendants are within the terms of coverage provided by the policies Pepper Hamilton purchased from CNA and are not excluded therefrom.

DOCSNY-249521v03

### Seventh Affirmative Defense to CNA's Counterclaims

CNA's counterclaims are barred, in whole or in part, because CNA has materially breached its contracts with Pepper Hamilton Defendants.

### Eighth Affirmative Defense to CNA's Counterclaims

CNA's counterclaims are barred because, under the insurance policies at issue, the insurers must await resolution of all fraud allegations in the underlying actions.

### Ninth Affirmative Defense to CNA's Counterclaims

CNA's counterclaims are barred because, under the insurance policies at issue, the insurers will be bound by the resolution of the fraud allegations in the underlying actions as to each named insured.

### Tenth Affirmative Defense to CNA's Counterclaims

The Pepper Hamilton Defendants incorporate by reference, as though fully set forth herein, each and every legal defense asserted in any pleading in this action which is applicable and supportive of the Pepper Hamilton Defendants' defense of CNA's counterclaims.

DOCSNY-249521v03

<u>Eleventh Affirmative Defense to CNA's Counterclaims</u>

The Pepper Hamilton Defendants reserve the right to amend and add

affirmative defenses that become known to them through discovery.

Dated:     New York, New York
           June 11, 2007

                              Respectfully submitted,

                              DICKSTEIN SHAPIRO LLP


                              By: /s/ Edward Tessler
                                  Randy Paar
                                  Edward Tessler
                                  Joan Lewis
                                  1177 Avenue of the Americas
                                  New York, New York 10036
                                  Telephone: (212) 277-6500
                                  Fax: (212) 277-6501
                                  *Attorneys for Pepper Hamilton LLP and*
                                  *W. Roderick Gagné*

26

# EXHIBIT 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------ X

EXECUTIVE RISK INDEMNITY INC.,                  :

                     Plaintiff,                  :

        -against-                  :

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ    :
and WESTPORT INSURANCE CORPORATION,

                          :

            Defendants.                  :

------------------------------------------------------------------ X

PEPPER HAMILTON LLP, and W. RODERICK GAGNÉ,    :

            Third-Party Plaintiffs,                  :

        -against-                  :

CONTINENTAL CASUALTY COMPANY, and    :
TWIN CITY FIRE INSURANCE COMPANY,

            Third-Party Defendants.                  :

------------------------------------------------------------------ X

Index No. 603624/05 E

Part 3

Hon. Karla A. Moskowitz

TP  Index No. 590185/07

**MEMORANDUM OF LAW OF PLAINTIFF EXECUTIVE RISK
INDEMNITY INC. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
AGAINST DEFENDANTS PEPPER HAMILTON LLP AND RODERICK GAGNÉ**

217208GBRIWBP.00002.wpd

## Table of Contents

Page(s)

PRELIMINARY STATEMENT ................................................... 1

The Prior Knowledge Exclusion ........................................ 1
The Claims Against Pepper are Deemed to Have Arisen Prior to ERII's Coverage .... 4

STATEMENT OF FACTS ..................................................... 6

I.      Pepper's Acts on Behalf of SFC ................................ 6
II.     Pepper's Recognition of the Likelihood That it Would be Sued .............. 8
III.    Gagné's Responses to Pepper's Insurance Application Survey
        Acknowledged Pepper's Awareness of POTENTIAL CLAIMS ............. 11
IV.     Pepper's Notice ............................................... 12
V.      Pepper's Insurance Structure .................................. 13
VI.     The Policy Language ........................................... 13

ARGUMENT .............................................................. 15

I.      Coverage is Excluded Because Pepper Was Aware That
        Its Representation of SFC Might Result in a CLAIM Against It ........... 15

        A.    The Hartford Exclusion is Dispositive ......................... 16
        B.    The Westport Exclusion is Dispositive ......................... 16
        C.    The Prior Notice Exclusions are Unambiguous ................... 17
        D.    The Applicable Law .......................................... 18
        E.    Pepper Knew That It Might Be Sued
              Because of Its Representation of SFC .......................... 18

II.     Pepper was Aware of Acts, Errors, or Omissions that a Reasonable Attorney
        Would Have Known Might be the Basis of a Claim Under the Policies ....... 20

III.    Pepper's Coverage Attached, if at All, in a Prior POLICY PERIOD ........ 24

CONCLUSION ............................................................ 25

**Table of Authorities**

**Page(s)**

Cases

*Certain Underwriters at Lloyd's v. Foster Wheeler Corp.,*
    36 A.D.3d 17, 822 N.Y.S.2d 30 (1st Dep't 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Coregis Home Ins. Co. v. Baratta & Fenerty, Ltd.,*
    264 F.3d 302 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 22

*Coregis Ins. Co. v. Lewis Johs, Avallone, Aviles and Kaufman, LLP,*
    No. 01 CV 3844(SJ), 2006 WL 2135782 (E.D.N.Y. July 28, 2006) . . . . . . . . . . . . 19, 20

*Coregis Ins. Co. v. McCollum,*
    No. 96-1068-CIV-T-17B, 1997 WL 128132 (M.D. Fla. Mar. 6, 1997) . . . . . . . . . . . . . 23

*Coregis Ins. Co. v. Wheeler,*
    24 F. Supp.2d 475 (E.D. Pa. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Ehrgood v. Coregis Ins. Co.,*
    59 F. Supp. 2d 438 (M.D. Pa. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co.,*
    316 F.3d 431 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Helberg v. Nat'l Union Fire Ins. Co.,*
    657 N.E.2d 832 (Ohio Ct. App. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Liberty Surplus Ins. Corp., Inc. v. Nowell Amoroso, P.A.,*
    916 A.2d 440 (N.J. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mirarchi v. Westport Ins. Corp.,*
    No. CIV.A. 99-4331, 2003 WL 1918975 (E.D. Pa. Apr. 21, 2003) . . . . . . . . . . . . 17, 22

*Mt. Airy Ins. Co. v. Klatsky & Klatsky,*
    No. CIV. 96-1231(GEB), 1997 WL 235131 (D.N.J. Jan. 28, 1997) . . . . . . . . . . . . . . . 23

*Selko v. Home Ins. Co.,*
    139 F.3d 146 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Page(s)**

Cases (cont.)

*Westport Ins. Corp. v. Mirsky,*
        No. CIV.A 00-4367, 2002 WL 31018554 (E.D. Pa. Sept. 10, 2002),
        *aff'd*, 84 Fed. Appx. 199 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

## PRELIMINARY STATEMENT

Plaintiff Executive Risk Indemnity Inc. ("ERII") has filed an action against defendants Pepper Hamilton LLP ("Pepper") and Roderick Gagné ("Gagné"), a Pepper partner, seeking a declaration that there is no coverage for two lawsuits (the "Underlying Actions" defined *infra* at 12) against those defendants under a professional liability excess insurance policy. The Underlying Actions seek to recover from those defendants hundreds of millions of dollars in damages arising from Pepper's representation of a former client who is alleged to have perpetrated a massive securities fraud. The combination of clear policy language and admissions that members of Pepper made in deposition testimony, firm memoranda, and elsewhere establish that the Underlying Actions are excluded from coverage under ERII's policy, and that ERII is entitled to summary judgment, because defendants were aware of the possibility of such claims before any ERII policy took effect, and, separately, because such awareness triggers a POLICY PERIOD before the inception of any ERII coverage.[1]

### The Prior Knowledge Exclusion

ERII's excess policy incorporates an exclusion from the primary policy issued by defendant Westport Insurance Corporation ("Westport") and a similar exclusion from the policy of the underlying excess insurer (Twin City Fire Insurance Company (hereafter "Hartford")). The Westport policy exclusion precludes coverage for "any CLAIM arising out of any act, error, omission, or PERSONAL INJURY occurring prior to the effective date of this POLICY if the INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission, or PERSONAL INJURY <u>might</u> be expected to be the basis of a CLAIM." (Emphasis added.) Here, the court need not assess whether Pepper <u>could</u> have foreseen that its acts "might be . . . the basis of a CLAIM" because its documents and Gagné's testimony establish that the defendants <u>did</u> foresee a CLAIM. In a series of memoranda that Gagné wrote between April and August 2002 -- months before the inception of ERII coverage -- he explicitly "recognize[d] the possibility that the firm will be sued"

---

[1] The words in capital are terms that are defined by the Westport policy.

because of its long term representation of Student Finance Corporation ("SFC") and its preparation of offering statements and agreements that SFC utilized to perpetrate a massive fraud upon investors, underwriters, and an insurance company that guaranteed its offerings. Gagné also made sure that Pepper's management was well aware of his concern that the firm "might be" sued.

SFC packaged and sold loans made to individuals attending trade schools, particularly trucking schools. These loans were bundled by SFC into certificates or securities, backed by projected payments from the borrowers, that SFC sold to investors. In a series of offering memoranda that Pepper drafted, SFC misrepresented material facts, including the default rates on the securitized loans. In order to conceal that a portion of the loans being securitized were in default, SFC created an illusion that students who had defaulted were still paying their loans. SFC did this by making past due payments, including using its own funds until they were inevitably exhausted, so that these loans would not be posted in the default column. The loan performance data that Pepper incorporated in the private placement memoranda, thus, gave a materially false picture of performance of the loan portfolios.

After SFC's scheme was exposed in March 2002, Gagné, Pepper's relationship partner for SFC, recognized that Pepper might be sued because of its involvement -- innocent or otherwise -- in SFC's alleged fraud. Gagné informed Pepper's management of his concerns on April 18, 2002:[2]

> I think we also need to recognize the possibility that the firm will be sued, as a deep pocket associated with SFC and these [fraudulent] transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility.

(Rule 19 Statement ("R19S") ¶ 38; Ex. 35.) When asked about this during his deposition, Gagné candidly replied: "we were a deep pocket, and there was a large loss, and my experience is, usually, anybody related to the transaction is getting sued." (R19S ¶ 39; Ex. 15 at 303-04.) Anticipating such litigation, Gagné had begun formulating Pepper's litigation strategy the prior day when he

---

[2] Gagné's memorandum was sent to Pepper's General Counsel, the chairs of the Finance and Ethics Committees and the Chief Administrative Officer. (R19S ¶ 38; Ex. 35.)

wrote: "our first line of defense as well as Student Finance Corporation's is that there was no fraud. . . ." (R19S ¶ 37; Ex. 34.) Beyond that, Gagné wrote that the representation put him in the position of "questioning what we can reveal to . . . investors and continually drawing a fine ethical line." (R19S ¶ 38; Ex. 35.)

Gagné also noted in an April 17, 2002 memo that "Royal Indemnity Company, another client of the firm, could be significantly damaged by the losses which have been estimated at between $150 Million and $200 Million Dollars." Royal had provided credit risk insurance for SFC, which now required Royal to pay hundreds of millions of dollars. (R19S ¶¶ 37, 43; Exs. 34 and 55.)

These memoranda establish that Pepper anticipated a CLAIM and was planning its defense more than six months before the inception of the first ERII policy.

The following month, Gagné prepared another memorandum addressed to Pepper's general counsel "to assist him in assessing any potential claims" brought against the firm. (R19S ¶ 42; Ex. 41 and Ex. 15 at 1335.) In a May 15, 2002 memo -- written more than five months before the inception of ERII's policy -- Gagné catalogued some of the conduct that led Pepper to resign as SFC's counsel the prior month. He noted, *inter alia*, that Pepper withdrew from representing SFC because (1) SFC executives had made material misrepresentations of fact to investors in Gagné's presence; (2) there had been a widespread use of so-called "forbearance payments" to conceal defaults under the loans; and (3) including these payments in the loan performance data presented in SFC's offering statements was misleading to investors and rating agencies because that made the loan pools appear to perform better than they in fact did. He also acknowledged that Pepper had worked on agreements that facilitated the fraudulent conduct. (R19S ¶ 42; Ex. 41.) That work, he later grudgingly admitted, was a necessary first step in enabling SFC's fraud scheme. (R19S ¶ 33; Ex. 15 at 497-99.)

On August 6, 2002, Gagné responded to a survey sent to all Pepper lawyers in connection with Pepper's insurance application, asking whether anyone was aware of "any fact or circumstance,

3

act, error, omission or personal injury which might be expected to be the basis of the *[sic]* claim or
suit for lawyers professional liability." Gagné responded that he was in fact aware of such matters:

> two matters of which I am aware are the Student Finance Corporation
> transactions of which you are familiar and [an unrelated Royal
> matter]. . . . With regard to the Student Finance Corporation action,
> two law suits have been filed in two different states and, to date, we
> have not been named in either action. <u>I am not certain as to whether
> we will be joined in the future.</u> (Emphasis added.)

Disregarding what Gagné knew and reported, Pepper responded with a simple "no" when asked on
the application whether Pepper had knowledge of any "fact or circumstance, act, error, [or]
omission" that might be the basis of a potential claim. The following year, when Pepper sought to
renew its coverage with ERII, Gagné made the same disclosure, and Pepper again concealed his
response from ERII. (R19S ¶¶ 47-52; Exs. 42-46.)

In short, Pepper's lead attorney in the SFC representation advised the firm's managing
partners of the "need to recognize the possibility that this firm will be sued," testified in his
deposition that he knew "anybody related to the transaction is getting sued," and wrote to the partner
who prepared and executed Pepper's insurance application that he was "aware" that the Student
Finance Corporation's transactions "might be the basis of [a] claim or suit for lawyers professional
liability." Gagné's knowledge is imputed to Pepper as a matter of partnership law. Here, however,
Gagné's knowledge need not be imputed by operation of law. Gagné made sure -- prior to the first
application that Pepper submitted to ERII and the first effective date of any ERII policy -- that his
firm's management knew what he knew, and was prepared for the litigation he anticipated. Nothing
more need be shown to invoke the prior knowledge exclusions incorporated in ERII's policies.

<u>The Claims Against Pepper are Deemed to Have Arisen Prior to ERII's Coverage</u>

ERII has no obligation to provide coverage for any CLAIMS for the Underlying Actions for
the additional reason that provisions in the underlying policies (which ERII's policy incorporates)
require such CLAIMS to be treated as if they had arisen no later than Gagné's April 2002 warning
that the firm should brace for litigation. The Westport policy, Insuring Agreement I. C provides:

4

If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the POLICY PERIOD of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

The Westport policy further provides that "POTENTIAL CLAIM" means:

1.    any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or

2.    any breach of duty to a client or third party which has not resulted in a CLAIM against any INSURED

There is no dispute that when Pepper gave written notice of its CLAIMS during April 2004, Westport had insured Pepper "continuously and without interruption" since April 27, 2001. There is no dispute that Pepper and Gagné "first became aware" of the full magnitude of SFC's fraud no later than March 12, 2002, a fact that they concede, and that on April 18, 2002, Gagné warned Pepper's management that the firm might be sued. Of course, defendants already were aware of their own conduct, benign or not, that contributed to SFC's fraud. As such, there can be no dispute that Pepper and Gagné were aware of a POTENTIAL CLAIM involving SFC <u>prior</u> to the October 27, 2002 effective date of ERII's initial policy. Hence, there is no coverage under any ERII policy because the CLAIMS at issue are deemed to have arisen before ERII provided any coverage.

Thus, ERII is entitled to a declaration that coverage under the ERII policy is not available for any LOSS incurred by Pepper or Gagné in connection with the Underlying Actions because (a) coverage for such actions is barred by the prior knowledge exclusions; and (b) the pertinent CLAIMS against Pepper fall into a POLICY PERIOD prior to the inception of ERII's excess policy.

5

## STATEMENT OF FACTS

I.    Pepper's Acts on Behalf of SFC

Pepper is a law firm with offices in Pennsylvania and New York, among other states. Gagné became a member of the firm, resident in its Philadelphia office, in 1996, when he joined it upon leaving a prior law firm. He brought with him as clients SFC and its principal, Andrew Yao. They had been Gagné's clients since approximately 1985, and that relationship was economically rewarding for him professionally and personally. From December 1996 through April 2002, Pepper billed SFC approximately $3.2 million for its services. In addition, members of Gagné's family and trusts from which he benefitted loaned substantial sums to SFC to support its liquidity needs. In turn, SFC paid interest up to 12% on these loans. Pepper contends that it obtained appropriate conflict waivers for the dealings between SFC and Gagné's family. (R19S ¶¶ 2-3, 18-19.)

SFC originated and acquired non-guaranteed student loans and tuition installment agreements, primarily from trucking schools. It then pooled those loans into certificates or securities that were sold using private placement memoranda that Pepper prepared. (R19S ¶¶ 35.) Given the nature of the risk inherent in providing tuition financing for trade schools, SFC obtained credit risk insurance from Royal, another Pepper client. Royal insured payment to those who purchased the certificates. Pepper also represented Royal on unrelated matters. Pepper and Gagné also contend they have appropriate conflict waivers from Royal and SFC. (R19S ¶¶ 22.)

Gagné and other Pepper attorneys drafted private placement memoranda for distribution to potential SFC investors. These memoranda reported data, among other things, regarding the performance of the loans in the pools, including payment delinquency rates, and further represented that "none of the student loans are . . . Defaulted Student Loans." (R19S ¶ 21; Exs. 18-25.)

From April 2000 to November 2001, Pepper drafted eight (8) private placement memoranda for a series of SFC certificates that were backed by over $465 million in student loan proceeds and Royal's insurance coverage. Pepper concedes that it included false and misleading data in these memoranda concerning student loan default rates and other loan performance data. Beginning at

least by 1999, the loan delinquency rates began to increase sharply, increasing substantially the risk to investors and Royal and, concomitantly, reducing their value. To mask this, SFC began making payments from so-called "forbearance accounts" and from its funds to conceal the fact that loans in the pools were more than 90 days overdue, and were thus in default. In 1999, these payments totaled more than $2 million. The following year, they had increased to more than $9.5 million. By April 2002, the forbearance payments had increased to approximately $45 million. (R19S ¶¶ 21-26.)

The performance data for the student loans, including the representation that no loans were in default, were clearly material to investors, underwriters and credit risk insurers because SFC's certificates were backed by the principal and interest payments generated by those loans. There is no dispute that loan performance data, including the default rates in the private placement memoranda that Pepper prepared, were materially understated. Further, there is no dispute that Pepper did not disclose these forbearance payments in any private placement memoranda that it prepared, or in any related opinion letter that it prepared and issued. (R19S ¶¶ 21-27.)

By early 2000, Gagné became aware that SFC wanted to sharply increase "forbearance" payments and that doing so would render the performance data in the private placement memoranda materially misleading. Gagné advised Yao on March 2, 2000 that such payments could make it look "like SFC is manipulating the pool performance" data. Gagné and Pepper nevertheless revised SFC's school and student loan agreements to facilitate SFC's ability to make "forbearance" payments, an act which Gagné later grudgingly admitted was a necessary first step in SFC's fraud scheme. (R19S ¶¶ 28-33.) Pepper and Gagné thus simultaneously: (a) prepared offering statements containing misleading default data; and (b) created the mechanism that enabled SFC to skew the data and mislead its investors, underwriters and credit risk insurers.

Starting in March 2000, Pepper's Wilmington office added a "forbearance" clause to the basic student loan contracts so that SFC could make loan payments on behalf of the students. (R19S ¶ 31; Ex. 29.) Beginning in late summer or early fall of 2000 and into 2001, Gagné and other Pepper attorneys reviewed and commented on a new forbearance clause that had been drafted by another

7

law firm. (R19S ¶ 30.) Gagné also drafted new language for the forbearance payment provisions. (R19S ¶ 30.) In a March 2, 2001 email to one of his partners who was working on this project, Gagné explained the purpose of the forbearance payments by stating that "[e]ssentially, it is a way of evening out default issues and keeps the Loans more current." (R19S ¶ 32; Ex. 31.) Thus, Pepper engaged in a series of acts that facilitated SFC's deception.

By March 2002, Gagné also was plainly aware of SFC's liquidity problems. His family had long provided SFC bridge loans, and SFC again borrowed a significant amount -- $3 million -- from Gagné's family. Also in March 2002, new financing fell through because a lender from which SFC was seeking financing discovered that the loan performance data was false, and that SFC was using its own money to mask the loan pools' true default rate. (R19S ¶¶ 34-35.) Among other things, this meant that SFC could not pay Pepper's bills.[3] This led Gagné to tell Pepper's management about the impending debacle and that Pepper might be sued because of its entanglement in SFC's fraud.

## II.    Pepper's Recognition of the Likelihood That it Would be Sued

After the scheme collapsed, Gagné wrote a series of memoranda describing what happened, Pepper's involvement in the fraud, and litigation he saw looming. On April 17, 2002, he wrote:

- [SFC] was taking monies to prop up these loans so that they would not go into default causing the default statistics on the loans and the static pools to be false.

- The magnitude of the fraud is also very disconcerting in that Royal Indemnity Company, another client of the firm, could be significantly damaged by the losses which have been estimated at between $150 Million and $200 Million Dollars.

- [If Pepper withdraws as SFC's counsel, that] will raise the specter with the capital markets that Student Finance Corporation has done something heinous and will impair SFC's ability to bring itself out of its liquidity crises. If they cannot, it will imperil the company and we may be subject to suit. (Emphasis added.) (Ex. 34.)

---

[3] Even when Gagné was fully aware of SFC's fraud and had so informed his partners in writings, Gagné questioned whether Pepper should discontinue its work for SFC because doing so "will put at substantial risk our fees." (R19S ¶ 38; Ex. 35.)

One day later, Gagné wrote his April 18, 2002 memorandum to James Murray, Pepper's Executive Partner, Laurence Shiekman, a member of Pepper's Finance Committee and Executive Committee, John Pooler, Pepper's Chief Administrative Officer, and Alfred Wilcox, Pepper's General Counsel, member of the firm's Insurance Committee and Professional Responsibility Committee and lead partner for insurance matters, Ex. 35, reporting the following:

- I think we also need to recognize the possibility that this firm will be sued, as a deep pocket associated with SFC and these [fraudulent] transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility. (Emphasis added.)

- [SFC] was using its own funds to make payments on the student loans so that the student loans would not appear to be in default (90 days delinquent).

- We believe that officers of SFC lied to investors and were complicit in misrepresenting this situation to investors, financial insurers and other parties. We know that the performance data distributed by SFC [and used in the placement memoranda that Pepper prepared] did not identify payments made by SFC out of this so-called forbearance account, but rather reported them as if they were collections received from the students. We also know that Royal was not aware of this situation, and now faces significant losses as a result of these loans becoming defaulted, triggering claims under the policies they issued.

- [T]o my knowledge, no one at SFC ever fully disclosed the use of the forbearance accounts, and, as described above, in my presence, in response to direct questions, the correct reason for the unusual [default] performance data was not given.

- In addition, it came to my attention on Thursday or Friday of last week that SFC destroyed its Executive Committee minutes. As a result, continued representation of the Company by its current auditors is in question.

On April 24, 2002, Pepper formally terminated its representation of SFC. (R19S ¶ 41.)

Gagné further described what had happened in a May 15, 2002 memorandum that he drafted "to set forth in writing my recollection of events pertaining to the representation of Student Finance Corporation" and to "assist [Pepper's General Counsel] in assessing any potential claims" that might be filed against Pepper. (Emphasis added.) (R19S ¶ 42; Ex. 41 and Ex. 15 at 1335.) He wrote:

9

- SFC was . . . applying reserves from the schools to make the delinquent student payments so that the loans never went into default. Gary Hawthorne and Perry Turnbull implemented this policy and therefore knew of this misrepresentation.

- [During Spring 2001] I [twice] personally witnessed Gary Hawthorne and Perry Turnbull [SFC officers] make statements to investors, underwriters and the Royal Indemnity Company which later proved to be false [regarding the default rate].[4]

- [During Fall 2000,] I also felt that the institution of the forbearance accounts to make the monthly payments would be misleading to investors and rating agencies since the payments potentially skewed all of the statistical data . . . [and] make the loans to perform better than they in fact did.[5]

- Forbearance payments were made on behalf of any delinquent student and were automatically pulled from the forbearance accounts. This widespread use of the forbearance payments completely eliminated defaults under the loans until such time as SFC funding ceased. . . . SEC also included forbearance payments in its static pools data which it distributed to the rating agencies, Royal, MBIA and others. The static pool data was manipulated to lessen the number of defaults.

- [SFC] sometime in 2001 requested that the student [and school] loan agreements. . . be revised to reflect the forbearance accounts. I personally was not aware of this change until after the Wilmington office made the changes. We again stated that we thought that this was a bad program. These agreements were given to prospective investors. When we inquired as to the use of the forbearance accounts, [SFC] informed us that forbearance payments were only made on behalf of students in very limited instances as set forth in the SFC policy manuals which were distributed to investors. In fact, this was not true which we discovered on March 12, 2002.

While peppered with self-serving statements and statements contradicted by his words elsewhere, Gagné admitted that he knew in 2000 that SFC wanted to increase its use of forbearance payments; this would have the effect of misleading investors, underwriters and insurers regarding

---

[4] Hawthorne and Turnbull "were directly asked why almost 60% of the portfolio of student loans were 60 days delinquent but never went into default." Gagné says that he did not realize that the response was a lie until he learned about SFC's massive use of forbearance payments. However, his denials are not credible in light of his knowledge of SFC's intention to ramp up those payments, Pepper's work in facilitating that objective, and his March 2001 admission that these payments were "a way of evening out default issues and keep[ing] the loans more current." However, the Court need not decide whether Gagné knew of the fraud in 2001. He admits that by March 2002, he knew, and, thus, that he also knew by then that the placement memos contained false data regarding loan pool performance.

[5] However, Gagné admits that the following year Pepper modified the loan agreements, which permitted the very manipulation that he believed would provide "misleading" information regarding the default rate "to investors and rating agencies" and, *a fortiori*, to Royal, the Pepper client insuring the credit risk for the certificates.

10



the default rate; Pepper continued work on new offerings despite a series of red flags; and he was fully aware of SFC's fraud by March 2002.

Soon after Gagné wrote that memoranda, litigation began to erupt. Four trucking schools filed involuntary bankruptcy petitions against SFC in June 2002. In July 2002, Royal was sued to recover for the benefit of the investors at least $400 million under the credit risk policies Royal had issued. (R19S ¶ 43.) Each of these developments substantially escalated the litigation threat that Pepper faced because of its work for SFC about which Gagné had been warning his firm.

III.    Gagné's Responses to Pepper's Insurance Application Survey
        Acknowledged Pepper's Awareness of POTENTIAL CLAIMS

Prior to the inception of ERII's initial POLICY PERIOD, and as a prerequisite to obtaining coverage, Pepper asked all of the firm's lawyers to respond to the question:

> 2. Are you aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of the claim or suit for lawyers professional liability?

Gagné responded in the affirmative on August 6, 2002, saying that he was in fact aware of two such matters: "The Student Finance Corporation transactions of which you are familiar and [an unrelated] Royal Indemnity Company representation." Gagné further stated:

> With regard to the Student Finance Corporation action, two law suits have been filed in two different states and to date, we have not been named in either action. I am not certain as to whether we will be joined in the future. (Emphasis added.) (Ex. 42.)

After surveying the firm, and obtaining an affirmative answer from Gagné, Pepper proceeded to give the opposite answer on its insurance application, checking "no" after the question:

> After inquiry of each lawyer, is the Applicant, . . . or any lawyer proposed for this insurance aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability? (Ex. 43.)

Pepper provided this misrepresentation on Westport's application form. Thereafter, on October 25, 2002, Pepper partner Barry Abelson, as agent for the firm, advised ERII in writing that

11

all declarations, representations and warranties made to Westport on September 6, 2002 were deemed made to ERII. Abelson also represented that he had polled all lawyers in the firm and that there were no claims or potential claims, other than those revealed in the Westport application. (R19S ¶ 49.) In reliance upon these representations, ERII issued the 2002-2003 ERII Policy.

The same sequence took place one year later, when Pepper applied for renewal policies. As part of the renewal process, Pepper again surveyed all its lawyers regarding their knowledge of any claim or any act, error, omission or circumstance that might result in a claim. On September 4, 2003, in response to that survey, Gagné again identified the SFC matter as one involving acts, errors and omissions that might result in a claim. Pepper, once again, concealed that information from ERII during the renewal application process. (R19S ¶ 50-52.)

IV.    Pepper's Notice

On April 22 and 27, 2004, during the 2003-2004 POLICY PERIOD (defined below), Pepper provided Westport with written notice of a POTENTIAL CLAIM by the SFC bankruptcy trustee after the trustee requested Pepper to enter into a tolling agreement. On November 1, 2004, the bankruptcy trustee filed suit in Delaware Bankruptcy Court in an action styled *Charles A. Stanziale, Jr., as Chapter 7 Trustee of Student Finance Corporation v. Pepper Hamilton LLP, et al.* against Pepper and Gagné, alleging that Pepper and Gagné were liable to SFC's creditors for breaching their fiduciary duty and for professional malpractice (the "*Stanziale* litigation"). On March 15, 2005, Royal filed suit in federal district court in Delaware in an action styled *Royal Indemnity Company v. Pepper Hamilton LLP, et al.* against Pepper and Gagné. Royal seeks to recover from Pepper and Gagné the hundreds of millions of dollars that Royal was required to pay under its credit risk insurance policies. Royal claims that, but for Pepper and Gagné's fraudulent conduct, the credit policies would never have been issued for SFC's benefit (the "*Royal* litigation") (the *Stanziale* litigation and *Royal* litigation are collectively referred to as the "Underlying Actions"). (R19S ¶¶ 44-46; Exs. 47, 48, 52, 55.)

These were the actions that Gagné had long anticipated because of Pepper's representation of SFC and described in warnings to his firm.

## V.    Pepper's Insurance Structure

Pepper had professional liability insurance with total limits of at least $40 million for each POLICY PERIOD from April 27, 2001 through October 27, 2004 with participating insurers as follows (R19S ¶¶ 5-10):

| 2001-2002 **Policy Period 1** | 2002-2003 **Policy Period 2** | 2003-2004 **Policy Period 3** |
|---|---|---|
| Westport -- $20MM | Westport -- $10MM | Westport -- $10MM |
| CNA -- $20MM | Hartford -- $10MM | Hartford -- $10MM |
| | ERII -- $10MM | ERII -- $10MM |
| | CNA -- $10MM | CNA -- $10MM |

## VI.    The Policy Language

ERII's policies for each of its two policy years follow the form of the underlying policies, *i.e.*, they provide that ERII's coverage "shall apply in conformance with the terms, conditions and endorsements of the policy immediately underlying this policy. . . ." The immediately underlying Hartford policy states:

> The insurance afforded by this policy follows the Insuring agreement(s) in the Underlying Insurance and is subject to the same warranties, conditions, exclusions, terms, and definitions except as to premium, the limits of liability, renewal, the duty to defend, or as may otherwise be changed by this policy.

Thus, ERII's policy incorporates the exclusions and limitations of both underlying policies.

The "immediately underlying" Hartford policy contains a "retroactive limitation clause" which states that:

> This policy does not apply to any claim: . . .
>
> 2. arising out of any act, error, or omission committed prior to the inception date of this policy which the Insured knew or should have

13

known could result in a claim, but failed to disclose to the Company at Inception. (Emphasis added.)

Westport's 2003-2004 policy (the POLICY PERIOD in which Pepper provided and Westport acknowledged notice of a POTENTIAL CLAIM) similarly states that coverage "shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from":

> Any CLAIM arising out of any act, error, omission or PERSONAL INJURY occurring prior to the effective date of this Policy if, a) . . . b) the INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission or PERSONAL INJURY at the effective date might be expected to be the basis of a CLAIM; provided however, that subsection b) does not apply to any INSURED who had no knowledge of or could not have reasonably foreseen that any such act, error, omission or PERSONAL INJURY might be expected to be the basis of a CLAIM. (Emphasis added.)

Westport's policy further states, in INSURING AGREEMENT I C, that:

> If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the POLICY PERIOD of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

The Westport policy defines a CLAIM as:

> ... a demand made upon any INSURED for LOSS, as defined in each of the attached COVERAGE UNITS, including, but not limited to, service of suit or institution of arbitration proceedings or administrative proceedings against any INSURED.

A POTENTIAL CLAIM is defined as:

> 1.      any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or

14

2.    any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED.

When the undisputed facts are applied to these key policy provisions, ERII's entitlement to summary judgment is firmly established.

## ARGUMENT

### I.

### Coverage is Excluded Because Pepper Was Aware That Its Representation of SFC Might Result in a CLAIM Against It

The written admissions and sworn testimony of Pepper lawyers firmly establish that prior to (a) the October 27, 2002 inception of ERII's initial coverage and (b) the October 27, 2003 inception of ERII's renewal coverage, Pepper and Gagné (in the language of Westport's exclusion) "knew or could have reasonably foreseen" that their activity on behalf of SFC "might be the basis of a claim" against them. They also establish (in the language of Hartford's exclusion) that Pepper and Gagné "knew or should have known" that Pepper's work for SFC "could result in a claim, but failed to disclose it to the Company at inception."

Gagné admits that, during Spring 2002, he was "concerned that we were a deep pocket, and there was a large loss, and my experience is, usually, anybody related to the transaction is getting sued." (Ex. 15 at 303-04 (emphasis added).) He warned his partners prior to ERII's initial POLICY PERIOD that Pepper might be sued because of its work for SFC, including explicitly warning in his April 18, 2002 memo that "we . . . need to recognize the possibility that this firm will be sued" and in his August 6, 2002 memo that "the Student Finance Corporation's transactions" involved acts (if not errors or omissions) that "might be expected to be the basis [for a] claim." Gagné made clear that Pepper remained under threat of litigation in September 2003, when he again responded "yes" on the firm's annual insurance survey, and again identified the SFC matter as a POTENTIAL CLAIM against his firm. The prior knowledge exclusions, therefore, preclude coverage under ERII's 2003-2004 Policy (or its prior policy) for the Underlying Actions.

15

### A.    The Hartford Exclusion is Dispositive

The Hartford exclusion bars coverage for "any claim . . . arising out of any act, error or omission . . . which the Insured knew or should have known could result in a claim, but failed to disclose to the Company at inception." The irrefutable evidence in this case presents a clear and egregious decision to withhold knowledge of POTENTIAL CLAIMS in an insurance application. The contrast between Gagné's memos and what was concealed on Pepper's insurance applications that were provided to ERII precludes coverage.

Not once, but twice, Gagné cited potential litigation because of the firm's representation of SFC in response to requests for information that Pepper was obligated to disclose on its insurance applications. Not once, but twice, Pepper concealed Gagné's red flag warnings, and did not provide truthful information when it reported that no "lawyer proposed for this insurance" is aware of anything "which might be expected to be the basis of a claim."

Under the explicit terms of the Hartford Policy, which ERII's policy incorporates by reference, such concealment automatically precludes coverage for any SFC-related CLAIM.

### B.    The Westport Exclusion is Dispositive

Equally impossible is for Pepper to avoid Westport's exclusion of coverage for any "CLAIM arising out of any act, error [or] omission" that the INSURED "knew or could have reasonably foreseen that such act, error [or] omission . . . might be expected to be the basis of a CLAIM."

The Court need look no further than Gagné's memoranda and testimony to find as a matter of law that he, and his firm, "knew" that the SFC matter "might" -- and almost certainly would -- be "the basis of a CLAIM." Even in the absence of these explicit memoranda setting forth what Gagné knew, and what he made sure that his firm knew, the result would be the same. For the depth of Pepper's involvement in SFC's offerings, the fraudulent nature of those offerings, and the magnitude of the hundreds of millions of dollars in losses that were suffered by another Pepper client and investors, was enough to make the likelihood of CLAIMS against Pepper distinctively obvious.

C.    **The Prior Notice Exclusions are Unambiguous**

Exclusions with the same core wording as the Westport and Hartford exclusions have consistently been held unambiguous under Pennsylvania law.[6] *See, e.g., Mirarchi v. Westport Ins. Corp.*, No. CIV.A. 99-4331, 2003 WL 1918975, at *3 (E.D. Pa. Apr. 21, 2003) (finding similar language "clear and unambiguous"); *Coregis Ins. Co. v. Wheeler*, 24 F. Supp. 2d 475, 480 (E.D. Pa. 1998) (finding similar language "clear and unambiguous").

A clear and fundamental element of these exclusions is that they do not require knowledge or even concern for the possibility of an "error or omission" attributable to an INSURED. By including any "act," the exclusions are expanded to include other indicia of POTENTIAL CLAIMS beyond any actual or imputed awareness of an "error or omission" that might result in a CLAIM. Indeed, such indicia need not include any wrongdoing by the INSURED. Coverage for such "acts," even benign "acts" that may result in a CLAIM, of course, is consistent with the insurer's duty to provide coverage benefits, such as defense costs, even if it is objectively impossible for an INSURED'S alleged act, error or omission to support the asserted claim. *See, e.g., Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 446 (3d Cir. 2003) ("allegations, *even if meritless*, trigger the insurer's duty to defend if they constitute claims relating to a risk against which the policy insures").

Pepper, of course, was aware of its own "acts" in representing SFC, and that those acts -- culpable or not -- entangled Pepper in SFC's fraud. Thus, Gagné perfectly described his awareness of "acts" which could result in a CLAIM against Pepper when he testified (Ex. 15 at 303-04):

> "I was . . . not worried about anything that we did [in representing SFC or] our legal advice . . . . I was only concerned that we were a deep pocket, and there was a large loss, and my experience with large losses, is, usually, anybody related to the transaction is getting sued."

---

[6] Pennsylvania law applies here because Pepper and its broker are based in Philadelphia, and, thus, ERII Policies were produced there. (R19S ¶¶ 2, 11.) *Certain Underwriters at Lloyd's v. Foster Wheeler Corp.*, 36 A.D.3d 17, 23, 822 N.Y.S.2d 30, 34 (1st Dep't 2006) ("law of the insured's domicile [applied] to liability insurance policies covering multi-state risks").

### D.    The Applicable Law

In the absence of state appellate court authority, *Selko v. Home Ins. Co.*, 139 F.3d 146 (3d Cir. 1998), is recognized as setting the general framework for interpreting a prior knowledge exclusion under Pennsylvania law. *Selko* addressed an exclusion for "act[s], error[s], or omission[s] happening prior to the effective date of the policy" and which -- unlike the exclusions here -- also required that those acts, errors, or omissions gave the INSURED a "basis to believe that the INSURED had breached a professional duty." *Id.* at 149. The Third Circuit analyzed the exclusion under a two-part test, asking if: (a) an insured knew of certain facts (a subjective inquiry), and (b) if a reasonable lawyer in possession of such facts would have a basis to believe the insured breached a professional duty (an objective inquiry). *Id.* at 152.

This subjective/objective test was later employed by the Third Circuit in analyzing an exclusion that, similar to the applicable provision in the instant action, excludes "any CLAIM arising out of any act, error, omission . . . if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission . . . might be expected to be the basis of a CLAIM." *Coregis Home Ins. Co. v. Baratta & Fenerty, Ltd.* ("*Baratta*"), 264 F.3d 302, 304 (3d Cir. 2001). *Baratta* used the same rubric as *Selko*, but, in light of the differences in policy language, asked whether an attorney (a) knew of certain facts, that (b) could have led a reasonable attorney to foresee that those facts could be the basis for a claim. *Id.* at 306. That same analysis applies here.

### E.    Pepper Knew That It Might Be Sued Because of Its Representation of SFC

Gagné's actual knowledge, communicated and imputed to Pepper, that Pepper might be sued because of its representation of SFC is fatal to Pepper's claim for coverage. Gagné's awareness of Pepper's involvement with SFC and its client's fraud led him to believe that the firm was at risk of being sued, and he explicitly told his partners in his April 18, 2002 memo: "I think we also need to recognize the possibility that the firm will be sued, as a deep pocket associated with SFC and these [fraudulent] transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility." He further said in an earlier draft of that memo: "our

18

first line of defense as well as Student Finance Corporation's is that there was no fraud. . . ." Gagné prepared his May 15 memorandum "to assist [Wilcox] in assessing any potential claims" that might be filed against Pepper. (Both emphasis added.) He repeated his warning on August 6, 2002, when he responded that he was "aware . . . [of a] fact or circumstance, act, error, omission . . . which might be expected to be the basis of a claim or suit for lawyers professional liability," and identified the SFC matter. And he repeated this again a year later on September 4, 2003, when he responded to the survey that Pepper conducted to prepare its application to renew its insurance coverage. Thus, Pepper and Gagné cannot dispute that prior to the inception of ERII's coverage, they knew that Pepper might be sued because of its representation of SFC. That knowledge came from Gagné's own assessment of the firm's predicament.

Having established defendants' awareness that its work on SFC's fraudulent security transactions exposed it to litigation, any subjective belief they may have, or the merits of such a claim, is irrelevant. *Baratta*, 264 F.3d at 307 ("He cannot assume that the claim will not be brought because he *subjectively* believes it is time barred or lacks merit."); *Westport Ins. Corp. v. Mirsky*, No. CIV.A 00-4367, 2002 WL 31018554, at *12 (E.D. Pa. Sept. 10, 2002) (*quoting Baratta*), *aff'd*, 84 Fed. Appx. 199 (3d Cir. 2003). Rather, the relevant inquiry is whether a reasonable attorney could have foreseen the circumstances leading to a claim under the policy.

Little needs to be said in this regard because Gagné and Pepper expressly realized that "anybody related to the transaction is getting sued." Having reached this conclusion regarding the exposure from their own conduct, and then having failed to disclose it, they cannot now disavow what they knew and previously said. In *Coregis Ins. Co. v. Lewis Johs, Avallone, Aviles and Kaufman, LLP*, No. 01 CV 3844(SJ), 2006 WL 2135782, at *11 (E.D.N.Y. July 28, 2006), an attorney made a statement in open court that: "If, indeed, a verdict comes in against [her client] . . . he may decide to sue my office for legal malpractice." The court in the subsequent coverage dispute held that the firm and the attorney "had knowledge of the fact that a legal malpractice claim

19

might result from the Medical Malpractice Action," the prior notice exclusion applied and coverage was excluded. *Id.* at *13.

Accordingly, before ERII's coverage attached in October 2002, and renewed in October 2003, Pepper and Gagné knew that there might be a CLAIM asserted against them. As such, under the plain meaning of the prior notice exclusions, and, therefore, as a matter of law, the Underlying Actions are excluded from coverage under any policy ERII issued to Pepper.

## II.

### Pepper was Aware of Acts, Errors, or Omissions that a Reasonable Attorney Would Have Known Might be the Basis of a Claim Under the Policies

Even if Gagné and Pepper had not explicitly recognized their exposure, a "reasonable attorney" would immediately comprehend that a firm that drafted deceptive offering statements and provided other legal services that were used to perpetrate a fraud resulting in hundreds of millions of dollars in damages "might be" sued or "is getting sued." Therefore, as a matter of law, the Underlying Actions are excluded from coverage under any excess policy ERII issued to Pepper.

Apart from their express acknowledgment that they might be sued, Gagné and Pepper knew of a variety of other factors regarding Pepper's representation of SFC that would almost certainly result in such a lawsuit. Among other things, prior to the initial inception of ERII's coverage in October 2002, Gagné and Pepper knew the following:

- Gagné and Pepper were SFC's longtime counsel;

- Gagné and Pepper had prepared 8 placement memoranda that SFC had used to sell more than $465 million of pooled loans;

- Those placement memoranda contained data regarding the performance of the loan pools, including representations that there were no defaults, upon which investors, underwriters and risk insurers relied in making decisions regarding the securitized loan pools that SFC sold;

- Royal, another Pepper client, had issued credit risk insurance which made it liable for the payment of the securitized loans;

20

- In March 2000, SFC had asked Pepper to revise certain provisions of the basic school loan agreement to facilitate its ability to make forbearance payments;

- Increased forbearance or reserve payments would have the effect of making it look like SFC was manipulating the pool performance. This would mislead investors and rating agencies since the payments potentially skewed all of the statistical data and made the loans appear to perform better than they in fact did;

- After Pepper raised questions regarding the possible manipulation of the pool performance through such payments, SFC used another law firm to revise the provisions necessary to facilitate the manipulation;

- The revised provisions, containing the changes that SFC sought regarding reserve payments, were incorporated into the basic school loan agreement. Knowing this, Pepper still modified that agreement to correct "several deficiencies," and modified the student loan agreement to permit forbearance payments;

- Gagné told one of his partners in March 2001 that forbearance payments "essentially, . . . [are] a way of evening out default issues and keeps the loans more current";

- Forbearance payments were made on behalf of any delinquent student and were automatically made from the forbearance accounts and from funds that SFC supplied. This widespread use of the forbearance payments to prop up pooled loans completely eliminated defaults under the loans, causing the default statistics on the loans and the static pools to be false;

- The performance data distributed by SFC and used in the placement memoranda that Pepper prepared was materially misleading in that the representations that there were no defaults and other performance data was false, and it further did not identify the payments made by SFC out of the forbearance account, but rather reported them as if they were collections received from the students;

- SFC officers had lied to investors and were complicit in misrepresenting loan performance data;

- Royal had not previously been aware of SFC's fraud, and, now faced losses then estimated at between $150 Million and $200 million as a result of the securitized loans going into default and triggering CLAIMS under the policies it had issued;

- SFC destroyed its Executive Committee minutes, according to the company's auditors. As a result, the auditors' continued representation was in doubt;

- If Pepper withdrew as SFC's counsel, that would imperil the company, and Pepper may be subject to suit;

21

- It was possible that Pepper would be sued because of its association with SFC and the fraudulent securitization transactions; and

- On August 6, 2002, Gagné responded "yes" to Pepper's annual polling inquiry concerning whether he was aware of any fact, circumstance, act, error or omission that might be expected to be the basis of a claim, and identified the "SFC matter as a potential claim."

This litany of actual knowledge establishes that, prior to the October 2002 effective date of ERII's initial coverage, any reasonable attorney would know -- as Pepper and Gagné admittedly did know -- that their SFC-related acts, errors and omissions "might be the basis of a CLAIM" against them. By way of example, in *Mirarchi v. Westport Ins. Corp.*, No. CIV.A. 99-4331, 2003 WL 1918975, at *7 (E.D. Pa. Apr. 21, 2003), an attorney admitted that he knew that he caused his estate client to make payments it was not obligated to make under state law, that the estate was in litigation over the payments, and that the estate took the position in the litigation that the attorney's actions were contrary to Pennsylvania law and that the executrix had not been informed of this fact. Despite the attorney's testimony that he made the disputed payments under the executrix's instructions and that he did not believe he would be sued, the court found that "a reasonable attorney in possession of these facts would have had a basis to believe that he had breached a professional duty," and granted summary judgment for the insurer. *Id.* at *7.

Similarly, in *Westport Ins. Corp. v. Mirsky*, No. CIV.A. 00-4367, 2002 WL 3108554, at *12 (E.D. Pa. Sept. 10, 2002), the court found that a reasonable attorney would realize that a dissatisfied client would almost certainly take legal action where the attorney knew of discovery issues, sanctions levied against him, the court's criticisms of how he handled the case, and the fact that his client "would have no other recourse but to file a legal malpractice suit, if she lost the appeal." *See also Baratta*, 264 F.3d at 308; *Coregis Ins. Co. v. Wheeler*, 24 F. Supp. 2d 475, 479-80 (E.D. Pa. 1998); *Ehrgood v. Coregis Ins. Co.*, 59 F. Supp. 2d 438, 443-44 (M.D. Pa. 1998). Royal, a client which was expected to lose at least $150 million because of Pepper's activity involving SFC's certificates, was most definitely a dissatisfied client with no apparent recourse other than a suit against Pepper.

22

Further, Pepper and Gagné knew that their SFC clients had misled investors; knew that Pepper had modified the basic loan agreements which were used to facilitate SFC's fraud; knew that Pepper prepared placement memoranda that disseminated materially misleading information regarding the default rate and related pool performance data; knew that SFC was facing claims related to its allegedly misleading practices; knew that Royal, another client of the firm, faced hundred of millions of dollars in claim payments because of SFC's fraud; knew that SFC had destroyed key business records; knew that Pepper was a "deep pockets" target; and knew that Gagné had twice told Pepper management that Pepper may be sued and knew that "anybody related to the transaction is getting sued." On these facts, no reasonable attorney could have concluded anything but that, at the time it sought coverage from ERII, Pepper faced a serious likelihood, if not a certainty, of a CLAIM being made against it.

Even if Pepper and Gagné did not "know" that they would be sued, they could reasonably foresee that they might be sued. *See Liberty Surplus Ins. Corp., Inc. v. Nowell Amoroso, P.A.*, 916 A.2d 440, 448 (N.J. 2007); *Coregis Ins. Co. v. McCollum*, No. 96-1068-CIV-T-17B, 1997 WL 128132, at *4-5 (M.D. Fla. Mar. 6, 1997) (coverage denied where attorney knew, prior to effective date of policy, of reasonable likelihood that client would file a malpractice claim); *Mt. Airy Ins. Co. v. Klatsky & Klatsky*, No. CIV. 96-1231(GEB), 1997 WL 235131, at *5 (D.N.J. Jan. 28, 1997) ("Once the insured is aware or it is reasonably foreseeable that [its] conduct might be expected to be the basis of a claim or suit, any claims arising out of that conduct are precluded from coverage regardless of whether the Insured expected or reasonably foresaw the claim by the particular claimant.").

Gagné and Pepper's undisputed awareness of possible CLAIMS against them based upon their role in SFC's fraudulent transactions preclude coverage for the Underlying Actions under any ERII Policy as a matter of law.

## III.

### Pepper's Coverage Attached, if at All, in a Prior POLICY PERIOD

To the extent Pepper is covered by any liability insurance, such coverage would have attached prior to the inception of ERII coverage for the 2003-2004 POLICY PERIOD, the period in which Westport acknowledged a notice of POTENTIAL CLAIM. This is so because Pepper had continuing professional liability coverage with Westport from April 2001 through October 2004. INSURING AGREEMENT I.C. of the 2003-2004 Westport Policy provides that if any CLAIM made against any INSURED which arises from a POTENTIAL CLAIM, which the INSURED first became aware of during a prior POLICY PERIOD during which it was insured by Westport, then such CLAIM is considered to have been first made and reported during the POLICY PERIOD of that prior policy. This language in Westport's Policy "indicates that the parties expected the coverage to be continuous if the policy was renewed at each successive policy expiration." *Helberg v. Nat'l Union Fire Ins. Co.,* 657 N.E.2d 832, 834 (Ohio Ct. App. 1995).

Pepper and Gagné first became aware of the POTENTIAL CLAIMS regarding SFC and Royal at some time prior to the time that Gagné wrote his May 15, 2002 memo setting forth his "recollection" of SFC's fraudulent conduct to assist Wilcox in assessing "any potential claims." Accordingly, Pepper became aware of this POTENTIAL CLAIM prior to the time that ERII provided insurance coverage to Pepper during the 2002-2003 and 2003-2004 POLICY PERIODS.

By operation of INSURING AGREEMENT I.C., the continuous coverage provision in the Westport Policy, the *Stanziale* litigation is deemed first made and reported no later than during the 2001-2002 POLICY PERIOD. Similarly, the *Royal* litigation is deemed first made and reported no later than during the 2001-2002 POLICY PERIOD. Accordingly, the Underlying Actions are deemed made and reported at a time when ERII did not yet insure Pepper or Gagné.

Therefore, ERII is entitled to a declaratory judgment that, pursuant to the terms, conditions, exclusions, and endorsements of its policy, including those incorporated by reference to the Westport Policy, the Underlying Actions are deemed to have been first made no later than when either Pepper

24

or Gagné first became aware of the potential claim (some time prior to May 15, 2002) and, therefore, ERII is not required to indemnify, or to provide any other benefit of coverage to, Pepper and Gagné as a result of either the *Stanziale* or *Royal* litigations.[7]

## CONCLUSION

ERII's motion for summary judgment should be granted because, as a matter of law, neither Pepper nor Gagné can establish a genuine issue of material fact precluding summary judgment based on their knowledge of a potential claim prior to the effective dates of ERII's initial and renewal coverage, and because of the "Renewed continuously and without interruption" provision in Westport's Policy.

Dated: New York, New York
      June 25, 2007

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

By: _William B. Pollard III_

William B. Pollard, III

757 Third Avenue, 18th Floor
New York, New York 10017
(212) 418-8600
Attorneys for Plaintiff Executive Risk Indemnity Inc.

Of Counsel:

      Howard S. Veisz
      Catherine C. Montjar
      Amy C. Gross

---

[7] Although the CLAIM is not made during the 2002-2003 POLICY PERIOD, it would be excluded from coverage under ERII's Policy during that period for the same reasons set forth in Point III.

# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

EXECUTIVE RISK INDEMNITY, INC.,

                     Plaintiff,

    -against-

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ
and WESTPORT INSURANCE CORPORATION,

                     Defendants.

-----------------------------------------------------------------x

PEPPER HAMILTON LLP and
W. RODERICK GAGNÉ,

               Third-Party Plaintiffs,

    -against-

CONTINENTAL CASUALTY COMPANY and
TWIN CITY FIRE INSURANCE COMPANY,

              Third-Party Defendants.

-----------------------------------------------------------------x

Index No.: 603624/05 E

Index No.: 590185/07 E

**FILED UNDER SEAL**


**MEMORANDUM OF LAW IN SUPPORT OF
CONTINENTAL CASUALTY COMPANY'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...…………………………………………………… 1

STATEMENT OF FACTS ...……………………………………….................................. 3

    **A.**    **Attorney Gagné's Personal Involvement With Yao and SFC** ...……………. 4

    **B.**    **The SFC Forbearance Payment Scheme** ...………………………………… 5

    **C.**    **Gagné Recognizes that Pepper Hamilton Likely Will Be Sued, and the Firm Mounts Its "First Line of Defense"**
    ...……………………………………………………………………………6

    **D.**    **Despite Knowing The Real Threat That it Could Be Sued, Pepper Hamilton Purchases Malpractice Insurance from Continental Casualty Without Revealing the SFC Circumstances** ...…………………………………… 8

        **1.**    **Pepper Hamilton Fails to Disclose the SFC Matters in its 2002 Malpractice Insurance Renewal** ...……………………………… 9

        **2.**    **Pepper Hamilton Again Conceals the SFC Debacle in its 2003-2004 Malpractice Insurance Renewal**
        ...……………………………………………………………… 11

    **E.**    **Not Surprisingly, Pepper Hamilton and Gagné are Sued by the Trustee and Royal**
    ...………………………………………...…………………………… 13

PROCEDURAL HISTORY OF THE INSTANT COVERAGE LITIGATION ……………… 14

LEGAL ARGUMENTS ...……………………………………………………...……… 16

    **I.**    **ANY RULING BY THE COURT AS TO THE PENDING MOTIONS SHOULD NOT BE ADVERSE TO OR PREJUDICE CONTINENTAL CASUALTY.**
    ...……………………………………………………………… 16

    **II.**    **THIS COURT SHOULD GRANT RESCISSION OF THE 2002-2003 AND 2003-2004 CONTINENTAL EXCESS POLICIES.**
    ...…………………………………………...…………………………... 18

    **A.**    **The Pepper Hamilton Defendants' Knowledge Must be Viewed from an Objective Standpoint.** ...…………………………………...…….. 18

**B.**   **The 2002-2003 and 2003-2004 Continental Excess Policies Should be Rescinded Because Pepper Hamilton Breached its Duties To Continental Casualty By Failing to Advise It About the Anticipated SFC Lawsuit.** ............................................................................................ 19

    **1.**   **Pepper Hamilton Made False Statements in its Insurance Applications and Knew Those Statements to be False** ............................................................................................ 20

    **2.**   **The Representations in Pepper Hamilton's Applications Were Materially False and Continental Casualty Relied on Pepper Hamilton's False Representations and Omissions** ............................................................................................ 22

**C.**   **There is No Coverage Under the 2001-2002 Continental Excess Policy Because of Pepper Hamilton's Failure to Disclose or Report the Circumstances Then Known to it** ............................................................................................ 24

    **1.**   **The Underlying Actions Were Not "Claims Made and Reported" During the 2001-2002 Policy Period** ............................................................................................ 24

    **2.**   **Insuring Agreement B of the 2001-2002 Primary Policy Does Not Apply Because There is No "Continuity of Coverage"** ............................................................................................ 25

        **a.**   **There is No "Continuity of Coverage" as the Later Policies are Subject to Rescission** ............................................................................................ 27

        **b.**   **Continental Casualty Issued Different Coverage in the Later Policy Periods, and There was Thus No "Continuous and Uninterrupted" Coverage** ............................................................................................ 27

CONCLUSION ............................................................................................ 29

## PRELIMINARY STATEMENT

Cross-Movant Continental Casualty Company ("Continental Casualty") is a Third-Party Defendant in this complex insurance coverage dispute between the Philadelphia-based law firm Pepper Hamilton, LLP ("Pepper Hamilton") and its four legal malpractice Insurers.

The current motions for summary judgment address whether Pepper Hamilton is entitled to coverage for malpractice lawsuits against it, which it knew were inevitable prior to the inception of the Insurers' Policies, but which it failed to disclose during the underwriting processes, despite its contractual and legal duties to do so.    Indeed, notwithstanding the limited discovery to date, the record is replete with evidence that Pepper Hamilton knew, but did not reveal to the Insurers when it sought malpractice insurance, either: (a) the scope of its knowledge of this eventuality arising from its longstanding representation of Student Finance Corporation ("SFC"), now in bankruptcy and the subject of lawsuits seeking hundreds of millions of dollars in damages relating to matters on which Pepper Hamilton counseled it and allegedly actively participated, or (b) the predicate events giving rise to the inevitable malpractice lawsuits against the firm.

In short, it is axiomatic that a policyholder cannot seek insurance coverage for lawsuits which may be brought against it unless it has advised its insurer during the underwriting process about the facts, circumstances, acts, errors and omissions giving rise to such potential suit.  But that is exactly what Pepper Hamilton endeavors to accomplish, by seeking malpractice insurance under policies that incepted long after Pepper Hamilton knew of the facts and circumstances giving rise to the suits against it and the inevitability of such suits.  Pepper Hamilton's claim for coverage for these matters comprises the subject of the relief sought by the Motion, brought by

Order to Show Cause, of Plaintiff Executive Risk Indemnity, Inc. ("Executive Risk"), as well as by the instant Cross-Motion.

At conferences before this Court, Continental Casualty expressed concern over the timing of the Order to Show Cause sought by Executive Risk, as Continental Casualty has only recently been brought into this two-year-old dispute, and it has not had the opportunity to obtain discovery as to, *inter alia,* its contention (by means of its Counterclaims) that Pepper Hamilton's years-long concealment of the underlying debacle compels rescission of two of the malpractice policies issued by Continental Casualty and a declaration of no-coverage as to a third Continental Casualty policy.  Still, the limited facts adduced to date, even without the opportunity for discovery by Continental Casualty, support a finding as a matter of law that Pepper Hamilton is not entitled to insurance under any of the malpractice policies issued to it by Continental Casualty.[1]

Notwithstanding the compelling facts of Pepper Hamilton's material nondisclosures to Continental Casualty and Continental Casualty's justifiable belief and reliance that Pepper Hamilton had not withheld material facts and circumstances during the underwriting process, to the extent the Court believes further evidence is necessary before it can rule on the issues

---

[1]     Continental Casualty also expressed concern about the impact on it, if any, of Executive Risk's Motion for Summary Judgment, to the extent that Motion and any resulting Order could bear on issues relevant to the coverage dispute between Continental Casualty on the one hand and Pepper Hamilton and its partner W. Rodney Gagné (collectively, the "Pepper Hamilton Defendants") on the other. In this respect, Continental Casualty understands, upon information and belief, that the Pepper Hamilton Defendants and Westport Insurance Corporation ("Westport") will oppose Executive Risk's Motion on the grounds that it is premature, as discovery remains in its incipient stage. Still, insofar as Executive Risk's motion is directed against only the Defendants in the main action—*i.e.,* the Pepper Hamilton Defendants— Continental Casualty respectfully submits that the Court should make no finding or ruling on Executive Risk's Motion which would have a *res judicata* or collateral estoppel effect with respect to the separate disputed issues between Continental Casualty and the Pepper Hamilton Defendants.

presented by the parties' motions, Continental Casualty requests an opportunity to pursue meaningful discovery concerning the panoply of issues presented by its Counterclaims against the Pepper Hamilton Defendants.

Indeed, Continental Casualty bases this Cross-Motion entirely on the evidence produced by Executive Risk in support of its Motion, with the addition of an Affidavit from a Continental Casualty underwriter. With this Cross-Motion, Continental Casualty seeks judgment in its favor on its Second Counterclaim (rescinding the 2002-2003 Continental Excess Policy) and Third Counterclaim (rescinding the 2003-2004 Continental Excess Policy), along with a declaration that there is no coverage under an earlier 2001-2002 Continental Excess Policy because the "claims made and reported" coverage of that Policy expired several years ago.[2]

---

[2]      It is important to note that the relief sought herein conforms to the factual record presented by Executive Risk's separate Motion as the constraints of time did not allow Continental Casualty to more fully explore and obtain discovery on the issues presented by Continental Casualty's Counterclaims against the Pepper Hamilton Defendants, including: (1) rescission of the 2001-2002 Continental Excess Policy (First Counterclaim); (2) application of Prior Knowledge Exclusion B of the 2003-2004 Policies (Fourth Counterclaim); (3) application of the known loss or loss-in-progress doctrines (Fifth Counterclaim); (4) certain damages sought in the underlying actions would not constitute covered Loss (Sixth Counterclaim), and; (5) breach of duty and failure to mitigate in unnecessarily exposing the 2003-2004 Continental Excess Policy to potential loss (Seventh Counterclaim). In the event this Court does not award Continental Casualty summary judgment on this Cross-Motion, these issues will require the parties to engage in detailed discovery, and likely will be the subject of additional motions later in the case. As such, Continental Casualty reserves the right, as necessary, to pursue discovery and further conduct motion practice on these matters.

## STATEMENT OF FACTS

For many years, the Pepper Hamilton Defendants represented SFC, which outwardly appeared as a successful student loan company. (*See,* Affidavit of William B. Pollard, III, annexed to Executive Risk's Motion for Summary Judgment, hereinafter "Pollard Aff.," at Ex. 4, No. 8; Exs. 35, 37, 52 and 55). But SFC was not as it appeared or what the Pepper Hamilton Defendants presented it to be. (Pollard Aff., Ex. 52). Rather, it turned out that SFC actually operated as a "loan mill," defrauding investors willing to lend money to the company and deceiving Royal Indemnity Company ("Royal"), which issued credit risk insurance to back the loans SFC produced and with respect to which the Pepper Hamilton Defendants provided legal advice and guidance. (Pollard Aff., Exs. 35, 52 and 55).

### A.    Attorney Gagné's Personal Involvement With Yao and SFC

Attorney Gagné long represented and provided legal counsel and services to a businessman named Andrew M. Yao and Yao's host of businesses, including SFC. (Pollard Aff., Ex. 35). When Gagné joined Pepper Hamilton in 1996, he brought the Yao and SFC accounts with him. (Pollard Aff., Ex. 4, No. 8). Thereafter, the Pepper Hamilton Defendants continued to represent Yao and SFC in various transactions and litigation. (Pollard Aff., Exs. 35).

Gagné also had a *personal* stake in SFC. (Pollard Aff., Ex. 4, No. 36). Some of the company's largest private investors were members of Gagné's own family, including trusts established for Gagné's benefit. (Pollard Aff., Ex. 4, No. 36; Exs. 32 and 36). Gagné allegedly served as counsel to both the Gagné family trusts and SFC during certain of those investment

4

transactions, and is alleged to have improperly used his unique position as counsel to the company and to the Gagné family trusts to extract millions of dollars of Gagné family money out of SFC just before the company collapsed and its creditors forced it into bankruptcy. (Pollard Aff., Ex. 52).

### B.    The SFC Forbearance Payment Scheme

SFC originated and acquired loans to students of truck driving schools nationwide. (Pollard Aff., Exs. 35, 52 and 55). Initially, it received funding from private investors. (Pollard Aff., Exs. 35, 52 and 55). Over time, however, it turned to large warehouse lending institutions for capital. (Pollard Aff., Exs. 35). For some time, Royal provided credit risk insurance for the benefit of the lenders to cover potential losses in the event a student loan went into default. (Pollard Aff., Exs. 35 and 55).

As part of its obligations to the lenders and Royal, SFC regularly reported on the performance of the student loans, including the subject loans' rates of default. (Pollard Aff., Exs. 35 and 55). Under various lending and insurance agreements, loans more than 90 days overdue were considered to be in default. (Pollard Aff., Exs. 35, 52 and 55). However, as was later revealed, SFC in fact used money from its own reserve accounts to make payments on many of the loans in order to deceptively make it appear that the loans were current. (Pollard Aff., Exs. 35, 52 and 55). Those payments -- which became known as "forbearance payments" or "ghost payments" -- allegedly masked the true default rates of the loans SFC originated. (Pollard Aff., Exs. 52 and 55). SFC purported concealed the poor loan performance in order to gain additional investment and lending, and to induce Royal to continue issuing credit risk insurance policies. (Pollard Aff., Exs. 52 and 55).

Prior to 2002, the Pepper Hamilton Defendants advised Yao as to the implications of the forbearance payments that SFC was making to hide the growing rate of student loan defaults. Most critically for purposes of this Cross-Motion, the Pepper Hamilton Defendants fully knew and understood the scheme's dangers before even applying for the malpractice insurance at issue in the present litigation. (Pollard Aff., Ex. 27). For instance, in a March 2, 2000 email to Yao, Gagné acknowledged a number of potential pitfalls with respect to the forbearance payments, especially as related to SFC's investors and other third-parties like Royal. (Pollard Aff., Ex. 27). Gagné also explained to Yao that the scheme could be perceived as though "SFC is manipulating the performance pool." (Pollard Aff., Ex. 27). Equivocating that implementation of the scheme "is not impossible, but it will not be easy," Gagné advised his long time client that, nevertheless, "we will take a crack at it." (Pollard Aff., Ex. 27).

In or about March 2002, SFC's forbearance payment methods came to the attention of SFC's creditors and investors, as well as to Royal, who apparently expressed their fears that SFC had all along deceived them. (Pollard Aff., Exs. 33, 35, 52 and 55). The forbearance payment scheme eventually proved too much for SFC, which collapsed under the mounting depletion of its reserves and was forced into bankruptcy by its creditors in June 2002. (Pollard Aff., Ex. 52). SFC's bankruptcy was thereafter converted into Chapter 7 liquidation proceedings and the Bankruptcy Court appointed the Trustee in Bankruptcy. (Pollard Aff., Ex. 54).

### C.    Gagné Recognizes that Pepper Hamilton Likely Will Be Sued, and the Firm Mounts Its "First Line of Defense"

By at least March 2002, SFC's lenders and Royal had learned of the SFC forbearance scheme (Pollard Aff., Exs. 32-33 and 35), causing the Pepper Hamilton Defendants to begin scrambling to consider how best to "distance" themselves from SFC and terminate the

6

representation. (Pollard Aff., Ex. 34, at 4). The record reveals that, by April 2002, Gagné wrote

to Pepper Hamilton management with his concerns of "ethical considerations" arising out of the

SFC situation, including that "officers of SFC lied to investors" and "the fact that members of

my family and trusts in which I am a beneficiary have made loans to Student Finance

Corporation from time to time and most recently on March 5, [2002,] at the request of Andrew

Yao." (Pollard Aff., Ex. 35, at 2, 5). In these writings to firm management, Gagné considered

these issues and the firm's "first line of defense" in the SFC debacle. (Pollard Aff., Ex. 34, at 4).

On April 18, 2002, Gagné wrote to the Ethics and Finance Committees of Pepper

Hamilton, as well as to Pepper Hamilton partner Alfred H. "Chub" Wilcox, who acted as the

firm's general counsel and its representative for matters of the firm's insurance. In his

memorandum, Gagné advised his Pepper Hamilton partners and colleagues that:

> I think we also need to recognize the possibility that **this firm will be
> sued**, as a deep pocket associated with SFC and these transactions, and it
> may be appropriate to consider whether one course of action or another
> might better mitigate this possibility.

(Pollard Aff., Ex. 35, at 5) (emphasis added).

When asked about this statement in the Underlying Actions, Gagné frankly explained that

as of April 2002 (if not before), litigation against Pepper Hamilton not only was possible, it was

probable, if not a certainty: "there was a large loss, and my experience with large losses, is,

*usually, anybody related to the transaction is getting sued.*" (Pollard Aff., Ex. 15, at 304)

(emphasis added).

On April 24, 2002, Pepper Hamilton withdrew from its representation of SFC. (Pollard

Aff., Ex. 37). The next day, Chub Wilcox advised those within Pepper Hamilton working on

7

SFC matters to discuss the situation only with Gagné or those "involved in protecting the firm's interests (i.e., me, Tom Zemaitis, Jim Murray)." (Pollard Aff., Ex. 38, at 2).

**D.    Despite Knowing The Real Threat That it Could Be Sued, Pepper Hamilton Purchases Malpractice Insurance from Continental Casualty Without Revealing the SFC Circumstances**

Prior to, during and after the SFC debacle, Pepper Hamilton applied for and maintained "claims made and reported" legal malpractice insurance from various Insurers, including Continental Casualty. (Pollard Aff., Exs. 5-14). Between 2001 and 2004, Continental Casualty issued three claims made and reported policies to Pepper Hamilton. (Pollard Aff., Exs. 6, 10 and 14).

From April 21, 2001 to October 27, 2002, Continental Casualty issued Pepper Hamilton's excess insurance (the "2001-2002 Continental Excess Policy"), which had an aggregate Limit of Liability of $30 million, excess of the $20 million of Westport's underlying Primary Policy and a $500,000 Deductible. (Pollard Aff., Ex. 6). Thereafter, Pepper Hamilton's malpractice insurance tower changed, and Continental Casualty issued a lower amount of excess insurance ($10 million) and at a higher attachment point ($30 million) in Policy Years 2002-2003 and 2003-2004. (Pollard Aff., Exs. 10 and 14). Pepper Hamilton also obtained excess insurance from Twin City Fire Insurance Company ("Twin City") and Executive Risk in the 2002-2003 and 2003-2004 Years. (Pollard Aff., Exs. 8-9, 12-13).

The following charts illustrate Pepper Hamilton's malpractice insurance towers for the relevant Policy Years:

| 04/21/01 to 10/27/02 | | 10/27/02 to 10/27/03 | | 10/27/03 to 10/27/04 | |
|---|---|---|---|---|---|
| Westport *(Primary)* | $20 million | Westport *(Primary)* | $10 million | Westport *(Primary)* | $10 million |
| Continental Cas. *(1st Excess)* | $30 million | Twin City *(1st Excess)* | $10 million | Twin City *(1st Excess)* | $10 million |
| | | Executive Risk *(2nd Excess)* | $10 million | Executive Risk *(2nd Excess)* | $10 million |
| | | Continental Casualty *(3rd Excess)* | $10 million | Continental Casualty *(3rd Excess)* | $10 million |

**1.    Pepper Hamilton Fails to Disclose the SFC Matters in its 2002 Malpractice Insurance Renewal**

In connection with Pepper Hamilton's application for renewed legal malpractice insurance in the summer of 2002, *after* Gagné's memo to firm leadership advising that the firm could expect to be sued (Pollard Aff., Ex. 35), Pepper Hamilton sent a memorandum to its attorneys, polling them about, among other things, whether any attorney was "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of the (sic) claim or suit for lawyers professional liability." (Pollard Aff., Ex. 42). Gagné wrote a responsive memorandum, dated August 6, 2002, in which he informed firm management that:

> The only two matters of which I am aware are the Student Finance Corporation transactions of which you are familiar and the Royal Indemnity Company representation. The only Royal representation that I currently think any claim could be made is where we represented them in a transaction which they terminated hours before the closing for a variety of reasons. I do not think we will be implicated in the Royal Indemnity Company matter since an action has not been filed and the action really lies against our client. With regard to the Student Finance Corporation action, two law suit (sic) have been filed in two different states and to

9

date, we have not been named in either action. I am not certain as to whether we will be joined in the future.

(Pollard Aff., Ex. 42, at 1).

Thereafter, on September 6, 2002, Pepper Hamilton prepared and executed a "Professional Premier for Lawyers - Application for Law Firms with more than 34 Attorneys - (Claims Made and Reported Basis)" (the "2002-2003 Application"), signed by Chub Wilcox for Pepper Hamilton. (Pollard Aff., Ex. 43). Question 20 of the 2002-2003 Application requested as follows:

> 20.    A. After inquiry of each lawyer, is the Applicant, its predecessor firms or any lawyers proposed for this insurance aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability?

(Pollard Aff., Ex. 43, at 3).

Despite Gagné's prior memoranda and his August 6, 2002 affirmative response to the Pepper Hamilton insurance inquiry, (Pollard Aff., Ex. 42, at 1), Pepper Hamilton responded to Question 20 by checking the box marked "No." (Pollard Aff., Ex. 43, at 3). Indeed, Pepper Hamilton inexplicably failed to mention or even allude in the 2002-2003 Application to the facts or circumstances of either the "Student Finance Corporation transactions" or "Royal Indemnity Company transactions" identified by Gagné in his August 6, 2002 insurance questionnaire memorandum, notwithstanding the knowledge of these matters by firm management and Chub Wilcox (the firm's in-house general counsel/risk manager). (Pollard Aff., Exs. 42 and 43).

The 2002-2003 Application, signed and acknowledged by Wilcox on behalf of Pepper Hamilton, also provided:

10

The undersigned understands and accepts that any policy issued will provide coverage on a claims-made and reported basis for only those claims that are made against the insured and reported while the policy is in force and that coverage ceases with the termination of the policy. *All claims will be excluded that result from any acts, circumstances or situations known prior to the inception of coverage being applied for, that could reasonably be expected to result in a claim.*

The undersigned represents that the statements set forth herein and in all supplemental forms and attachments are true, complete and accurate and that there has been no attempt at suppression or misstatement of any material facts known, or which should be known, and agrees that this application shall become the basis of any coverage that be issued by the Company.

\*\*\*

The applicant understands and agrees that she or he is obligated to report any changes in the information provided in this application that occur after the date of the application.

(Pollard Aff., Ex. 43, at 4-5) (emphasis added).

The 2002-2003 Application was submitted to Continental Casualty. (*See*, Affidavit of Continental Casualty underwriter Noreen Calisto, hereinafter "Calisto Aff.," at ¶ 10). No materials submitted by Pepper Hamilton in connection with the 2002-2003 Application identified for Continental Casualty the facts or circumstances of the SFC fiasco. (Calisto Aff., at ¶ 13). Continental Casualty issued the 2002-2003 Excess Policy in reliance on the 2002-2003 Application. (Pollard Aff., Ex. 10, at 1, Insuring Agreement).

## 2. Pepper Hamilton Again Conceals the SFC Debacle in its 2003-2004 Malpractice Insurance Renewal

Pepper Hamilton thereafter sought to renew its legal malpractice insurance for the 2003-2004 Policy Year. (Pollard Aff., Ex. 45, at 1; Ex. 46). As in prior years, the firm again conducted an internal poll of its attorneys to obtain information for the insurance renewal.

11

(Pollard Aff., Ex. 45). Chub Wilcox and another Pepper Hamilton partner, Charlie Leasure, wrote a memorandum, dated August 25, 2003, to the firm's attorneys polling them for information to be used in the professional liability insurance application and admonishing the lawyers to be "complete in your responses." (Pollard Aff., Ex. 45, at 1).

Gagné provided his hand-written responses to the various questions, and signed and dated the document September 4, 2003. (Pollard Aff., Ex. 45). Answering Wilcox's and Leasure's question of whether an attorney was "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers' professional liability," Gagné affirmatively responded, "Yes – I have spoken to Charlie [Leasure] and Chub [Wilcox] with respect to the SFC matter." (Pollard Aff., Ex. 45, at 1).

Pepper Hamilton then prepared and submitted "Lawyers Professional Liability Insurance Renewal Application - (Claims Made and Reported Basis)" (the "2003-2004 Application"), dated September 15, 2003 and signed by Charles Leasure, III. (Pollard Aff., Ex. 46). Incredibly, and in the face of Gagné's affirmative response the he was indeed aware of facts or circumstances that might be expected to result in a claim (Pollard Aff., Ex. 45, at 1), Pepper Hamilton yet again knowingly failed to disclose in the firm's 2003-2004 Application or supporting materials to its prospective malpractice insurers the facts, circumstances or even the mere existence of the "SFC matter" identified by Gagné. (Pollard Aff., Ex. 46).

Continental Casualty thereafter issued the 2003-2004 Continental Excess Policy in reliance on the 2003-2004 Application materials. (Pollard Aff., Ex. 14, at 1, Insuring Agreement).

12

**E.**    **Not Surprisingly, Pepper Hamilton and Gagné are Sued by the Trustee and Royal**

On April 27, 2004, well after each of the three towers of malpractice insurance had been obtained and were in place, Pepper Hamilton at long last disclosed to its malpractice Insurers the existence of a possible claim relating to SFC. (Pollard Aff., Ex. 48). At that time, Pepper Hamilton finally wrote to Westport to advise of a "threatened claim" by the SFC Trustee. (Pollard Aff., Ex. 48, at 1).

Thereafter, and certainly not surprisingly, Gagné's admonitions proved to be correct (Pollard Aff., Ex. 35), as the Pepper Hamilton Defendants were sued in separate actions by the SFC Trustee and Royal in federal court in Delaware (the "Underlying Actions"). (Pollard Aff., Exs. 52 and 55).

The SFC Trustee filed suit (the "Trustee Action"), on November 4, 2004 against Pepper Hamilton and Gagné, among others. (Pollard Aff., Ex. 52). Generally, the Trustee accuses the Pepper Hamilton Defendants of ignoring obvious conflicts of interest and of breaching their duties to SFC by either assisting in the fraud at SFC or by failing to recognize and advise SFC of the adverse impact of its conduct, including its impending financial insolvency. (Pollard Aff., Ex. 52). Separately, on April 12, 2005, Royal filed a First Amended Complaint (the "Royal Action") against Pepper Hamilton and Gagné, accusing them of being willing participants in a fraudulent enterprise of SFC's scheme. (Pollard Aff., Ex. 55).

13

## PROCEDURAL HISTORY OF THE INSTANT COVERAGE LITIGATION

Just over four months ago, Pepper Hamilton and Gagné filed a Third-Party Complaint in which it added Continental Casualty and Twin City as Third-Party Defendants in this action. (*See*, accompanying Affirmation of Kevin M. Mattessich, hereinafter "Mattessich Aff.," at Ex. 1). Twin City filed an Answer and Counterclaims on or about April 30, 2007. (Mattessich Aff., at Ex. 2). Continental Casualty filed an Answer, Affirmative Defenses and Counterclaims on or about May 8, 2007 (*i.e.*, just over two months ago). (Mattessich Aff., at Ex. 3). Pepper Hamilton and Gagné filed an Answer to Continental Casualty's Counterclaims on or about June 11, 2007. (Mattessich Aff., at Ex. 4). In other words, the pleadings with respect to Continental Casualty closed just over 30 days ago.

Continental Casualty has been proactive in attempting to move this case along by serving the Pepper Hamilton Defendants with tailored requests for discovery. For example, in late May and early June 2007, the Insurers, including Continental Casualty, served the Pepper Hamilton Defendants with certain discovery and document production demands. (Mattessich Aff., at ¶ 7). For its part, on June 1, 2007, Continental Casualty served the Pepper Hamilton Defendants with Combined Demands for Discovery and Inspection.[3] (Mattessich Aff., at Ex. 5). This document discovery remains on-going. (Mattessich Aff., at ¶ 9).

---

[3]    These Combined Demands included the following: 1) Demand for Copies of Pleadings and Discovery in Related Cases; 2) Demand for Discovery and Inspection of Third-Party Defendants' Statements; 3) Demand for the Discovery and Inspection of Any Statements of Adverse Parties and Witnesses; 4) Demand for Identification of Expert Witness and Expert Information, and; 5) Continental Casualty's First Demand for Discovery and Inspection of Documents Directed to Pepper Hamilton LLP and W. Roderick Gagné. (Mattessich Aff., at Ex. 5).

Continental Casualty also served the Pepper Hamilton Defendants with a Notice to Take Depositions Upon Oral Examination. (Mattessich Aff., at Ex. 6). On June 5, 2007, Continental Casualty noticed the depositions of 10 Pepper Hamilton-related witnesses for the week of June 25, 2007, but later adjourned the depositions because of incomplete document discovery. (Mattessich Aff., at Ex. 6 and ¶ 11). Westport likewise has recently served deposition notices in this case. (Mattessich Aff., at Ex. 7). No depositions have yet occurred as document discovery continues. (Mattessich Aff., at ¶ 13).

While the Court has held several status conferences with regard to this action generally, no Preliminary Conference has yet occurred.

15

## LEGAL ARGUMENTS

### I.     ANY RULING BY THE COURT AS TO THE PENDING MOTIONS SHOULD NOT BE ADVERSE TO OR PREJUDICE CONTINENTAL CASUALTY.

As discussed above, Continental Casualty and Twin City only recently have been brought into this litigation as Third-Party Defendants. (Mattessich Aff., at Ex. 1). Continental Casualty served its Counterclaims against the Pepper Hamilton Defendants on May 8, 2007, (Mattessich Aff., at Ex. 3), and issue of the Third-Party action was not joined until the Pepper Hamilton Defendants served their Answer to Counterclaims on or about June 11, 2007. (Mattessich Aff., at Ex. 4).

At the time Executive Risk filed its Motion for Summary Judgment on June 25, 2007, Continental Casualty had only weeks earlier served its Combined Demands and a Notice of Depositions on the Pepper Hamilton Defendants. (Mattessich Aff., at Exs. 5 and 6). Westport likewise served deposition notices. (Mattessich Aff., at Ex. 7). While some document exchange has taken place, discovery on the issues continues. (Mattessich Aff., at ¶ 9).

Accordingly, Continental Casualty requests that any rulings made by the Court in connection with Executive Risk's Motion for Summary Judgment or any rulings denying the instant Cross-Motion for Summary Judgment should not be deemed *res judicata* or have any collateral estoppel effect as to Continental Casualty because it has not been afforded the opportunity for discovery.

That said, however, as discussed in greater detail below, the record submitted to the Court provides a sound basis as a matter of law to support the entry of summary judgment in

16

favor of Continental Casualty. Indeed, the record introduced by Executive Risk as part of its Motion more than sufficiently demonstrates that the Pepper Hamilton Defendants are not entitled to insurance under any of the malpractice policies issued by Continental Casualty.

More specifically, further discovery will not and cannot counter the facts that: (1) the Pepper Hamilton Defendants knew of the SFC forbearance payment fraud by no later than April 2002, (Pollard Aff., Exs. 34-35); (2) Pepper Hamilton had knowledge, by no later than April 18, 2002, of "the possibility that this firm will be sued," (Pollard Aff., Ex. 35, at 5); (3) Gagné affirmatively advised Pepper Hamilton's management and its risk manager on August 6, 2002 that he was aware of facts or circumstances, etc., which might be expected to be the basis of a claim or suit, (Pollard Aff., Ex. 42); (4) Pepper Hamilton checked "No" in response to Question 20 of the 2002-2003 Application and did not mention or even allude to the SFC matter in the 2002-2003 Application or its accompanying materials, (Pollard Aff., Ex. 43, at 3); (5) Gagné affirmatively advised Pepper Hamilton's management and its risk manager on September 4, 2003 that he was aware of facts or circumstances, etc., which might be expected to be the basis of a claim or suit, (Pollard Aff., Ex. 45); (6) Pepper Hamilton did not mention or even allude to the SFC matter in its 2003-2004 Application or accompanying materials, (Pollard Aff., Ex. 46); and (7) it was not until April 27, 2004 (after each and all of the malpractice policies were in place) that Pepper Hamilton for the first time informed its Insurers of the SFC circumstances, (Pollard Aff., Ex. 48). Continental Casualty contends that these facts alone are dispositive of coverage and support entry of summary judgment in Continental Casualty's favor.

In short, the record presented by Executive Risk contains more than sufficient evidence to award Continental Casualty summary judgment on its claims for rescission of the 2002-2003 and 2003-2004 Continental Excess Policies and to preclude coverage under the 2001-2002

17

Continental Excess Policy. Nonetheless, should this Court conclude that summary judgment for Continental Casualty is not appropriate on the present record, it should set the Cross-Motion aside or deny it without prejudice and allow this litigation to proceed in due course.

## II.    THIS COURT SHOULD GRANT RESCISSION OF THE 2002-2003 AND 2003-2004 CONTINENTAL EXCESS POLICIES.

In view of the record now before this Court, there is no genuine issue that the 2002-2003 and 2003-2004 Continental Excess Policies were obtained improperly and should be rescinded. Moreover, and as a consequence, there is no possibility of coverage under the 2001-2002 Continental Excess Policy because the SFC matters do not fall within the claims made and reported nature of the insurance provided thereunder.

### A.    The Pepper Hamilton Defendants' Knowledge Must be Viewed from an Objective Standpoint

An attorney's knowledge of whether his conduct might be expected to be the basis of a legal malpractice claim must be viewed from an objective, rather than a subjective, standard. Westport Ins. Corp. v. Goldberger & Dubin, P.C., 2006 U.S. Dist. LEXIS 31329 (S.D.N.Y. 2006). See also, Mt. Airy Ins. Co. v. Thomas E. Angst & Assoc., P.C., 954 F.Supp. 1040 (E.D.Pa. 1997).

In applying the objective standard and finding that the insured law firm's prior knowledge precluded coverage, the Goldberger court reasoned:

> To be sure, an insured should not be denied coverage for an act, error, or omission, of which he was unaware or which he reasonably expected could not give rise to a claim. But, having knowledge of such an act, error, or omission, the insured cannot perform his own risk assessment based on a subjective impression as to whether or not the aggrieved client

18

will sue, which would impermissibly usurp the insurance company's role in assessing risk.

Westport Ins. Corp. v. Goldberger & Dubin, P.C., 2006 U.S. Dist. LEXIS at 31329 (S.D.N.Y. 2006).[4]

Here, Gagné's written warnings to Pepper Hamilton's management and risk manager concerning the likelihood of future litigation is evidence of what the firm knew and thought, irrespective of whether one takes a subjective or objective approach.

**B.      The 2002-2003 and 2003-2004 Continental Excess Policies Should be Rescinded Because Pepper Hamilton Breached its Duties To Continental Casualty By Failing to Advise It About the Anticipated SFC Lawsuit.**

An insurance policy may be rescinded where the policyholder has made a material misstatement, a material misrepresentation, or a material omission of fact to induce the insurer to issue the policy. Chicago Ins. Co. v. Fascina, 2006 WL 3714310, at *3 (S.D.N.Y. 2006). "A material misrepresentation, even if innocent or unintentional, is sufficient to warrant a rescission of the policy." Id.

In the present case, the unassailable record shows that Pepper Hamilton submitted to its Insurers in September 2002 and September 2003 Applications for legal malpractice coverage which contained material misstatements and omissions of fact. In turn, those Applications formed the basis for the 2002-2003 and 2003-2004 Continental Excess Policies, as Continental Casualty reasonably relied on the information provided in Pepper Hamilton's Applications and attachments in deciding to issue the Continental Excess Policies on the terms and for the premiums provided.      Based upon Pepper Hamilton's bad-faith and knowing material

---

[4]      It is noteworthy that the Westport v. Goldberger & Dubin case involved virtually the same Westport Prior Knowledge Exclusion B at issue in this litigation.

misstatements and omissions, and in light of Continental Casualty's reasonable reliance thereon, the 2002-2003 and 2003-2004 Continental Excess Policies should be rescinded.

### 1.    Pepper Hamilton Made False Statements in its Insurance Applications and Knew Those Statements to be False

It is beyond question that the Pepper Hamilton Defendants knew of the facts and circumstances of the SFC forbearance scheme by the time they submitted to Continental Casualty each of the 2002-2003 and 2003-2004 Applications. Gagné succinctly outlined the details of the scheme and the implications thereof in his March and April 2002 emails with Yao and his corresponding April and May 2002 memoranda to Pepper Hamilton leadership. (Pollard Aff., Exs. 32-36, 41).

Moreover, the Pepper Hamilton Defendants effectively knew that the firm would be sued as a result of its role in SFC's forbearance scheme, yet failed to disclose this material fact to Continental Casualty in conjunction with its Applications for the 2002-2003 and 2003-2004 Continental Excess Policies. To the point, Gagné forewarned Pepper Hamilton's management and its risk manager in his April 18, 2002 memorandum that "I think we also need to recognize the possibility that *this firm will be sued*, as a deep pocket associated with SFC and these transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility." (Pollard Aff., Ex. 35, at 5) (emphasis added). When asked to explain the basis for his warning to Pepper Hamilton's management and risk manager, Gagné stated that he was "concerned that we were a deep pocket, and there was a large loss, and my experience with large losses, is, *usually, anybody related to the transaction is getting sued.*" (Pollard Aff., Ex. 15, at 304) (emphasis added). In other words, Gagné did not simply believe in April 2002 that Pepper Hamilton possibly would be sued, he and others at Pepper Hamilton

20

clearly believed and anticipated that malpractice litigation was probable, if not a certainty. For this reason, perhaps among others, by April 2002, the Pepper Hamilton Defendants already had began plotting the firm's "first line of defense," as described in Gagné's April 17, 2002, draft memorandum to Pepper Hamilton's management. (Pollard Aff., Ex. 34, at 4).

Putting it differently, by April 2002, a reasonably prudent lawyer in the shoes of the Pepper Hamilton Defendants admittedly would have been "aware of a fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit," under a typical lawyers' professional liability insurance policy. That same reasonably prudent lawyer would be expected to recognize an insurer's interest in being on the same footing with the lawyer as it determined whether to insure the risk of the anticipated event. Yet, Pepper Hamilton failed to disclose the anticipated litigation to Continental Casualty when it submitted the 2002-2003 or 2003-2004 Applications to the Insurers, notwithstanding that the 2002-2003 Application required that Pepper Hamilton identify whether, *after inquiry of each attorney*, any lawyers proposed for the insurance were "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability."

Equally telling, Pepper Hamilton affirmatively elected not to advise Continental Casualty about the future SFC-related malpractice litigation, even though Gagné had specifically identified the "Student Finance Corporation transactions" and "Royal Indemnity Company transactions" when responding to Pepper Hamilton management's August 2002 survey of attorneys regarding future legal malpractice lawsuits, (Pollard Aff., Ex. 42), and notwithstanding that the Insurers specifically asked about possible future litigation in the 2002-2003 Application. (Pollard Aff., Ex. 43, at 3). In other words, Pepper Hamilton consciously withheld from

21

Continental Casualty and its other Insurers the information it learned *after making inquiry of each attorney.*

Again, in August 2003, Pepper Hamilton queried its lawyers as to knowledge of a possible legal malpractice lawsuit. (Pollard Aff., Ex. 45). Yet again, on September 4, 2003, Gagné expressly identified "the SFC matter." (Pollard Aff., Ex. 45, at 1). And again, Pepper Hamilton consciously omitted Gagné's response from the firm's 2003-2004 insurance Application. (Pollard Aff., Ex. 46). Irrespective of Pepper Hamilton's purported reason for failing to advise its Insurers of "the SFC matter," the contents of its 2003-2004 Application for legal malpractice insurance, like that of its 2002-2003 Application, were materially untrue, and Pepper Hamilton knew it.

### 2. The Representations in Pepper Hamilton's Applications Were Materially False and Continental Casualty Relied on Pepper Hamilton's False Representations and Omissions

A misstatement or omission is material where "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract." Chicago Ins. Co. v. Fascina, 2006 WL 3714310, at *3. In other words, if the misstated or omitted fact would have influenced the judgment of the underwriter in issuing the policy or in fixing the premium, the misstatement or omission was material. Rohm and Haas Co. v. Continental Cas. Co., 1999 Pa.Super. 102, 732 A.2d 1236, 1251 (1999).

As evidenced by the accompanying Affidavit of Noreen Calisto, an underwriter with Continental Casualty, had the facts or circumstances of the SFC situation been disclosed by the Pepper Hamilton Defendants, Continental Casualty would not have issued the 2002-2003 and 2003-2004 Continental Excess Policies on the same terms as actually issued. (Calisto Aff., at ¶

22

15). In Underwriter Calisto's judgment, Continental Casualty would have insisted that the 2002-2003 and/or 2003-2004 Continental Excess Policies contain an exclusion for SFC-related matters, would have sought to fix a higher premium, or would have refused to issue those Policies at all. (Calisto Aff., at ¶¶ 12, 14-15). Surely any other reasonable underwriter of lawyers' professional liability insurance in that situation would have sought certain concessions or term changes, or would not have issued the policy at all, had he or she been informed by the applicant of "the possibility that this firm will be sued," accord, Pollard Aff., Ex. 35, at 5, in a malpractice action alleging hundreds of millions of dollars in damages. Accordingly, Continental Casualty submits that there exists no genuine issue that the Pepper Hamilton Defendants' misstatements and/or omissions in the Applications were material.

Moreover, when Pepper Hamilton submitted its 2002-2003 Application, it acknowledged that: "All claims will be excluded that result from any acts, circumstances or situations known prior to the inception of coverage being applied for, that could reasonably be expected to result in a claim." (Pollard Aff., Ex. 43, at 4). Pepper Hamilton cannot now, with any mark of credibility, claim that its misstatements and/or omissions were immaterial or that Pepper Hamilton did not realize its material misstatements and/or omissions could result in preclusion of coverage for the undisclosed SFC matters.

Further, the 2002-2003 and 2003-2004 Continental Excess Policies were expressly issued in reliance on the statements made in the respective Applications. (Pollard Aff., Exs. 10 and 14). More specifically, the Continental Excess Policies provide that the Insuring Agreements were made: "In consideration of the payment of the premium, and *in reliance* on all statements made and information furnished to the Company in the Application, including all attachments, a copy

23

of which is attached hereto and made a part hereof ... ."  (Pollard Aff., Exs. 10 and 14, at Insuring Agreement) (emphasis added).

In short, the record adduced to date commands a finding that the 2002-2003 and 2003-2004 Continental Excess Policies should be rescinded, as there exists no genuine issue that the Pepper Hamilton Defendants made material misstatements and/or omissions of known facts in inducing Continental Casualty to issue the 2002-2003 and 2003-2004 Continental Excess Policies.  Accord, Chicago Ins. Co. v. Fascina, supra.  Accordingly, Continental Casualty is entitled to judgment as a matter of law.

### C. There is No Coverage Under the 2001-2002 Continental Excess Policy Because of Pepper Hamilton's Failure to Disclose or Report the Circumstances Then Known to it

Just as there is no insurance under Pepper Hamilton's 2002-2003 and 2003-2004 Policies, there is no coverage under its 2001-2002 Policy with Continental Casualty, as Pepper Hamilton's April 27, 2004 notification to the SFC circumstances came well after the 2001-2002 Continental Excess Policy had expired.  The Underlying Actions cannot be covered under that Policy as they did not constitute a "claim made and reported" during the period the 2001-2002 Continental Excess Policy was effective, and the unreported Claim does not relate back to that policy period.

### 1. The Underlying Actions Were Not "Claims Made and Reported" During the 2001-2002 Policy Period

On its face, the 2001-2002 Continental Excess Policy provides in unambiguous, bolded terms:

> THIS IS A CLAIMS MADE AND REPORTED POLICY.  EXCEPT TO SUCH EXTENT AS MAY BE PROVIDED HEREIN, THIS POLICY IS LIMITED TO LIABILITY FOR THOSE CLAIMS THAT ARE BOTH

24

FIRST MADE AGAINST THE INSURED AND REPORTED TO THE
COMPANY DURING THE POLICY PERIOD.  PLEASE READ THE
POLICY CAREFULLY AND DISCUSS WITH YOUR INSURANCE
AGENT OR BROKER.

(Pollard Aff., Ex. 6, at 1).

It is beyond issue that Pepper Hamilton first notified Westport of the "threatened claim"

by the SFC Trustee no earlier than April 27, 2004.  (Pollard Aff., Ex. 48).  As such, the SFC

matter certainly was not a claim "BOTH FIRST MADE AGAINST THE INSURED AND

REPORTED TO THE COMPANY DURING THE POLICY PERIOD."  Moreover, on the facts

presented, nothing in the 2001-2002 Continental Excess Policy enables Pepper Hamilton to

obtain retroactive insurance for the Underlying Actions.  As such, there is no coverage under the

2001-2002 Continental Excess Policy, and Continental Casualty is entitled to summary judgment

under this policy as well.

### 2.    Insuring Agreement B of the 2001-2002 Primary Policy Does Not Apply Because There is No "Continuity of Coverage"

The 2001-2002 Primary Policy issued by Westport contains the following Insuring

Agreement B:

B.    If, during the current POLICY PERIOD, any INSURED first
becomes aware of a POTENTIAL CLAIM and gives written notice
of such POTENTIAL CLAIM to the Company either during the
current POLICY PERIOD, or during the POLICY PERIOD of any
subsequent policy issued to the NAMED INSURED as a result of
continuous and uninterrupted coverage with [Westport], any
CLAIMS subsequently made against any INSURED arising from
the POTENTIAL CLAIM shall be considered to have been first
made during the POLICY PERIOD the INSURED first became
aware of a POTENTIAL CLAIM.

(Pollard Aff., Ex. 5).

25

The 2001-2002 Westport Primary Policy defines the term "Potential Claim" to mean:

1)   any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or

2)   any breach of duty to client or third party which has not resulted in a CLAIM against an INSURED.

(Pollard Aff., Ex. 5).

While Continental Casualty disputes that this provision applies to the 2001-2002 Continental Excess Policy, neither the parties nor the Court need to address this issue, as even, *arguendo*, were it to apply, the predicates to coverage thereunder have not been satisfied and do not exist in the instant case.

Specifically, Insuring Agreement B only applies to those POTENTIAL CLAIMS notified under later Policy Years where the firm maintained "continuous and uninterrupted coverage" with its Insurers. Because the 2002-2003 and 2003-2004 Continental Excess Policies are subject to rescission, as demonstrated above, there was not "continuous and uninterrupted" coverage in place at the time Pepper Hamilton finally notified its Insurers of the POTENTIAL CLAIM of the SFC matters. Moreover, setting to one side the rescission issues, Continental Casualty placed significantly different coverages in 2002-2003 and 2003-2004, versus 2001-2002, and did not therefore provide "continuous" coverage of the same substance among the relevant Policy Years.

<p style="text-align: center;"><u>a.</u>    <u>There is No "Continuity of Coverage" as the<br/>Later Policies are Subject to Rescission</u></p>

Under the plain terms of Insuring Agreement B, coverage potentially exists *only* if there is "continuous and uninterrupted coverage" in place from the time Pepper Hamilton first learned of the POTENTIAL CLAIM to the time it notified the Insurers. It obviously follows, then, that once the 2002-2003 and/or the 2003-2004 Continental Excess Policies have been rescinded, there is no such "continuous and uninterrupted" coverage. As such, coverage would not be afforded under the 2001-2002 Continental Excess Policy, and Continental Casualty is entitled to judgment in its favor.

<p style="text-align: center;"><u>b.</u>    <u>Continental Casualty Issued Different Coverage<br/>in the Later Policy Periods, and There was Thus<br/>No "Continuous and Uninterrupted" Coverage</u></p>

Separate and apart from the issue of rescission, the different coverages provided under the 2001-2002 Continental Excess Policy on the one hand and the 2002-2003 and 2003-2004 Continental Excess Policies on the other certainly do not equate to "continuous and uninterrupted" coverage for purposes of applying Insuring Agreement B.

Black's Law Dictionary defines the term "interruption" as "[a] break in continuity or uniformity." Black's Law Dictionary 567 (6th ed. 1991). The term "continuous," according to the American Heritage College Dictionary, means being "uninterrupted in time, sequence, substance or extent." American Heritage College Dictionary 301 (3rd ed. 1993).

Thus, being "continuous and uninterrupted" means being continuous not only in time, but in substance. The coverage issued by Continental Casualty in the 2001-2002 Year ($30 million, excess of $20 million in underlying insurance) was not continuous either in sum or in substance

<p style="text-align: center;">27</p>

with the higher-position, lower-dollar stake taken in the 2002-2003 and 2003-2004 Years ($10 million, excess of $30 million in underlying insurance). Accordingly, the coverages were not "uniform" or "uninterrupted in substance," and, thus, Continental Casualty did not provide "continuous and uninterrupted" coverage throughout the relevant Policy Years to implicate Insuring Agreement B, even, *arguendo*, were it incorporated into the 2001-2002 Continental Excess Policy.

Insofar as the predicates required to trigger Insuring Agreement B of the 2001-2002 Primary Policy do not exist here, Continental Casualty is entitled to a judgment in its favor as a matter of law that the 2001-2002 Continental Excess Policy does not provide coverage to the Pepper Hamilton Defendants with respect to the Underlying Actions.

## CONCLUSION

For all of the foregoing reasons, Continental Casualty respectfully submits that this Court should award summary judgment to Continental Casualty by rescinding the 2002-2003 and 2003-2004 Continental Excess Policies and declaring coverage unavailable under the 2001-2002 Continental Excess Policy.

Dated: New York, New York
      July 18, 2007

Respectfully submitted,

COZEN O'CONNOR

By: _____

Kevin M. Mattessich
Patrick M. Kennell
Cozen O'Connor
45 Broadway – 16th Floor
New York, New York 10006
Phone: (212) 509-9400
Facsimile: (212) 509-9492
*Attorneys for Third-Party Defendant*
CONTINENTAL CASUALTY COMPANY

TO:

Randy Paar, Esq.
Joan L. Lewis, Esq.
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, New York 10036-2714
*Attorneys for Defendant / Third-Party Plaintiffs*
PEPPER HAMILTON LLP and
W. RODERICK GAGNÉ

Samuel Mayer, Esq.
Scott H. Casher, Esq.
EDWARDS, ANGELL, PALMER & DODGE, LLP
750 Lexington Avenue
New York, New York 10022
*Attorneys for Third-Party Defendant*
TWIN CITY FIRE INSURANCE COMPANY

Howard Veisz, Esq.
William B. Pollard, III, Esq.
KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017-2013
*Attorneys for Plaintiff*
EXECUTIVE RISK INDEMNITY, INC.

Gregg Weinstock, Esq.
GARBARINI & SCHER, P.C.
432 Park Avenue South, 9th Floor
New York, New York 10016
*Attorneys for Defendant*
WESTPORT INSURANCE CORPORATION

Robert Conlon, Esq.
Joyce F. Noyes, Esq.
WALKER WILCOX MATOUSEK, LLP
225 West Washington Street, Suite 2400
Chicago, Illinois 60606
*Attorneys for Defendant*
WESTPORT INSURANCE CORPORATION

NEWYORK_DOWNTOWN\242314\3

# EXHIBIT 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

EXECUTIVE RISK INDEMNITY, INC.,

                    Plaintiff,

          -v-

PEPPER HAMILTON LLP, W. RODERICK
GAGNE and WESTPORT INSURANCE
CORPORATION,

                    Defendants.

---

PEPPER HAMILTON LLP and W. RODERICK
GAGNE,

                    Third-Party Plaintiffs,

          -v-

CONTINENTAL CASUALTY COMPANY and
TWIN CITY FIRE INSURANCE COMPANY,

                    Third-Party Defendants.

---

Index No. 603624-05

Part 3

Hon. Karla A. Moskowitz

TP Index No. 590185-07

<br>

**MEMORANDUM OF LAW OF THIRD PARTY DEFENDANT TWIN CITY
IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT
AGAINST DEFENDANTS PEPPER HAMILTON LLP AND RODERICK GAGNE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 3

    SFC's Alleged Fraud Scheme .............................................................................................. 3

    Pepper and Gagne's Involvement with SFC and Awareness of SFC's "Ghost
    Payments" ............................................................................................................................ 5

    Pepper and Gagne's Belief that They May be Sued Based on Their Work for SFC .......... 6

THE PRIOR KNOWLEDGE POLICY PROVISIONS ............................................................. 12

    1.    The Westport Prior Knowledge Provisions ............................................................. 12

    2.    The Twin City Prior Knowledge Provision ............................................................. 13

    3.    The Twin City Warranty Letter ............................................................................... 13

    4.    The Westport Potential Claim Provision ................................................................. 14

LEGAL ARGUMENT.................................................................................................................. 15

    Point I - The Prior Knowledge Provisions Bar Coverage For This Claim As A
    Matter Of Law...................................................................................................................... 15

    Point II – The Westport Prior Knowledge Provisions Bar Coverage ................................ 20

    Point III - The Twin City Prior Knowledge Provisions Bar Coverage.............................. 21

    Point IV - Pepper's Breach Of Its Warranty Letters To Twin City Bars Coverage ......... 23

    Point V - The Westport Potential Claims Provision Bars Coverage Under the
    2003-2004 Policies............................................................................................................. 25

STM_231826_3.DOC/SCASHER

## TABLE OF AUTHORITIES

**Cases**

*Alvarez v. Propsect Hosp.*, 68 N.Y. 2d 320 (1986) ...................................................................... 15

*Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231 (3d Cir. 2006) ................... 19, 20

*Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302 (3d Cir. 2001) ........................... 18, 19

*Coregis Ins. Co. v. Wheeler*, 24 F.Supp.2d 475 (E.D.Pa.1998).................................................... 17

*Ehrgood v. Coregis Ins. Co.*, 59 F.Supp.2d 438 (M.D. Pa.1998) ................................................ 17

*Houghton v. American Guaranty Life Ins. Co.*, 692 F.2d 289 (3d Cir.1982) ............................... 16

*Murphy v. Coregis Ins. Co.*, No. 98-5065, 1999 WL 627910 (E.D. Pa. Aug.17, 1999).............. 16

*Selko v. Home Ins. Co.*, 139 F.3d 146 (3d Cir. 1998)............................................................. 17, 18

*Stain less, Inc., et. Al. v. Employers Fire Insurance Company*, 69 A.D.2d 27 (1st Dep't 1979)............................................................................................................................................ 2, 16

*Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983).......................................................................................................................................... 16

*Vlastos v. Sumitomo Marine & Fire Ins. Co. (Europe) Ltd.*, 707 F.2d 775 (3rd Cir. 1983)......... 25

*Waddington v. Wm. Penn Fire Ins. Co.*, 65 Pa. D. & C. 431, 1949 WL 2898 (Pa. Com. Pl. 1949) ......................................................................................................................................... 25

*Westport Ins. Corp. v. Mirsky*, 2002 WL 31018554 (E.D. Pa. 2002) .......................................... 16

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)............................................... 23

*Zuckerman v. City of New York*, 49 N.Y. 2d 557 (1980)............................................................... 15

## Preliminary Statement

It is undisputed that on April 17, 2002, defendant Roderick Gagne ("Gagne"), then (and now) a partner of defendant Pepper Hamilton LLP ("Pepper") authored and circulated to other Pepper partners a memorandum (the "Memorandum") indicating that Pepper "may be subject to suit." The Memorandum noted that, in essence, Pepper represented two clients in connection with certain transactions and ongoing matters. The Memorandum stated that, in connection with such matters, one of these clients (Student Finance Corporation, hereinafter "SFC") defrauded the other client (Royal Indemnity Company, hereinafter "Royal"). Thus, Gagne expressed his well-founded belief that Pepper "may be subject to suit."

It is also undisputed that Twin City Fire Insurance Company ("Twin City") issued a Lawyers Professional Liability policy to Pepper, which was effective as of October 27, 2003 (the "Policy"), which was a "follow-form excess" policy sitting above a primary policy issued by Westport Insurance Company ("Westport").[1] The Policy (via the Westport policy, as well its own provisions) expressly excludes coverage for any "Claim arising out of any act ... that the Insured at the effective date knew or could reasonably have foreseen ...might be expected to be the basis of a Claim" (the "Prior Knowledge Exclusion"). Thus, Twin City has taken the position that the Prior Knowledge Exclusion excludes coverage for matters arising from any of the acts described in the Memorandum.

It is also undisputed that both Royal and SFC have, directly or, in the case of SFC, through a Chapter 7 bankruptcy trustee, brought suit against Pepper in connection with the matters referred to in the Memorandum. Pepper has reported the lawsuits as a claim under the Policy. Because the claim is excluded from coverage by the Prior Knowledge Exclusion, Twin

---

[1] Twin City issued a first excess policy to Pepper effective October 27, 2002. That policy was renewed effective October 27, 2003. Pepper tendered its claim to Twin City under 2003-04 policy (the "Policy").

City was compelled to disclaim coverage. Other carriers within the Pepper insurance program took similar positions and this coverage litigation ensued.

The law is well settled that a party opposing a motion for summary judgment must assemble and lay bare affirmative proof to demonstrate the existence of a genuine triable issue of fact. *Stain less, Inc., et. Al. v. Employers Fire Insurance Company,* 69 A.D.2d 27 (1st Dep't 1979). In the case at bar, Pepper has not demonstrated -- and cannot demonstrate -- proof that would place in genuine dispute any of these facts. Furthermore, granting summary judgment in favor of Twin City will not leave Pepper without coverage. In fact, there is actually more coverage available to Pepper -- $50 million -- in the 2001-2002 policy year.

Moreover, and as detailed below, the factual record has additional, irrefutable evidence that further establishes the clear applicability of the Prior Knowledge Exclusion to this claim as a matter of law. For example, prior to the effective date of the Policy, Pepper's General Counsel issued a memo directing a "litigation hold" to attorneys of the firm who had worked on SFC matters. Indeed, although proof of a policyholder's "intent to deceive" the insurer is not required in order for the Prior Knowledge Exclusion to apply to a claim, Pepper affirmatively -- but falsely -- stated to Twin City on several occasions prior to the effective date of the Policy that, after making relevant inquiries, Pepper was unaware that its actions on behalf of SFC might result in a claim or suit.

The legal principles governing this motion are straightforward. As demonstrated herein, courts have consistently construed language substantially identical to the language of the Prior Knowledge Exclusion to be clear and unambiguous. A plain reading of the Prior Knowledge Exclusion against the undisputed facts therefore compels summary judgment in favor of Twin City. There simply is no evidence that establishes any genuine issue as to whether, as of the

- 2 -

effective date of the Policy, Pepper held a subjective belief that it might later be sued arising

from its dealings with SFC and Royal. Moreover, and as an alternate basis for summary

judgment, there is no evidence that creates any genuine, factual issue as to whether, as of the

effective date of the Policy, Pepper had a subjective knowledge of information sufficient to make

a suit by Royal and/or SFC against Pepper reasonably foreseeable. It is indisputable that Pepper

held such knowledge. Hence, on either ground, Twin City is entitled to summary judgment as a

matter of law. Twin City therefore respectfully requests summary judgment that the claim

submitted under the Policy for the lawsuits brought by Royal and SFC, respectively, is not

covered under the Policy.

## **Statement of Facts**

### SFC's Alleged Fraud Scheme

SFC was a company that financed student tuition loans at various trade schools, primarily

truck driving schools. (Rule 19 Statement ("R19S"), ¶ 1.) SFC was established by Andrew Yao

("Yao") in the early 1990s, and Yao was the president and sole or majority stockholder of SFC.

(Id.) Gagne started representing Yao around 1985, and represented Yao and SFC prior to joining

the Pepper law firm as a partner in 1996. (R19S, ¶ 2.) After Gagne joined Pepper in 1996, Yao

and SFC became clients of Pepper. (Id.) SFC obtained financing to support its financing of

student loans through private lenders and bank financing. Pepper assisted SFC in obtaining that

financing by drafting private placement memoranda and legal opinions. (R19S, ¶ 3.) Some of

the private lenders included Gagne and members of his family, who together loaned SFC nearly

$32 million. (Id.)

SFC pooled the student loans, securitized them, and sold them to specially created trusts.

The investors in the trusts purchased certificates backed by the pooled loans. (R19S, ¶ 4.) SFC

- 3 -

needed credit risk insurance to cover potential loan defaults, obtain credit lines, and market the securitizations. (Id.) In or about 1999, SFC obtained that credit risk insurance from Royal Insurance Group ("Royal"), also a client of Pepper. (R19S, ¶ 5.) SFC obtained the credit risk insurance by providing data to Royal that showed the student loans were defaulting at modest rates. (Id.) Subsequent status reports from SFC to Royal showed the same thing, leading Royal to issued additional policies, totaling eleven in all. (Id.)

Unbeknownst to Royal, although known to Pepper and Gagne, SFC used income from borrowed funds and securitization sales and made systematic payments in order to mask the actual rate of defaults on the student loans. (R19S, ¶ 6.)  SFC represented and reported to Royal that the students themselves were paying back their loans on time. (Id.)  SFC referred to its loan payments as "forbearance payments," but SFC, with the knowledge of Pepper and Gagne, concealed the fact that SFC was paying the loans to keep the default rate low. (R19S, ¶ 7.) These "ghost payments" by SFC, as referred to by Royal in its complaint, led Royal to believe the loan program and SFC's business were sound, and so Royal issued additional credit insurance policies to SFC, totaling in excess of $600 million. (Id.)

Royal alleges that by March 2002, true student loan default rates were skyrocketing, Yao had taken $40 million out of SFC for personal use, SFC was unable to obtain new financing in order to continue making "ghost payments" to keep the loan default rates low, and SFC was ultimately forced to reveal to Royal that a significant number of student loans were about to default and Royal would be faced with an enormous amount of claims, which by the end of 2002 totaled nearly $400 million. (R19S, ¶ 8.)  Default rates ultimately were determined to exceed 85%, and involuntary bankruptcy proceedings were commenced against SFC in June, 2002. (Id.) Yao was indicted in 2006 and convicted of fraud in March 2007. (R19S, ¶ 9.)

STM_231826_3.DOC/SCASHER

Pepper and Gagne's Involvement with SFC and Awareness of SFC's "Ghost Payments"

Royal alleges that Pepper and Gagne knew as early as 1999 that SFC was concealing the "ghost payments" from investors to disguise the true rate of default for student loans. (R19S, ¶ 10.)

Royal points to the following facts in support of its allegations:

- In 1999, Pepper defended SFC in a lawsuit in which it was revealed during discovery through an SFC witness that SFC was paying the student loans to conceal the true default rate from investors
- In March 2000, before Royal began issuing policies to SFC, Pepper and SFC discussed the use of "ghost payments" by SFC to conceal the performance of the SFC loan pools
- During that discussion, memorialized in a March 2, 2000 email from Gagne to Yao, Gagne suggested that SFC's use of funds to pay loans, other than funds from students themselves, may cause concern by investors and Royal, and it may look like the SFC is "manipulating the pool performance." Gagne added that Royal "will be directly affected and is if the plan is being used now." Gagne advised SFC that Royal was already hesitant to issue credit risk policies to SFC, and would be even more hesitant if Royal was aware that the students were not able to keep their loans current
- In March 2000, Pepper added a "forbearance" clause to the basic student loan contracts so that SFC would make loan payments on behalf of students
- Pepper's first private placement memorandum for SFC in connection with SFC's efforts to attract investors, was finalized on April 11, 2000, one month after the March 2 email described above
- Pepper drafted seven more private placement memoranda ("PPM") for SFC
- The PPM did not mention that SFC was making "ghost payments," the impact of such payments on the loan default rate, or the actual default rate of the loans
- Royal relied on the statements contained in the PPM and issued credit insurance to SFC based on the PPM
- Pepper and Gagne knew that Royal relied on the content of the PPM
- SFC made false statements to Royal representatives regarding the loan payments in Gagne's presence; Gagne knew the statements were false and said nothing
- Gagne and his family loaned nearly $32 million to SFC from 1996 to 2002 at above-market interest rates
- Pepper represented SFC in these loan transactions

(R19S, ¶ 11.)

Pepper and Gagne's Belief that They May be Sued Based on Their Work for SFC

In March 2002, SFC revealed to Royal that SFC had lied to Royal and investors regarding payment of the loans and the true default rate, that SFC had been making "ghost payments" all along to keep the student loans current, that SFC's loan payments totaled approximately $50 million, that SFC was no longer able to pay the loans, and that there would now be a large spike in defaults which would result in massive claims against Royal under the credit risk policies. (R19S, ¶ 12.) In response to that disclosure to Royal and the imminent collapse of SFC, on April 17, 2002, Gagne drafted the Memorandum to Pepper's Finance Committee and Ethics Committee regarding Pepper's knowledge of SFC's concealment and lies to investors and to Royal with respect to the performance of the student loans, SFC's use of "ghost payments," and the possibility that Pepper could be sued as a result of its work for SFC:

> In the past month, it has come to our attention that officers of Student Finance Corporation lied to investors and were complicit in misrepresenting certain material faults regarding the financial performance of the student loans which investors financed through a variety of mechanisms. The crux of the issue is that Student Finance Corporation would use reserves that they took from schools at which the students ?? to make payments on the student loans so that the student loans would not go into default (90 days delinquent). Two officers of the Company when asked why almost 60% of the pools were remaining in a 60-day delinquency bucket, explained that it is the habit of truck drivers to pay immediately preceding a road trip and again when they return. As a result, most of the loans are always going to be in a 60-day delinquency bucket. They asserted other reasons, but never said that SFC and the schools were paying for the loans. In fact, Student Finance Corporation was taking monies to prop up these loans so that they would not go into default causing the default statistics on the loans and the static pools to be false.

> \*\*\*

> The magnitude of the fraud is also very disconcerting in that Royal Indemnity Company, another client of the firm, could be significantly damaged by the losses which have been estimated at

- 6 -

between $150 Million and $200 Million Dollars. We have a
waiver of this conflict as well.

<div align="center">***</div>

My initial reaction is that we should distance ourselves from
Student Finance Corporation ("SFC") and terminate our
representation of SFC. If we do so, I am sure that Andrew N. Yao
will not pay our fees. In addition, our withdrawal will raise the
spector with the capital markets that Student Finance Corporation
has done something heinous and it will impair SFC's ability to
bring itself out of its liquidity crisis. If they cannot, it will imperil
the company and **we may be subject to suit.** (emphasis added)

In addition, **our first line of defense** as well as Student Finance
Corporation's **is that there was no fraud** since the forbearance
accounts were disclosed in their financial statements. (emphasis
added)

The revised school agreements in which these forbearance
accounts were created were drafted by another law firm, Fox
Rothchild. **When we were given the task, I strongly
recommended against it because I thought that the forbearance
accounts could create misrepresentations in the static pool and
to Royal Indemnity Company for the reasons that we are
seeing now.** They did not like my answer and took it to another
firm. **However, certain aspects of the agreements were
implemented into the student loans by the Wilmington office** so
as to comply with the state consumer handling laws. This is
another example of their answer shopping. These notes were
distributed to investors and investment bankers. If you looked
hard enough, you would have discovered the use of forbearance
payments as skewing the data. In fact, that is exactly how the
problem was discovered by another lender who looked carefully at
the data. **To my knowledge, no one at Student Finance
Corporation ever fully disclosed the use of the forbearance
accounts and certainly not to my knowledge in response to
direct questions was the correct reason ever given.** (emphasis
added)

(R19S, ¶ 13.)

At a minimum, this draft Memorandum is very strong evidence of at least one thing: by

April 17, 2002, Pepper knew it "may be subject to suit" due to its work on behalf of SFC. (R19S,

¶ 14.) Pepper was already considering its "first line of defense" to such a claim. (Id.) Pepper

<div align="center">- 7 -</div>

also admits that SFC asked it to draft the forbearance clauses for the student loan contracts, but Pepper claims in this draft Memorandum that it refused to do that work because it could create misrepresentations to Royal regarding the true default rate of the loans. (R19S, ¶ 15.) However, the important fact that Gagne does not include in this draft Memorandum is that Pepper was in fact reviewing and commenting on the forbearance clauses being drafted by the other law firm and Pepper billed its time for that work. (R19S, ¶ 16.) Thus, Pepper was aware that misrepresentations were being made to Royal regarding the true default rate of the loans. (R19S, ¶ 17.) Moreover, Pepper admits in this draft Memorandum that its Wilmington office added the forbearance clauses to the student loan contracts. (Id.)

One day later, on April 18, 2002, the draft Memorandum was revised and finalized. (R19S, ¶ 18.) Apart from some stylistic and content changes to soften the tone of the description of the fraud, four significant substantive changes were made which bear directly on the issue of Pepper's knowledge that it might be exposed to a claim. (Id.)

First, Pepper deleted the entire second-to-last paragraph regarding the legal work performed by Pepper and the other law firm on the SFC forbearance clauses in the student loan contracts, regarding Pepper's knowledge in March 2000 that the clauses misrepresented to Royal the true rate of default of the loans, and regarding Pepper's knowledge that SFC concealed from Royal and others the use of forbearance ("ghost") payments. (R19S, ¶ 19.)

Second, Pepper deleted the sentence explaining that Pepper's "first line of defense" to a claim should be "that there was no fraud." (R19S, ¶ 20.)

Third, Gagne admitted in the April 18 memo that SFC lied to Royal and others regarding the student loan payments and default rates and did so in his presence:

> In a meeting in which I was present, in response to direct questions on this issue, two officers of the Company stated that it is the habit of truck drivers to pay immediately preceding a road trip and again when they return, and as a result most of the loans are always

- 8 -

> going to be in a 60-day delinquency bucket. They asserted other
> reasons, but never said that SFC and the schools were paying on
> the loans, as it has turned out was clearly the case.

(R19S, ¶ 21.)

Finally, the original sentence stating that Pepper "may be subject to suit," was changed as
follows:

> I think we also need to recognize the possibility that this firm will
> be sued, as deep pocket associated with SFC and these
> transactions, and it may be appropriate to consider whether one
> course of action or another might better mitigate this possibility.

(R19S, ¶ 22.) Thus, Pepper admitted on April 18, 2002, that it knew or could have reasonably
foreseen that its work for SFC might subject Pepper to suit as a deep pocket. Moreover, the
memo recommends that Pepper begin planning its defense to such a suit. (R19S, ¶ 23.)

On April 24, 2002, Pepper withdrew from its representation of SFC, except that Pepper
agreed to continue representing SFC regarding a loan from Royal on the condition that Pepper
would not provide Royal with a legal opinion. (R19S, ¶ 24.)

On April 25, 2002, Alfred Wilcox, who serves as Pepper's General Counsel, as a member
of Pepper's Insurance Committee and Professional Responsibility Committee and lead partner
for insurance matters, sent a memo to all Pepper attorneys who worked on SFC matters, with a
copy to Jim Murray (Pepper's Executive Partner), which advised that Pepper had resigned from
representing SFC except with respect to the Royal loan. (R19S, ¶ 25.) He directed that all
attorneys preserve all records including emails regarding SFC, and he further directed as follows:

> Do not discuss any aspect of this situation with anyone outside the
> firm; within the firm, discuss these matters only with those who
> have a need to know because of they are working in the transition
> to successor counsel (e.g., Roderick Gagne), or because they are
> involved in protecting the firm's interests (i.e., me, Tom Zemaitis,
> Jim Murray).

(R19S, ¶ 26.)

On May 15, 2002, Gagne sent Wilcox a draft memo summarizing Pepper's work for SFC in connection with the forbearance ("ghost") payments to "help him and assist him in <u>assessing any potential claims that were -- could have been filed</u> by Student Finance Corporation <u>against Pepper</u>." (emphasis added). (R19S, ¶ 27.)  In the memo, Gagne again admits, although this time with more detail, that he was present at two separate meetings when SFC made material misrepresentations to Royal and others regarding the payment of loans and the default rate of the loans. (R19S, ¶ 28.)  Gagne further admits that in August 2001 Pepper reviewed and commented on the forbearance clauses that were drafted by Fox Rothchild, clauses that Pepper refused to draft because it thought the clauses could create misrepresentations to Royal regarding the true default rate of the loans, and Gagne also admits that Pepper attorneys included the forbearance clauses in the new SFC student loan contracts. (R19S, ¶ 29.)

Shortly after Gagne's May 15, 2002 memo, litigation ensued regarding SFC's "ghost payment" practices and scheme to conceal the true rate of student loan defaults.  Four trucking schools filed involuntary bankruptcy petitions against SFC in June 2002. (R19S, ¶ 30.)  Royal was sued in July 2002 for $400 million by investors looking to recover their losses under the credit risk policies. (R19S, ¶ 31.)

On July 22, 2002, Pepper circulated to all lawyers in the firm questions to be answered in connection with Pepper's insurance applications. (R19S, ¶ 32.)  The policy period for Twin City's initial excess policy issued to Pepper did not begin until October 27, 2002. (R19S, ¶ 33.)  One question to be answered by all lawyers was as follows:

> Are you aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of the claim or suit for lawyers professional liability?

STM_231826_3.DOC/SCASHER

(R19S, ¶ 34.)

On August 6, 2002, Gagne answered that question affirmatively and gave the following explanation:

> The only two matters of which I am aware are the Student Finance Corporation transactions of which you are familiar and the Royal Indemnity Company representation. The only Royal representation that I currently think any claim could be made is where we represented them in a transaction which they terminated hours before the closing for a variety of reasons. I do not think we will be implicated in the Royal Indemnity Company matter since an action has not been filed and the action really lies against our client. With regard to the Student Finance Corporation, two lawsuits have been filed in two different states and to date, we have not been named in either action. I am not certain as to whether we will be joined in the future.

(R19S, ¶ 35, Exh. 12.)

Despite the above statement by Gagne that he was aware that Pepper's involvement with SFC and Royal might be expected to be the basis of the claim or suit for lawyers professional liability, although he disputed the merit of any such claim, Pepper submitted an insurance application form to Westport in which it answered "No" to the following question: "After inquiry of each lawyer, is the Applicant, its predecessor firms or any lawyer proposed for this insurance aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability?" (R19S, ¶ 36.)

Royal and the Trustee for SFC filed two separate lawsuits against SFC, Yao, Pepper, Gagne, and members of Gagne's family (the "Underlying Actions"). (R19S, ¶ 37.) The Trustee lawsuit was filed in 2004 and the Royal lawsuit was filed in 2005. (Id.) The claims against Pepper and Gagne include RICO violations, fraud, aiding and abetting fraud, conspiracy to commit fraud, negligent misrepresentation, breach of fiduciary duty, and professional malpractice. (Id.)

STM_231826_3.DOC/SCASHER

### The Prior Knowledge Policy Provisions

Twin City seeks summary judgment, because coverage for the claims in the Underlying

Actions is barred by one or more of four policy provisions which, although their wording differs,

all bear upon the state of knowledge or awareness possessed by Pepper Hamilton prior to the

2003-04 policy period of the Twin City Policy.

1.  The Westport Prior Knowledge Provisions

The primary Westport policy, to which the Twin City Policy follows form,

contains the following provision in an endorsed Amendment of Lawyers Professional Liability

Coverage Unit:

> [T]his COVERAGE UNIT shall not apply to any CLAIM based
> upon, arising out
>
> of, attributable to, or directly or indirectly resulting from the
> following additional exclusion:
>
> Any CLAIM arising out of any act, error, omission or PERSONAL
> INJURY occurring prior to the effective date of this POLICY if a)
> the matter had previously been reported to any professional
> liability insurance company or b) the INSURED at the effective
> date *knew or could reasonably have foreseen* that such act, error,
> omission or PERSONAL INJURY at the effective date might be
> expected to be the basis of a CLAIM; provided however, that
> subsection b) does not apply to any INSURED who had no
> knowledge of or could not have reasonably have foreseen that any
> such act, error, omission or PERSONAL INJURY might be the
> basis of a CLAIM. (emphasis added)

(R19S, ¶ 38.)

An endorsed Amendment of Exclusion B provides similarly:

> [T]his COVERAGE UNIT shall not apply to any CLAIM based
> upon, arising out of, attributable to, or directly or indirectly
> resulting from:
>
> ***
>
> B. any act, error, omission, circumstance or PERSONAL INJURY
> occurring prior to the effective date of this POLICY if any
> INSURED at the effective date *knew or could reasonably have*

- 12 -

> *foreseen* that such act, error, omission, circumstance or
> PERSONAL INJURY might be the basis of a CLAIM. This
> exclusion does not apply to any INSURED who had no knowledge
> or could not have reasonably foreseen that such act, error,
> omission, circumstance or PERSONAL INJURY might be the
> basis of a claim. (emphasis added)

(R19S, ¶ 39)

These prior knowledge provisions use the wording "knew or could reasonably have

foreseen" that the act, error, omission or circumstance "might be the basis of a claim."

### 2.  The Twin City Prior Knowledge Provision

The Twin City first excess policy at Section VII.D.2. provides:

> This policy does not apply to any claim:
> \*\*\*
> 2.  arising out of any act, error, or omission committed prior to the
> inception date of this policy which the insured *knew or should
> have known* could result in a claim, but failed to disclose to the
> Company at inception. (emphasis added)

(R19S, ¶ 40.)  This prior knowledge provision uses the wording "knew or should have

known" that the act, error or omission "could result in a claim."

### 3.  The Twin City Warranty Letters

Pepper executed two Warranty Letters to Twin City, the first on October 25, 2002 and the

second on November 14, 2003, and delivered them to Twin City.  In the October 25, 2002

Warranty Letter, Pepper stated as follows:

> *This warranty letter shall confirm that as of October 25, 2002*
> there have been no material changes in the application submitted to
> the Hartford which is signed and dated September 6, 2002 and that
> *any person to be insured does not have knowledge or information
> of any act, error or omission which might reasonably be expected
> to give rise to a claim against the applicant at some point in the
> future.*

- 13 -

The signing of this warranty letter will confirm that the firm has circulated this letter to each attorney in the firm or has in place such internal controls that would disclose the information requested herein to the management committee of the firm.

The information submitted herein becomes a part of the Lawyer's Professional Liability Policy issued through the Hartford, by a member of the Hartford Group of Insurance Companies, its affiliates and subsidiaries. (emphasis added)

(R19S, ¶ 43.) A Warranty Letter executed by Pepper Hamilton on November 14, 2003, states:

This is to acknowledge that, after inquiry, *I am not aware* of any claims and/or circumstances, acts, errors or omissions that might be expected to be the basis of a claim or suit. (emphasis added)

(R19S, ¶ 44.)

This prior knowledge provision uses the wording "not aware" of circumstances, acts,

errors or omissions that "might be expected to be the basis of a claim or suit."

### 4.  The Westport Potential Claim Provision

The Westport primary policy at Section I.C. provides:

If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the policy period of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

(R19S, ¶ 46.)

Section VIII.E. provides:

"POTENTIAL CLAIM" WHENEVER USED IN THIS COVERAGE UNIT MEANS:

1.  any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or

- 14 -

STM_231826_3.DOC/SCASHER

       2. any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED.

(R19S, ¶ 47.)

This prior knowledge provision uses the wording "first became aware" of a potential claim to determine the applicable policy period.

On April 22 and 27, 2004, Pepper Hamilton first sent to Westport a written notice of a potential claim by the SFC Trustee, and Westport acknowledged receipt of notice of the potential claim on April 23, 2004. (R19S, ¶ 49.)

### LEGAL ARGUMENT

### POINT I

### THE PRIOR KNOWLEDGE PROVISIONS BAR COVERAGE FOR THIS CLAIM AS A MATTER OF LAW

A party is entitled to summary judgment when it makes a *prima facie* showing of entitlement to judgment as a matter of law by offering evidence sufficient to demonstrate the absence of any material issues of fact. CPLR 3212(b); *Alvarez v. Propsect Hosp.*, 68 N.Y. 2d 320, 324 (1986). Once a party makes such a *prima facie* showing, the burden shifts to the other party to produce evidence sufficient to raise an issue of material fact that would require a trial. *Id.* "[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions" are insufficient to raise a question of material fact. *Zuckerman v. City of New York*, 49 N.Y. 2d 557, 562 (1980). As noted above, the law is well settled that a party opposing a motion for summary judgment must assemble and lay bare affirmative proof to demonstrate the existence of a genuine triable issue of fact. *Stain less, Inc., et. Al. v. Employers Fire Insurance Company*, 69 A.D.2d 27 (1st Dep't 1979).

- 15 -

The motion for summary judgment filed by Executive Risk Indemnity Inc. ("ERII") assumes that the policy provisions should be construed under the laws of Pennsylvania. Solely for purposes of this cross motion, we make the same assumption.

Pennsylvania law governing the interpretation of insurance policies is well settled. Where the language of the policy is clear and unambiguous, a court is required, as with any contract, to enforce that language as it is written. *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 304, 469 A.2d 563, 566 (1983). A court should attempt to interpret a policy to give effect to all of its provisions and to avoid ambiguity. *Houghton v. American Guaranty Life Ins. Co.,* 692 F.2d 289, 291 (3d Cir.1982).

Pennsylvania case law already has determined that the exclusionary wording contained in Exclusion B in the primary Westport policy is clear and unambiguous. *Westport Ins. Corp. v. Mirsky,* 2002 WL 31018554 (E.D. Pa. 2002) (citing *Murphy v. Coregis Ins. Co.,* No. 98-5065, 1999 WL 627910 (E.D. Pa. Aug.17, 1999); *Coregis Ins. Co. v. Wheeler,* 24 F.Supp.2d 475 (E.D.Pa.1998); *Ehrgood v. Coregis Ins. Co.,* 59 F.Supp.2d 438 (M.D. Pa.1998)). The prior knowledge exclusion in the Twin City Policy contains nearly identical language to Exclusion B in the primary Westport policy, and is therefore equally clear and unambiguous.

There is no controlling Pennsylvania state court case law on the specific issue of the construction of so-called "prior knowledge" coverage defenses contained in a lawyers' professional liability policy, although other courts have applied Pennsylvania law to the construction of such policy provisions in lawyers professional liability cases. *See, e.g., Selko v. Home Ins. Co.,* 139 F.3d 146 (3d Cir. 1998). In *Selko,* the lawyers malpractice policy issued to the plaintiff's attorney in that case afforded coverage for an act, error or omission provided that the act, error or omission occurred "(aa) during the policy period or (bb) prior to the policy

- 16 -

period provided that prior to the effective date of this policy the insured had *no basis to believe that the insured had breached a professional duty....*" *Selko* at n.1 (emphasis added). It is at once apparent that the wording in the *Selko* prior knowledge provision differs markedly from any of the four provisions in any of the Pepper policies quoted above in that (1) the policy in *Selko* uses the phrase "basis to believe" (instead of the less subjective "knew or should have known" or "aware" or "reasonably foreseen" language contained in the various Pepper policies) and (2) the policy in *Selko* uses the phrase "breached a professional duty" (instead of the broader "could result in a claim" or "might be expected to be the basis of a claim" contained in the various Pepper policies). Thus, the language of the *Selko* policy required the insurer in that case to meet a materially higher proof burden than do the Pepper policies at issue in this case: a very subjective standard to the policyholder's state of mind, coupled with need for the insurer to show that the policyholder recognized a "breach of professional duty," which seems more difficult for the insurer to prove than the insured's simple anticipation of a claim.

In *Selko*, the Third Circuit applied a two-stage analysis under Pennsylvania law for the construction of the prior knowledge provisions in the subject policy (139 F.3d at 152):

> First, it must be shown that the insured knew of certain facts. Second, in order to determine whether the knowledge actually possessed by the insured was sufficient to create a "basis to believe," it must be determined that a reasonable lawyer in possession of such facts would have had a basis to believe that the insured had breached a professional duty.

Subsequently, the Third Circuit applied the two-stage *Selko* analysis in other cases to prior knowledge provisions lacking the phrases "basis to believe" and "breached a professional duty." In *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302 (3d Cir. 2001), the policy provision read:

> This policy does not apply to ... any CLAIM arising out of any act, error, omission or PERSONAL INJURY occurring prior to the effective date of this policy if any INSURED at the effective date *knew or could have reasonably foreseen* that such act, error, omission or PERSONAL INJURY might be expected to be the basis of a CLAIM.... (emphasis added)[2]

Applying the two-stage *Selko* analysis, the court in *Coregis* found that the insured actually had knowledge of facts which could be viewed as a breach of a professional duty. Secondly, the court held that "[w]hen an attorney has a basis to believe he has breached a professional duty, he has a reason to foresee that his conduct might be the basis of a professional liability claim against him" in the language of the above quoted exclusion. *Coregis* at 307. The court noted that a breach of a professional duty and a basis for a claim are "two peas in a pod" so that "[I]f the former occurs, experience teaches that the latter can be expected to follow." *Coregis* at n.3. Thus, under the wording of the Coregis policy at issue, when a court finds that the facts of which the insured is aware demonstrate a breach of professional duty, it follows almost as a matter of course that the insured can reasonably foresee a basis for a claim.[3]

This conclusion is consistent with the Westport policy definition of Potential Claim quoted in Part 4 of the preceding section of this Memorandum, in that the Westport policy definition recognizes two separate and independent bases for a Potential Claim: (1) an act, error, omission or circumstance which might reasonably be expected to give rise to a claim; and (2) a breach of a professional duty which has not yet resulted in a claim. Neither one is a prerequisite of the other; however, prior knowledge of either one can serve as a basis for application of the Westport Prior Knowledge Provisions.

---

[2] This wording is materially similar to that in the Westport prior knowledge provisions quoted at Part 1 in the preceding section of this memorandum.
[3] Twin City is <u>not</u> arguing the converse:, i.e., that awareness of facts showing a breach of a professional duty is a condition precedent to any finding that the knowledge possessed by the insured is sufficient to foresee that those facts might be expected to be the basis of a claim.

STM_231826_3.DOC/SCASHER

In *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231 (3d Cir. 2006), the Third Circuit applied the *Selko* analysis – this time under New Jersey law. The [lawyers malpractice] policy at issue there provided retroactive coverage for claims "provided that the insured had no knowledge of any suit, or any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance." This phrasing is similar to that contained in the Twin City prior knowledge provision quoted in Part 2 of the preceding section of this Memorandum because it focuses on the policyholder's "knowledge." In *Colliers*, the Court of Appeals provided the following reasoning for its holding that the prior knowledge exclusion was applicable:

> As a matter of law, we hold that the policy exclusion in this case is clear and unambiguous, and that its plain language mandates a subjective test for the first part of the necessary inquiry and an objective test for the second part of the inquiry. *** The first condition in the exclusion is satisfied if *the insured had knowledge* of the relevant suit, act, error, or omission. Accordingly, we conclude that this part of the exclusion depends on the insured's actual knowledge, or subjective awareness, of the relevant suit, act, error, or omission. The second condition in the exclusion, in contrast, is satisfied if the suit, act, error, or omission *might reasonably be expected* to result in a claim or suit. This language does not require that the insured actually form such an expectation, and we conclude that this part of the exclusion gives rise to an objective test: whether a reasonable professional in the insured's position might expect a claim or suit to result.

*Id.* 458 F.3d at 237.

Except for its citation to *Selko*, the Third Circuit did not reference the concepts of "basis to believe" or "breached a professional duty" phrases that were central to the *Selko* outcome, but which do not appear in any of the policy provisions at issue in this case. Nevertheless, the *Selko* two-part analysis continues to be applied as a general legal proposition by the Third Circuit.

For purposes of Twin City's legal arguments, below, Twin City recognizes and will apply the general *Selko* two-pronged analysis as the appropriate legal standard for construing the insurers' burden of proof, but without reference to the specific exclusionary wording at issue

- 19 -

in the *Selko* policy provision that have no bearing on or applicability to Twin City's excess

policy wording or legal position because the particular wording is absent. We will also,

however, note the relevance of particular wording in the Westport and Twin City policies, such

as use of the word "circumstance" in the Westport policy Amendment of Exclusion B and the

definition of Potential Claim giving separate treatment to "breach of professional duty" (see Parts

1 and 4 of the preceding section of this Memorandum).

## POINT II

### THE WESTPORT PRIOR KNOWLEDGE PROVISIONS BAR COVERAGE

The first prong of the *Selko* test is subjective and inquires as to the knowledge of the

insured. Here, the undisputed facts and documents demonstrate that Pepper and Gagne had

knowledge of an "act, error, omission, circumstance" (R19S, ¶¶ 38-39, Westport policy)

regarding their representation of SFC at least as early as April 18, 2002 (R19S, ¶¶ 13-23.) and

that in subsequent months prior to the October 27, 2002, inception date of the first policy issued

by Twin City, they were involved in planning strategy for anticipated litigation, including

dissemination of a "litigation hold" to attorneys of the firm who had worked on SFC matters

(R19S, ¶¶ 24-36.) These facts at the very minimum constitute knowledge of "circumstances,"

namely, that by virtue of their representation of SFC, the close relation of Gagne and his family

to SFC and Yao, Pepper Hamilton's conflicting representation of Royal, and the known

fraudulent conduct of SFC, the Private Placement Memoranda and other work that Pepper

Hamilton and Gagne continued to perform would involve acts, errors and omissions connected

with that fraudulent conduct and that conflict. Thus, both Pepper Hamilton and Gagne knew,

prior to the Twin City 2003-04 policy period (and even prior to the 2002-03 policy period), of

the facts establishing the acts, errors, omissions and circumstances required to satisfy the first prong of the *Selko* test.

The second prong asks whether Pepper Hamilton and Gagne knew or could reasonably have foreseen that the acts, errors, omissions or circumstances might be the basis of a claim, i.e., whether a reasonable attorney in their position could reasonably have foreseen that those acts, errors, omissions or circumstances might be the basis of a claim. The documents generated by Pepper and Gagne leave no room for dispute that this prong of the *Selko* test, which is judged by an objective standard, has been satisfied (R19S, ¶¶ 13-36.)

Based upon the foregoing analysis and the "follow form" provision in its policy, Twin City is entitled to summary judgment in its favor that its policy affords no coverage for the claims in the Underlying Actions, because such coverage is barred by the Westport Prior Knowledge Provision.

## POINT III

## THE TWIN CITY PRIOR KNOWLEDGE PROVISIONS BAR COVERAGE

As noted above, *supra Point II*, the first prong of the *Selko* test has been met, as the undisputed facts and documents demonstrate that Pepper and Gagne had knowledge of an "act, error, or omission" (R19S, ¶¶ 41-42, Twin City Policy, Section VII.D.2.) regarding their representation of SFC at least as early as April 18, 2002 (R19S, ¶¶ 13-23.) that "could result in a claim" (R19S, ¶¶ 41-42, Twin City Policy, Section VII.D.2.), but failed to disclose that to Twin City at inception.

Also as noted above, *supra Point II*, the second prong of the *Selko* test has been met. A reasonable attorney in the position of Pepper and Gagne "should have known" (R19S, ¶¶ 41-42, Twin City Policy, Section VII.D.2.) by April 18, 2002, that their representation of SFC could

- 21 -

result in a claim. There is ample evidence to support that proposition. For example, in its April 17 and 18, 2002 memos, Pepper explicitly stated that it "may be subject to suit," that it should plan its "first line of defense," and that it had to "recognize the possibility that this firm will be sued, as deep pocket associated with SFC and these transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility." (R19S, ¶¶ 13-23.)

In addition, Pepper's General Counsel Wilcox issued a memo the following week that directed a "litigation hold" to attorneys of the firm who had worked on SFC matters. (R19S, ¶¶ 25-26.) It goes without saying that if Pepper, a sophisticated large law firm, simply believed that only its client SFC was exposed to suit, there would be no need for Pepper to direct a "litigation hold." If this were not the case, all law firms would be in the untenable position of directing a "litigation hold" every time someone in the firm believed that a client might be sued. Rather, Pepper issued the SFC "litigation hold" in April 2002 because it knew that it might also be subject to a lawsuit and that its duty to preserve relevant evidence had therefore been triggered. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (obligation to issue "litigation hold" arises when party is aware of a potential claim against it and that it is in possession of evidence that may be relevant to such a claim).

Moreover, the "litigation hold" memo was followed by a May 15, 2002 memo, admittedly sent by Gagne to Wilcox to "help him and assist him in assessing any potential claims that were -- could have been filed by Student Finance Corporation against Pepper." (emphasis added). (R19S, ¶¶ 27-29.) Finally, the May 2002 memo was followed by Gagne's August 2002 response to questions from Pepper in connection with its insurance applications, in which Gagne indicated that he was aware that Pepper's involvement with SFC and Royal might be expected to

be the basis of a claim or suit against the firm for lawyers professional liability. (R19S, ¶¶ 32-36.)

The documents generated by Pepper and Gagne described above prove that the second "objective" prong of the *Selko* test has been met. Based upon the foregoing analysis, Twin City is entitled to summary judgment in its favor that its policy affords no coverage for the claims in the Underlying Actions, because such coverage is barred by the Twin City Prior Knowledge Provision.

## POINT IV

### PEPPER'S BREACH OF ITS
### WARRANTY LETTERS TO TWIN CITY BARS COVERAGE

Pepper executed two Warranty Letters to Twin City, the first on October 25, 2002 and the second on November 14, 2003, and delivered them to Twin City as part of Pepper's application for the successive Twin City excess policies. In the October 25, 2002 Warranty Letter, Pepper stated as follows:

> *This warranty letter shall confirm that as of October 25, 2002* there have been no material changes in the application submitted to the Hartford which is signed and dated September 6, 2002 and that *any person to be insured does not have knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim against the applicant at some point in the future.*
>
> The signing of this warranty letter will confirm that the firm has circulated this letter to each attorney in the firm or has in place such internal controls that would disclose the information requested herein to the management committee of the firm.
>
> The information submitted herein becomes a part of the Lawyer's Professional Liability Policy issued through the Hartford, by a member of the Hartford Group of Insurance Companies, its affiliates and subsidiaries. (emphasis added)

- 23 -

(R19S, ¶ 43.) In the November 14, 2003 Warranty Letter, Pepper stated as follows:

> This is to acknowledge that, after inquiry, *I am not aware* of any claims and/or circumstances, acts, errors or omissions that might be expected to be the basis of a claim or suit. (emphasis added)

(R19S, ¶ 44.)

As shown in a prior section of this brief, *supra, Points II and III,* the undisputed facts and documents demonstrate that, at least as early as April 18, 2002, long before Pepper executed the Warranty Letters, Pepper possessed "knowledge or information" of an "act, error or omission" regarding its representation of SFC "which might reasonably be expected to give rise to a claim against [it] at some point in the future," or, alternatively, it was "aware" of "circumstances, acts, errors or omissions" regarding its representation of SFC that "might be expected to be the basis of a claim or suit." However, Pepper withheld that knowledge, information or awareness from Twin City. Therefore, Twin City is entitled to summary judgment on the ground that Pepper's breach of one or both of its Warranty Letters to Twin City bars coverage for the claim asserted in the Underlying Actions. *See Vlastos v. Sumitomo Marine & Fire Ins. Co. (Europe) Ltd.,* 707 F.2d 775, 777 (3rd Cir. 1983) (internal citations omitted) (under Pennsylvania law, a warranty is part of the insurance contract, and "if the fact is not as warranted, the insurer may deny recovery"); *see also Waddington v. Wm. Penn Fire Ins. Co.,* 65 Pa. D. & C. 431, 1949 WL 2898 (Pa. Com. Pl. 1949) (no coverage under insurance policy where warranty is breached).

### POINT V

### THE WESTPORT POTENTIAL CLAIMS PROVISION BARS COVERAGE UNDER
### THE 2003-2004 POLICIES

Pursuant to the Westport primary policy, to which the Twin City Policy follows form, if an insured provides written notice to Westport of a "potential claim" during a policy period, of which the insured "first became aware" during a *prior* policy period, <u>and</u> the prior policy was renewed continuously and without interruption through the inception of the later policy, then any claim subsequently made against the insured arising from that potential claim is considered to have been made during the prior policy period. ((R19S, ¶ 46, Westport policy, Section I.C.) The phrase "potential claim" is defined in the Westport primary policy as "any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED." (R19S, ¶¶ 47, Westport policy, Section I.C.)

On April 22, 2004, Pepper Hamilton first sent to Westport a written notice of a potential claim by the SFC Trustee, and Westport acknowledged receipt of notice of that potential claim on April 23, 2004. (R19S, ¶¶ 49.) By at least as early as April 18, 2002 -- during a prior Westport policy period, Pepper "first became aware" of an "act, error, omission or circumstance" regarding its representation of SFC that "might reasonably be expected to give rise to a CLAIM" against Pepper and/or Gagne. Pepper maintained continuous and uninterrupted professional liability coverage with Westport from 2001 to 2004. (Casher Aff., Exh. 5, Exh 7, Exh 11.)

Therefore, the lawsuit subsequently filed by the SFC Trustee on November 1, 2004 against Pepper and Gagne, which was anticipated in Pepper's April 22, 2004 notice of a potential

<div align="center">- 25 -</div>

claim, should be deemed to have first been made during the April 27, 2001 to April 27, 2002 Westport policy period, *i.e.*, when Pepper "first became aware" (at the very least) of an "act, error, omission or circumstance" regarding its representation of SFC that "might reasonably be expected to give rise to a CLAIM" against Pepper. Thus, Twin City is alternately entitled to summary judgment in its favor on the ground that the Twin City Policy affords no coverage for the Underlying Actions because the Westport policy's terms require that such claim be treated as a claim made during a prior policy period, during which no excess coverage was provided by Twin City.

Dated: July 18, 2007

EDWARDS ANGELL PALMER & DODGE LLP

By:

John F. McCarrick
Samuel B. Mayer
Scott H. Casher
750 Lexington Avenue
New York, New York 10022
212.308.4411

*Attorneys For Twin City Fire Insurance Company*

- 26 -

# EXHIBIT 12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------- X
EXECUTIVE RISK INDEMNITY, INC.,                        :
                                                                              Index No. 603624/05 E
                                    Plaintiff,                    :
                                                                              Part 3
            -against-                                              :
                                                                              Hon. Karla A. Moskowitz
PEPPER HAMILTON LLP. W. RODERICK GAGNÉ      :
and WESTPORT INSURANCE CORPORATION,
                                                                       :
                                    Defendants.             :
------------------------------------------------------------------- X
PEPPER HAMILTON LLP, and W. RODERICK GAGNÉ,
                                                                       :              TP Index No. 590185/07
                                    Third-Party Plaintiffs,
                                                                       :
            -against-
                                                                       :
CONTINENTAL CASUALTY COMPANY, and
TWIN CITY FIRE INSURANCE COMPANY,              :
                                    Third-Party Defendants.   :
------------------------------------------------------------------- X

**DEFENDANT WESTPORT INSURANCE CORPORATION'S MEMORANDUM OF
LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AGAINST DEFENDANTS PEPPER HAMILTON LLP AND RODERICK GAGNÉ**

## Table of Contents

**Page(s)**

PRELIMINARY STATEMENT............................................................................1

STATEMENT OF FACTS...............................................................................7

ARGUMENT.............................................................................................12

I.    IN THE ABSENCE OF A CONFLICT OF LAWS,
      NEW YORK LAW SHOULD GOVERN THE RESOLUTION
      OF THIS MOTION...............................................................................12

II.   THIS MOTION IS PREMATURE AS THERE ARE QUESTIONS
      OF FACT THAT PRECLUDE SUMMARY JUDGMENT...........................12

      A. Questions of Fact Exist as to Whether the Tolling Agreement
         Was a CLAIM..............................................................................15

      B. Alternatively, if the Tolling Agreement Constitutes a
         POTENTIAL CLAIM, Questions of Fact Exist as to
         When Pepper was First Aware of the POTENTIAL
         CLAIM.......................................................................................19

CONCLUSION..........................................................................................21

## TABLE OF AUTHORITIES

### CASES

*Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Ins. Co.,*
   189 F.3d 208 (2nd Cir. 1999)...................................................................... 15, 16

*Caguas Central Fed. Savings Bank v. United States,*
   215 F.3d 1304 (Fed. Cir. 2000)................................................................. 15

*Evanston Ins. Co. v. GAB Business Svcs., Inc.,*
   521 N.Y.S.2d 692 (App.Div. 1 Dept. 1987) ................................................ 15

*Groves v. Land's End Housing Co., Inc.,*
   80 N.Y.2d 978 (1992) .................................................................................. 14

*Halali v. Vista Environments, Inc.,*
   779 N.Y.S.2d 117 (App.Div. 2 Dept. 2004) ................................................ 1

*In Re Ambassador Group, Inc. Litigation,*
   830 F.Supp. 147 (E.D.N.Y. 1993) ............................................................... 15

*Lattanzio v. Lattanzio,*
   2006 WL 3409907 (N.Y.Sup. Nov. 24, 2006)............................................. 12

*Marlin & Edmondson, P.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,*
   2005 WL 3508011 ....................................................................................... 15

*Matter of Allstate Ins. Co. (Stolarz),*
   81 N.Y.2d 219 (N.Y. 1993) ......................................................................... 12

*Metichecchia v. Palmeri,*
   803 N.Y.S.2d 813 (App.Div. 3 Dept. 2005) ................................................ 14

*OK Petroleum Dist. Corp. v. Nassau/Suffolk Fuel Oil Corp.,*
   793 N.Y.S.2d 152........................................................................................ 14

*Purcigliotti v. Risk Enterprise Mgmt. Ltd.,*
   658 N.Y.S.2d 296 (App.Div. 1997).......................................................... 5, 15

*Ross v. Curtis-Palmer Hydro-Electric Co.,*
   81 N.Y.2d 494 (N.Y. 1993) ......................................................................... 14

### STATUTES

NY CPLR 3212 .............................................................................................. 13, 14

## PRELIMINARY STATEMENT

Defendant Westport Insurance Company ("Westport") submits this Memorandum of Law in support of its Opposition to the Motion for Summary Judgment Against Defendants Pepper Hamilton LLP ("Pepper") and Roderick Gagné ("Gagné") filed by Defendant Executive Risk Indemnity Inc. ("Executive Risk"). This Memorandum will demonstrate that Executive Risk's motion is premature, in that there are unresolved questions of fact that preclude summary judgment at this time.[1]

Executive Risk originally brought this action against Pepper, Gagné and Westport, seeking a declaration that there is no coverage for various claims against Pepper and Gagné ("the underlying claims") arising out of an alleged securities fraud scheme perpetrated by a company called Student Finance Corporation ("SFC"), a former client of Pepper and Gagné. Westport issued a series of primary professional liability policies to Pepper between April 21, 2001 and October 27, 2004. Executive Risk issued excess policies during a portion of that time period.[2] Executive Risk asserts that its excess policies incorporate the terms and conditions of the underlying Westport policies. Other excess insurers, Continental Casualty Company ("CNA") and Twin City Fire and Casualty Company ("Hartford") have also been added to the litigation as third-party defendants.

---

[1] Executive Risk's Motion addresses two issues: 1) whether, as a matter of law, coverage for the underlying claims is barred under "Prior Knowledge Exclusions" incorporated by reference into the Executive Risk polices, and 2) assuming that the underlying claims are covered at all, which policy period the claims fall within (the so-called "trigger of coverage" issue). This Memorandum will address only the trigger of coverage issue. Westport takes no position at this time on the applicability of the "Prior Knowledge Exclusion."

[2] Executive Risk's motion states that it is directed against Defendants Pepper and Gagné. However, the motion seeks a ruling as to which policy period should apply to the underlying claims. Because such a ruling would significantly impact Westport's potential liability, Westport is a party in interest with standing to respond to Executive Risk's motion. See, Halali v. Vista Environments, Inc., 779 N.Y.S.2d 117, 118 (App.Div. 2 Dept. 2004). For a further discussion of how Westport's potential exposure, rights and obligations are impacted by ERII's Motion, see also Westport's Rule 19A Counterstatement at ¶ 14 (hereinafter "Counterstatement at ¶").

Executive Risk's assertion that there are no unresolved issues of fact flies in the face of the fact that discovery in this complex matter began only within the past few weeks. Pepper served written responses to Westport's requests for production on July 10, 2007 and only recently began the production of documents from the underlying litigation.[3] Further, of the documents produced to date many responsive documents, including deposition transcripts, are subject to a confidentiality order in the underlying litigation so they have been produced in redacted form. Pepper has promised to make other documents available for inspection, but has not made such documents available. Thus, at this point only a sub-set of Pepper's responsive documents have been produced, and many of those are redacted or incomplete. Not a single deposition has taken place, but Westport has noticed the depositions of numerous Pepper employees believed to have relevant knowledge.[4] Westport has since noticed the depositions of the Bankruptcy Trustee and the Trustee's counsel involved in the underlying claims and additional Pepper witnesses.

Three successive policy periods have been placed at issue in this case. Westport issued primary policies continuously throughout this entire period. The first Westport policy (the "Year 1 Policy") incepted on April 27, 2001 and expired on October 27, 2002. The second Westport policy (the "Year 2 Policy") had a policy period of October 27, 2002 to October 27, 2003. The third Westport policy (the "Year 3 Policy") had a policy period of October 27, 2003 to October 27, 2004. Thus, one of the many issues in this case is one of timing: assuming *arguendo* that the claims against Pepper are covered at all, which of these multiple policy periods potentially bears responsibility for the claims (subject, of course, to the terms, conditions and exclusions of the responding policy)? Discovery is necessary to determine which policy period responds. It is

---

[3] For a further discussion as to the status of discovery in the instant coverage matter, please see Counterstatement at ¶ 18.
[4] CNA has also noticed numerous depositions.

also possible that additional discovery will reveal that the claims arose before the inception of any Westport coverage.

Not surprisingly, Executive Risk argues that the claims should be deemed to fall within a period when Executive Risk did not insure Pepper. Executive Risk issued excess coverage during Year 2 and Year 3, and Executive Risk now argues that the claims should be deemed to have arisen in Year 1. However, the determination of when the claims arose depends upon numerous factual issues that cannot be resolved on the basis of the limited record currently available.

Pepper first gave notice of the claims to the insurers during Year 3, in a letter dated April 27, 2004.[5] Executive Risk's Motion asserts that it is entitled to summary judgment because, notwithstanding Pepper's providing notice in Year 3, the claims should be deemed to have arisen sometime prior to October 27, 2002, which is the inception date of the first Executive Risk policy. In support of this argument Executive Risk cites Insuring Agreement I.C of the Westport primary policy, which provides:

> If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the policy period of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

---

[5] Westport notes that Pepper's notice letter to Westport is dated April 27, 2004. Ex. 48 to Plaintiff ERII's Moving Affidavit of William B. Pollard, III, dated June 25, 2007, hereinafter "Ex." However, Westport responded to Pepper's "April 22, 2004 notice" on April 23, 2004 – a fact that is confirmed by the facsimile legend at the top of the Westport acknowledgment letter. (Ex. 47) This is one more question for resolution in discovery. However, based on discovery to date, Westport believes that the Wilcox letter (Ex. 48) is misdated and was actually issued on April 22, 2007.

Executive Risk argues that the notice letter dated April 27, 2004 constituted notice of a POTENTIAL CLAIM as that term is defined in the Westport Policy. Executive Risk asserts that even though notice was provided during the period of the Year 3 Policy, pursuant to Insuring Agreement I.C such notice "relates back" to the policy in effect when the insured first became aware of the POTENTIAL CLAIM. Executive Risk goes on to contend that the insured first became aware of the POTENTIAL CLAIM no later than March 12, 2002. Accordingly, Executive Risk concludes the POTENTIAL CLAIM must relate back to the policy in effect at that time, which was the Year 1 Policy.

Executive Risk's argument is misplaced for several reasons. First and foremost, in focusing exclusively on Insuring Agreement I.C (which by its terms deals only with POTENTIAL CLAIMS) Executive Risk utterly ignores *the other* Insuring Agreements in the policy, in particular Insuring Agreement I.A. Insuring Agreement I.A deals with *CLAIMS*, as opposed to POTENTIAL CLAIMS. Insuring Agreement I.A provides as follows:

> The Company shall pay on behalf of any INSURED all LOSS in excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against any INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter, by reason of any WRONGFUL ACT occurring on or after the RETROACTIVE DATE, if any[.]

Under the plain language of this Insuring Agreement, the policy treats CLAIMS differently than POTENTIAL CLAIMS. If a CLAIM, (as opposed to a POTENTIAL CLAIM) is first made during the period of a particular Policy and is reported to the Company within 60 days thereafter, there is nothing in Insuring Agreement I.A about "relation back" to a prior policy period. In other words, if an *actual CLAIM* was made and reported in Year 3, it is the Year 3 Policy which responds.

According to the existing record, Pepper gave notice to the insurers during Year 3,

shortly after Pepper's receipt of a proposed Tolling Agreement from the Bankruptcy Trustee of

various claimants against SFC. The Tolling Agreement provided in relevant part:

> [The Trustee] believes that there are valid claims and causes of action that can be
> brought on behalf of the [bankrupt's] estate and/or creditors of Student Finance
> Corporation ("SFC") against Pepper Hamilton LLP, W. Roderick Gagné, the
> [Gagné family] trusts and partnerships ... Pamela B. Gagné and Robert L. Bast
> [sic] (collectively the "Pepper Parties") arising out of the Pepper Parties'
> representation of Student Finance Corporation ("SFC"), transactions with SFC,
> relationships and transactions with Andrew Yao and Yao's family, relationships
> with SFC-affiliated entities and representation of Royal Indemnity Company
> and/or related entities.

Executive Risk's entire argument depends upon its unproven conclusion that this Tolling

Agreement was a *POTENTIAL* CLAIM, and that therefore a relation back analysis is warranted.

Even on the incomplete record currently available, it appears likely that the receipt of the Tolling

Agreement constituted a CLAIM, not merely a POTENTIAL CLAIM. If the Tolling Agreement

was a CLAIM there is no relation back, and the claim would fall within the Year 3 policy.

Interestingly, Executive Risk itself characterized the Tolling Agreement as a "Claim" in an

Executive Risk claims database entry in May or June 2004, which stated: "Coverage Analysis:

Will obtain copy of underlying policy, but expect that request for tolling agreement constitutes a

'Claim.'"

Further discovery is needed to confirm whether the Tolling Agreement was a CLAIM or

POTENTIAL CLAIM. The Policy defines CLAIM as "a demand made upon any insured for

LOSS . . . including but not limited to, service of suit or institution or arbitration proceedings

against any INSURED." Cases interpreting this language have held that a communication is a

"claim" when it demands something from the insured as a consequence of the insured's alleged

wrongdoing. Purcigliotti v. Risk Enterprise Mgmt., Ltd., 658 N.Y.S.2d 296, 297 (App.Div. 1

Dept. 1997). Westport seeks discovery into the correspondence and discussions between the Bankruptcy Trustee and representatives of Pepper up to and around the time the Tolling Agreement was sent to Pepper. It is expected that this discovery, including depositions of the Bankruptcy Trustee and knowledgeable Pepper personnel, will shed light on whether a "demand for loss" was made of Pepper in connection with the Tolling Agreement. Although at this time many factual details remain unknown, Westport expects that this discovery will confirm that the Tolling Agreement constitutes a CLAIM. If that proves to be the case, only the Year 3 Policy will be triggered.

Alternatively, even if one assumes that the Tolling Agreement constitutes a POTENTIAL CLAIM as opposed to a CLAIM, there are still questions of fact as to when Pepper first became aware of the POTENTIAL CLAIM, i.e. how far back does the POTENTIAL CLAIM relate?[6]

POTENTIAL CLAIM is defined in the Westport Policy as follows:

**"POTENTIAL CLAIM" WHENEVER USED IN THIS COVERAGE UNIT MEANS:**
1.  any act, error, omission, circumstances or PESONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or
2.  any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED.

Executive Risk asserts that Pepper first became aware of the POTENTIAL CLAIM no later than April 18, 2002 (during the Year 1 Policy), when Gagné wrote a memo suggesting that it was conceivable that Pepper might be sued for its involvement in the SFC transactions. However, it is hardly unusual for a lawyer with a large and sophisticated corporate practice to acknowledge a subjective recognition that a client has done something which could theoretically

---

[6] Again, an analysis and factual determination of how far back the POTENTIAL CLAIM relates is necessary only if the claim at issue is a POTENTIAL CLAIM as opposed to an actual CLAIM as defined in the Westport Policy. If it is an actual CLAIM, then the policy period in which the insurers received notice of the CLAIM is triggered subject to their terms, conditions and exclusions.

lead to a claim against his firm. Whether and when this *theoretical recognition of the possibility* of a claim rose to the level of a *reasonable expectation* of a claim is a highly fact-specific inquiry.

Executive Risk seeks to place the requisite knowledge squarely in Year 1, when Executive Risk did not issue a policy to Pepper. However, once all the facts are known, it is entirely possible that Pepper will be deemed to have had the requisite knowledge later, or earlier, than Year 1. Resolution of this issue is impossible based upon the limited record currently available.

In summary, questions of fact exist concerning whether notice of the Tolling Agreement constituted notice of a CLAIM. Alternatively, if notice of the Tolling Agreement was notice of a POTENTIAL CLAIM, questions of fact exist as to when Pepper first became aware of the POTENTIAL CLAIM. These factual questions preclude summary judgment, and accordingly Executive Risk's Motion for Summary Judgment should be denied as premature.

## STATEMENT OF FACTS

### Pepper's Notice of Claim to Westport

It is undisputed that the first notice Westport received regarding any variety of claim against Pepper with respect to SFC was a notice letter dated April 27, 2004 from Pepper counsel Alfred Wilcox ("Wilcox") addressed to Westport. (Ex. 48). In his letter, Wilcox notified Westport of what he characterized as a "threatened claim," which Pepper allegedly received from the Chapter 7 Trustee of SFC. (Ex. 48, at 1). The April 27, 2004 letter does not explain what Wilcox meant by a "threatened claim." To date, there has been no discovery concerning and Wilcox has proffered no clear explanation of what he meant by a "threatened claim" at that point in time.

Wilcox further stated in his notice letter that on April 19, 2004, Pepper received a draft Tolling Agreement from counsel for the Trustee. (Ex. 48, at 1). Wilcox enclosed a copy of the draft Tolling Agreement that the Trustee demanded Pepper to execute. (Westport Ex. 5).[7]

Importantly, and indicative of the lack of developed critical facts in this matter, the letter to Wilcox enclosing the draft Tolling Agreement provides "In accordance with our conversation last week, I am enclosing a proposed Tolling Agreement." (Westport Ex. 5, at 1). Westport, however, has no information regarding the referenced conversation between Wilcox and the Trustee's counsel or any other correspondence between the parties prior to the Trustee's demand that Pepper sign the Tolling Agreement.

In the April 27, 2004 notice letter, Wilcox spelled out in detail the nature of the claims referenced in the Tolling Agreement he believed the Trustee had, based upon the facts as he understood them. (Ex. 48). Wilcox also noted that he spoke with Sheryl Auerbach, counsel for the Trustee, seeking further information about the nature of the claims she had in mind, but Wilcox provided scant details of that conversation. (Ex. 48, at 1). Wilcox expressed his hope to meet with the Trustee's counsel. (Ex. 48, at 4).

The draft Tolling Agreement provides in part that the Trustee "believes there are valid claims and causes of action that can be brought on behalf of the estate and/or creditors of Student Finance Corporation against" Pepper, Gagné and others. (Westport Ex. 5, at 2). It calls for a period of time for the parties to settle "their differences." (Westport Ex. 5, at 2).

Executive Risk has given a mixed message of its view of the effect of the Tolling Agreement. On one hand, Executive Risk produced a document from its internal claims analysis system which stated that the Tolling Agreement Pepper forwarded to Westport constitutes notice

---

[7] "Westport Ex." refers to exhibits in the Appendix to Westport's Affirmation of Robert P. Conlon, dated July 18, 2007.

of an actual claim. The document states in pertinent part: "COVERAGE ANALYSIS: Will obtain copy of underlying-policy, but expect that request for Tolling Agreement constitutes a "Claim," as opposed to a potential claim. (Westport Ex. 4).

On the other hand, in support of its Motion for Summary Judgment, Executive Risk contends that the Tolling Agreement constituted notice to Westport of a POTENTIAL CLAIM. (ERII Motion at 12). Further discovery is needed to confirm that the Tolling Agreement was, as Executive Risk initially acknowledged, notice of an actual claim, as opposed to Executive Risk's subsequent litigation position that the Tolling Agreement was a potential claim.

On April 23, 2002, Westport Claims Consultant David Marseille sent a letter to Wilcox confirming receipt of his letter dated April 27, 2004. (Ex. 47). Based on limited factual details then available to Westport, Marseille referred to the SFC matter as a "potential claim." (Ex. 47, at 2). In seeking to gain a better understanding of the factual issues in this matter, Westport requested that Pepper provide it with certain documents. (Ex. 47, at 3).

On July 15, 2004, counsel for the Bankruptcy Trustee, Stephen Harmelin, sent a letter to Wilcox wherein he set forth in detail the claims the Trustee had against Pepper and Gagné. (Ex. 49). Introducing the core issues, he states "The Trustee's claims arise, *inter alia*, because..." (Ex. 49, at 1). Harmelin then sets forth the allegations against Pepper, Gagné and members of Gagné's family and trusts for which Gagné is trustee. Harmelin also stated the Bankruptcy Trustee's intention to seek damages in excess of $500 million. (Ex. 49, at 7). The Bankruptcy Trustee's discussions of the various claims against Pepper and Gagné parallels Wilcox's notice letter to Westport sent two months earlier.

There are strong indications that there were other communications or exchanges of information between Pepper and the Bankruptcy Trustee immediately before and after Pepper's

receipt of the April 19, 2004 letter and proposed Tolling Agreement and Harmelin's July 15, 2004 letter. For example, the July 15, 2004 letter references a letter agreement executed by the Trustee and Pepper dated July 8, 2004, and the initial transmittal letter from the Trustee to Pepper refers to "our conversation last week." (Ex. 49, at 1), (Westport Ex. 5, at 1). Westport has not seen the so-called letter agreement and has no knowledge of its terms, and has no information concerning the "conversation" between the Bankruptcy Trustee and Pepper.

On August 6, 2004, Mr. Wilcox sent a letter to Harmelin responding to his July 15, 2004 letter. (Ex. 50). Wilcox made numerous factual averments with respect to Pepper and Gagné in support of his argument that a lawsuit against Pepper and Gagné based on the claims referenced in the Tolling Agreement and articulated in the Bankruptcy Trustee's letter would be unjustified. It is clear from this letter that there had been further communications between Harmelin and Pepper since the July 15, 2004 letter, but Westport has no information regarding any such communications.

**Pepper and Gagné's Representation of SFC**

Gagné and Pepper have a long history of representing SFC and its Principal Andrew Yao ("Yao"). Gagné joined Pepper in December 1996, moving from a previous law firm. (Westport Ex. 7 at 14:5-13). He first met Yao in the 1980's, while working as an associate on a transaction for Yao with the law firm Polino & Lentz. (Westport Ex. 7 at 25:23-26:7). In late 1992 or early 1993, Gagné assisted Yao in setting up SFC. (Westport Ex. 7 at 26:11-17). He provided legal services for SFC from that time until 2002. (Westport Ex. 7 at 27:1-9). At Pepper, Gagné was the billing partner responsible for the legal services Pepper provided SFC. (Westport Ex. 7 at 32:14-17; 51:7-8). Gagné supervised more than 100 Pepper partners, associates and other employees on SFC-related matters. (Ex. 49, at 2). In its capacity as SFC's general counsel,

Pepper provided service on a wide array of matters. (Ex. 49, at 2). SFC was Gagné's largest client with respect to amounts billed in each of the years 1999 through 2001. (Westport Ex. 7 at 33:18-34:2). Also, Pepper paralegal Marie DeCarlo served as an officer, Assistant Secretary, of SFC through April 2002. (Ex. 49, at 2). During this period, Pepper billed SFC approximately $3.2 million for legal work. (Ex. 49, at 2).

Gagné also provided personal legal services for Yao, including estate planning work. (Westport Ex. 7 at 361:4-18). Additionally, members of Gagne's family and trusts from which he benefited invested in SFC by making loans of substantial sums to SFC to support its liquidity. (Ex. 49, at 4). SFC paid interest ranging from 10-15% on these loans. (Ex. 49, at 4).

As Plaintiff contends, by 1999 at the latest, loan delinquency rates had increased sharply, increasing the risk to investors and reducing their value. (ERII R19S ¶ 25). To obscure this, SFC began making payments from so-called "forbearance accounts" using its own funds to conceal the fact that the loans were in default. (Ex. 49 at 3). Gagné acknowledges that SFC made forbearance payments on delinquent student loans in 1999. (Westport Ex. 7 at 1101:15-21). Discovery is needed as to whether and when Pepper may have been aware of SFC's practice of using forbearance payments to reduce the rate of defaults on student loan accounts as early as February 1999, as evidenced by billing records and email communications between Gagné and Yao from 1999 and 2000. (Ex. 49, at 3).

Further, SFC's practice of making forbearance payments apparently predates 1999. Beginning in 1998, Pepper represented SFC in a dispute with Neilsen Electronics Institute, a truck driving school. (Westport Ex. 7 at 601:1-8; 611:12-612:8). In the course of that litigation, Pepper attorneys came into possession of materials indicating that SFC was running a Ponzi scheme, using internal transaction codes to mask payments SFC was making on student loan

accounts and effectively distorting student loan default rates included in private placement memoranda ("PPMs") prepared by Pepper. (Westport Ex. 6 at 172:24-173:7), (Westport Ex. 7 at 909:9-912:3). It is apparent that SFC was using its own funds to make forbearance payments on student loans prior to 1999.

## ARGUMENT

### I. IN THE ABSENCE OF A CONFLICT OF LAWS, NEW YORK LAW SHOULD GOVERN THE RESOLUTION OF THIS MOTION

As a threshold point, Executive Risk's motion makes the broad assertion that Pennsylvania law should apply to the issues presented by this motion. This is contrary to New York choice of law rules.

The first step in a choice of law analysis is to determine whether there is a conflict between the laws of the jurisdictions involved as to a particular issue. Matter of Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223 (N.Y. 1993); Lattanzio v. Lattanzio, Slip Copy, 2006 WL 3409907, *6 (N.Y.Sup. Nov. 24, 2006). If there is no conflict, then by default a New York court is to apply New York law. Lattanzio, 2006 WL 3409907 at 6. Executive Risk argues that Pennsylvania law applies without satisfying the threshold requirement of identifying a conflict with New York law.

Westport submits that, in the absence of Executive Risk's demonstration of a conflict, New York law applies. In this Memorandum Westport cites and relies upon New York law.

### II. THIS MOTION IS PREMATURE AS THERE ARE QUESTIONS OF FACT THAT PRECLUDE SUMMARY JUDGMENT

As noted above, Pepper first gave the insurers notice of the underlying claims in a letter dated April 27, 2004. (Ex. 48). The notice letter was received during the policy period of the

Year 3 Policy. The notice letter was precipitated by Pepper's receipt of a proposed Tolling

Agreement from the Bankruptcy Trustee involved in the underlying claims. (Westport Ex. 5).

In its motion, Executive Risk characterizes the Tolling Agreement as a POTENTIAL

CLAIM, and accordingly argues that Insuring Agreement I.C applies. Executive Risk asserts

that, pursuant to Insuring Agreement I.C, the concept of "relation back" applies so that the policy

in effect at the time the insured first became aware of the POTENTIAL CLAIM is triggered and

must respond. Executive Risk argues that the insured had the requisite knowledge during the

Year 1 Policy period, a period in which Executive Risk did not insure Pepper.

However, contrary to Executive Risk's argument, if the Tolling Agreement of which

Pepper gave notice constituted a CLAIM, as opposed to a POTENTIAL CLAIM, it falls within

Insuring Agreement I.A. There is no "relation back" language in Insuring Agreement I.A, so if

the Tolling Agreement was a CLAIM then the policy in effect when notice was given – in this

instance the Year 3 Policy – would be triggered. Thus, determination of whether the Tolling

Agreement constituted a CLAIM or a POTENTIAL CLAIM is essential to resolution of the

trigger issue.

Issues of fact make it impossible to resolve this question on the basis of the limited record

available. These factual questions can be properly resolved only after additional discovery,

particularly the taking of the depositions of those individuals with knowledge of the

circumstances surrounding the Tolling Agreement. Until the completion of additional discovery,

the motion for summary judgment is premature and should be denied under New York CPLR

3212(f).

New York CPLR 3212(f) provides:

**(f) Facts unavailable to opposing party.** Should it appear from affidavits
submitted in opposition to the motion [for summary judgment] that facts essential

> to justify opposition may exist but cannot then be stated, the court may deny the motion or may order a continuance to permit affidavits to be obtained or disclosure to be had and may make such other order as may be just.

In Ross v. Curtis-Palmer Hydro-Electric Co., the New York Court of Appeals held that it would be premature to grant a defendant summary judgment under CPLR 3212 when the parties had conducted only limited discovery. 81 N.Y.2d 494, 506 (N.Y. 1993). In holding that the motion was premature, the court noted that certain depositions had not yet been taken and certain documents had not yet been produced. Id. See also, Groves v. Land's End Housing Co., Inc., 80 N.Y.2d 978, 980 (1992) (summary judgment premature under CPLR 3212(f) "[g]iven that defendants in their affidavits asserted that they needed more discovery time to depose witnesses…and given that the discovery timetables set forth in a preliminary conference order had not yet expired"); OK Petroleum Dist. Corp. v. Nassau/Suffolk Fuel Oil Corp., 793 N.Y.S.2d 152, 153 (App.Div. 2 Dept. 2005) (summary judgment premature where non-movants demonstrated inadequate opportunity to conduct discovery and that facts essential to their opposition may exist but are within knowledge of other party); Metichecchia v. Palmeri, 803 N.Y.S.2d 813, 814 (App.Div. 3 Dept. 2005) (summary judgment premature, stating that "[i]t is axiomatic that a summary judgment motion is properly denied as premature when the nonmoving party has not been given reasonable time and opportunity to conduct disclosure relative to pertinent evidence that is within the exclusive knowledge of the movant or a codefendant").

There are a number of facts which Westport expects to uncover in discovery that will permit a determination of whether the Tolling Agreement was a CLAIM or POTENTIAL CLAIM. That determination is not possible based on the present evidence. This Memorandum

will go on to discuss the known facts and, more importantly, the as-yet unknown facts, that

Westport believes are necessary to determine the issues presented by Executive Risk's motion.

**A.    Questions of Fact Exist as to Whether the Tolling Agreement was a CLAIM**

Contrary to Executive Risk's argument that the Tolling Agreement is a POTENTIAL

CLAIM, Westport believes that additional discovery will demonstrate that the Tolling

Agreement is instead an actual CLAIM.  The Westport Policy defines CLAIM as follows:

> **"CLAIM" MEANS** a demand made upon any INSURED for LOSS, as defined
> in each of the attached COVERAGE UNITS, including but not limited to, service
> of suit or institution of arbitration proceedings or administrative proceedings
> against any INSURED.

New York cases interpreting similar language have acknowledged that a "claim" exists

not when an insured is merely aware of the possibility that it has done something wrong, but

rather exists when a third party has made "a demand for specific relief that can be defended,

settled and paid by the insurer." Purcigliotti, 658 N.Y.S.2d at 297.  A "claim" generally includes

a mention of damages, compensation, performance or a reservation of the third party's right or

remedies against the insured. Evanston Ins. Co. v. GAB Business Svcs., Inc., 521 N.Y.S.2d 692,

693-696 (App.Div. 1 Dept. 1987). See also, In Re Ambassador Group, Inc. Litigation, 830

F.Supp. 147, 154-155 (E.D.N.Y. 1993) (acknowledging that "a claim may be something other

than a formal lawsuit" and indicating that letter sent to insured could have been a "claim" under

policy if it had included a demand for relief and enumeration of wrongful acts).

Numerous courts have acknowledged that a tolling agreement constitutes an actual

"claim." See, Caguas Central Fed. Savings Bank v. United States, 215 F.3d 1304, 1310 (Fed.

Cir. 2000) (purpose of tolling agreement was to try to settle claims between the parties and to

avoid litigation of those claims); Marlin & Edmondson, P.C. v. Nat'l Union Fire Ins. Co. of

Pittsburgh, PA, 2005 WL 3508011, *8 (treating tolling agreement as claim); Andy Warhol

Foundation for the Visual Arts, Inc. v. Federal Ins. Co., 189 F.3d 208, 217 (2nd Cir. 1999)

(suggesting that if tolling agreement had included third party's claims against insured, then court

might have considered tolling agreement a claim).

The text of the proposed Tolling Agreement itself indicates that an actual CLAIM may

have existed by that time. The proposed Tolling Agreement stated:

> [The Trustee] believes that there *are* valid claims and causes of action *that can be
> brought on behalf of the [bankrupt's] estate and/or creditors of Student Finance
> Corporation ("SFC") against Pepper Hamilton LLP, W. Roderick Gagné, the
> [Gagné family] trusts and partnerships* ... Pamela B. Gagné and Robert L. Bast
> [sic] (collectively the "Pepper Parties") arising out of the Pepper Parties'
> representation of Student Finance Corporation ("SFC"), transactions with SFC,
> relationships and transactions with Andrew Yao and Yao's family, relationships
> with SFC-affiliated entities and representation of Royal Indemnity Company
> and/or related entities (emphasis added).

(Westport Ex. 5, at 2).

Further, it is apparent that the proposed Tolling Agreement was not created in a factual

vacuum; there is evidence that the Bankruptcy Trustee and Pepper engaged in various

communications prior to the time the proposed Agreement was transmitted. (Ex. 49), (Ex. 50),

(Westport Ex. 5 at 1). Westport seeks to conduct discovery into those communications and the

overall circumstances surrounding the Agreement to determine whether a CLAIM existed at the

time Pepper provided notice.

The limited information currently in the record strongly indicates that additional

discovery is warranted. A cover letter from counsel for the Bankruptcy Trustee to Pepper

regarding the Tolling Agreement confirms that the Agreement did not arise in isolation, stating,

"In accordance with our conversation last week, I am enclosing a proposed Tolling Agreement."

(Westport Ex. 5, at 1). The cover letter references a conversation between the Bankruptcy

Trustee's counsel and Wilcox, managing partner of Pepper, a week earlier. Westport believes

that deposition discovery from Wilcox and from the Bankruptcy Trustee concerning this conversation may reveal that a demand was made upon Pepper, but that the Bankruptcy Trustee agreed to defer litigation temporarily via the Tolling Agreement. Westport also anticipates that such discovery will reveal whether the telephone call or meeting was one in which the Bankruptcy Trustee's counsel articulated the allegations against Pepper and Gagné, conveyed the magnitude of alleged damages in excess of $500 million, and communicated that it was prepared to sue Pepper and Gagné. Accordingly, Westport seeks to depose Wilcox, the Bankruptcy Trustee, the Bankruptcy Trustee's counsel and, if appropriate, additional personnel at Pepper with knowledge of these communications.

Further, after the proposed Tolling Agreement was proffered to Pepper, a period of discussion and exchange of information between Pepper and the Bankruptcy Trustee ensued, including a letter from the Bankruptcy Trustee's counsel, Stephen Harmelin ("Harmelin"), to Wilcox dated July 15, 2004. (Ex. 49). In that letter the Bankruptcy Trustee laid out the allegations against Pepper and Gagné, and advised that the Bankruptcy Trustee would seek damages against them in excess of $500 million. Wilcox responded to Harmelin via letter dated August 6, 2004, stating "You have told us...that unless we can demonstrate to your satisfaction that Rod Gagné was not complicit in SFC's manipulation of default rates on its student loans, you intend to sue Pepper and others for upwards of $500 million." (Ex. 50). The Bankruptcy Trustee's July 15, 2004 letter indicates that the Trustee had significantly developed factual allegations and theories of liability against Pepper and Gagné in July 2004 that largely mirror what Wilcox said he "suspected" would be alleged in his initial notice letter dated April 27, 2004 to Westport. (Ex. 49), (Ex. 48). This correspondence provides further indications that a demand may have been made against Pepper at the time of the proposed Tolling Agreement such that an

actual CLAIM existed.  Once again, deposition discovery is necessary to confirm these

indications, including the depositions of Wilcox, the Bankruptcy Trustee and the Bankruptcy

Trustee's counsel.

The July 15 letter also references a "letter agreement of July 8, 2004" between the

Trustee and Pepper.  (Ex. 49).  It is unclear whether the "letter agreement of July 8, 2004" means

that the parties actually executed some form of Tolling Agreement while engaged in discussions.

This is yet another matter on which Westport needs additional discovery, for Westport has never

received a copy of an executed Tolling Agreement if one exists.  It would be premature and

unfair to grant Executive Risk's motion, which depends to some extent on the existence, content

and impact of a Tolling Agreement, where there is an open question whether the parties ever

executed the Tolling Agreement and, if they did, where it has never been produced to Westport.

Finally, and importantly, Executive Risk itself characterized the Tolling Agreement as a

CLAIM in May or June 2004.  A printout from Executive Risk's electronic claims notes states:

"Coverage Analysis: Will obtain copy of underlying policy, but expect that request for tolling

agreement constitutes a 'Claim.'"[8] (Westport Ex. 4).  The printout indicates Executive Risk

viewed the Tolling Agreement as a CLAIM as opposed to its current litigation position that the

Tolling Agreement is a POTENTIAL CLAIM.

The deposition transcripts from the underlying actions provide some very limited

information, but they do not discuss in detail the Tolling Agreement and circumstances

surrounding it.  For this reason, discovery, including deposition discovery, must be allowed to

proceed so that Westport can question those involved about the circumstances surrounding the

---

[8] This document was initially produced on June 15, 2007 by ERII but the above-cited portion of the document was
cut off such that one could not see the text after "...tolling agreement."  It was re-produced by Executive Risk on
*July 10, 2007*, well after their summary judgment brief was submitted and shortly before the response deadline.

Tolling Agreement. Accordingly, Executive Risk's motion should be denied as premature until

the court is presented with a full and proper record.

**B.      Alternatively, if the Tolling Agreement Constitutes a POTENTIAL CLAIM, Questions of Fact Exist as to When Pepper was First Aware of the POTENTIAL CLAIM**

Alternatively, even if discovery does not ultimately establish that a CLAIM had been

made by the time of the proposed Tolling Agreement, there is an issue of fact as to when the

Pepper first knew or should have known of a POTENTIAL CLAIM. Additional discovery is

needed to determine when Pepper first became aware of circumstances that could be "reasonably

expected" to give rise to a CLAIM.

Insuring Agreement I.C of the Westport primary policy provides:

> If, during this POLICY PERIOD, any INSURED provides written notice to the Company of a POTENTIAL CLAIM which any INSURED first became aware of during the period of a prior policy issued by the Company to the NAMED INSURED, which policy was Renewed continuously and without interruption through the inception of this POLICY, then any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made and reported during the policy period of the policy in effect when any INSURED first became aware of such POTENTIAL CLAIM subject to the terms, conditions and limits of liability of the policy in effect at such time.

The Westport policy defines a POTENTIAL CLAIM as:

**"POTENTIAL CLAIM" whenever used in this coverage unit means:**

1.      any act, error, omission, circumstances or PESONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY; or
2.      any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED.

Pursuant to these provisions, the policy in effect when the insured "*first* became aware"

of a circumstance that "might reasonably be expected to give rise to a claim" is the policy which

is triggered. Thus, resolution of the trigger requires a detailed inquiry into "what did Pepper and

Gagné know and when did they know it?" This is a highly fact-specific determination that can only be explored by asking questions of Mr. Gagné and others at Pepper.

Executive Risk asserts that Pepper had the requisite knowledge in April 2002 because Mr. Gagné began writing memoranda expressing concerns about SFC at that time. The mere fact that Mr. Gagné wrote several memoranda falls far short of conclusively resolving the trigger issue.

Mr. Gagné had represented Yao since the 1980's, and SFC since its inception in late 1992 or early 1993. (Westport Ex. 7 at 25:23-26:7; 26:11-17; 27:1-9). The July 15, 2004 letter from the Bankruptcy Trustee produced in discovery asserts that Pepper began representing SFC as early as 1996 when Gagné joined the firm as a lateral hire. (Ex. 49 at 2). The letter refers to emails between Gagné and Yao as early as February 1999 discussing the fact that SFC had begun making forbearance payments to cover up loan defaults. The letter refers to a highly inflated number of forbearance payments reflected in SFC's financial statements, indicating that something was amiss. The letter claims that, notwithstanding these problems, Gagné continued to advise lender clients to take an interest in the student loan accounts that would not return the investment.

Thus, the date on which Mr. Gagné was *first* concerned about SFC activities and the possibility that they could lead to claims against Pepper could have been long before he committed those concerns to writing in April 2002. He could have discussed those concerns with others at Pepper long before April 2002 as well. He may even have done so prior to the inception of the Year 1 Policy. There is no way to know without deposing Mr. Gagné and others at Pepper.

Alternatively, the mere fact that by April 2002 Mr. Gagné had unease about the activities

of a client, and expressed the view that those activities could conceivably give rise to CLAIMS,

does not mean that he "reasonably expected" that those activities would give rise to a CLAIM.

That "reasonable expectation" may not have arisen in the mind of Mr. Gagné or others at Pepper

until much later than April 2002.  Again, there is no way to know without depositions of persons

with knowledge.

## CONCLUSION

For the foregoing reasons, Westport submits that Executive Risk's motion for summary

judgment should be denied as premature.


Dated: New York, New York
      July 18, 2007


              GARBARINI & SCHER, P.C.

              /s/ Gregg Weinstock
              Gregg Weinstock, Esq.
              432 Park Avenue South, 9th Floor
              New York, New York 10016-8013
              (212) 689-1113

              WALKER WILCOX MATOUSEK LLP
              Robert P. Conlon, Esq.
              Joyce F. Noyes, Esq.
              225 West Washington Street
              Suite 2400
              Chicago, IL 60606-3418
              Telephone:    (312) 244-6700
              Facsimile:    (312) 244-6800

              Attorneys for Defendant
              *Westport Insurance Corporation*

# EXHIBIT 13

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

**PRESENT:**    Hon.  **KARLA MOSKOWITZ**        **PART   03**
                                Justice

**FBEM**

_____x

EXECUTIVE RISK INDEMNITY, INC.,                    INDEX NO.   603624/2005E

                                    Plaintiff,     MOTION DATE _____

            - against -                            MOTION SEQ. NO.   002

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ             MOTION CAL. NO. _____
and WESTPORT INSURANCE CORPORATION,

                                    Defendants.
_____x

PEPPER HAMILTON LLP and W. RODERICK GAGNÉ,        INDEX NO.   590185/2007

                            Third-Party Plaintiffs,    MOTION DATE _____

            - against -                            MOTION SEQ. NO. _____

CONTINENTAL CASUALTY COMPANY and TWIN             MOTION CAL. NO. _____
CITY FIRE INSURANCE COMPANY,

                            Third-Party Defendants,
_____x

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

## Cross-Motion:     ☒ Yes     ☐ No

Upon the foregoing papers, it is

    ORDERED that this motion is decided in accordance with the accompanying
Decision and Order.

Dated: September 10, 2007

                                        _____
                                        **KARLA MOSKOWITZ**      _J.S.C._

Check one:        ☐ FINAL DISPOSITION        ☒ NON-FINAL DISPOSITION

Check if appropriate:     ☐ DO NOT POST        ☐ REFERENCE

1SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 3

-----------------------------------------------------------------------x

EXECUTIVE RISK INDEMNITY, INC.,

                                    Plaintiff,            Index No. 603624/2005

              - against -

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ
and WESTPORT INSURANCE CORPORATION,

                                    Defendants.
-----------------------------------------------------------------------x    **DECISION and ORDER**

PEPPER HAMILTON LLP and W. RODERICK GAGNÉ,

                              Third-Party Plaintiffs,

              - against -                                Index No. 590185/2007

CONTINENTAL CASUALTY COMPANY and
TWIN CITY FIRE INSURANCE COMPANY,

                              Third-Party Defendants.
-----------------------------------------------------------------------x

**MOSKOWITZ, J.:**

These insurance coverage actions arise from underlying lawsuits involving the alleged

professional malpractice, breach of fiduciary duty and fraudulent conduct of defendants Pepper

Hamilton LLP ("PH") and W. Roderick Gagné ("Gagné"). Plaintiff Executive Risk Indemnity,

Inc. ("ERII") seeks a declaration that it has no obligation to indemnify PH or Gagné under an

excess indemnity insurance policy.

PH and Gagné assert three counterclaims against ERII, seeking a declaration that they are

entitled to coverage under the 2003-2004 excess policy, for breach of contract for failing to

perform under that policy, and for attorneys' fees and costs. PH and Gagné also assert a cross-

claim against defendant Westport Insurance Corporation ("Westport"), the primary insurer in this

dispute, seeking a declaration that Westport is obligated to defend and indemnify them under the

2003-2004 Westport Policy, or, alternatively, under the 2001-2002 Westport Policy.

PH and Gagné also commenced a third-party action against additional excess insurers, Continental Casualty Company ("CNA") and Twin City Fire Insurance Company ("Hartford"). In the third-party action, PH and Gagné seek a declaration that CNA and Hartford are obligated to defend and indemnify PH and Gagné pursuant to excess professional liability policies that CNA and Hartford issued for the policy period 2003-2004, or, alternatively, a declaration that PH and Gagné are covered under a policy that CNA issued for 2001-2004. Hartford asserts counterclaims, seeking a declaration that it is not obligated to provide coverage to PH and Gagné. CNA asserts counterclaims, seeking to rescind its excess insurance policies for the two policy periods covering 2002-2004 and a declaration that it is not obligated to provide coverage to PH and Gagné under the 2001-2002 policy.

ERII now moves, by order to show cause, for summary judgment on the complaint, granting the declaratory relief. Hartford cross-moves for summary judgment, seeking a declaration that it has no obligation to indemnify PH or Gagné under its excess policies. CNA cross-moves for summary judgment on its counterclaims, seeking to rescind its coverage for the policy years 2002-2003 and 2003-2004 and a declaration that its 2001-2002 excess insurance policy does not cover PH or Gagné in connection with the underlying actions.

Facts

The Insurance Policies

For the first policy period, April 27, 2001 to October 27, 2002, Westport issued a $20 million Customized Practice Coverage Policy, naming PH as the insured ("2001-2002 Westport Policy"). CNA issued a Lawyers Excess Professional Liability Policy for the same period, providing PH with an excess layer of coverage in the amount of $30 million ("2001-2002 CNA

Policy").

For the second policy period, October 27, 2002 to October 27, 2003, Westport issued a

Customized Practice Coverage Policy, naming PH as the insured, in the amount of $10 million

("2002-2003 Westport Policy"). Hartford issued the first layer of excess coverage for this policy

period in the amount of $10 million ("2002-2003 Hartford Policy"). ERII issued the second layer

of excess coverage for this policy period in the amount of $10 million, that would cover any

liability exceeding the underlying $20 million limits ("2002-2003 ERII Policy"). CNA issued a

third layer of excess coverage for this policy period in the amount of $10 million, that would

cover any liability exceeding the underlying $30 million limits ("2002-2003 CNA Policy"). Each

layer of excess insurance followed form to the underlying coverage.

PH renewed the 2002-2003 tower of coverage for a third policy period that ran from

October 27, 2003 to October 27, 2004 with the same insurers and limits as in the second policy

period.

The Hartford policies contain a "Retroactive Limitation Clause," that states that

Hartford's policies do "not apply to any claim: . . . 2. arising out of any act, error, or omission

committed prior to the inception date of this policy which the Insured knew or should have

known could result in a claim but failed to disclose to the Company at inception." (Pollard, Ex.

8, at PH INS 00000168 and Ex. 12, at PH INS 00000181).

The 2003-2004 Westport Policy states that coverage:

> shall not apply to any CLAIM based upon, arising out of,
> attributable to, or directly or indirectly resulting from the following
> additional exclusion:
>
> Any CLAIM arising out of any act, error, omission or PERSONAL
> INJURY occurring prior to the effective date of this POLICY if, . .

3

> . b) the INSURED at the effective date knew or could have
> reasonably foreseen that such act, error, omission or PERSONAL
> INJURY at the effective date might be expected to be the basis of a
> CLAIM . . . .

(*Id.*, Ex. 11, at PH INS 00000289).  The 2003 - 2004 Westport Policy also had a provision

containing nearly identical policy exclusion language, but in addition to acts, errors and

omissions, this new section included "circumstances" that "might be the basis of a CLAIM." (*Id.*

at PH INS 00000295).  This 2003-2004 Westport Policy defines "claim" as "a demand made

upon any INSURED for LOSS, as defined in each of the attached COVERAGE UNITS,

including, but not limited to, service of suit or institution of arbitration proceedings or

administrative proceedings against any INSURED." (*Id.* at PH INS 00000306).  The 2001-2002

and 2002-2003 Westport Policies contain similar exclusions.

<u>PH, Gagné and the Underlying Actions</u>

Gagné is a member of PH, a Philadelphia-based law firm.  Non-party Student Finance

Corporation ("SFC"), and its principal, Andrew Yao ("Yao"), were clients of PH and Gagné

during the years 1996 through 2002.  SFC originated and acquired non-guaranteed student loans

and tuition installment agreements primarily for trucking schools.  SFC pooled the loans into

certificates and sold them to investors.  SFC obtained financing for some of the loans from

private lenders, including Gagné and members of Gagné's family, and from trusts in which

Gagné was a beneficiary.  SFC obtained credit risk insurance from non-party Royal Insurance

Company ("Royal"), that was also a client of PH.

PH represented SFC in preparing eight private placement memoranda ("PPMs") in 2000

and 2001, for use in connection with SFC's sale of the certificates.  The PPMs covered SFC's

issuance of certificates totaling over $465 million.  The PPMs represented that "none of the

4

Student Loans are [or will be], as of the Cut-Off Date, Defaulted Student Loans." (*Id.*, Exs. 18-25).

According to the pleadings, delinquency rates of loans in various pools began to increase, and SFC began making payments, for the benefit of the investors, to accounts that held installment payments from student-borrowers. SFC allegedly made these payments to cover past-due loan payments, in order to prevent the loans from becoming more than 90 days overdue and in default. By 2002, SFC had approximately $45 million in so-called "forbearance payments." SFC allegedly supplied $39 million of these payments. The PPMs did not disclose any forbearance payments and continued to represent that the student loans in the securitized pools were not in default. This scheme allegedly allowed SFC to skew the performance data for the student loans, making them more attractive to investors, underwriters and credit risk insurers, such as Royal. As a result, SFC understated its loan default rates, a fact that the PPMs that PH prepared did not disclose.

In an e-mail dated March 15, 2002, Gagné informed Yao about: (1) Royal's concerns regarding the forbearance payments and (2) Gagné's own concerns about SFC retaining and originating loans that could not be funded because this practice "may be fraudulent and may rise to the level of criminal fraud." (Pollard Aff., Ex. 33). In the same e-mail, Gagné warned Yao to "watch out for class actions." (*Id.*). In a draft memorandum to PH's Finance and Ethics Committees, dated April 17, 2002, Gagné described SFC's purportedly fraudulent conduct in connection with PH's continued representation of SFC. The memo states, in pertinent part, as follows:

> In the past month, it has come to our attention that officers of [SFC] lied to investors and were complicit in misrepresenting

5

certain material faults regarding the financial performance of the student loans . . . . Two officers of [SFC] . . . explained that it is the habit of truck drivers to pay immediately preceding a road trip and again when they return. As a result, most of the loans are always going to be in a 60-day delinquency bucket. They asserted other reasons, but never said that SFC and the schools were paying for the loans. In fact, [SFC] was taking monies to prop up these loans so that they would not go into default causing the default statistics on the loans and the static pools to be false.

. . . .

The magnitude of the fraud is also very disconcerting in that [Royal], another client of the firm, could be significantly damaged by the losses which have been estimated at between $150 [m]illion and $200 [m]illion [d]ollars.

. . . .

My initial reaction is that we should distance ourselves from [SFC] and terminate our representation of SFC. If we do so, I am sure that [Yao] will not pay our fees. In addition, our withdrawal will raise the specter with the capital markets that [SFC] has done something heinous and it will impair SFC's ability to bring itself out of its liquidity crisis. If they cannot, it will imperil the company *and we may be subject to suit.*

In addition, *our first line of defense* as well as [SFC's] is that there was no fraud since the forbearance accounts were disclosed in their financial statements.

Pollard Aff., Ex. 34 (emphasis added).

The next day, Gagné revised and finalized the April 17th memorandum ("4/18/02

Memo"). The 4/18/02 Memo addressed to PH's Finance and Ethics Committees states, in

pertinent part, as follows:

The crux of the issue we face is that [SFC] was using its own funds to make payments on the student loans so that the student loans would not appear to be in default (90 days delinquent). It accounted for these payments as draws against a "forebearance [*sic*] account" established on their balance sheet pursuant to their

6

agreements with the schools. We did not prepare the agreements with the schools and were unaware of this issue until this past month. The issue came to light when SFC's latest round of financing fell through (at least in part because the proposed lender discovered this situation), and SFC was [*sic*] no longer had the liquidity to make up the monthly short-falls in payments.

We believe that officers of SFC lied to investors and were complicit in misrepresenting this situation to investors, financial insurers and other parties. We know that the performance data distributed by SFC did not identify payments made by SFC out of this so-called forebearance [*sic*] account but rather reported them as if they were collections received from the students. We also know that Royal was not aware of this situation and now faces significant losses as a result of these loans becoming defaulted, triggering claims under the policies they issued. Furthermore, last summer, issues were raised about the fact that the reported performance statistics on the SFC loans showed that almost 60% of the pools were remaining in a 60-day delinquencies bucket, but never becoming 90 days past due. In a meeting at which I was present, in response to direct questions on this issue, two officers of [SFC] stated that it is the habit of truck drivers to pay immediately preceding a road trip and again when they return, and as a result most of the loans are always going to be in a 60-day delinquency bucket. They asserted other reasons but never said that SFC and the schools were covering the payments on the loans, as it has turned out was clearly the case.

. . . If you looked hard enough, you would have discovered the use of the forbearance payments as skewing the data. In fact, that is exactly how the problem was discovered by another lender who looked carefully at the data. However, to my knowledge, no one at [SFC] ever fully disclosed the use of the forbearance accounts, and as described above, in my presence, in response to direct questions [,] the correct reason for the unusual performance data was not given.

. . . Royal Indemnity is conducting an audit and has discovered that some of the schools were participating in a fraud and that many of the loans were fraudulent loans. In addition, they have uncovered other false statistics and SFC's failure to adhere to its own internal policies. . . . In addition, it came to my attention on Thursday or Friday of last week that SFC destroyed its Executive Committee minutes. As a result, continued

7

representation of the Company by its current auditors is in question.

. . . I am finding myself in the difficult situation of never being comfortable that we have been apprised of the full facts, always trying to ensure that full disclosure is made to all parties, not being able to rely on statements of the officers that such disclosures have been made, questioning what we can reveal to these investors and continually drawing a fine ethical line.

Adding to the ethical considerations is the fact that members of my family and trusts in which I am a beneficiary have made loans to [SFC] from time to time and most recently on March 5, at the request of [Yao].

. . . .

*I think we also need to recognize the possibility that this firm will be sued, as a deep pocket associated with SFC and these transactions, and it may be appropriate to consider whether one course of action or another might better mitigate this possibility.*

I am looking for guidance from the Finance and the Ethics Committees on what steps to take in our further representation of SFC. My preference is to resign since I no longer have confidence in the representations made to us. However, I understand this will put at substantial risk our fees and, thus, I am asking for guidance.

*Id.*, Ex. 35 (emphasis added).

When questioned about his draft of this memorandum at his deposition, Gagné testified

that he was "only concerned that we were a deep pocket, and there was a large loss, and my

experience with large losses, is, usually, anybody related to the transaction is getting sued."

(Pollard Aff., Ex. 15, at 303-04).

By letter dated April 24, 2002, PH terminated its representation of SFC. By e-mail dated

April 25, 2002, PH's general counsel, Alfred Wilcox ("Wilcox"), sent a memorandum to PH's

attorneys. ("4/25/02 Wilcox Memo"). This document states that PH resigned from

8

representation of SFC and directed "[e]veryone who has been involved in [PH] providing services to SFC [to] save all records relating to those services, including e-mail records." (Casher Aff., Ex. 38). The 4/25/02 Wilcox Memo then states as follows:

> Do not discuss any aspect of this situation with anyone outside the firm; within the firm, discuss these matters only with those who have a need to know because they are working in the transition to successor counsel (e.g. Rod Gagné), *or because they are involved in protecting the firm's interests* . . . . It is possible that these circumstances will become the subject of media attention.

*Id.* (emphasis added).

On May 15, 2002, Gagné prepared a memorandum to Wilcox's attention "to set forth in writing [his] recollection of events pertaining to the representation of [SFC]" (Pollard Aff., Ex. 41) and to assist PH's in-house counsel "in assessing any potential claims that were – could have been filed by [SFC] against [PH]" (*id.*, Ex. 15, at 1335) ("5/15/02 Memo"). The 5/15/02 Memo reiterates SFC's misrepresentations to investors, underwriters and Royal in connection with the forbearance payments, deficiencies and defaults. The memo states Gagné's belief that the forbearance accounts would "be misleading to investors and rating agencies since the payments potentially skewed all of the statistical data since it would apply payments from the schools on behalf of the students, which would make the loans to [*sic*] perform better than they in fact did." (*Id.*, Ex. 41). It also states that "[f]orbearance payments were made on behalf of any delinquent student and were automatically pulled from the forbearance accounts," actions that "completely eliminated defaults under the loans until such time as SFC's funding ceased." (*Id.*). Gagné claimed that PH "did not discover how SFC was applying the forbearance accounts until about March 12, 2002." (*Id.*). Wilcox admits that he received the 4/18/02 Memo, but he claims that he never received the 5/15/02 Memo.

9

In June 2002, four trucking schools filed involuntary bankruptcy petitions against SFC.

In July 2002, non-parties Wells Fargo Bank Minnesota, N.A. and MBIA Insurance Corporation

filed lawsuits against Royal, seeking recovery of hundreds of millions of dollars under credit risk

policies that Royal had issued in connection with SFC's conduct.

On July 22, 2002, Wilcox requested information from Gagné in connection with PH's

insurance application. In a memorandum dated August 6, 2002 ("8/6/02 Memo"), Gagné restated

Wilcox's question and answered as follows:

> Are you aware of any fact or circumstance, act, error, omission or
> personal injury which might be expected to be the basis of the
> claim or suit for lawyers professional liability? **Answer:** The only
> two matters of which I am aware are the [SFC] transactions of
> which you are familiar and the [Royal] representation. . . . With
> regard to the [SFC] action, two law suits have been filed in two
> different states and to date, we have not been named in either
> action. I am not certain as to whether we will be joined in the
> future.

*Id.*, Ex. 42.

On its 2002-2003 Westport Policy insurance application, dated September 6, 2002, PH

represented that "[a]fter inquiry of each lawyer," it was not "aware of any fact or circumstance,

act, error, omission or personal injury which might be expected to be the basis of a claim or suit

for lawyers professional liability." ("9/6/02 Westport Insurance Application"). (*Id.*, Ex. 43, at 3).

PH also acknowledged its understanding that "any policy issued will provide coverage on a

claims-made and reported basis for only those claims that are made against the insured and

reported while the policy is in force and that coverage ceases with the termination of the policy."

(*Id.* at 4). PH further acknowledged that "[a]ll claims will be excluded that result from any acts,

circumstances or situations known prior to the inception of coverage being applied for that could

10

reasonably be expected to result in a claim." (*Id.*).

By letter dated October 25, 2002, PH represented to ERII that "all declarations, representations and warranties made by [PH] on [the 9/6/02 Westport Insurance Application] shall be deemed to have been made to [ERII]." (*Id.*, Ex. 44). PH also represented that there have been no material changes in the information set forth in Westport's insurance application and that "after having polled all the lawyers in the firm, there are no claims or circumstances that may result in a claim being made against or involving an insured except as disclosed in the Application." (*Id.*). PH submitted similar letters to Hartford on October 25, 2002, and November 14, 2003. (Casher Aff., Exs. 44 and 47).

In a memorandum dated August 25, 2003, Wilcox and Charlie Leasure, another PH attorney, asked PH attorneys whether they were "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers' professional liability?" (Pollard Aff., Ex. 45). On September 4, 2003, Gagné responded in a memorandum ("9/4/03 Memo"): "[y]es - I have spoken to both Charlie and [Wilcox] with respect to the SFC matter." (*Id.*). On September 15, 2003, PH executed Westport's renewal application, representing that no "new individual proposed for this insurance [is] aware of any circumstance, act, error, omission or personal injury which might be expected to be the basis of a legal malpractice claim or suit that has not previously been reported to the firm's insurance carrier." (*Id.*, Ex. 46). PH also represented on this application that it made "no attempt at suppression or misstatement of any material facts known, or which should be known." (*Id.* at 2).

On April 19, 2004, SFC's bankruptcy trustee, Charles A. Stanziale, Jr., sent Wilcox a proposed tolling agreement in connection with the trustee's belief that SFC had claims against,

11

among others, PH and Gagné. Wilcox notified Westport and PH's excess insurers of the tolling

agreement. By letter dated April 23, 2004 to Wilcox, Westport stated that the 2003-2004

Westport Policy would respond to the reported "potential claim."

On November 1, 2004, the trustee filed suit against, among others, PH and Gagné, in the

United States Bankruptcy Court for the District of Delaware, and on March 15, 2005, Royal filed

suit against, among others, PH and Gagné, in the United States District Court for the District of

Delaware (together, "Underlying Actions"). The Underlying Actions seek to recover damages

arising from PH's representation of SFC while SFC perpetrated a securities fraud.

Discussion

### ERII & Hartford's Summary Judgment Motions

ERII argues that it is entitled to a declaration that coverage under its policies is not

available for any loss that PH or Gagné incurred in connection with the Underlying Actions

because (1) Gagné's prior knowledge bars coverage and (2) because the claims against PH and

Gagné fall into a policy period that precedes the inception of ERII's coverage. Hartford makes

the same arguments in support of its cross-motion for summary judgment.

A.    Choice of Law

"The law of the insured's domicile [applies] to liability insurance policies covering

multistate risks." (*Certain Underwriters at Lloyd's, London v Foster Wheeler Corp.*, 36 AD3d

17, 20 [1st Dept 2006]). ERII and Hartford apply Pennsylvania law. PH and Gagné apply the

laws of various states, including, among others, New York and Pennsylvania. The parties have

not briefed the issue of choice of law. However, PH and Gagné do not dispute ERII and

Hartford's application of Pennsylvania law pursuant to *Certain Underwriters.* (36 AD3d 17).

12

As PH is based in Pennsylvania (PH Opp. Mem. of Law, at 2), Pennsylvania law applies.

B.    Prior Knowledge Exclusion

Under Pennsylvania law, contracts are interpreted "to ascertain the intent of the parties as manifested by the language of the written instrument." (*Standard Venetian Blind Co. v American Empire Ins. Co.*, 503 Pa 300, 305, 469 A2d 563 [Pa 1983] ["Where . . . the language of the contract is clear and unambiguous, a court is required to give effect to that language.])" (*Id.*). Application of the policy exclusion requires an examination of whether: (1) the insured knew of certain facts that (2) could have led a reasonable attorney to foresee that those facts might be the basis of a claim. (*Coregis Ins. Co. v Baratta & Fenerty, Ltd.*, 264 F3d 302, 306 [3d Cir 2001]; *Selko v Home Ins. Co.*, 139 F3d 146, 152 [3d Cir 1998]; *see e.g. Zubulake v UBS Warburg LLC*, 220 FRD 212, 216 [SD NY 2003] [noting that the "'obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation' (citation omitted)"]). Moreover, "[an attorney] cannot assume that the claim will not be brought because he *subjectively* believes it is time barred or lacks merit." (*Coregis Ins. Co.*, 264 F3d at 307 [emphasis in original]).

Here, Pennsylvania courts have already determined that Westport's "Exclusion B [is] clear and unambiguous." *Westport Ins. Corp. v Mirsky*, 2002 WL 31018554, *12 (ED Pa 2002), *affd* 84 Fed Appx 199 (3d Cir 2003); *see also Mirarchi v Westport Ins. Corp.*, 2003 WL 1918975, *3 (ED Pa 2003) (same). The Hartford prior knowledge exclusion is nearly identical to Exclusion B in the Westport Policy. Therefore, its prior knowledge exclusion is also unambiguous.

ERII and Hartford's excess insurance coverage commenced on October 27, 2002, and PH

13

renewed this coverage on October 27, 2003. Gagné's 4/18/02 Memo, 5/15/02 Memo, 8/6/02

Memo, 9/4/03 Memo and his testimony all establish that Gagné, on numerous occasions,

informed PH that its representation of SFC "could result in a claim" and "might be expected to

be the basis of a CLAIM" in accordance with the Westport, Hartford and ERII Policies. This

evidence demonstrates that, by April 2002, Gagné, the lead PH attorney working for SFC, had

actual knowledge of the potential for a suit against him and PH. This evidence also establishes

that defendants knew and reasonably foresaw that their work on SFC's fraudulent securities

transactions would expose them to litigation.

The existence of the 4/25/02 Wilcox Memo also supports the conclusion that PH

reasonably anticipated litigation from its representation of SFC. Moreover, Gagné admittedly

drafted the 5/15/02 Memo to Wilcox "to help him and assist him in assessing any potential

claims that there were - could have been filed by [SFC] against [PH]." (Casher Aff., Ex. 15, at

1335). Taken together, the evidence establishes Gagné's subjective awareness of certain facts

that could, and in fact did, lead a reasonable attorney to foresee that those facts might be the basis

of a claim. Further, any subjective belief that defendants may have regarding the actual merits of

claims arising from their work on SFC's fraudulent transactions is irrelevant. For the foregoing

reasons, ERII and Hartford have made a prima facie showing that the prior knowledge exclusions

apply.

PH and Gagné counter that the phrase "act, error or omission" refers to an act of

malpractice, not the mere representation of a client. However, Westport's Insuring Agreement,

which is incorporated into ERII and Hartford's policies, provided PH with coverage for

"CLAIMS first made against any INSURED . . . by reason of any WRONGFUL ACT . . . ."

14

(Pollard Aff., Ex. 11, at PH INS 00000309). "WRONGFUL ACT" is defined as "any act, error,

omission (circumstance) . . . in the rendition of legal services for others, either for a fee or pro

bono in the INSURED'S capacity as a lawyer . . . of the NAMED INSURED . . . ." (*Id.*, at PH

INS 00000315). Thus, coverage extends to claims based upon any act by a PH lawyer in the

rendition of legal services for others that results in a claim, and the prior knowledge exclusion

encompasses all such claims. Nothing contained in the policy language limits claims to

malpractice. Therefore, this argument is unpersuasive.

 Defendants also argue that the prior knowledge exclusion is ambiguous because it is

inconsistent with the continuous coverage provisions of the policies. The 2003-2004 Westport

Policy provides that:

> If, during this POLICY PERIOD, any INSURED provides written
> notice to the Company of a POTENTIAL CLAIM which any
> insured first became aware of during the period of a prior policy
> issued by the Company to the NAMED INSURED, which policy
> was Renewed continuously and without interruption through the
> inception of this POLICY, then any CLAIMS subsequently made
> against any INSURED arising from the POTENTIAL CLAIM shall
> be considered to have been first made and reported during the
> policy period of the policy in effect when any INSURED first
> became aware of such POTENTIAL CLAIM subject to the terms,
> conditions and limits of liability of the policy in effect at such time.

Pollard Aff., Ex. 11, at PH INS 00000309. This policy's notice provision provides that:

> If, during the POLICY PERIOD, any INSURED first becomes
> aware of a POTENTIAL CLAIM and gives written notice of such
> POTENTIAL CLAIM to the Company during the POLICY
> PERIOD, <u>or any subsequent POLICY PERIOD as a result of
> continuous and uninterrupted coverage with the Company</u>, ANY
> CLAIMS subsequently made against any INSURED arising from
> the POTENTIAL CLAIM shall be considered to have been made
> during the POLICY PERIOD.

*Id.* at PH INS 00000292 (emphasis in original). "Potential claim" is defined as "any act, error,

15

omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY," or "any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED." (*Id.*, at PH INS 00000314). According to defendants, these provisions contradict the prior knowledge exclusion because they provide or anticipate coverage for potential claims even if some knowledge of the potential claims predates the policy period.

The continuous coverage provision identifies the point in time when coverage attaches after an insured gives notice of a "potential claim" and it has a "policy [that] was renewed continuously and without interruption" over several policy periods. (*Id.*, at PH INS 00000309 and PH INS 00000292). In other words, if an insured becomes aware of a "potential claim" in one policy period and gives notice in a subsequent policy period, coverage attaches during the policy period when the insured first became aware of the potential claim. This interpretation is consistent with the prior knowledge exclusion, which excludes coverage for a "claim" in a present policy period when the insured knew or reasonably could foresee that a lawsuit may arise before that coverage attached. Therefore, defendants' argument is unpersuasive.

The court has considered PH and Gagné's additional arguments and finds them unpersuasive. Thus, PH and Gagné fail to rebut ERII and Hartford's prima facie showing.[1] For the foregoing reasons, the court grants ERII and Hartford's motions for summary judgment as

---

[1] Although ERII and Hartford's summary judgment motions are directed only at PH and Gagné, Westport submits opposition papers to both motions. Westport's oppositions are based upon ERII and Hartford's alternative arguments concerning which year coverage was triggered. However, Westport takes no position on the applicability of the prior knowledge exclusion. Because the court's decision on ERII and Hartford's motions is based upon the prior knowledge exclusion, the court will not address Westport's opposition papers or arguments challenging Westport's standing to submit opposition papers.

against PH and Gagné.

### CNA's Cross-Motion for Summary Judgment

CNA seeks rescission of the 2002-2003 and 2003-2004 CNA Policies and a declaration that there is no coverage under the 2001-2002 CNA Policy. PH and Gagné counter that: (1) issues of fact preclude summary judgment and (2) CNA has not established the elements of rescission.

The parties dispute whether Pennsylvania law applies, but they have not briefed the issue of choice of law. However, the parties agree that New York and Pennsylvania share overlapping requirements on a rescission claim, with Pennsylvania requiring an additional showing of bad faith. CNA argues that, in any event, PH and Gagné acted in bad faith, thereby satisfying both the New York and the Pennsylvania standards.

A.    Claim for Rescission

Under the laws of both states, to rescind an insurance policy due to a misrepresentation in the application, the insurer must prove that: (1) the applicant's statements were false; (2) the applicant's statements were material; (3) the applicant knew that the statements were false; and (4) the insurer relied on the statements in issuing the policy. (*Chicago Ins. Co. v Fasciana*, 2006 WL 3714310, *3 [SD NY 2006]; *Mt. Airy Ins. Co. v Thomas E. Angst & Assoc., P.C.*, 954 F Supp 1040, 1042-43 [ED PA 1997]). No genuine issue of material fact remains regarding an applicant's knowledge and bad faith where an insurance application "contain[s] misrepresentations indicating no knowledge of circumstances, acts, errors or omissions that could result in a professional liability claim against any attorney of the firm." (*Mt. Airy Ins. Co*, 954 F Supp at 1045). "Information withheld is material for purposes of allowing an insurer to

17

rescind a policy if the information, if given, would have influenced the judgment of the insurer in issuing the policy, in estimating the degree and character of the risk, or in fixing a premium rate." (*Rohm and Haas Co. v Continental Cas. Co.*, 732 A2d 1236, 1250 [Pa Super 1999], *affd* 566 Pa 464, 781 A2d 1172 [Pa 2001]). Pennsylvania requires the additional element that the applicant made the false statements in bad faith. (*Mt. Airy Ins. Co.*, 954 F Supp at 1043).

     1.    Falsity of PH's Statements and Bad Faith

As discussed above, in its 2002-2003 Westport Policy application, PH represented that "[a]fter inquiry of each lawyer," neither PH nor "any lawyer proposed for this insurance" is "aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability[.]" (Pollard Aff., Ex. 43, at 3). In the 2003-2004 Westport Policy application, PH represented that it made "no attempt at suppression or misstatement of any material facts known, or which should be known." (*Id.*, Ex. 46, at 2). Gagné's 4/18/02 Memo, 5/15/02 Memo, 8/6/02 Memo, 9/4/03 Memo, and Gagné's testimony all demonstrate that PH's representations on the insurance applications were false and that PH knew that the statements were false.

     2.    Materiality of PH's Statements and CNA's Reliance

CNA submits the affidavit of Noreen Calisto ("Calisto"), a director in underwriting lawyers' professional liability insurance policies, who was the underwriter for PH's account in the 2003-2004 policy year. Calisto's affidavit states that in the underwriting process, "[k]nowledge by the prospective insured of any fact, circumstance, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers professional liability has a material effect on the determination of premium and policy terms." (Calisto Aff., ¶ 7). She

<div align="center">18</div>

also states that an insurer "may modify the terms of the policy or increase the premium charged in order to account for the increased risk." (*Id.*). Calisto's affidavit concludes that CNA would not have issued the 2002-2003 and 2003-2004 CNA Policies on the same terms if PH had disclosed the circumstances surrounding PH's representation of SFC. (Calisto Aff., ¶¶ 14-16).

Calisto's affidavit is consistent with PH's acknowledgment in the 2002-2003 insurance application that "[a]ll claims will be excluded that result from any acts, circumstances or situations known prior to the inception of coverage being applied for that could reasonably be expected to result in a claim." (Pollard Aff., Ex. 43, at 4). It is also consistent with the disclosure requirements of the 2003-2004 application, concerning suppression or misstatement of material facts known (*id.*, Ex. 46, at 2), and the CNA Policies themselves, that CNA expressly issued in reliance upon PH's application statements and supporting materials. Specifically, the 2002-2003 and 2003-2004 CNA Policies state that CNA issued the policies "[i]n consideration of the payment of the premium and *in reliance on all statements made and information furnished to the Company in the Application*, including all attachments, a copy of which is attached hereto . . . ." (Pollard Aff., Exs. 10 and 14, at 1 [emphasis added]). PH also represented that the statements in the 2002-2003 application were "true, complete and accurate and that there ha[d] been no attempt at suppression or misstatement of any material facts known, or which should be known, and agree[d] that th[e] application shall become the basis of any coverage that may be issued by the Company." (*Id.*, Ex. 43, at 5). Thus, the insurance applications, policies and Calisto's affidavit all support the conclusions that the information withheld was material and CNA relied upon it.

In addition, Gagné's 4/18/02 Memo, 5/15/02 Memo, 8/6/02 Memo, 9/4/03 Memo,

19

Gagné's testimony and PH's representations on its insurance applications all establish that PH and Gagné had knowledge that was not disclosed to CNA even though it was relevant to CNA's underwriting process.

For the foregoing reasons, CNA has made a prima facie showing establishing that it is entitled to rescission of the 2002-2003 and 2003-2004 CNA Policies. PH and Gagné do not submit any evidence that rebuts this showing. Therefore, the court grants CNA's cross-motion for summary judgment to the extent that the 2002-2003 and 2003-2004 CNA Policies are rescinded.

B.    Declaration of No Coverage

CNA next argues that there is no coverage under the 2001-2002 CNA Policy because the Underlying Actions did not constitute a claim made and reported during the 2001-2002 CNA Policy.

The 2001-2002 CNA Policy states that it is "A CLAIMS MADE AND REPORTED POLICY. EXCEPT TO SUCH EXTENT AS MAY BE PROVIDED HEREIN, THIS POLICY IS LIMITED TO LIABILITY FOR THOSE CLAIMS THAT ARE BOTH FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD." Pollard Aff., Ex. 6, at 1. Here, PH first notified Westport of the "threatened claim" on April 27, 2004 (*id.*, Ex. 48), over two years after the 2001-2002 CNA Policy expired. Thus, the Underlying Actions did not involve claims "BOTH FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD."

The underlying 2001-2002 Westport Policy provides that:

> If, during this POLICY PERIOD, any INSURED first becomes
> aware of a POTENTIAL CLAIM and gives written notice of such

POTENTIAL CLAIM to the Company either during the current
POLICY PERIOD, or during the POLICY PERIOD of any
subsequent policy issued to the NAMED INSURED as a result of
continuous and uninterrupted coverage with the Company, any
CLAIMS subsequently made against any INSURED arising from
the POTENTIAL CLAIM shall be considered to have been first
made during the POLICY PERIOD the INSURED first became
aware of a POTENTIAL CLAIM.

Pollard Aff., Ex. 11, at PH INS 00000211.

However, this provision applies only to notification of potential claims under later policy

years where the firm maintained "continuous and uninterrupted coverage" with its insurers.

Because CNA is entitled to rescission of the 2002-2003 and 2003-2004 CNA Policies, as

discussed above, PH did not have "continuous and uninterrupted coverage" in place when it

notified its insurers of the "threatened claim" on April 27, 2004. For the foregoing reasons, CNA

has made a prima facie showing demonstrating that there is no coverage under the 2001-2002

CNA Policy. PH fails to rebut this showing.

Accordingly, it is hereby

ORDERED that the court grants the motions of plaintiff Executive Risk Indemnity, Inc.

and third-party defendant Twin City Fire Insurance Company for summary judgment on the

complaint and counterclaims, respectively, to the extent that these parties are entitled to a

declaratory judgment that, based upon a prior knowledge exclusion, Executive Risk Indemnity

and Twin City Fire Insurance Company have no obligation to indemnify defendants Pepper

Hamilton LLP or W. Roderick Gagné under the 2003-2004 Excess Indemnity Policy of

Executive Risk Indemnity, Inc. (policy number 8170-3836), the 2003-2004 Policy of Excess

Insurance of Twin City Fire Insurance Company (policy number 00 PF 0214459), or any other

Executive Risk Indemnity, Inc. or Twin City Fire Insurance Company excess policy for any claim

21

made as a result of the underlying actions *In re Stanziale v Pepper Hamilton* (Case No. 02-11620-JBR, in the United States Bankruptcy Court for the District of Delaware) and *Royal Indemnity Company v Pepper Hamilton LLP* (C.A. No. 05-165, in the United States District Court for the District of Delaware); and it is futher

ORDERED that the court grants the cross-motion for summary judgment of third-party defendant Continental Casualty Company on its counterclaims to the extent that Continental Casualty Company is entitled to a declaratory judgment that: (a) the 2002-2003 and 2003-2004 Continental Excess Insurance Policies (policy number LLE-192857748) are rescinded and (b) that the 2001-2002 Continental Excess Insurance Policy does not cover or respond to the underlying actions *In re Stanziale v Pepper Hamilton* (Case No. 02-11620-JBR, in the United States Bankruptcy Court for the District of Delaware) and *Royal Indemnity Company v Pepper Hamilton LLP* (C.A. No. 05-165, in the United States District Court for the District of Delaware); and it is further

ORDERED that the court dismisses the counterclaims of defendants Pepper Hamilton LLP and W. Roderick Gagné; and it is further

ORDERED that the court dismisses the third-party complaint; and it is further

ORDERED that Pepper Hamilton LLP and W. Roderick Gagné's cross-claim against co-defendant Westport Insurance Corporation is hereby severed and shall continue.

Plaintiff is directed to settle judgment providing for appropriate declarations.

Dated:  September *16*, 2007

ENTER:

_____
J.S.C.

22

# EXHIBIT 14

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

---------------------------------------------------- x

EXECUTIVE RISK INDEMNITY INC.

                                   Plaintiff,

            *- against -*

PEPPER HAMILTON LLP, W. RODERICK
GAGNÉ AND WESTPORT INSURANCE
CORPORATION,

                             Defendants.

---------------------------------------------------- x

PEPPER HAMILTON LLP AND W. RODERICK
GAGNÉ,

                         Third-Party Plaintiffs,

            *- against -*

CONTINENTAL CASUALTY COMPANY AND
TWIN CITY FIRE INSURANCE COMPANY,

                   Third-Party Defendants.

----------------------------------------------------x

**NOTICE OF APPEAL**

Index No. 603624/05

TP Index No. 590185/07

         PLEASE TAKE NOTICE, that Defendants/Third-Party Plaintiffs

Pepper Hamilton LLP and W. Roderick Gagné hereby appeal to the Appellate

Division, First Department, of the Supreme Court of the State of New York

from the Order and Judgment of the Honorable Jacqueline Silbermann, the

Supreme Court of the State of New York for the County of New York, entered

in the office of the Clerk of the County of New York on January 29, 2008, a

complete and accurate copy of which is attached as Exhibit A.

Dated:  January 31, 2008

<div style="margin-left:45%">

CAHILL GORDON & REINDEL LLP

By: _Charles A. Gilman_

     Charles A. Gilman
Eighty Pine Street
New York, New York 10005
(212) 701-3000
*Attorneys for Pepper Hamilton LLP*

DICKSTEIN SHAPIRO LLP
Randy Paar
Edward Tessler
1177 Avenue of the Americas
New York, New York 10036
(212) 277-6500
*Attorneys for Pepper Hamilton LLP
and W. Roderick Gagné*

</div>

TO:   Clerk of the Court
      Supreme Court of the State of New York
      County of New York
      60 Centre Street
      New York, New York 10007

CC:   William B. Pollard III, Esq.
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue
New York, New York 10017
*Attorneys for Plaintiff Executive Risk Indemnity Inc.*

Robert P. Conlon, Esq.
Walker Wilcox Matousek LLP
225 W. Washington Street
Chicago, Illinois 60606
*Attorneys for Defendant Westport Insurance Corporation*

Samuel B. Mayer, Esq.
Edwards Angell Palmer & Dodge LLP
750 Lexington Avenue
New York, NY 10022
*Attorneys for Third-Party Defendant Twin City Fire Insurance Company*

Kevin M. Mattessich, Esq.
Cozen O'Connor
45 Broadway
New York, New York 10006
*Attorneys for Third Party Defendant Continental Casualty Company*

# SUPREME COURT OF THE STATE OF NEW YORK
# APPELLATE DIVISION — FIRST DEPARTMENT

-------------------------------------------------- x

EXECUTIVE RISK INDEMNITY INC.

                Plaintiff/Respondent,

        - *against* -

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ,

             Defendants/Appellants,

      AND WESTPORT INSURANCE CORPORATION,

             Defendants/Appellants.

-------------------------------------------------- x

PEPPER HAMILTON LLP AND W. RODERICK GAGNÉ,

      Third-Party Plaintiffs/Appellants,

        - *against* -

CONTINENTAL CASUALTY COMPANY AND TWIN CITY FIRE INSURANCE COMPANY,

      Third-Party Defendants/Respondents.

-------------------------------------------------- x

**Preargument Statement**

New York County
Index No. 603624/05

New York County
TP Index No. 590185/07

      Defendants/Appellants Pepper Hamilton LLP and W. Roderick Gagné submit this Preargument Statement pursuant to § 600.17 of the Rules of the Appellate Division, First Department:

-2-

## TITLE OF THIS ACTION:

The initial title of this action was *Executive Risk Indemnity Inc.* v. *Pepper Hamilton LLP, W. Roderick Gagné and Westport Insurance Corporation*. A third-party complaint, captioned *Pepper Hamilton LLP and W. Roderick Gagné* v. *Continental Casualty Company and Twin City Fire Insurance Company*, was also filed.

## PARTIES:

1. Pepper Hamilton LLP ("Pepper") and W. Roderick Gagné ("Gagné"), Defendants and Third-Party Plaintiffs below, are Appellants in this appeal. Westport Insurance Corporation ("Westport"), Defendant below, is also an Appellant in this appeal.

2. Executive Risk Indemnity Inc. ("ERII"), Plaintiff below, Continental Casualty Company ("CNA") and Twin City Fire Insurance Company ("Hartford") (together with ERII and CNA, the "Insurers"), Third-Party Defendants below, are Respondents in this appeal.

## APPELLANTS' COUNSEL ARE:

> Charles A. Gilman, Esq.
> Cahill Gordon & Reindel LLP
> Eighty Pine Street
> New York, New York 10005
> (212) 701-3000
> *Attorneys for Pepper Hamilton LLP*

-3-

Randy Paar, Esq.
Edward Tessler, Esq.
Dickstein Shapiro LLP
1177 Avenue of the Americas
New York, New York 10013
(212) 277-6501
*Attorneys for Pepper Hamilton LLP and*
*W. Roderick Gagné*

Robert P. Conlon, Esq.
Walker Wilcox Matousek LLP
225 W. Washington Street, Suite 2400
Chicago, Illinios 60606-3418
*Attorneys for Westport Insurance Corporation*

**RESPONDENTS' COUNSEL ARE:**

William B. Pollard III, Esq.
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue
New York, New York 10017
*Attorneys for Plaintiff Executive Risk Indemnity Inc.*

Samuel B. Mayer, Esq.
Edwards Angell Palmer & Dodge LLP
750 Lexington Avenue
New York, NY 10022
*Attorneys for Third-Party Defendant Twin City Fire Insurance Company*

Kevin M. Mattessich, Esq.
Cozen O'Connor
45 Broadway
New York, New York 10006
*Attorneys for Third-Party Defendant Continental Casualty Company*

**COURT FROM WHICH APPEAL IS TAKEN:**

Supreme Court of the State of New York

-4-

County of New York
(Hon. Karla Moskowitz, J.S.C., Hon. Jacqueline Silbermann, J.S.C.)

**NATURE AND OBJECT OF ACTION:**

Pepper is a law firm. Gagné is one of its partners. The following chart sum-

marizes Pepper's professional liability insurance coverage:

| 2001/2002 Policy Year | 2002/2003 Policy Year | 2003/2004 Policy Year |
|---|---|---|
| Westport . . . . $20 million | Westport . . . . . $10 million | Westport . . . . . $10 million |
| Westport | Hartford . . . . . $10 million | Hartford . . . . . $10 million |
| CNA . . . . . . $30 million | ERII . . . . . . . . $10 million | ERII . . . . . . . . $10 million |
| CNA | CNA . . . . . . . .$10 million | CNA . . . . . . . .$10 million |
| CNA | [none] | [none] |
| Total Coverage: $50 million | Total Coverage: $40 million | Total Coverage: $40 million |

In all periods the excess insurance policies "followed the form" of the pri-

mary Westport policy, which throughout contained a "Continuous Coverage" pro-

vision that was incorporated in all of the excess insurance policies and served as an

exception to the "claims made" timing of notice required to invoke coverage under

the policies. It provides that claims made in a subsequent policy period "shall be

considered to have been first made and reported" during the policy period in effect

when the insured "first became aware of" the potential claim. The Continuous

Coverage provision assures coverage, but raises issue as to whether the underlying

claims were covered under the 2001-2002 Program (Westport and CNA policies

-5-

aggregating $50 million in coverage) or the 2003-2004 Program (Westport, Hartford, ERII and CNA policies aggregating $40 million in coverage).

In April 2004 Pepper was approached by the bankruptcy trustee of a former client that Pepper had ceased representing two years earlier. The trustee asked for a "tolling agreement" while he considered whether or not to assert any claims against Pepper. Pepper immediately notified its primary and excess professional liability insurers of the potential claim. Subsequently, the trustee sued. Pepper's claim was deemed made under the 2003-04 policies. The insurer that issued Pepper's primary layer of insurance, and whose policy form controlled, acknowledged the timeliness of Pepper's notice and began honoring defense obligations. The three excess insurers disagreed. This lawsuit followed, with the excess insurers seeking declarations that they owed no coverage obligations, and Pepper seeking declarations that they did. The facts relevant to assessment of the timeliness of Pepper's notice to its insurers and the related accuracy of its applications for renewal insurance coverage were disputed, both as between Pepper and its insurers and as between the insurers themselves. So was interpretation of a Continuous Coverage provision common to all insurance policies.

**RESULT REACHED IN COURT BELOW:**

-6-

Despite material facts being in dispute, less than seven weeks after the pleadings were closed, without allowing essential discovery, and ignoring that the insurers themselves disagreed as to the timeliness of Pepper's notice and the interpretation of policy provisions common to all of their policies, the Supreme Court, New York County (Hon. Karla Moskowitz), granted motions for summary judgment filed by the three excess insurers. The effect of the lower court's Decision & Order is to strip Pepper of at least $30 million in professional liability insurance coverage. Judgment was entered in favor of the Insurers and against Pepper and Gagné in Supreme Court, New York County (Hon. Jacqueline Silbermann) on January 29, 2008.

**GROUNDS FOR REVERSAL:**

The facts relevant to assessment of the timeliness of Pepper's notice to its insurers and the related accuracy of its applications for renewal coverage for the 2002-2003 Program and the 2003-2004 Program were disputed, both as between Pepper and its insurers and as between the insurers themselves. So was interpretation of the Continuous Coverage provision common to all policies.

Nevertheless, with Pepper's primary and excess insurers in disagreement as to what policy period covered Pepper's claim, the three excess insurers actively refused to provide discovery and moved for summary judgment. Pepper's primary

-7-

insurer opposed their motions, explaining that numerous issues of fact precluded summary judgment, and that "discovery in this complex matter began only within the past few weeks." Pepper and Gagné were caught in the middle.

While agreeing with Westport that discovery was necessary, Pepper and Gagné also opposed the excess insurers' motions with affidavits from Alfred Wilcox, Pepper's General Counsel and the individual who had handled Pepper's notice to insurers and the firm's insurance applications. Wilcox attested to his knowledge and good faith in giving notice when he did, with supporting evidence from the limited record that had been obtained in the first weeks of discovery.

As insureds, Pepper and Gagné were entitled to every benefit in the court's construction of the insurance policies at issue. As non-movants on motions for summary judgment, Pepper and Gagné were also entitled to every benefit in the disputed facts presented. The lower court gave them neither.

Instead, it applied an incorrect legal standard, did not reference sworn evidence presented by Pepper and Gagné, and resolved against them material facts that were very much in dispute. It did not permit essential discovery, and then made findings on the precise facts on which the insurers refused to provide discovery. It drew inferences in favor of the insurers despite the absence of admissible evidence from which such inferences could be drawn, and overlooked that the in-

-8-

surers did not present evidence in support of each element of claims as to which they had the burden of proof. It ignored settled law applicable to coverage disputes, erroneously conflated alleged client misconduct with attorney malpractice, and erred in its application of policy provisions that compelled coverage for Pepper. The lower court's decision is wrong, fails to abide the controlling law, and works a substantial injustice. Pepper and Gagné should be allowed discovery and given an opportunity present their evidence to a jury at trial.

Dated:    January 31, 2008

<div style="text-align:right">

CAHILL GORDON & REINDEL LLP

By: _Charles A. Gilman_

Charles A. Gilman
Eighty Pine Street
New York, New York 10005
(212) 701-3000
*Attorneys for Pepper Hamilton LLP*

DICKSTEIN SHAPIRO LLP
Randy Paar
Edward Tessler
1177 Avenue of the Americas
New York, New York 10036
(212) 277-6500
*Attorneys for Pepper Hamilton LLP
and W. Roderick Gagné*

</div>

TO:  Clerk of the Court
     Supreme Court of the State of New York
     County of New York

-9-

60 Centre Street
New York, New York 10007

William B. Pollard III, Esq.
Kornstein Veisz Wexler & Pollard LLP
757 Third Avenue
New York, New York 10017
*Attorneys for Plaintiff Executive Risk Indemnity Inc.*

Samuel B. Mayer, Esq.
Edwards Angell Palmer & Dodge LLP
750 Lexington Avenue
New York, NY 10022
*Attorneys for Third-Party Defendant Twin City Fire Insurance Company*

Kevin M. Mattessich, Esq.
Cozen O'Connor
45 Broadway
New York, New York 10006
*Attorneys for Third-Party Defendant Continental Casualty Company*

Robert P. Conlon, Esq.
Walker Wilcox Matousek, LLP
225 Washington Street, Suite 2400
Chicago, Illinois 60606-3418
*Attorneys for Defendant Westport Insurance Company*

# EXHIBIT 15

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

EXECUTIVE RISK INDEMNITY, INC.,

Index No.: 603624/2005

Plaintiff,

-against-

**NOTICE OF APPEAL**

PEPPER HAMILTON, LLP, W. RODERICK GAGNÉ and
WESTPORT INSURANCE CORPORATION,

Defendants.

PEPPER HAMILTON, LLP, and W. RODERICK GAGNÉ,
Third-Party Plaintiffs,

Index No. 590185/07

-against-

CONTINENTAL CASUALTY COMPANY and TWIN CITY
FIRE INSURANCE COMPANY,

Third-Party Defendants.

**PLEASE TAKE NOTICE** that defendant WESTPORT INSURANCE

CORPORATION hereby appeals to the Appellate Division, First Judicial Department from

the Decision and Order (Hon. Karla Moskowitz, J.S.C.), dated September 26, 2007, and

filed in the New York County Clerk's Office on January 3, 2008.

Dated: New York, New York
      January 28, 2008

Yours etc.,

F:\cases\16073\Notice of Appeal   Page 1

WALKER WILCOX MATOUSEK LLP

By: *Robert P. Conlon*

Robert P. Conlon
Joyce F. Noyes
Joseph Borders
Attorneys for Appellant/Defendant
WESTPORT INSURANCE CORPORATION
225 West Washington Street, Suite 2400
Chicago, Illinois 60606-3418
(312) 244-6700

GARBARINI & SCHER, P.C.
William D. Buckley
Attorneys for Appellant/Defendant
WESTPORT INSURANCE CORPORATION
432 Park Avenue South
New York, New York 10016-8013
(212) 689-1113

To:   KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
Attorneys for Plaintiff
EXECUTIVE RISK INDEMNITY INC.
757 Third Avenue
New York, New York 10017
(212) 418-8600

DICKSTEIN SHAPIRO LLP
Attorneys for Defendants/Third-Party Plaintiffs
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
1177 Avenue of the Americas
New York, New York 10036
(212) 277-6500

CAHILL GORDON & REINDEL LLP
Appellate Counsel to Defendants/
Third-Party Plaintiffs/Appellants/Respondents
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
80 Pine Street
New York, New York 10005
(212) 701-3000

COZEN O'CONNOR
Attorneys for Third-Party Defendant
CONTINENTAL CASUALTY COMPANY
45 Broadway, 16th Floor
New York, New York 10006
(212) 509-9400

EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Third-Party Defendant
TWIN CITY FIRE INSURANCE COMPANY
750 Lexington Avenue
New York, New York 10022
(212) 308-4411

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST JUDICIAL DEPARTMENT

EXECUTIVE RISK INDEMNITY INC.,

    Plaintiff/Respondent,

         -against-

PEPPER HAMILTON LLP and W. RODERICK
GAGNÉ,

    Defendants/Appellants/Respondents,

         -and-

WESTPORT INSURANCE CORPORATION,

    Defendant/Respondent/Appellant.

PEPPER HAMILTON LLP and W. RODERICK
GAGNÉ,

    Third-Party Plaintiffs/Appellants/Respondents,

         -against-

CONTINENTAL CASUALTY COMPANY and
TWIN CITY FIRE INSURANCE COMPANY,

    Third-Party Defendants/Respondents.

**PRE-ARGUMENT
STATEMENT**

Index No. 603624/05
(New York County)

TP Index No. 590185/07
(New York County)

     **PLEASE TAKE NOTICE** that, pursuant to 22 N.Y.C.R.R. §§ 600.17(a) and (b), defendant/respondent/appellant WESTPORT INSURANCE CORPORATION hereby submits the following as its Pre-Argument Statement:

     1. The title of the action, including a third-party action, is above in the caption.

     2. The full names of the original parties, as well as the full names of the parties in the third-party action, are above in the caption.

3a.  Counsel for defendant/respondent/appellant WESTPORT INSURANCE CORPORATION ("WESTPORT") is Walker Wilcox Matousek LLP, 225 West Washington Street, Suite 2400, Chicago, Illinois 60606-3418.  Telephone: (312) 244-6700.

3b.  Local counsel in New York for WESTPORT is Garbarini & Scher, P.C., 432 Park Avenue South, New York, New York 10016-8013.  Telephone: (212) 689-1113.

4a.  Counsel for plaintiff/respondent EXECUTIVE RISK INDEMNITY, INC. ("ERII") is Kornstein Veisz Wexler & Pollard, ILP, 757 Third Avenue, New York, New York 10017.  Telephone: (212) 418-8600.

4b.  Counsel for defendants/third-party plaintiffs/appellants/respondents PEPPER HAMILTON LLP ("PEPPER") and W. RODERICK GAGNÉ ("GAGNÉ")  is Dickstein Shapiro LLP, 1177 Avenue of the Americas, New York, New York 10036; telephone: (212) 277-6500.  Their appellate counsel is Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005; telephone: (212) 701-3000.

4c.  Counsel for third-party defendant/respondent CONTINENTAL CASUALTY COMPANY ("CNA") is Cozen O'Connor, 45 Broadway, 16th Floor, New York, New York 10006.  Telephone: (212) 509-9400.

4d.  Counsel for third-party defendant/respondent TWIN CITY FIRE INSURANCE COMPANY ("HARTFORD") is Edwards Angell Palmer & Dodge LLP, 750 Lexington Avenue, New York, New York 10022.  Telephone: (212) 308-4411.

5.  This is an appeal from Supreme Court of New York, County of New York,

6.  Plaintiff/Respondent ERII issued excess insurance policies providing professional liability coverage to law firm Defendant/Appellant PEPPER and its partner, Defendant/Appellant GAGNÉ.  ERIII commenced the action in the lower court against PEPPER, GAGNÉ, and their primary professional liability insurer, Defendant/Appellant

WESTPORT. In its complaint, ERII sought a declaration that there is no coverage under the ERII insurance policies for claims against PEPPER and GAGNÉ which arose out of an alleged securities fraud scheme perpetrated by a former client, Student Finance Corporation ("SFC"). PEPPER and GAGNÉ filed a counterclaim against ERII, a cross-claim against WESTPORT and third-party complaints against Third Party Defendant/Respondent HARTFORD and Third Party Defendant/Respondent CNA. In these pleadings, PEPPER and GAGNÉ alleged that each professional liability insurer was obligated to defend and indemnify PEPPER and GAGNÉ against the SFC claims.

At issue are three successive "towers" of professional liability insurance policies. Each tower consists of a primary insurance policy issued by WESTPORT and one or more excess insurance policies issued by the other insurer-parties. All of the policies are "claims-made" policies, meaning that coverage is provided solely for claims first made against the insured and reported to the insurer during the time the policy is in effect, the so-called "policy period." The first tower (the "Year 1 Tower") had a policy period of April 27, 2001 to October 27, 2002. The second tower (the "Year 2 Tower") had a policy period of October 27, 2002 to October 27, 2003. The third tower (the "Year 3 Tower") had a policy period of October 27, 2003 to October 27, 2004. ERII and HARTFORD issued excess policies only in the Year 2 and Year 3 Towers. CNA issued excess policies in all three Towers.

In order to establish coverage under these "claims-made" policies, the insured must prove that either: (1) the "Claim" (as defined by the insurance policy) was first made against the insured and reported to the insurer during the policy period; or (2) pursuant to the terms of the insurance policy, the "Claim" is "considered" first made and reported during the policy period. Under the second method, for a "Claim" to be "considered" first

made and reported during a given policy period, PEPPER must establish that during "continuous and uninterrupted coverage," PEPPER <u>first</u> became aware of a "Potential Claim" (as defined by the insurance policy) and provided notice of that "Potential Claim" to the insurer. In such instances, any subsequent "Claim" will relate back to and trigger the policy in effect on the date PEPPER <u>first</u> became aware of a "Potential Claim." However, if PEPPER first became aware of a "Potential Claim" <u>before</u> the start of "continuous and uninterrupted coverage", then the subsequent "Claim" will not relate back to or trigger an earlier policy. Thus, if PEPPER did indeed <u>first</u> become aware of a matter as a "Potential Claim" <u>before</u> the inception of "continuous and uninterrupted coverage," then the subsequent "Claim" is not covered at all. In addition, the policies all contain "Prior Knowledge" exclusions that bar coverage for any "Claim" based upon any act, error or omission committed prior to the inception date of the policy which PEPPER knew or should have known could result in a "Claim."

In this case, in April 2004 (during the Year 3 Tower), PEPPER notified WESTPORT and the other insurers that the bankruptcy trustee of SFC had recently proposed a "Tolling Agreement" to PEPPER. The Tolling Agreement provided, *inter alia*, that the bankruptcy trustee and PEPPER "agree it is in their mutual best interests to explore possible settlement of their differences."

Shortly after ERII's coverage suit was filed and before discovery had begun in earnest, ERII and HARTFORD moved for summary judgment on alternative theories: that the "Claim" was either barred by their policies' "Prior Knowledge" exclusions or that the "Claim" was considered first made during the Year 1 Tower, a tower that contained only WESTPORT and CNA policies.

7. In the order appealed, the lower court granted ERII's and HARTFORD's motions

F:\cases\16073\Notice of Appeal   Page 4

for summary judgment on the grounds that the memorandum to PEPPER's management drafted by GAGNÉ in April 2002 established that ERII's and HARTFORD's "Prior Knowledge" exclusions applied.    The lower court declined to rule on ERII's and HARTFORD's alternative grounds for summary judgment, that the SFC Claim relates back to and triggers the Year 1 Tower policies of WESTPORT and CNA.

8.  This Court is not required to adopt the rationale articulated by the lower court to affirm the lower court's decision, *Ween v. Dow*, 35 A.D.3d 58, 822 N.Y.S.2d 257, 260 (1st Dept 2006). WESTPORT files this appeal in opposition to ERII's and HARTFORD's alternative basis for summary judgment. ERII's and HARTFORD's alternative argument – that the "Claim" was considered first made during the Year 1 Tower and therefore coverage was purportedly not available under their Year 3 Tower policies – is not supported by the law or the current (incomplete) record.  It fails for a number of reasons.

First, the Tolling Agreement was an actual "Claim" made during the Year 3 Tower, and therefore PEPPER did not provide notice of a "Potential Claim" that could trigger an earlier policy. (An earlier policy could only have been triggered by PEPPER's earlier notice of a "Potential Claim." Common sense dictates that once a matter is an actual "Claim," it no longer exists as a "Potential Claim.")

Second, should this Court disagree with the lower court's finding that the Tolling Agreement was a "Claim," further discovery is necessary to determine whether an actual "Claim" had otherwise been asserted prior to PEPPER's notice to its insurers.  If an actual "Claim" had been asserted by the time PEPPER provided notice to its insurers, such notice cannot trigger an earlier policy.

Third, should this Court disagree with the lower court's finding and determine that PEPPER gave notice of a "Potential Claim," ERII and HARTFORD need only show that

PEPPER's awareness of that "Potential Claim" predated the Year 2 and Year 3 Towers. If PEPPER did not first become aware of the "Potential Claim" during an ERII or HARTFORD policy, then the subsequent "Claim" cannot relate back to an ERII or HARTFORD policy. It is irrelevant for ERII's and HARTFORD's purposes whether that awareness came one month or twenty years earlier. Consequently, a further determination as to whether PEPPER first became aware of the "Potential Claim" during the Year 1 Tower should not be made in the context of a motion that does not involve the Year 1 Tower insurers. Accordingly, it is inappropriate for ERII and HARTFORD to seek such a determination.

Fourth, should this Court disagree with the lower court's finding and determine that PEPPER provided notice of a "Potential Claim," further discovery is necessary to determine when PEPPER first became aware of that "Potential Claim."

Dated: New York, New York
January 28, 2008

Yours etc.,

WALKER WILCOX MATOUSEK LLP

By: *Robert P. Conlon*

Robert P. Conlon
Joyce F. Noyes
Joseph Borders
Attorneys for Defendant/Respondent/Appellant
WESTPORT INSURANCE CORPORATION
225 West Washington Street, Suite 2400
Chicago, Illinois 60606-3418
(312) 244-6700

GARBARINI & SCHER, P.C.
William D. Buckley
Attorneys for Defendant/Respondent/Appellant
WESTPORT INSURANCE CORPORATION
432 Park Avenue South
New York, New York 10016-8013
(212) 689-1113

To:

KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
Attorneys for Plaintiff/Respondent
EXECUTIVE RISK INDEMNITY INC.
757 Third Avenue
New York, New York 10017
(212) 418-8600

DICKSTEIN SHAPIRO LLP
Attorneys for Defendants/Third-Party Plaintiffs/Appellants/Respondents
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
1177 Avenue of the Americas
New York, New York 10036
(212) 277-6500

CAHILL GORDON & REINDEL LLP
Appellate Counsel to Defendants/
Third-Party Plaintiffs/Appellants/Respondents
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
80 Pine Street
New York, New York 10005
(212) 701-3000

COZEN O'CONNOR
Attorneys for Third-Party Defendant/Respondent
CONTINENTAL CASUALTY COMPANY
45 Broadway, 16th Floor
New York, New York 10006
(212) 509-9400

EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Third-Party Defendant/Respondent
TWIN CITY FIRE INSURANCE COMPANY
750 Lexington Avenue
New York, New York 10022
(212) 308-4411

## **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF NEW YORK )

      HARRIET OFMAN, being duly sworn, deposes and says, that the deponent is not a party of the action and is over 18 years of age.

      That on the 28th day of January, 2008, the undersigned served the within **NOTICE OF APPEAL and PRE-ARGUMENT STATEMENT** dated January 28, 2008 upon the attorneys named below by **E-MAIL** and by depositing a true copy of the same enclosed in a postpaid properly addressed wrapper in an official depository under the exclusive care and custody of the United States Post Office Department within the State of New York, and directed to the said attorneys at the address indicated below, such address being the address designated by said attorneys for that purpose.

KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
Attorneys for Plaintiff/Respondent
EXECUTIVE RISK INDEMNITY INC.
757 Third Avenue
New York, New York 10017
(**Wpollard@kvwmail.com** and **Cmontjar@kvwmail.com**)

DICKSTEIN SHAPIRO LLP
Attorneys for Defendants/Third-Party Plaintiffs/Appellants/Respondents
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
1177 Avenue of the Americas
New York, New York 10036
 (**lewisj@dicksteinshapiro.com**)

CAHILL GORDON & REINDEL LLP
Appellate Counsel to Defendants/
Third-Party Plaintiffs/Appellants/Respondents
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
80 Pine Street
New York, New York 10005
(mmcloughlin@cahill.com)

COZEN O'CONNOR
Attorneys for Third-Party Defendant/Respondent
CONTINENTAL CASUALTY COMPANY
45 Broadway, 16th Floor
New York, New York 10006
(**kmattessich@cozen.com**)

EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Third-Party Defendant/Respondent
TWIN CITY FIRE INSURANCE COMPANY
750 Lexington Avenue
New York, New York 10022
(**smayer@eapdlaw.com**)

HARRIET OFMAN

Sworn to before me this
28th day of January, 2008

WILLIAM D. BUCKLEY
NOTARY PUBLIC, State of New York
No. 31-4989224
Qualified in New York County
Commission Expires Jan. 5, 20__10

# EXHIBIT 16

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| EXECUTIVE RISK INDEMNITY, INC., | **Index No. 603624/2005** |
| Plaintiff/Respondent, | |
| - against - | |
| PEPPER HAMILTON, LLP and W. RODERICK GAGNÉ, | **NOTICE OF CROSS-APPEAL** |
| Defendants/Appellants, | |
| - and - | |
| WESTPORT INSURANCE CORPORATION, | |
| Defendant/Cross-Appellant. | **Index No. 590185/07** |
| PEPPER HAMILTON, LLP and W. RODERICK GAGNÉ, | |
| Third-Party Plaintiffs/Appellants, | |
| - against - | |
| CONTINENTAL CASUALTY COMPANY and TWIN CITY FIRE INSURANCE COMPANY, | |
| Third-Party Defendants/Respondents. | |

**PLEASE TAKE NOTICE** that defendant/cross-appellant WESTPORT INSURANCE CORPORATION hereby cross-appeals to the Appellate Division, First Judicial Department from the Order and Judgment (Hon. Jacqueline W. Silbermann, J.S.C.), dated January 24, 2008, and filed by the New York County Clerk's Office on January 29, 2008.

Dated: New York, New York
February 1, 2008

F:\cases\16073\Notice of Cross-Appeal   Page 1

Yours etc.,

GARBARINI & SCHER, P.C.

By: *William D. Buckley*

William D. Buckley
Attorneys for Defendant/Cross-Appellant
WESTPORT INSURANCE CORPORATION
432 Park Avenue South
New York, New York 10016-8013
(212) 689-1113

WALKER WILCOX MATOUSEK LLP
Robert P. Conlon
Joyce F. Noyes
Joseph Borders
Attorneys for Defendant/Cross-Appellant
WESTPORT INSURANCE CORPORATION
225 West Washington Street, Suite 2400
Chicago, Illinois 60606-3418
(312) 244-6700


To:    KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
       Attorneys for Plaintiff/Respondent
       EXECUTIVE RISK INDEMNITY INC.
       757 Third Avenue
       New York, New York 10017
       (212) 418-8600

       DICKSTEIN SHAPIRO LLP
       Attorneys for Defendants/Third-Party Plaintiffs/Appellants
       PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
       1177 Avenue of the Americas
       New York, New York 10036
       (212) 277-6500

       CAHILL GORDON & REINDEL LLP
       Appellate Counsel to Defendants/
       Third-Party Plaintiffs/Appellants
       PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
       80 Pine Street
       New York, New York 10005
       (212) 701-3000

COZEN O'CONNOR
Attorneys for Third-Party Defendant/Respondent
CONTINENTAL CASUALTY COMPANY
45 Broadway, 16th Floor
New York, New York 10006
(212) 509-9400

EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Third-Party Defendant/Respondent
TWIN CITY FIRE INSURANCE COMPANY
750 Lexington Avenue
New York, New York 10022
(212) 308-4411

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| EXECUTIVE RISK INDEMNITY, INC., | |
| Plaintiff/Respondent, | **Index No. 603624/2005** |
| - against - | |
| PEPPER HAMILTON, LLP and W. RODERICK GAGNÉ, | **PRE-ARGUMENT STATEMENT** |
| Defendants/Appellants, | |
| - and - | |
| WESTPORT INSURANCE CORPORATION, | |
| Defendant/Cross-Appellant. | **Index No. 590185/07** |
| PEPPER HAMILTON, LLP and W. RODERICK GAGNÉ, | |
| Third-Party Plaintiffs/Appellants, | |
| - against - | |
| CONTINENTAL CASUALTY COMPANY and TWIN CITY FIRE INSURANCE COMPANY, | |
| Third-Party Defendants/Respondents. | |

**PLEASE TAKE NOTICE** that, pursuant to 22 N.Y.C.R.R. §§ 600.17(a) and (b), defendant/cross-appellant WESTPORT INSURANCE CORPORATION hereby submits the following as its Pre-Argument Statement:

1. The title of the action, including a third-party action, is above in the caption.

2. The full names of the original parties, as well as the full names of the parties in the third-party action, are above in the caption.

3a.    Counsel for defendant/cross-appellant WESTPORT INSURANCE CORPORATION ("WESTPORT") is Walker Wilcox Matousek LLP, 225 West

Washington Street, Suite 2400, Chicago, Illinois 60606-3418. Telephone: (312) 244-6700.

3b.  Local counsel in New York for WESTPORT is Garbarini & Scher, P.C., 432 Park Avenue South, New York, New York 10016-8013. Telephone: (212) 689-1113.

4a.   Counsel for plaintiff/respondent EXECUTIVE RISK INDEMNITY, INC. ("ERII") is Kornstein Veisz Wexler & Pollard, ILP, 757 Third Avenue, New York, New York 10017. Telephone: (212) 418-8600.

4b. Counsel for defendants/third-party plaintiffs/appellants PEPPER HAMILTON LLP ("PEPPER") and W. RODERICK GAGNÉ ("GAGNÉ") is Dickstein Shapiro LLP, 1177 Avenue of the Americas, New York, New York 10036; telephone: (212) 277-6500. Their appellate counsel is Cahill Gordon & Reindel LLP, 80 Pine Street, New York, New York 10005; telephone: (212) 701-3000.

4c.   Counsel for third-party defendant/respondent CONTINENTAL CASUALTY COMPANY ("CNA") is Cozen O'Connor, 45 Broadway, 16th Floor, New York, New York 10006. Telephone: (212) 509-9400.

4d. Counsel for third-party defendant/respondent TWIN CITY FIRE INSURANCE COMPANY ("HARTFORD") is Edwards Angell Palmer & Dodge LLP, 750 Lexington Avenue, New York, New York 10022. Telephone: (212) 308-4411.

5.    This is an appeal from Supreme Court of New York, County of New York.

6.     Plaintiff/respondent ERII issued excess insurance policies providing professional liability coverage to law firm Defendant/Appellant PEPPER and its partner, defendant/appellant GAGNÉ. ERIII commenced the action in the lower court against PEPPER, GAGNÉ, and their primary professional liability insurer, defendant/cross-appellant WESTPORT. In its complaint, ERII sought a declaration that there is no

coverage under the ERII insurance policies for claims against PEPPER and GAGNÉ which arose out of an alleged securities fraud scheme perpetrated by a former client, Student Finance Corporation ("SFC").   PEPPER and GAGNÉ filed a counterclaim against ERII, a cross-claim against WESTPORT and third-party complaints against third-party defendant/respondent HARTFORD and third-party defendant/respondent CNA. In these pleadings, PEPPER and GAGNÉ alleged that each professional liability insurer was obligated to defend and indemnify PEPPER and GAGNÉ against the SFC claims.

At issue are three successive "towers" of professional liability insurance policies. Each tower consists of a primary insurance policy issued by WESTPORT and one or more excess insurance policies issued by the other insurer-parties. All of the policies are "claims-made" policies, meaning that coverage is provided solely for claims first made against the insured and reported to the insurer during the time the policy is in effect, the so-called "policy period." The first tower (the "Year 1 Tower") had a policy period of April 27, 2001 to October 27, 2002.   The second tower (the "Year 2 Tower") had a policy period of October 27, 2002 to October 27, 2003. The third tower (the "Year 3 Tower") had a policy period of October 27, 2003 to October 27, 2004. ERII and HARTFORD issued excess policies only in the Year 2 and Year 3 Towers. CNA issued excess policies in all three Towers.

In order to establish coverage under these "claims-made" policies, the insured must prove that either: (1) the "Claim" (as defined by the insurance policy) was first made against the insured and reported to the insurer during the policy period; or (2) pursuant to the terms of the insurance policy, the "Claim" is "considered" first made and reported during the policy period.   Under the second method, for a "Claim" to be

"considered" first made and reported during a given policy period, PEPPER must establish that during "continuous and uninterrupted coverage," PEPPER <u>first</u> became aware of a "Potential Claim" (as defined by the insurance policy) and provided notice of that "Potential Claim" to the insurer. In such instances, any subsequent "Claim" will relate back to and trigger the policy in effect on the date PEPPER <u>first</u> became aware of a "Potential Claim." However, if PEPPER first became aware of a "Potential Claim" <u>before</u> the start of "continuous and uninterrupted coverage", then the subsequent "Claim" will not relate back to or trigger an earlier policy. Thus, if PEPPER did indeed <u>first</u> become aware of a matter as a "Potential Claim" <u>before</u> the inception of "continuous and uninterrupted coverage," then the subsequent "Claim" is not covered at all. In addition, the policies all contain "Prior Knowledge" exclusions that bar coverage for any "Claim" based upon any act, error or omission committed prior to the inception date of the policy which PEPPER knew or should have known could result in a "Claim."

In this case, in April 2004 (during the Year 3 Tower), PEPPER notified WESTPORT and the other insurers that the bankruptcy trustee of SFC had recently proposed a "Tolling Agreement" to PEPPER. The Tolling Agreement provided, *inter alia*, that the bankruptcy trustee and PEPPER "agree it is in their mutual best interests to explore possible settlement of their differences."

Shortly after ERII's coverage suit was filed and before discovery had begun in earnest, ERII and HARTFORD moved for summary judgment on alternative theories: that the "Claim" was either barred by their policies' "Prior Knowledge" exclusions or that the "Claim" was considered first made during the Year 1 Tower, a tower that contained only WESTPORT and CNA policies.

7. The lower court granted ERII's and HARTFORD's motions for summary

judgment on the grounds that the memorandum to PEPPER's management drafted by GAGNÉ in April 2002 established that ERII's and HARTFORD's "Prior Knowledge" exclusions applied. The lower court declined to rule on ERII's and HARTFORD's alternative grounds for summary judgment, that the SFC Claim relates back to and triggers the Year 1 Tower policies of WESTPORT and CNA. The Judgment appealed reflects that Order of summary judgment.

8. This Court is not required to adopt the rationale articulated by the lower court to affirm the lower court's decision, *Ween v. Dow*, 35 A.D.3d 58, 822 N.Y.S.2d 257, 260 (1st Dept 2006). WESTPORT files this appeal in opposition to ERII's and HARTFORD's alternative basis for summary judgment. ERII's and HARTFORD's alternative argument – that the "Claim" was considered first made during the Year 1 Tower and therefore coverage was purportedly not available under their Year 3 Tower policies – is not supported by the law or the current (incomplete) record. It fails for a number of reasons.

First, the Tolling Agreement was an actual "Claim" made during the Year 3 Tower, and therefore PEPPER did not provide notice of a "Potential Claim" that could trigger an earlier policy. (An earlier policy could only have been triggered by PEPPER's earlier notice of a "Potential Claim." Common sense dictates that once a matter is an actual "Claim," it no longer exists as a "Potential Claim.")

Second, should this Court disagree with the lower court's finding that the Tolling Agreement was a "Claim," further discovery is necessary to determine whether an actual "Claim" had otherwise been asserted prior to PEPPER's notice to its insurers. If an actual "Claim" had been asserted by the time PEPPER provided notice to its insurers, such notice cannot trigger an earlier policy.

Third, should this Court disagree with the lower court's finding and determine that

PEPPER gave notice of a "Potential Claim," ERII and HARTFORD need only show that PEPPER's awareness of that "Potential Claim" predated the Year 2 and Year 3 Towers. If PEPPER did not first become aware of the "Potential Claim" during an ERII or HARTFORD policy, then the subsequent "Claim" cannot relate back to an ERII or HARTFORD policy. It is irrelevant for ERII's and HARTFORD's purposes whether that awareness came one month or twenty years earlier. Consequently, a further determination as to whether PEPPER first became aware of the "Potential Claim" during the Year 1 Tower should not be made in the context of a motion that does not involve the Year 1 Tower insurers. Accordingly, it is inappropriate for ERII and HARTFORD to seek such a determination.

Fourth, should this Court disagree with the lower court's finding and determine that PEPPER provided notice of a "Potential Claim," further discovery is necessary to determine when PEPPER first became aware of that "Potential Claim."

Dated: New York, New York
February 1, 2008

Yours etc.,

GARBARINI & SCHER, P.C.

By:  _William D Buckley_

William D. Buckley
Attorneys for Defendant/Cross-Appellant
WESTPORT INSURANCE CORPORATION
432 Park Avenue South
New York, New York 10016-8013
(212) 689-1113

WALKER WILCOX MATOUSEK LLP
Robert P. Conlon
Joyce F. Noyes
Joseph Borders
Attorneys for Defendant/Cross-Appellant
WESTPORT INSURANCE CORPORATION
225 West Washington Street, Suite 2400
Chicago, Illinois 60606-3418
(312) 244-6700

TO:

KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
Attorneys for Plaintiff/Respondent
EXECUTIVE RISK INDEMNITY INC.
757 Third Avenue
New York, New York 10017
(212) 418-8600

DICKSTEIN SHAPIRO LLP
Attorneys for Defendants/Third-Party Plaintiffs/Appellants
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
1177 Avenue of the Americas
New York, New York 10036
(212) 277-6500

CAHILL GORDON & REINDEL LLP
Appellate Counsel to Defendants/
Third-Party Plaintiffs/Appellants
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
80 Pine Street
New York, New York 10005
(212) 701-3000

COZEN O'CONNOR
Attorneys for Third-Party Defendant/Respondent
CONTINENTAL CASUALTY COMPANY
45 Broadway, 16th Floor
New York, New York 10006
(212) 509-9400

EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Third-Party Defendant/Respondent
TWIN CITY FIRE INSURANCE COMPANY
750 Lexington Avenue
New York, New York 10022
(212) 308-4411

SCANNED ON 1/29/2008

At Part 50-L of the Supreme Court of the State of
New York, held in and for the County of New York
at the Courthouse at 60 Centre Street, New York,
New York on the __24th__ day of January, 2008

PRESENT:

HON. JACQUELINE SILBERMANN

Justice.

------------------------------------------------------X

EXECUTIVE RISK INDEMNITY INC.,                    :

                 Plaintiff,     :

    -against-                                  :

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ :
and WESTPORT INSURANCE CORPORATION,

                         :

               Defendants.    :

------------------------------------------------------X

PEPPER HAMILTON LLP and
W. RODERICK GAGNÉ,                                 :

          Third-Party Plaintiffs,    :

    -against-                                  :

CONTINENTAL CASUALTY COMPANY, and    :
TWIN CITY FIRE INSURANCE COMPANY,

                         :

        Third-Party Defendants.

------------------------------------------------------X

Index No. 603624/05 E

RECEIVED

JAN 25 2008

MOTION SUPPORT
OFFICE

TP Index No. 590185/07

Order and
JUDGMENT

      Plaintiff Executive Risk Indemnity Inc. having brought the within action on or about

October 12, 2005 against defendants Pepper Hamilton LLP, W. Roderick Gagné, and Westport

Insurance Corporation, seeking declaratory relief, and defendants Pepper Hamilton LLP and W.

Roderick Gagné having filed an answer with counterclaims against Executive Risk Indemnity

Inc. seeking declaratory relief and for breach of contract and a cross-claim against Westport

T:\725\68\XXX\Order\LXXX2.wpd

Insurance Corporation seeking declaratory relief on February 14, 2007, and defendants Pepper

Hamilton LLP and W. Roderick Gagné having filed a third-party complaint against third-party

defendants Continental Casualty Company and Twin City Fire Insurance Company on March 2,

2007 seeking declaratory relief, and third-party defendant Twin City Fire Insurance Company

having filed an answer and counterclaims seeking declaratory relief on April 30, 2007, and third-

party defendant Continental Casualty Company having filed an answer and counterclaims

seeking declaratory relief and rescission of insurance policies that it issued to Pepper Hamilton

LLP between 2001 and 2004 on May 8, 2007, and plaintiff Executive Risk Indemnity Inc. having

moved for summary judgment on its claim for declaratory relief against defendants Pepper

Hamilton LLP and W. Roderick Gagné by order to show cause on June 25, 2007, and third-party

defendant Twin City Fire Insurance Company having cross-moved for summary judgment on its

counterclaims for declaratory relief against third-party plaintiffs Pepper Hamilton LLP and W.

Roderick Gagné on July 18, 2007, and third-party defendant Continental Casualty Company

having cross-moved for summary judgment on its counterclaims for rescission and declaratory

relief against third-party plaintiffs Pepper Hamilton LLP and W. Roderick Gagné on July 18,

2007, and the Court having rendered a decision and order (1) granting plaintiff Executive Risk

Indemnity Inc. summary judgment on its claim for declaratory relief against defendants Pepper

Hamilton LLP and W. Roderick Gagné, (2) granting third-party defendant Twin City Fire

Insurance Company summary judgment on its counterclaim for declaratory relief against third-

party plaintiffs Pepper Hamilton LLP and W. Roderick Gagné, (3) granting third-party defendant

Continental Casualty Company summary judgment on its counterclaims for declaratory relief and

rescission against third-party plaintiffs Pepper Hamilton LLP and W. Roderick Gagné, (4)

2

dismissing the counterclaims of defendants Pepper Hamilton LLP and W. Roderick Gagné, (5)

dismissing the third-party complaint, and (6) severing Pepper Hamilton LLP and W. Roderick

Gagné's cross-claim against co-defendant Westport Insurance Corporation, and the Court having

directed plaintiff Executive Risk Indemnity Inc. to settle judgment providing for appropriate

declarations.

NOW, on the motion of Kornstein Veisz Wexler & Pollard, LLP, attorneys for plaintiff

Executive Risk Indemnity Inc., it is:

1.      ADJUDGED and DECLARED that: based upon prior knowledge exclusions to

coverage, Executive Risk Indemnity Inc. and Twin City Fire Insurance Company have no

obligation to indemnify defendants Pepper Hamilton LLP or W. Roderick Gagné under the 2003-

2004 Excess Indemnity Policy of Executive Risk Indemnity, Inc. (policy number 8170-3836), the

2003-2004 Policy of Excess Insurance of Twin City Fire Insurance Company (policy number 00

PF 0214459), or any other Executive Risk Indemnity Inc. or Twin City Fire Insurance Company

excess policy issued to defendants Pepper Hamilton LLP for any claim made as a result of the

underlying actions known as *In re Stanzlale v. Pepper Hamilton* (Case No. 02-11620-JBR, filed

in the United States Bankruptcy Court for the District of Delaware) and *Royal Indemnity*

*Company v. Pepper Hamilton LLP* (C.A. No. 05-165, filed in the United States District Court for

the District of Delaware);

2.      ADJUDGED and DECLARED that: the 2002-2003 and 2003-2004 Continental

Casualty Company Excess Insurance Policies (policy number LLE-192857748) are rescinded;

and that the 2001-2002 Continental Casualty Company Excess Insurance Policy does not cover

or respond to the underlying actions known as *In re Stanziale v. Pepper Hamilton* (Case No. 02-

3

11620-JBR, filed in the United States Bankruptcy Court for the District of Delaware) and *Royal*

*Indemnity Company v. Pepper Hamilton LLP* (C.A. No. 05-165, filed in the United States

District Court for the District of Delaware);

      3.     ADJUDGED that the counterclaims of defendants Pepper Hamilton LLP and W.

Roderick Gagné are dismissed;

      4.     ADJUDGED that the third-party complaint is dismissed;

      5.     ~~ADJUDGED~~ *Ordered* that Pepper Hamilton LLP and W. Roderick Gagné's cross-claim

against co-defendant Westport Insurance Corporation is severed and shall continue.

     ENTER

                              J.S.C.

                     HON. JACQUELINE W. SILBERMANN

EXECUTIVE RISK INDEMNITY INC.
Plaintiff
55 Water Street
New York, New York 10041

PEPPER HAMILTON LLP
Defendant and third-party plaintiff
1180 Avenue of the Americas
New York, New York 10036

     and

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

W. RODERICK GAGNÉ
Defendant and third-party plaintiff
1180 Avenue of the Americas
New York, New York 10036

     and

FILED

JAN 29 2008

COUNTY CLERKS OFFICE
NEW YORK

4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

EXECUTIVE RISK INDEMNITY INC.,

               Plaintiff,

-against-

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ
and WESTPORT INSURANCE CORPORATION,

               Defendants.
------------------------------------------------------------------X
PEPPER HAMILTON LLP, W. RODERICK GAGNÉ
and WESTPORT INSURANCE CORPORATION,

               Third-Party Plaintiff,

-against-

CONTINENTAL CASUALTY COMPANY, and
TWIN CITY FIRE INSURANCE COMPANY,

               Third-Party Defendants.
------------------------------------------------------------------X

Index No. 603624/05 E

TP. Index No. 590185/07



KORNSTEIN VEISZ WEXLER & POLLARD, LLP
Attorneys for Plaintiff
757 Third Avenue
New York, New York 10017
(212) 418-8600

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK   )
                  ) ss.:
COUNTY OF NEW YORK )

     MAUREEN GRIFFIN, being duly sworn, deposes and says, that the deponent is not a party of the action and is over 18 years of age.

     That on the 1st day of February, 2008, the undersigned served the within **NOTICE OF CROSS-APPEAL and PRE-ARGUMENT STATEMENT** dated February 1, 2008 upon the attorneys named below by **E-MAIL** and by depositing a true copy of the same enclosed in a postpaid properly addressed wrapper in an official depository under the exclusive care and custody of the United States Post Office Department within the State of New York, and directed to the said attorneys at the address indicated below, such address being the address designated by said attorneys for that purpose.

KORNSTEIN, VEISZ, WEXLER & POLLARD, LLP
Attorneys for Plaintiff/Respondent
EXECUTIVE RISK INDEMNITY INC.
757 Third Avenue
New York, New York 10017
(**Wpollard@kvwmail.com** and **Cmontjar@kvwmail.com**)

DICKSTEIN SHAPIRO LLP
Attorneys for Defendants/Third-Party Plaintiffs/Appellants
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
1177 Avenue of the Americas
New York, New York 10036
(**lewisj@dicksteinshapiro.com**)

CAHILL GORDON & REINDEL LLP
Appellate Counsel to Defendants/
Third-Party Plaintiffs/Appellants
PEPPER HAMILTON LLP and W. RODERICK GAGNÉ
80 Pine Street
New York, New York 10005
(**mmcloughlin@cahill.com** and **cgilman@cahill.com**)

COZEN O'CONNOR
Attorneys for Third-Party Defendant/Respondent
CONTINENTAL CASUALTY COMPANY
45 Broadway, 16th Floor
New York, New York 10006
(**kmattessich@cozen.com**)

EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Third-Party Defendant/Respondent
TWIN CITY FIRE INSURANCE COMPANY
750 Lexington Avenue
New York, New York 10022
(**smayer@eapdlaw.com**)

_____

MAUREEN GRIFFIN

Sworn to before me this
1st day of February, 2008

_____

WILLIAM D. BUCKLEY
NOTARY PUBLIC, State of New York
No. 31-4989224
Qualified in New York County
Commission Expires Jan. 5, 20 / 0